UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAN 1 8 2008

FIGUEIREDO FERRAZ E ENGENHARIA DE
PROJETO LTDA.,

                                    Plaintiff,

          -against-

THE REPUBLIC OF PERU and THE MINISTRY OF
HOUSING, CONSTRUCTION AND CLEAN-UP OF
THE REPUBLIC OF PERU - PROGRAMA AGUA
PARA TODOS (formerly known as  PROGRAMA DE
APOYO A LA REFORMA DEL SECTOR
SANEAMIENTO (PARSSA), and also formerly known
as PROYECTO ESPECIAL PROGRAMA NACIONAL
DE AGUA POTABLE Y ALACANTARILLADO
(PRONAP)),

                                    Defendants.

08  CV  0492

**COMPLAINT**

JAN 1 8 2008

U.S.D.C. S.D. N.Y.
CASHIERS

          Plaintiff Figueiredo Ferraz E Engenharia de Projeto Ltda, by its counsel Chadbourne

& Parke LLP, as and for its complaint herein against defendants The Republic of Peru and The

Ministry of Housing, Construction and Clean-up (Ministerio de Vivienda, Construccion y

Saneamiento) of The Republic of Peru - Programa Agua Para Todos (formerly known as

Programa de Apoyo a la Reforma Del Sector Saneamiento (PARSSA), and also formerly known

as Proyecto Especial Programa Nacional de Agua Potable  y Alacantarillado (PRONAP))

(hereinafter the "Ministry"), respectfully alleges as follows:

## NATURE OF THE ACTION

          1.    This is an action to confirm and enforce an arbitration award dated January 20,

2005 (the "Award") rendered by a duly constituted Arbitral Tribunal in Lima, Peru in favor of

plaintiff and against the Ministry (a duly certified copy of the Award and an English translation thereof are annexed hereto as Exhibits A and B, respectively). The Award found the Ministry liable to plaintiff for damages for breaching an agreement under which plaintiff rendered engineering consulting services to the Ministry. Because the Ministry has failed to pay the amount fixed in the Award, the plaintiff brings this action to confirm the Award in this forum so the Award can be enforced against defendants' assets in the United States. Those assets include, without limitation, proceeds from bond offerings in the United States by The Republic of Peru and the commercial accounts held by The Republic of Peru. Plaintiff is entitled to enforcement of the Award pursuant to the Inter-American Convention on International Commercial Arbitration codified at Chapter 3 of the Federal Arbitration Act, 9 U.S.C. § 301, et. seq. (the "Convention").

## PARTIES

2.     Plaintiff is a corporation duly organized and existing under the laws of Brazil with is principal place of business at Avenida Fagundes Filho, 141 - São Judas - 9° andar CEP 04304 – 010 - São Paulo - SP - Brazil.

3.     Defendant Ministry is a ministry of The Republic of Peru with its principal place of business at Av Paseo de la Republica No. 3361, Distrito de San Isidro, Provincia y Departamento de Lima, Peru. The Ministry is a political subdivision of a foreign state and, as such, is considered a foreign state under 28 U.S.C. § 1603(a). Accordingly, The Republic of Peru is liable for the debts of such Ministry and the Award may be confirmed and enforced against it.

2

4.      The Ministry was formerly known as Programa de Apoyo a la Reforma del Sector Saneamiento  (PARSSA) and, prior to 2002, was known as Proyecto Especial Programa Nacional de Agua Potable y Alacantarillado (PRONAP).

5.      Defendant The Republic of Peru is a foreign state as defined in 28 U.S.C. § 1603(a).

## JURISDICTION AND VENUE

6.      This Court has original jurisdiction over this action pursuant to 9 U.S.C. § 203 and 28 U.S.C. § 1330(a).

7.      This Court has personal jurisdiction over defendants pursuant to 28 U.S.C. § 1330(b).

8.      Venue is proper in this judicial district pursuant to 9 U.S.C. § 302, 9 U.S.C. § 204 and 28 U.S.C. § 1391(f)(1).

## FACTS

**A.      The Agreement to Arbitrate**

9.      On November 12, 1997, plaintiff and the Ministry entered into a Consulting Services Agreement (the "Agreement") by which the Ministry contracted to pay plaintiff for the preparation of certain engineering studies on the expansion of water and sewage services to certain localities in The Republic of Peru, which plaintiff was to prepare based upon information contained in a preliminary study provided by the Ministry (duly certified copies of the Agreement and an English translation thereof are annexed hereto as Exhibits C and D, respectively).

10.    Section Eight of the Agreement contained an arbitration clause (Ex. D § 8) and Section One provided that disputes thereunder were governed by Peruvian law (Ex. D § 1, ¶ 2).

**A.    Defendant's Breaches of the Agreement**

11.    In 1997, the Ministry solicited bids for the engineering consulting services described above.  Plaintiff submitted a bid for that project that the Ministry ultimately accepted. Plaintiff's bid was based upon information the Ministry provided concerning the scope of the services required.

12.    The information the Ministry provided concerning the scope of services required turned out to be incomplete and erroneous.  As a consequence, plaintiff was forced to undertake significantly more work over a significantly longer period of time to complete the study requested by the Ministry than plaintiff had anticipated in its bid.

13.    After plaintiff completed the study, it informed the Ministry that the it owed plaintiff additional amounts for services provided by plaintiff to the Ministry in excess of those contemplated in its bid.

14.    While the Ministry paid the base bid price, the Ministry refused to pay the amounts referred to in paragraph 13 above for the additional services that plaintiff rendered on the Ministry's behalf.

**B.    The Arbitration**

15.    After its unsuccessful attempts to convince the Ministry to pay the additional monies owed, on October 29, 2001, plaintiff filed a request for arbitration with the Ministry pursuant to the arbitration clause set forth in the Agreement.  Thereafter, both parties appointed

their respective arbitrators who in turn elected a third arbitrator to act as chairman; thus, the

Arbitral Tribunal was constituted and it initiated the arbitration proceeding.

    16.    Represented by counsel, the Ministry participated fully in the arbitration

proceedings and arbitration hearings.  The arbitration hearings were held on November 11,

2002, May 17, 2004, September 17, 2004, October 21, 2004 and November 30, 2004.  The

Ministry participated in those hearings, submitted evidence and advanced its arguments, thus

exercising its right to defend.

    17.    On January 20, 2005, the Arbitral Tribunal rendered its Award in writing,

acknowledged it, and delivered it to the parties.

    18.    Both parties filed written requests for clarification of the Award.  These

requests were answered by the Arbitral Tribunal by means of Resolution No. 83 dated February

3, 2005 (the "Award Clarification") (duly certified copies of the Award Clarification and an

English translation thereof are annexed hereto as Exhibits E and F, respectively).

    19.    The Award ordered the Ministry to make the following payments to plaintiff:

    (a)    US $3,557,369 (three million five hundred fifty seven thousand three hundred sixty nine US Dollars);

    (b)    S/. 3,982,950 (three million nine hundred eighty two thousand nine hundred fifty Nuevos Soles) (converted to US $1,321,045[1] (one million three hundred

---

[1]    As of January 2, 2008, the exchange rate was 3.0150 Nuevos Soles per U.S. dollar.  Yahoo! Finance Currency Converter, http://finance.yahoo.com/currency?u (last visited January 2, 2008).  As the conversion to U.S. dollars will take place at the time of final judgment based on the currency exchange note in effect at that time, the conversions in this complaint are for illustrative purposes only.

twenty one thousand forty five US Dollars)), plus General Sales Tax (I.G.V.) for a total of S./ 4,739,175 (four million seven hundred thirty nine thousand one hundred seventy five Nuevos Soles) (converted to US $1,571,865 (one million five hundred seventy one thousand eighty hundred sixty five US Dollars));

(c)    S/. 944,281 (nine hundred forty four thousand two hundred eighty one Nuevos Soles) (converted to US $313,194 (three hundred thirteen thousand one hundred ninety four US Dollars)), plus General Sales Tax (I.G.V.) for a total of S./ 1,129,564 (one million one hundred twenty nine thousand five hundred sixty four Nuevos Soles) (converted to US $374,648 (three hundred seventy four thousand six hundred forty eight US Dollars)); this is an adjustment to the Award, required thereunder, to reflect the increase in the Peruvian Consumer Price Index between September 18, 1997 and December 31, 2004; in addition the Award Clarification provides that the adjustments pursuant to the Consumer Price Index shall be applied until final payment of the Award;

(d)    Interest at the Peruvian currency lending rate (known as TAMN) for the amount owed in Peruvian currency, and at the foreign currency lending rate (known as TAMEX) for the amount owed in US dollars, accruing from July 25, 2002 until the date such payment is made, said interest through the date of the Award totaling S/. 34,955,649 (thirty four million nine hundred fifty five thousand six hundred forty nine Nuevos Soles) (converted to US $11,593,913 (eleven million five hundred ninety three thousand nine hundred thirteen US Dollars)) plus US $5,181,059 (five million one hundred eighty one thousand fifty nine US Dollars); and

(e)    US $10,500 (ten thousand five hundred US Dollars) as reimbursement to plaintiff for the Arbitration Tribunal's fees and the administrative costs.

Thus, using the current exchange rate, the total Award not including the post-Award increase to the Consumer Price Index or post-Award interest, was US $22,289,354 (twenty two million two hundred eight nine thousand three hundred fifty four US Dollars).

20.    On February 18, 2005, the Ministry commenced an action in the Superior Court of Justice of Lima, Peru by which it sought to annul the Award. The ground for that action was that that certain Peruvian statutes required that the arbitration should have been conducted as an arbitration at law rather than an equitable arbitration. Following extensive

briefing on the issue, by decision dated October 5, 2005, the Peruvian Court dismissed that challenge to the Award, finding that the Peruvian General Arbitration Act did not permit annulment of the Award since the issues raised by the Ministry had been determined by the Arbitral Tribunal.  Certified copies of the Court's decision and an English translation thereof are submitted herewith as Exhibits G and H, respectively.  Under Peruvian arbitration law, the decision of the Peruvian Court is final and cannot be appealed, therefore, the award is executable without any objection (which has been so recognized by the Ministry in certain communications to plaintiff).

     21.    The Ministry has nevertheless failed to satisfy its obligations under the Award. Its only payment to plaintiff since the Award was rendered was an amount converted to US $658,719 (six hundred fifty eight thousand seven hundred nineteen US Dollars), paid by five checks received on July 7, September 6 and November 13, 2007, and January 3, 2008, which in accordance with Section 1257 of the Civil Code of The Republic of Peru, have been applied to post-Award interest accrued but not to the Award amount itself.  Accordingly, the Ministry has paid only a negligible fraction of the post-Award interest due to plaintiff and has not paid any of Award amount.

     22.    Plaintiff has repeatedly demanded full payment of the Award, but the Ministry has failed to comply.

     23.    In addition, in accordance with paragraph 3 of the Award, plaintiff owes post-Award interest.  The Award provides for the payment of interests accrued by the Ministry for the amount owed to plaintiff under ¶¶ 19(a)-(b), <u>infra</u>, from July 25, 2002 "until the actual date

of payment" and measured as "the TAMN rate for local currency and TAMEX for foreign currency."

24.     Furthermore, the Award Clarification states that the adjustments of the amount in Nuevos Soles pursuant to the Consumer Price Index shall be applied until its final payment.

## CLAIM FOR RELIEF
### (Confirmation and Enforcement of Foreign Arbitration Award Pursuant to 9 U.S.C. § 301, et. seq.)

25.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 24 above as if set forth fully herein.

26.     Brazil, Peru and the United States are each signatories to the Convention.

27.     The Convention incorporates by reference Section 207 of the Federal Arbitration Act, which provides that "[w]ithin three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration."

28.     Plaintiff and the Ministry entered into the Agreement, which is a valid and binding contract.

29.     Pursuant to the Agreement, the plaintiff and the Ministry agreed to arbitrate dispute thereunder.  The Ministry appeared and defended itself throughout the arbitral proceedings.

30.     After consideration of all the evidence presented at the hearings, the Arbitral Tribunal rendered the Award.

31. The Award became a final judgment under Peruvian law once the Peruvian Court dismissed the request of annulment of the Award presented by the Ministry, as set forth in paragraph 20 above.

32. The Ministry has failed to pay the Award.

33. The Ministry is a political subdivision of The Republic of Peru and therefore the same legal entity thus the Award can therefore be confirmed and enforced against The Republic of Peru.

WHEREFORE, based on the foregoing, plaintiff respectfully demands judgment as follows:

(a) confirming the Award as against defendants;

(b) entering judgment in favor of plaintiff and against defendants in the amount of the Award of approximately US $22,289,354 (twenty two million two hundred eight nine thousand three hundred fifty four US Dollars), using the exchange rate in effect at the time of the filing of this complaint, plus the adjustment required by the Award and the Award Clarification to reflect the increase in the Peruvian Consumer Price Index.

(c) awarding plaintiff post-Award interest accruing at the rate and pursuant to the procedure specified in the Award from January 20, 2005 until the date of full payment;

(d) awarding plaintiff its attorneys' fees, expenses, disbursements and costs; and

(e) granting plaintiff such other and further relief as this Court may deem just and proper.

Dated:    January 18, 2008

CHADBOURNE & PARKE LLP

By_____
          Thomas J. Hall (TH-3398)
              A Member of the Firm
Attorneys for Plaintiff
30 Rockefeller Plaza
New York, New York  10112
(212) 408-5100
thall@chadbourne.com

# EXHIBIT A

## LAUDO ARBITRAL DE CONCIENCIA



NOTARIA SOTOMAYOR
Coronel Inclán 179
Miraflores
Teléfs.: 4464582
4466717 - 4460373
4460239

Lima, 20 de Enero de 2005.

**I.- LAS PARTES** : **FIGUEIREDO FERRAZ CONSULTORIA E ENGENHARIA DE PROJETO LTDA.**

En adelante DEMANDANTE

**PROGRAMA DE APOYO A LA REFORMA DEL SECTOR SANEAMIENTO – PARSSA (EX – PRONAP)**

En adelante DEMANDADA

**TRIBUNAL ARBITRAL:** Dr. VICTOR PALOMINO RAMÍREZ, PRESIDENTE;

ING. HÉCTOR BECERRA MARTÍNEZ, ÁRBITRO;

Dr. ÁLVARO GONZÁLEZ PELÁEZ, ÁRBITRO;

Dr. LUIS UBILLAS RAMÍREZ, SECRETARIO.

## II.- ANTECEDENTES.-

Mediante carta N°. T- 811-01/97043-007/01 de fecha 29 de Octubre del 2001, el **DEMANDANTE** presenta su solicitud de arbitraje a la **DEMANDADA** para que se resuelva con carácter definitivo las controversias relacionadas con el Contrato de Servicios Consultoría celebrado entre las partes con fecha 12 de Noviembre de 1997, para la elaboración de los Estudios Definitivos de la Primera Etapa de Inversión de los Planes de Expansión de Mínimo Costo de los Servicios de Agua Potable y Alcantarillado de las localidades de Tacna, Juliaca, Puno Ayaviri, Ilave, Cusco y Sicuani.

En la referida comunicación, el **DEMANDANTE** designó como Árbitro de parte al Dr. Sergio Tafur Sánchez confiriéndole a la **DEMANDADA** el plazo de diez días para que proceda a la designación de su árbitro de parte.

Transcurrido el plazo conferido, concordante con el plazo de Ley para la designación del árbitro de parte, sin que se hubiera producido ésta, el **DEMANDANTE** acudió al Poder Judicial para solicitar que un Juez Especializado en lo Civil de Lima, designe al árbitro en defecto de la **DEMANDADA**; designación que se produjo con intervención



del **Vigésimo Cuarto Juzgado Especializado en lo Civil de Lima, Expediente** 6336-2002, el cual mediante Resolución Nº 8 de fecha 12 de Abril del 2002, designó como árbitro de conciencia al Ingeniero Héctor Becerra Martínez..

Mediante carta Nº T- 811- 01- 97043- 001-02 de fecha 23 de Abril del 2002, el **DEMANDANTE**, informa que el árbitro que designó ha declinado de su función y designa en su reemplazo al Dr. Álvaro González Peláez.

Los árbitros así designados procedieron a nombrar al Dr. Víctor Palomino Ramírez como tercer árbitro y Presidente del Tribunal Arbitral, debiendo destacarse que la designación de los Árbitros no fue objeto de observación por ninguna de las partes.

El Tribunal Arbitral se instaló el día 24 de Junio del 2002 conforme consta en el Acta correspondiente, designándose en dicho acto al Dr. Luis Emilio Ubillas Ramírez, como Secretario. En la misma acta de instalación se aprobaron las Reglas del Proceso y se le confirió a la **DEMANDADA** el plazo de diez días para que presente su demanda. El acta en referencia, se notificó a las partes el día 11 de Julio del 2002.

**El DEMANDANTE** cumplió con presentar su demanda el 25 de Julio del 2002, dentro del plazo establecido, la cual fue admitida mediante Resolución N.° 04 de fecha 31 de Julio del 2002, que a la vez tuvo por ofrecida la prueba documental anexada y corrió traslado a la **DEMANDADA** por el término de 10 días útiles. La **DEMANDADA** fue notificada con fecha 02 de Agosto del 2002.

Paralelamente, con fecha 25 de Julio del 2002, la **DEMANDADA** interpuso escrito Nº 1, solicitando que se corrija el eventual error, de calificar el presente arbitraje como uno de Conciencia, arguyendo que lo correcto es que se procese como uno de Derecho, por tratarse de un arbitraje internacional.

Por Resolución Nº 5 de fecha 31 de Julio del 2002, se corrió traslado del incidente al **DEMANDANTE**, la misma que fue notificada con fecha 02 de Agosto del 2002.

Mediante escrito Nº 02 de fecha 07 de Agosto del 2002, el **DEMANDANTE** absuelve el traslado conferido, quedando el incidente expedito para la decisión respectiva, la cual fue expedida mediante Resolución Nº 07 de fecha 12 de Agosto del 2002, declarando infundada la petición de modificar el carácter de conciencia conferido al presente arbitraje, por las razones que allí se expone; resolución que fue notificada a las partes con fecha 13 de Agosto 2002.

Mediante escrito Nº 02 de fecha 16 de Agosto del 2002, la **DEMANDADA** interpone recurso de Reposición, del cual se corre traslado al **DEMANDANTE** mediante Resolución Nº 08 de fecha 19 de Agosto del 2002, notificado a las partes con fecha 21 de Agosto 2002.

Mediante escrito Nº 3 de fecha 26 de Agosto del 2002, el **DEMANDANTE** absuelve el traslado conferido; y, analizada las cuestiones de fondo propuestas, el Tribunal Arbitral expidió la Resolución Nº 14 de fecha 15 de Octubre del 2002 declarando

2

infundado el recurso de Reposición por las razones que allí se exponen; resolución que fue notificada a las partes en la misma fecha.

Concluido el incidente, se procede a dar cuenta de la absolución de la contestación de la demanda, la misma que se formalizó con fecha 16 de Agosto del 2002, oportunidad en que la **DEMANDADA** presentó su contestación a la demanda dentro del plazo concedido mediante Resolución Nº 04; no obstante, al observarse que no había adjuntado la constancia de pago de los honorarios arbitrales y los gastos administrativos, se expidió la Resolución Nº 09 teniendo por recibida la contestación de la demanda en plazo oportuno, suspendiéndose su admisión y trámite hasta que diera cumplimiento al pago según las reglas del proceso, confiriéndosele el término de cinco días para dicho fin, plazo que fue prorrogado en reiteradas ocasiones a solicitud de la parte **DEMANDADA**.

Con fecha 15 de Octubre del 2002, la **DEMANDADA** cumplió con cancelar los honorarios arbitrales y los gastos administrativos, expeditándose la continuación del proceso arbitral.
Mediante Resolución N° 15, de fecha 15 de Octubre del 2002, el Tribunal Arbitral dio cuenta del escrito de contestación a la demanda, lo admitió, tuvo por ofrecida la prueba documental anexada y señaló fecha para la audiencia de acuerdo Pre - Arbitral para el 29 de Octubre del 2002, a horas 9.30 a.m. reprogramada luego para que se lleve a efecto el día 11 de Noviembre a la misma hora.

En la fecha indicada precedentemente, se llevó a cabo la Audiencia de Acuerdo Pre-Arbitral ámbito en el que se declaró saneado el proceso, se exhortó a Conciliación a las partes no poniéndose de acuerdo ninguno de los representantes, fijó los puntos controvertidos y admitió las pruebas ofrecidas por la parte **DEMANDANTE** y **DEMANDADA** en sus escritos de demanda y contestación a la demanda respectivamente, y precisó que quedaba a criterio del Tribunal Arbitral designar a los Peritos correspondientes; señalar día y hora para las declaraciones testimoniales; y, expeditar la actuación de las diversas pruebas ofrecidas, oportunamente.

Atendiendo a la complejidad del caso, a la abundante prueba ofrecida por las partes y al evento previsible de que su actuación excedería el término probatorio establecido en las Reglas del Proceso, el tribunal Arbitral emitió la Resolución N° 24 de fecha 17 de Enero del 2003, mediante la cual dispuso la ampliación del término probatorio, por todo el tiempo que requiera la actuación de todas las pruebas formalmente ofrecidas y admitidas por el Tribunal.

Mediante Resolución N° 25 de fecha 17 de Enero del 2003, el Tribunal Arbitral designó como Perito al Ingeniero Armando Alva Katan y estableció el objeto y alcances de la pericia; Resolución que fue notificada a las partes con fecha 30 de Enero del 2003.

Mediante escrito N° 6 de fecha 04 de Febrero del 2003, el **DEMANDANTE** interpuso Recurso de Reposición contra la Resolución N° 25, cuestionando el objeto y alcances de la Pericia; corrido traslado mediante Resolución N° 26 de fecha 06 de Febrero del 2003; absuelto el traslado mediante escrito N° 10 de la **DEMANDADA**, se resolvió la

3

incidencia mediante Resolución N° 28 de fecha 27 de Febrero del 2003 por la que se declaró fundado el recurso de Reposición interpuesto por el **DEMANDANTE** y se procedió a la modificación del objeto y alcances de la pericia, en términos compatibles con la prueba pericial unificada, requerida por ambas partes.

De otro lado, declinada la aceptación del cargo por el Perito designado Ingeniero Armando Alva Katan, el Tribunal Arbitral por mayoría, procedió a designar en su reemplazo al Ingeniero Civil Álvaro Horacio Flores Boza, con el voto singular del señor Árbitro Ingeniero Héctor Becerra Martínez, mediante Resolución N° 30 de fecha 11 de Marzo del 2003.

Formalizada la aceptación del cargo, el Tribunal Arbitral expidió la Resolución N° 32 que aprueba los honorarios periciales en la suma de US $ 15,000.00 Dólares USA y fija el plazo de ejecución de la pericia en 90 días calendario computados desde el día siguiente de recibida bajo cargo la información total requerida para la ejecución del trabajo y que se detalla en dicha Resolución.
La documentación requerida para la realización de la Pericia, fue entregada por las partes en diferentes oportunidades, siendo la última constancia de recepción de documentos por el Perito, el 28 de Junio del 2003; motivo por el cual, el plazo para la ejecución de la Pericia vencía el 28 de Septiembre del 2003, ampliado al 30 del mismo mes y año, a solicitud del Perito.

Con fecha 30 de Septiembre, el Perito comunica al Tribunal Arbitral la culminación de su trabajo, adjuntando los recibos de honorarios profesionales extendidos para cada una de las partes.

El **DEMANDANTE** procedió a la cancelación de los honorarios periciales dentro del término establecido por el Tribunal Arbitral; y la entidad demandada, por diversos inconvenientes de carácter administrativo, recién cumplió con el pago respectivo, el día 20 de Enero del año 2004, dejando expedita la entrega del Informe Pericial, el mismo que fue ingresado al Tribunal Arbitral con fecha 26 de Enero del 2004.

Mediante Resolución N° 51 de fecha 28 de Enero del 2004, el Tribunal Arbitral puso a conocimiento de las partes el resultado del Informe Pericial, a los efectos de que expresen lo que corresponda a su Derecho, dentro del término de diez días, el mismo que fue ampliado por Resolución N° 56 de fecha 27 de Febrero de 2004, hasta el día 09 de Marzo de 2004.

En la fecha indicada precedentemente, las partes cumplieron con formular sus observaciones, las mismas que fueron objeto de traslado a conocimiento del Perito, mediante Resolución N° 57 de fecha 15 de Marzo 2004, a los efectos de que absuelva las observaciones en el plazo de diez días, ampliado luego por diez días adicionales, mediante Resolución N° 59, con vencimiento el día 20 de Abril 2004.

Con fecha 20 de Abril de 2004, el Perito cumplió con absolver las observaciones formuladas por las partes; y, siendo el estado de la causa, mediante Resolución N° 60 de fecha 27 de Abril 2004, se señaló el día 12 de Mayo 2004 para que se lleve a

4

cabo la Audiencia de Informe Pericial, reprogramada por Resolución Nº 61 de fecha 07 de Mayo 2004 para el día 17 de Mayo 2004, a horas 10 a.m.

El día y hora indicados precedentemente, se llevó a cabo la Audiencia de Informe Pericial, oportunidad en la que el Ing. Álvaro Flores Boza, expuso el resultado de la pericia, con intervención de las partes en la formulación de preguntas, observaciones y petición de aclaraciones que el Perito absolvió en el acto; haciendo lo propio los señores miembros del Tribunal Arbitral; todo lo cual consta en una cinta magnetofónica que como documento se integró al expediente.

Mediante escrito Nº 22, ampliado luego mediante escrito 23, la **DEMANDADA** solicitó la subrogación del Perito y la realización de una Pericia ampliatoria a cargo de otro profesional, aduciendo que el Perito se había mostrado renuente a absolver el punto Nº 5 del objeto y alcance de la Pericia ordenada por el Tribunal Arbitral; petición que dio lugar a la Resolución Nº 64 de fecha 23 de Junio de 2004, que dispuso la realización de un informe pericial ampliatorio a cargo del Perito designado Ing. Álvaro Flores Boza, precisando su alcance y ámbito, así como el plazo de su realización; e, infundada la solicitud de subrogación planteada.

La Resolución Nº 64, fu objeto de un recurso de Reposición planteado por la **DEMANDADA** mediante escrito Nº 25 recibido con fecha 30 de Junio 2004; el cual fue resuelto mediante Resolución Nº 69 de fecha 06 de Agosto 2004, que declara infundada la Reposición solicitada, dándose término al incidente.

Con fecha 23 de Julio 2004, el Perito formuló el informe pericial ampliatorio, el que dio lugar a ala Resolución Nº 70 de fecha 13 de Agosto 2004, que resuelve: por cumplido el mandato, agréguese a los autos con conocimiento de las partes; y, posteriormente, mediante Resolución Nº 72 de fecha 08 de Septiembre 2004, se señaló el día 17 de Septiembre 2004, a horas 11 a.m. para la realización del la Audiencia de Informe Pericial Ampliatorio, modificada luego por Resolución Nº 74 de fecha 14 de Septiembre 2004, para llevarse a efecto el día 20 de Septiembre 2004, a horas 10 a.m.

El día y hora indicados, se realizó la Audiencia de Informe Pericial Ampliatorio, con intervención de las partes y de los señores Árbitros en la formulación de preguntas u observaciones, dejándose constancia de los detalles de la reunión en una cinta magnetofónica integrada como documento a los autos arbitrales.

De otro lado, mediante Resolución Nº 77 de fecha 14 de Octubre de 2004, se señaló el 21 de Octubre para la Audiencia de Informe Pericial Contable ordenado mediante Resolución Nº 71 de fecha 08 de Septiembre de 2004, oportunidad en la se designó al Sr. CPC Félix Daniel Aquije Soler para que realice dicha pericia, solicitada como medio probatorio por el **DEMANDANTE**.

En la fecha indicada, se realizó la Audiencia de Informe Pericial Contable, en los términos que constan del acta respectiva.

5



La **DEMANDADA**, habiéndose desistido de las declaraciones testimoniales ofrecidas como prueba al postular su demanda, debidamente aceptada por el Tribunal arbitral mediante Resolución Nº 58 de fecha 26 de Marzo de 2004; y, no habiendo pruebas pendientes de actuación, el Tribunal Arbitral expidió la Resolución Nº 78 declaró concluida la etapa probatoria, concediendo a las partes el término de cinco días para que formulen sus alegatos por escrito, la cual fue notificada a las partes el día 04 de Noviembre del 2004.

Con fecha 11 de Noviembre del 2004, las partes cumplieron con formular sus alegatos por escrito, lo que origina la Resolución Nº 79, que fijó el día 30 de Noviembre de 2004 a horas 10 a.m. como fecha y hora para el informe oral solicitado por ambas partes.

El día y hora indicado, se llevó a cabo la Audiencia de Informe Oral, en los términos que constan del acta respectiva y de la grabación magnetofónica que se integró al expediente, como documento constitutivo del mismo.

Mediante Resolución Nº 81 de fecha 02 de Diciembre de 2004, siendo el estado de la causa se dispone; tráigase para Laudar, fijándose el plazo respectivo en veinte días computados desde el día siguiente de notificada la presente, lo que se verificó el día 02 de Diciembre de 2004.

Posteriormente, mediante Resolución Nº 82 de fecha 27 de Diciembre 2004, notificada a las partes el mismo día, se amplió el plazo para Laudar por el término de quince días, cuyo vencimiento se fijó para el día 21 de Enero de 2005.

III. BREVE RESEÑA DE LA DEMANDA-

Con escrito de fecha 25 de Julio del 2002, el **DEMANDANTE** presenta una demanda postulando diversas pretensiones relacionadas con el Contrato de Consultoría celebrado entre las partes con fecha 12 de Noviembre de 1997.

Las pretensiones de la demanda son las siguientes:

1. Que se ordene a la **DEMANDADA** el pago de la suma de US $ 3'557,369.60 (Tres millones quinientos cincuenta y siete mil trescientos sesenta y nueve y 60/100 dólares americanos) incluido IGV y S/. 3'982,950.00 (Tres millones novecientos ochenta y dos mil novecientos cincuenta y 00/100Nuevos Soles) más IGV, por concepto de honorarios por los servicios del personal profesional y técnico de la **DEMANDANTE**, que se han derivado de los servicios complementarios a aquellos que fueron materia de contratación, y que resultan consecuencia directa de las mayores labores que se han tenido que realizar por una ampliación de cerca del triple del plazo inicial del Contrato de Servicios de Consultoría para la elaboración de los Estudios Definitivos de la Primera Etapa de Inversión de los Planes de Expansión de Mínimo Costo de los Servicios de Agua Potable y Alcantarillado de las localidades de Tacna, Juliaca, Puno

6

Ayaviri, llave, Cusco y Sicuani, suscrito con fecha 12 de noviembre de 1997.

2. Que se ordene a la **DEMANDADA** el pago del monto que resulte de actualizar la suma de S/. 3'982,950.00 en base del índice de precios al consumidor de Lima Metropolitana – IPC de Lima, desde el 18 de Septiembre de 1997 (conforme a la cláusula cuarta numeral 01 del contrato suscrito), más IGV. Esta actualización deberá efectuarse hasta la fecha de emisión del Laudo en el presente proceso arbitral.

3. Que se ordene a la **DEMANDADA** el pago de los intereses devengados por las cantidades no pagadas anteriormente desde la fecha en que se generó la obligación de su abono, tomando en cuenta la tasa de interés bancario máxima de operaciones comerciales establecida por el Banco Central de Reserva. Estos intereses se generan hasta la fecha real de pago.

4. Que se ordene a la **DEMANDADA** el pago de la suma de US $ 15,628.05 y S/. 134,388.92 por concepto de gastos y comisiones bancarias derivados de la necesidad de tener que mantener las cartas fianzas otorgadas por la **DEMANDANTE** a la suscripción del contrato hasta la fecha, lo que se ha motivado por situaciones ajenas a su parte.

5. Que se declare que no resulta oponible a la **DEMANDANTE** lo dispuesto en la Resolución Directoral Nº 233-2001/PRES/VMI/PRONAP/DE de fecha 10 de octubre del 2001, emitida por el Director Ejecutivo de la **DEMANDADA**, aprobando la Liquidación del Contrato celebrado, en el extremo que desestima y no considera los conceptos señalados en los puntos 1 a 4 del petitorio de la demanda.

Como fundamentos de las pretensiones que postula, el **DEMANDANTE** sostiene que la **DEMANDADA** ha violentado el principio elemental de la buena fe, en tanto pilar básico de toda contratación, al proporcionar información para la elaboración de sus propuestas, asumiendo aspectos técnicos que cuando fueron contrastados en la práctica, resultaron sustancialmente distintos, originándole mayores actividades que las previstas en función a la información proporcionada y que ha conllevado a que un contrato pactado a 315 días, se extienda en términos reales prácticamente en 984 días, (hasta el 23 de Agosto del año 2000, fecha en que entregó su Informe Final, después de subsanadas las últimas observaciones del Supervisor); sin que la **DEMANDADA** se muestre dispuesta a compensar por esta situación totalmente ajena al **DEMANDANTE** y originada en la conducta que la propia **DEMANDADA** ha demostrado.

Además, El **DEMANDANTE** sostiene que de la revisión de su propuesta se puede observar claramente que ella contemplaba en la parte técnica un número determinado de Hombres / Hora que en la realidad se ha visto excesivamente incrementado.

Así mismo, El **DEMANDANTE** refiere que en base a esta relación (horas/ hombre), tenían planificado la entrega de aproximadamente 1,644 planos, en función al número de profesionales que propuso y los tiempos internacionales aceptados por la Ingeniería Consultiva; sin embargo, sostienen que han tenido que elaborar 7,109

7

planos, tal como aparece en la página 28 de su informe de liquidación, en aspecto que según refieren, no ha sido desconocido por la **DEMANDADA**.

El **DEMANDANTE** expone que si bien el hecho descrito podría inducir a pensar que esta situación obedece a una indebida propuesta realizada por ellos, por el hecho objetivo e incontrastable que todos los Consultores contratados por la **DEMANDADA** en virtud al mismo concurso de méritos para la elaboración de los Estudios Definitivos de la Primera Etapa de Inversión de los Planes de Expansión de Mínimo Costo de los Servicios de Agua Potable y Alcantarillado en diversas ciudades, han tenido el mismo problema y se encuentran algunos de ellos también en arbitraje por la misma razón, como es el caso de la Asociación Parsons – Cesel; por lo que señalan, procede preguntarse ¿dónde se originó el problema, en el **DEMANDANTE** o en los Estudios de Factibilidad proporcionados por la **DEMANDADA?**.

Abundando en argumentos en torno a la forma como según sostienen, la **DEMANDADA** ha violentado el principio de buena fe, indican que existen algunas circunstancias particulares, pero objetivas y relevantes que explican tal afirmación; así, refieren que tiene singular relevancia el hecho que el Supervisor SMS (Consorcio Inspector Sondotécnica – Multiservice – Serconsult), fue el mismo que antes se había encargado de la Supervisión de los Estudios de Factibilidad de los Planes de Expansión de Mínimo Costo de los Sistemas de Agua Potable y Alcantarillado de las 07 ciudades que les fueron encomendadas, con lo cual se verifica un eventual conflicto de intereses por estar comprometido con la realización de estos estudios, que haría difícil, por no decir imposible, que cualquier deficiencia que la **DEMANDANTE** pudiera haber detectado en los Estudios de Factibilidad fuera aceptada por dicha Supervisión, por cuanto sostiene, estaría aceptando a la vez su propia deficiencia en la realización de los referidos estudios, que sirvieron de base para la elaboración de su propuesta y la ejecución de los Estudios Definitivos.

De otro lado, señalan que la extensión de los plazos de la Consultoría que les fuera encomendada, no constituye un hecho aislado que les pueda ser atribuido; sino que, por el contrario, ha sido una constante común que se ha verificado también con las otras dos Consultoras de reconocido prestigio internacional ganadoras en el mismo proceso convocado para otras ciudades, las cuales también elaboraron sus propuestas sobre la base de la información técnica (esencialmente los Estudios de Factibilidad) de las respectivas ciudades asignadas a cada una, igualmente proporcionada por la **DEMANDADA**.

En base a lo expuesto, **EL DEMANDANTE** propone que el análisis que el Tribunal Arbitral debe realizar en torno a este extremo, es si resulta acorde a la Buena Fe Contractual que la **DEMANDADA** pretenda beneficiarse de las mayores labores que han tenido que realizar como consecuencia de haberse ampliado el plazo de ejecución del contrato en cerca del triple del plazo pactado, por causas que no le pueden ser imputables y que se han originado por la información deficiente proporcionada por la **DEMANDADA** y que según manifiesta, resultaba en muchos casos sustancialmente distinta con la observada en el campo; es decir, mas allá de cualquier margen razonable que permita un simple ajuste de los Estudios de Factibilidad.

8

Sostienen que carece de toda justicia y equidad, así como de amparo en el derecho que el estado pretenda obtener una posición ventajosa derivada de la ejecución de un contrato, aún cuando este fuere a suma alzada, si se advierte que ello obedece a una flagrante inobservancia del principio elemental de la buena fe.

A continuación, el **DEMANDANTE** argumenta sobre la dependencia insoslayable entre el Estudio Definitivo y el Estudio de Factibilidad que le sirve de sustento; para explicar que para realizar un proyecto a nivel definitivo, se requiere que exista previamente el proyecto a nivel de factibilidad y quien pretenda realizar el Estudio Definitivo debe basarse esencialmente en la revisión del Estudio de Factibilidad para poder delinear y/ o tener una visión general de los aspectos principales que éste debe abarcar.

Sostiene que el Estudio de Factibilidad, sustenta la extensión y características del Estudio Definitivo, sirviéndole de base para dimensionar la cantidad de servicios requeridos y calcular su costo global; por lo cual éstos deben ser idóneos y confiables, así como completos y concluidos con relación a lo que se pretende que se haga en los Estudios Definitivos; de modo que la metodología para su realización la señalan sus términos de referencia y los propios Estudios de Factibilidad.

El **DEMANDANTE** refiere que su propuesta para la elaboración de los Estudios Definitivos, fue realizada tomando como base estos documentos; principalmente en el dimensionamiento de los recursos necesarios para su ejecución.

Indican que los Estudios de Factibilidad y sus propios términos de referencia, permiten un conocimiento claro de los trabajos realizados durante su ejecución y señalan el punto de partida para los trabajos a ser realizados por los Estudios Definitivos; así como para la evaluación y cálculo de los recursos necesarios; de tal manera que cuando los Estudios de Factibilidad no cumplen con lo señalado (en sus términos de referencia) y se verifica fehacientemente que no son idóneos, que están incompletos y lo que puede ser mas grave aún, que las soluciones propuestas en sus planteamientos no sean factibles; entonces habrán fallado en su razón principal y consecuentemente habrá fallado el cálculo de los recursos que fueron estimados, para realizar los Estudios Definitivos, en base a estos documentos deficientes y no idóneos.

Sostienen que en el presente caso, la referida verificación, sólo era posible hacerla en el desarrollo de los trabajos que fueron contratados, por lo que los datos mostrados por los Estudios de Factibilidad se consideraron correctos y concluidos en base a un elemental principio de buena fe; de lo contrario, se hubiera hecho indispensable su verificación a través de trabajos de campo y otros para evaluar los recursos necesarios para el trabajo propuesto.

Argumentan también que la metodología señalada por los términos de referencia para el desarrollo de los Estudios Definitivos en la que los datos necesarios para la conclusión de los informes debían de ser recogidos en actividades incluidas en etapas posteriores a las que debían servir de base, tuvo como consecuencia, al no

9

ser permitida la reorganización de las actividades de forma adecuada, un camino mucho mas largo demorado y oneroso sobre el que no les corresponde responsabilidad.

En base a lo expuesto, refieren que cuando los Estudios de Factibilidad son deficientes, incompletos o erróneos, también lo serán los Estudios Definitivos que se basan en éste; enfatizando que esta afirmación es tan cierta que incluso la Cláusula Quinta, numeral II 03 del contrato celebrado con la **DEMANDADA** se estableció textualmente: **"En el caso de los Estudios de Factibilidad de los Planes de Expansión de Mínimo Costo que han sido aprobados por el PRONAP para las localidades que comprenden el presente contrato y que cuentan con la no objeción del BID, estos documentos se tomarán como base para el desarrollo de los diseños definitivos".**

El **DEMANDANTE** expone sin embargo, que la situación que encontró al momento de proceder a la consolidación de las soluciones propuestas en los Estudios de Factibilidad, fue totalmente distinta, ya que después de analizar las soluciones que proponían, contrastándolas con la realidad en base a los resultados de los trabajos de campo, ha tenido que rehacer completamente o diseñar de forma adecuada, por primera vez, los componentes de los sistemas, concluyendo que esto no puede ser entendido simplemente como consolidar las soluciones que señalaba la Factibilidad, sino como la elaboración completa de una nueva solución factible.

Argumenta que los errores en su mayoría, tienen como origen los planos e informaciones básicas obtenidas de las EPS para la urbanización y los catastros de los sistemas, con deficiencias que no fueron adecuadamente corregidas o contrastados con la realidad durante la realización de los Estudios de Factibilidad, como ellos han podido verificar al final de la ejecución de todos los servicios de campo.

Por la razón indicada, refieren que la solución de mínimo costo, la verdadera solución consolidada que fue completamente diseñada por el **DEMANDANTE**, solo pudo ser concluida después de comprobado la no factibilidad de las soluciones propuestas, al final del proyecto básico, cuando tuvo que volver al campo con sus equipos profesionales para el planteamiento de las nuevas soluciones y realizar nuevamente trabajos de campo para el detalle de las mismas.

También hace referencia en el numeral II.5, respecto del proceso de selección, las bases, términos de referencia y la relevancia de los Estudios de Factibilidad realizados para la elaboración de su propuesta para los Estudios Definitivos, indicando que esta se realiza en función a la información proporcionada por la entidad, básicamente contenida en los Estudios de Factibilidad.

Sustenta lo anterior haciendo referencia a las bases del concurso y sus términos de referencia, que definen respecto de los Estudios de Factibilidad y los Estudios Definitivos, entre otros, que los primeros son previos y base para el desarrollo de los Estudios Definitivos (ANEXO 1 GLOSARIO DE TERMINOS, item F), conforme establece el contrato de consultoría celebrado entre las partes en su cláusula Quinta

10

numeral II 03 ( 3, Pág. 25, demanda); y que los Estudios Definitivos deben elaborarse, expediente técnico (diseño de ingeniería de detalle, planos presupuesto, fórmula polinómica, especificaciones técnicas, cronograma de obras, entre otros), para la ejecución de las obras de mejoramiento y ampliación de los sistemas de agua potable y alcantarillado de la Primera Etapa de inversión, identificada en los Estudios de Factibilidad de los planes de expansión de mínimo costo.

A continuación destacan que si bien se obligaron a hacer los ajustes necesarios a los Estudios de Factibilidad, ello no puede significar en forma alguna que se pretenda considerar que bajo dicha obligación prácticamente tenían la obligación adicional de rehacer estos estudios; ya que, según sostienen, hacer ajustes no significa descartar los estudios y sus soluciones determinadas, para buscar nuevas soluciones que fuesen factibles y realizables incluyendo obligatoriamente por su vinculación fundamental, el planteamiento y desarrollo de las soluciones para la Segunda Etapa, lo que tampoco era previsto contractualmente, como se deslinda claramente en el Contrato de Servicios Consultoría celebrado entre las partes con fecha 12 de Noviembre de 1997, para la elaboración de los Estudios Definitivos de la Primera Etapa de Inversión de los Planes de Expansión de Mínimo Costo de los Servicios de Agua Potable y Alcantarillado de las localidades del Grupo 2.

Respecto a todos estos temas se explayan con amplitud en la formulación de su demanda y medios probatorios para sustentar las pretensiones que postulan y que serán también objeto de análisis y apreciación en el rubro correspondiente del presente Laudo Arbitral.

Precisa que los hechos descritos y otros que constan de la demanda (medios probatorios, correspondencias referidas y oficios comprobatorios), explican porqué los supuestos sobre los que realizaron su propuesta técnica y económica y, que sirvió de base para establecer el monto del contrato, quedó totalmente desvirtuada durante la ejecución del mismo.

De otro lado, el **DEMANDANTE**, precisando los argumentos específicos que sustentan cada una de sus pretensiones, sostiene, respecto al pago de US $ 3'557,369.60 Dólares USA incluido IGV; y de S/. 3'982,050.00 Nuevos Soles, más IGV por concepto de honorarios por los servicios de su personal profesional y técnico, que estos le corresponden por derecho, en razón de los mayores servicios brindados a la **DEMANDADA**, originados por las actividades adicionales a aquellas que fueron materia de contratación, y que sostiene, han tenido que realizar por ampliaciones de plazo de cerca del triple del periodo inicialmente contratado, por causas imputables directamente a la deficiencia excesiva de los Estudios de Factibilidad proporcionados por la **DEMANDADA**; argumentan que dicho pago procede, por los siguientes motivos:

a)    Por la inconsistencia que se detectó en los Estudios de Factibilidad y que sirvió de base para la elaboración de su propuesta técnica y económica, así como para el inicio de sus actividades;

11



Refieren que en efecto, su propuesta técnica y económica, se basó en el análisis de los Términos de Referencia que formaban parte del contrato y de los Estudios de Factibilidad;

Indican que solo después de iniciadas sus actividades, pudieron apreciar que el Supervisor SMS empezó sistemáticamente a rechazar sus informes parciales, requiriéndoles la ejecución de servicios que alteraban las características y diseño del proyecto y lo expresamente ofertado en su propuesta técnica, encontrándose en la necesidad de tener que acatar dichos requerimientos para que fueran aprobados los respectivos informes, haciendo referencia a la correspondencia y oficios que derivaran trabajos y complicaban las relaciones entre las empresas involucradas en los mismos.

**b)** Por la existencia de cambios substanciales entre lo establecido en los Estudios Definitivos que desarrolló, con relación a los Estudios de Factibilidad y que han sido aceptados por el Supervisor y por la **DEMANDADA**, identificándolos en Cuadros Resumen de Identificación de Diferencias detectadas entre las soluciones propuestas por los Estudios de Factibilidad y las nuevas soluciones desarrolladas en los Estudios Definitivos respecto a cada una de las localidades, así como diseños individuales y comparativos de los planteamientos hidráulicos, sectorizaciones y respectivas soluciones de agua potable y Alcantarillado de cada una de las localidades del grupo 2, que adjuntan a su demanda en el medio probatorio 2, Anexo 1D, el que demostraría plenamente las nuevas soluciones que tuvo que desarrollar en sustitución de las propuestas por la Factibilidad. En tal sentido, sostiene que queda claro que debido a esta situación los supuestos sobre los que realizó su propuesta técnica y económica, y en base a lo que finalmente fijo el monto contractual quedaron totalmente desvirtuados durante la ejecución del contrato.

**c)** Por los planteamientos de la nueva sectorización hidráulica en las ciudades objeto del grupo 2, que demostrarían el cambio total de la concepción hidráulica propuesta; que la realización del Estudio de Factibilidad no obedeció a sus propios términos de referencia que señalaban la realización de diversas actividades necesarias para darles la idoneidad y confiabilidad respectiva y, como consecuencia de su no realización resultaron documentos que se demostraron no ser una base confiable para la ejecución de los Estudios Definitivos, obligando al demandante a realizar una serie de actividades que debieron ser realizadas durante la ejecución de la Factibilidad y por lo tanto no previstas en el marco de su propuesta y del contrato que finalmente demandó para su ejecución prácticamente el triple del tiempo inicialmente establecido.

**d)** Por la constatación que fue la Entidad la responsable por los estudios de pre - Factibilidad y de Factibilidad, y que la Supervisora (SMS) que los fiscalizó, son respectivamente también responsable y supervisor en el desarrollo de los Estudios Definitivos, queda claro que ambas empresas conocían perfectamente las dolencias de los Estudios de Factibilidad, que se demostraron ser deficientes, no idóneos y que fallaron en su principal producto, presentando planteamientos cuyas soluciones propuestas y a consolidar se verificaron "no ser factibles",y por lo tanto al Consultor no le cabe ninguna responsabilidad por los sobre tiempos y costos vinculados que excedieron a lo presupuestado y que fueron necesarios como consecuencia de lo

12

expuesto, para desarrollar y consolidar nuevos planteamientos hidráulicos, soluciones en sustitución a aquellas de la Factibilidad, que se verificaron no sólo factibles involucrando trabajos referentes a la búsqueda y determinación de soluciones no solamente para la Primera Etapa de Inversión de los Planes de Expansión de Mínimo Costo de los Servicios de Agua Potable y Alcantarillado de las localidades del Grupo 2, sino también para la Segunda Etapa por su necesidad de tener entre ambas una perfecta identidad conceptual en todos los aspectos, especialmente en el hidráulico que depende directamente de las fuentes y de la topografía.

e)    Dice también **EL DEMANDANTE** respecto a la obligación de **LA DEMANDADA** de reconocer el pago de los valores demandados referidos a los honorarios por los servicios del personal profesional y técnico por los mayores servicios brindados como consecuencia de la ampliación de los plazos por causas no imputables al consultor y sobre la implicancia del contrato a suma alzada, que cuando el contrato fue suscrito 12 de noviembre de 1997 se encontraba vigente el Decreto Supremo No. 208-87-EF-REGAG aplicable en este caso y que en el Art. 117 faculta a la entidad (PRONAP) a pagar directamente al contratista la ejecución de servicios complementarios, en casos debidamente justificados, lo que en el presente caso esta dado por todas las deficiencias de los Estudios de Factibilidad y sus consecuencias ya comentadas en el numeral anterior, resaltando en el presente numeral la exigencia de PRONAP y Supervisora conforme registrada en el Oficio No. 458-99/PRES/VMI/PRONAP/PDES y correspondencia SMS 664-99 respectivamente, de mantener su personal profesional y técnico a disposición en las localidades, hasta la aprobación del último informe final, así como la obtención de la No Objeción por parte del BID.

f)    Alega también el **DEMANDANTE** que la Entidad **DEMANDADA** y el Supervisor fueron concientes y aceptaron a satisfacción los Estudios Definitivos que si hubiesen sido sobre la base de lo señalado estrictamente en los Estudios de Factibilidad, hubiesen sido deficientes, incompletos y hasta inejecutables en el terreno.

g)    Continúa argumentando que en el presente caso cuando ha tenido que hacer aspectos que los términos de referencia y esencialmente el Estudio de Factibilidad que lo sustenta, consideraban como válidos, es decir, servicios complementarios por cuanto no se encontraban previstos en la propuesta técnica ni económica, es evidencia de que ya no se puede hablar del concepto de suma alzada, para pretender desconocer un pago que resulta no solo de acuerdo a derecho, sino lógico, justo y equitativo, que es lo que en definitiva debe meritar este Tribunal Arbitral, más aun tratándose de un arbitraje de conciencia.

En lo relativo a la determinación del valor de los honorarios por los mayores servicios complementarios, sostiene **EL DEMANDANTE** que habiendo demostrado fehacientemente que en efecto, se han prestado servicios mayores a los ofrecidos y contratados, considera que el valor de los mismos debe ser determinado en función de los mayores plazos que por las situaciones presentadas y exigencia de la propia



**DEMANDADA,** tuvo que mantener a su personal profesional y técnico desarrollando actividades y a permanente disponibilidad y requerimiento de la Entidad, para lograr la conclusión de los Estudios Definitivos a satisfacción de **LA DEMANDADA** .

En mérito a lo expuesto, sostiene que no resultaría válido que el monto de su compensación sea determinado por una simple sumatoria de su propuesta por elaboración de los Estudios Definitivos, más el costo de los Estudios de Factibilidad, por cuanto por la metodología de trabajo que le fue impuesta fue obligado a realizar excesiva labor adicional para finalmente llegar a los resultados definitivos; expone ejemplos comparativos y finalmente vuelve a repetir que su propuesta económica fue presentada sobre la base de información incorrecta que le fue proporcionada por la propia Entidad patrocinadora del Concurso de Méritos, como base para el desarrollo de sus actividades contratadas, razón por la que se han tenido que realizar dichas actividades no previstas en periodos de tiempo que jamás pudieron preverse para la labor que se les contrató.

Finalmente refiere **EL DEMANDANTE,** que en el peritaje que se realice oportunamente en torno a los Estudios de Factibilidad y de los Estudios Definitivos ejecutados a entera satisfacción de la Supervisión y de la **DEMANDADA,** se podrá observar claramente la existencia de los cambios sustanciales, que demuestran plenamente que tuvieron que desarrollar nuevas soluciones en sustitución de las propuestas por los Estudios de Factibilidad, las que tuvieron que ser desechadas por haber quedado demostrado que no eran factibles o realizables, lo que claramente no formaba parte de sus obligaciones contractuales.

En lo que concierne a la actualización del pago en nuevos soles que reclama en el punto anterior, sostiene **EL DEMANDANTE** que el contrato establece un monto en Dólares Americanos y un monto en Nuevos Soles y en la cláusula Cuarta numeral 01 establece que estas sumas deben ser actualizadas hasta la fecha de emisión del Laudo, en función al Índice de Precios al Consumidor de Lima Metropolitana con relación a precios al 18 de Septiembre de 1997.

Con respecto a los intereses devengados por las cantidades demandadas, señala que según el Art. 94 del REGAG al que el propio contrato se remite, "en el caso que la entidad consultante no cumpliese con efectuar el pago de los montos retenidos dentro del plazo señalado en el articulo 93 (60 días después de concluido el servicio), el consultor tendrá derecho al pago de intereses y comisiones iguales a las máximas que establezca el Banco Central de Reserva del Perú; dice además que PRONAP al no haber cancelado los servicios complementarios realizados durante la ejecución del contrato, y haberse negado al reconocimiento de los mismos, les corresponde que se proceda a pagar los intereses respectivos conforme a la norma antes indicada, solicitando al Tribunal un pronunciamiento expreso sobre la forma en que deben de calcularse estos intereses, y la fecha desde la cual se generan.

En lo concerniente al pago demandado por concepto de gastos y comisiones bancarias derivados de la necesidad de mantener las cartas de fianza más allá de la fecha prevista, por razones que no le son imputables, **EL DEMANDANTE** sostiene que ello es consecuencia del plazo de ejecución del contrato, al haberse extendido más allá del plazo inicialmente establecido, por razones ajenas a su parte y que en

14

esencia se ha demostrado que obedecen al hecho de haberse visto obligado a realizar servicios complementarios a los propuestos y que ante la negativa de la **DEMANDADA** de proceder al pago reclamado se ha tenido que mantener las Cartas Fianza, más allá del plazo inicialmente previsto en el contrato, tanto en Nuevos Soles como en Dólares Americanos. Dichas sumas ascienden a US $ 15,628.05 y S/. 134,388.92, conforme se aprecia en el anexo 1P y que solo corresponde a los costos por los mayores tiempos que se ha tenido que mantener esa garantía.

Finalmente, respecto a la desestimación de la liquidación final practicada por la **DEMANDADA** y aprobada por la Resolución Directoral No. 233-2001/PRES/VMI/PRONAP/DE, **EL DEMANDANTE** solicita al Tribunal Arbitral que en la medida que dicha liquidación no recoge las sumas demandadas, debidamente detalladas en los puntos precedentes, sea desestimada sólo en dicho extremo, máxime si precisamente por esta razón es que ha solicitado el presente arbitraje. Solicita también, en vista de estar de acuerdo ambas partes sobre todos los demás puntos de la liquidación, y solo esta en discusión los aspectos materia del presente arbitraje, disponga el Tribunal que la Liquidación Final que se realice sea idéntica y únicamente se incorporen los aspectos que en este arbitraje se dispongan, a fin de evitar que posteriormente la entidad pretenda realizar una liquidación distinta.
Finalmente aduciendo los motivos expuestos, **EL DEMANDANTE** solicita que su demanda sea declarada fundada en todos sus extremos.

## V. BREVE RESEÑA DE LA CONTESTACION DE LA DEMANDA

La **DEMANDADA** mediante escrito recibido por Secretaria el día 16 de Agosto del 2002, absuelve el trámite de contestación a la demanda, para negarla y contradecirla en todas y cada una de las pretensiones que plantea, por las razones que expone en dicho escrito.

Argumentando su posición, expone ampliamente sobre el contrato de obra y sobre el concepto a suma alzada.

Respecto al contrato de obra, sostiene que el primer aspecto que el Tribunal Arbitral debe tomar en cuenta y sobre el cual debe adoptar una convicción, es que en el presente caso estamos sin duda ante lo que nuestro Código Civil denomina y tipifica como un contrato de obra en su artículo 1771; el mismo que constituye una especie perfectamente precisada y tipificada de los contratos cuyo género se denomina en el artículo 1751 del acotado, como prestación de servicios.

Señala que el artículo 1771 del Código Civil define el Contrato de Obra, como uno por el cual el contratista se obliga a hacer una obra determinada y el comitente a pagarle una retribución.

Precisa que en esta definición, el elemento esencial del contrato para el contratista, es que promete y se obliga a cierto resultado que es precisamente la obra; mientras que la obligación a cargo del comitente, es pagar el precio convenido, poniendo como ejemplo típico de contrato de obra, al contrato de construcción civil;



15

enfatizando que el contrato de obra se caracteriza por la obligación que asume el empresario de proporcionar al dueño de la obra el resultado de la prestación de sus servicios, contra el pago de una retribución.

Señala que si bien han puesto como ejemplo de contrato de obra el contrato de construcción civil, no siempre la obra ha de ser material, pues sostienen que es perfectamente posible que la obra sea artística, arquitectónica, intelectual, científica; en suma, cualquier labor de la que se espera y exige un resultado determinado, puede ser objeto de un contrato de obra.

Refieren que tratándose de la realización de proyectos de arquitectura, ingeniería u otros similares, la obra consistirá en la realización de todos los diseños, planos, esquemas y sus respectivas explicaciones (memorias o especificaciones técnicas); de tal modo que el empresario o contratista entregará como obra, un conjunto completo de documentos técnicos que permitan al futuro constructor realizar la construcción, edificio, estructura o proyecto complejo correspondiente.

En torno al concepto de suma alzada, refieren que la retribución del contratista en un contrato de obra, puede estipularse de varias maneras que resultan modalidades o variables; de modo que el contrato siempre será un contrato de obra, pero diferirá en la forma como se calcula, estipula y paga la retribución.

Indican que el Código Civil en su artículo 1776, menciona dos modalidades de pago de la retribución; obra por ajuste alzado y obra por pieza o medida; no obstante, refieren que hay otras modalidades, algunas de importancia, recogidas por los usos y costumbres en la actividad de la construcción, en especial la obra a precios unitarios y la obra por administración controlada y otras modalidades que la libertad de contratación consagrada en el artículo 1354 del Código Civil permite a los contratantes.

Precisan que el concepto de contrato a suma alzada, es idéntico al concepto que nuestro Código Civil recoge como ajuste alzado y ambos a la vez, similares al concepto usual de "a todo costo".

Sustentan que la modalidad de pago a suma alzada, significa que el contratista se obliga a realizar el íntegro de la obra, tal como ha sido pactada, precisada y definida con sus especificaciones y detalles, hasta entregarla totalmente terminada; y, que como retribución recibirá por todo concepto una suma fija convenida entre las partes.

Refieren que en esta modalidad de ajuste alzado, las partes convienen establecer una equivalencia entre el valor de la obra terminada y el precio o retribución pactada, de tal manera que el contratista no podrá cobrar ninguna cantidad adicional por todo lo que haga para terminar la obra, sin excepción, porque los costos de la obra son de exclusiva cuenta y riesgo del contratista.

Sostienen que la intención de las partes al pactar por ajuste alzado o a suma alzada; es decir, a todo costo/ a cargo del contratista, es asegurar de antemano el monto total y único que deberá desembolsar el comitente, propietario de la obra, por recibir

16

ésta terminada y completa, con las características integrantes y accesorias pactadas en el contrato. Para ello sostienen que el contratista es responsable de calcular o estimar el total de recursos que tendrá que invertir en la obra y sus costos, agregarle un margen para imprevistos y adicionar su propia utilidad o ganancia.

Argumentan que en caso de que el contratista logre con su eficiencia y actividad, realizar la obra a menos costo que el calculado, aumentará su ganancia, en caso contrario, disminuirá su ganancia; y, en el extremo podrá incluso sufrir alguna pérdida.

Indican que esta es la esencia del ajuste alzado o a suma alzada, donde el contratista tiene la oportunidad de ganar más si actúa con eficiencia y diligencia; corre el riesgo de sufrir pérdidas o de ganar menos, si incurre en ineficiencia, negligencia, morosidad, o errores. Para el dueño o comitente, su aceptación de la suma alzada implica que acepta que la obra le salga más cara de lo que podría resultar si se hace de acuerdo con su real costo más una utilidad prevista para el contratista; en cambio, se asegura que no habrá fluctuaciones desfavorables en el costo y que éste se mantendrá fijo e inalterable.

Sostienen que esta intención de las partes en que cada uno tiene determinada ventaja y cierto riesgo, es la esencia del pacto, que debe cumplirse conforme a la regla del artículo 1362 del Código Civil.

En lo que concierne a los ajustes en el contrato a suma alzada, sostienen que una vez pactado el contrato de obra a suma alzada, ello no significa que sea inmutable. Afirman que lo que sí es inmutable y debe ser respetado por las partes, es la equivalencia o equilibrio establecido: obra pactada – precio fijo convenido; sin embargo, por Ley o por pacto, utilizando la libertad contractual, es posible que durante la ejecución de una obra se susciten algunos cambios en la retribución.

Señalan que la causa legal de aumento de la retribución es la que fija el artículo 1776 del Código Civil, de modo tal que si aumenta la obra a pedido escrito del propietario o comitente, es fundado un incremento en la retribución como compensación por la mayor cantidad o coste de la obra.

Aparte de la causa legal, indican que el propio contrato puede y suele establecer algunas circunstancias que permiten al contratista exigir un aumento en su estipendio.

En lo relativo a la naturaleza jurídica del contrato suscrito entre las partes denominado Contrato de Servicios de Consultoría, sostienen que es indiscutible que se trata de un contrato de obra por ajuste alzado; es decir, un contrato de prestación de servicios de acuerdo al artículo 1735 del Código Civil, pero no en la modalidad de locación de servicios sino precisamente en el de contrato de obra conforme al artículo 1771 del Código Civil, para la elaboración de un proyecto específico, por una suma fija, a todo costo.

17

Enfatizan que se trata de un contrato de resultados, en virtud del cual el Contratista (DEMANDANTE) debe entregar el fruto concreto de determinados trabajos: el proyecto definitivo de las obras de agua y alcantarillado de las localidades estipuladas, con sus planos, memorias, etc.; sostienen que es una obra, aunque no sea de construcción, de tipo inmaterial o técnico, pero que considera finalmente como obligación del contratista llamado Consultor en el contrato suscrito, la de preparar, terminar y entregar un resultado especifico, compuesto de una serie de planos de diversas clases, memorias e informes técnicos que en su conjunto configuran la confección hasta de los detalles técnicos del proyecto para construir una red de agua potable y alcantarillado en cada una de las localidades que se estipuló.

Sostienen que el contrato suscrito entre las partes, es uno a suma alzada o ajuste alzado, porque el total de la obra está pactado en una cantidad fija en Nuevos Soles y otra en Dólares, donde expresamente se pacta la retribución en un monto a suma alzada, según Cláusula Cuarta, numeral 01.
Refieren que en la Cláusula Cuarta, numeral 01 del contrato, se estableció que la cantidad de la retribución pactada en Nuevos Soles, sea reajustada en el curso del contrato, de acuerdo con el IPC para Lima Metropolitana, lo cual sostienen que han cumplido. Aparte de este reajuste, el contrato sólo contempla el caso de fuerza mayor, definido en la forma usual y tradicional, sujeto a un procedimiento para su respectivo reconocimiento.

Sostienen que en el caso negado de haberse producido alguna circunstancia que califique como fuerza mayor o caso fortuito, tal hecho debió ser denunciado en su momento por el Consultor DEMANDANTE a la Inspección y a la empresa DEMANDADA y haberse acreditado con las correspondientes pruebas.
Aparte de lo expuesto, indican que el contrato no tiene ninguna otra cláusula de reajuste o de reconocimiento de mayores costos o gastos.

De otro lado, la DEMANDADA refiere que en momento alguno le ordenó al DEMANDANTE que realizara algún trabajo adicional; ni convino con él en pagarle suma adicional alguna por ellos.

En lo relativo a las demoras ocasionadas por errores o deficiencias en los Estudios de Factibilidad denunciados por el DEMANDANTE, la DEMANDADA sostiene que tal alegación carece de sustento en el contrato, pues refiere que la lectura integra del mismo convence que en momento alguno se ha estipulado que el contratista DEMANDANTE tuviera que limitarse a desarrollar el proyecto conforme a los Estudios de Factibilidad; enfatizando que mucho menos se ha estipulado que si el contratista DEMANDANTE realizaba algún replanteo o modificación del proyecto con relación a alguno de los Estudios de Factibilidad, debía por ello recibir una retribución adicional.

Aduce que el contrato dice que PRONAP proporcionará al contratista "CONSULTOR" todos los documentos previos e informes (que incluyen los de factibilidad) relacionados con los servicios de agua potable y alcantarillado pertinentes, cuyas recomendaciones serán sólo referenciales para los fines de los

[8

análisis que debe realizar el contratista "CONSULTOR". Los Estudios de Factibilidad que cuentan con la no objeción del BID se tomarán como base para el desarrollo de los diseños definitivos por EL CONSULTOR **DEMANDANTE.**

Sostiene que el **DEMANDANTE** estaba en la obligación de revisar los Estudios de Factibilidad y realizar el proyecto definitivo, las modificaciones y soluciones diferentes que a su criterio convinieran. Que los Estudios de Factibilidad operaban como bases, a partir de las cuales el **DEMANDANTE** aplicando su propia ciencia profesional determinaría las soluciones definitivas; y haría los diseños finales para las obras.

Sostiene que no se ha declarado que tales estudios son perfectos y que sólo falta desarrollar su detalle; por el contrario, refieren que se ha estipulado que la obligación del Consultor **DEMANDANTE** es elaborar los Estudios Definitivos, de acuerdo con los términos de referencia y anexos, propuesta técnica y económica negociada, de modo que se alcancen plenamente los objetivos del Programa. Los Estudios de Factibilidad y otros documentos previos son solo bases o datos referenciales que ayudaran al contratista "CONSULTOR", pero que no lo exoneran de su propia responsabilidad y obligación de efectuar él los proyectos definitivos a nivel de construcción.

Argumenta que el **DEMANDANTE** no puede ahora aducir que tuvo que hacer replanteos o cambios a las soluciones propuestas en los Estudios de Factibilidad, toda vez que la revisión de las soluciones propuestas en tales estudios, así como la búsqueda y desarrollo de mejores alternativas era parte de su propia obligación asumida, por lo que no puede reclamar por ello mayor retribución, porque se comprometió a realizar todo el trabajo a suma alzada, por una retribución fija e invariable previamente pactada.

En síntesis refiere que la obligación del contratista **DEMANDANTE** era y es la realización positiva y completa consistente en "elaboración del Expediente Técnico" necesaria para construir los sistemas de agua y alcantarillado de las localidades contratadas.

Respecto a las demoras ocasionadas por falta de información de catastro y otras de las Municipalidades y Empresas Prestadoras de las localidades objeto de los proyectos denunciadas por el **DEMANDANTE**, argumentan en el numeral 1.9, que éstas no figuran en el contrato como obligaciones de la **DEMANDADA**, enfatizando que sí cumplieron con la obligación de proporcionar la información de la cual disponían. Que se entiende por la forma genérica en que esta redactada esta cláusula (Cláusula Quinta, II, 03), que esta documentación es la que previa y realmente exista en poder de PRONAP., por lo que se entendería que "EL CONSULTOR" trabajará en base a los documentos que existan, en especial los Estudios de Factibilidad, pero que no puede exigir otros.

Refiere que la Cláusula Quinta II, 02, del contrato estipula que las EPS están obligadas a proporcionar al "CONSULTOR" **DEMANDANTE** toda la información y documentos que dispongan relacionados con el estudio; pero que se limita a informar que ciertos terceros, las EPS, se han comprometido frente a PRONAP a dar

19

información al CONSULTOR. Adicionalmente indica que el compromiso es de sólo entregar la información y documentos de que dispongan; de tal modo que no existe una determinada lista o relación de documentos e informaciones obligatorias, cuya carencia o demora pueda ser invocada por el DEMANDANTE como pretexto para no cumplir con sus obligaciones.

LA DEMANDADA, absolviendo puntualmente las pretensiones que plantea la demanda, dice:

En torno al pago mayores sumas por servicios LA DEMANDADA sostiene que esta pretensión es absolutamente infundada conforme a la naturaleza del contrato suscrito entre las partes, por el cual no se contrata al personal profesional y técnico de EL DEMANDANTE, de modo tal que el pago de los profesionales y técnicos que el contratista emplee para la realización de la obra y cumplimiento de su obligación, son de su exclusiva incumbencia, costo, cargo y responsabilidad.

Sostiene que este punto del petitorio desnaturaliza la forma de pago pactada a suma alzada, para pretender que se le pague de acuerdo a cuentas sustentadas como es en el caso de los contratos por administración, lo cual no es admisible al finalizar el contrato, sin posibilidad alguna para que la DEMANDADA compruebe la realidad de tales gastos, como pudo haberlo hecho semana por semana, si la obra se hubiera contratado por el sistema de administración controlada.

LA DEMANDADA aduce que no se han verificado servicios complementarios que ameriten el pago de honorarios adicionales, porque el DEMANDANTE se limitó a ejecutar los trabajos por los que se contrató; por ende no ha realizado servicios complementarios a los eran materia de sus obligaciones contractuales.

Respecto a la alegación del DEMANDANTE sobre la ampliación del triple del plazo pactado, la DEMANDADA sostiene que hay una evidente confusión de conceptos, puesto que todas las labores necesarias para alcanzar el resultado pactado del contrato de obra, son labores de cargo, costo y responsabilidad del contratista DEMANDANTE; de modo que, el hecho que para realizar tales labores se haya demorado mas días, no implica que haya realizado mayores labores o servicios complementarios.

La DEMANDADA aduce que son los mismos trabajos y servicios, sólo que el contratista DEMANDANTE se ha demorado mas en hacerlos, lo cual no le da derecho a cobrar mas, sino por el contrario a que se le apliquen las penalidades por mora pactadas en la Cláusula Sexta, numeral 02 del contrato.

Abundando en su argumentación señala que el DEMANDANTE no puede invocar su propia demora en forma genérica e indiscriminada para pretender una mayor paga, puesto que no se le contrató a tanto por día, sino por una suma global que se denomina suma alzada, habida cuenta que el tiempo a favor del contratista sólo se da en los casos en que por fuerza mayor se paralicen los trabajos, originando un gasto ocioso, que el contratista debe sustentar documentadamente al propietario, cosa que el DEMANDANTE nunca hizo.

20

En lo relativo a la segunda pretensión sobre reajuste por inflación del monto demandado en Nuevos Soles, la **DEMANDADA** sostiene que esta pretensión es infundada, puesto que, al ser infundada la pretensión de pago de Nuevos Soles del primer punto del petitorio, al no haber importe o cifra alguna por reactualizar, por lógica, tampoco procede el reajuste demandado; no obstante, señalan que en el supuesto negado que hubiera alguna cifra por reajustar, es un exceso pretender que éste se realice desde el inicio del contrato, debiendo ser desde la fecha en que realmente se efectuó el gasto.

Respecto a los intereses demandados en la tercera pretensión, la **DEMANDADA** sostiene que tal pretensión es infundada, porque no existen sumas adeudadas al contratista y siendo que los importes que reclama a través de las pretensiones 1 y 2, son también infundadas, no hay intereses por pagar.

Aduce que respecto a esta pretensión hay también un exceso al pretender por este concepto la máxima tasa de interés bancaria para operaciones comerciales, porque el contrato no establece pacto de intereses y cuando ello es así, sólo procede el interés legal del artículo 1245 del Código Civil.

En lo que concierne a la pretensión para que la **DEMANDADA** reembolse los gastos por fianzas bancarias, sostiene que el **DEMANDANTE** no explica cuál es el fundamento de su petición, toda vez que los costos por fianzas bancarias son de cuenta del contratista, de modo que si el **DEMANDANTE** ha tenido que mantener vigentes ciertas cartas fianza, es porque no terminó de subsanar las observaciones de la Supervisión al cumplimiento de sus obligaciones, lo cual es asunto de su exclusiva responsabilidad.

Finalmente, la **DEMANDADA** se pronuncia sobre la quinta pretensión relativa a que no se aplique la R.D. Nº 233-2001-PRES/VMI/PRONAP, manifestando que este tema es ajeno al arbitraje, porque de lo que se resuelva respecto a las pretensiones demandadas sobre diversas sumas adicionales, resultará si se debe enmendar o no por la citada resolución.

Seguidamente, la **DEMANDADA** expone con amplitud y detalle los demás argumentos de su defensa, sobre los diversos temas expuestos por el **DEMANDANTE**, para rebatirlos, negarlos y contradecirlos, los mismos que serán objeto de análisis y apreciación en el rubro correspondiente del presente Laudo Arbitral.

La **DEMANDADA** solicita finalmente que en mérito a los fundamentos que expone, debe declararse infundada la demanda, con expresa condena de costas.

21

## VI.- DEL PERITAJE TÉCNICO, DE LAS OBSERVACIONES DE LAS PARTES Y DE LA AMPLIACIÓN DEL PERITAJE:

Con fecha 30 de Septiembre, el Perito comunica al Tribunal Arbitral la culminación de su trabajo, adjuntando los recibos de honorarios profesionales extendidos para cada una de las partes.

El **DEMANDANTE** procedió a la cancelación de los honorarios periciales dentro del término establecido por el Tribunal Arbitral; y la entidad demandada, por diversos inconvenientes de carácter administrativo, recién cumplió con el pago respectivo, el día 20 de Enero del año 2004, dejando recién expedita la entrega del Informe Pericial, el mismo que fue ingresado al Tribunal Arbitral con fecha 26 de Enero del 2004.

### VI.1 BREVE RESEÑA DE LA PERICIA TÉCNICA

Después de revisado el expediente técnico y documentos recibidos del Tribunal Arbitral, el Perito atendiendo al objeto y alcances de la Pericia dispuestos por el Tribunal Arbitral, a través de las Resoluciones Nº 25 y Nº 28, elabora su peritaje y entrega el resultado en cuatro (04) volúmenes;

**Volumen I   Informe Principal:** Respuestas a las preguntas encargadas por el Tribunal Arbitral.

**Volumen II   Soluciones de los Sistemas de Agua Potable y Alcantarillado:** Descripción, evaluación y comparación de las soluciones de ingeniería de los Estudios de Factibilidad y Definitivos.

**Volumen III   Resumen de los Sistemas Existentes y las Soluciones adoptadas:** estudio y análisis comparativos de las soluciones de ambos estudios aplicadas a las localidades del contrato.

**Volumen IV   Planos en dos volúmenes:** de las localidades con las soluciones de ambos estudios para Agua Potable y Alcantarillado, diseñadas sobre transparencias para efectos comparativos por sobre posición.

El Perito designado por el Tribunal Arbitral, Ing. Álvaro H. Flores Boza, inicia su trabajo presentando el marco conceptual, dentro del que ha realizado el peritaje encomendado; informa que el marco citado ha sido elaborado sobre la base de las definiciones para los principales conceptos utilizados, que se encuentran en los documentos del contrato, resaltando que estos mismos conceptos son manejados y así entendidos por organismos estatales, privados y los principales organismos multilaterales de crédito. Entre las conclusiones a que arriba y destaca en este marco, se tiene las siguientes:

a) Después de hacer las consideraciones del caso sobre las principales definiciones señaladas en los documentos del contrato al respecto de los Estudios de Factibilidad y Definitivo concluye que: existe una dependencia insoslayable, en saneamiento principalmente, entre un Estudio de Factibilidad y su consecuente Estudio Definitivo.

22

b) Igualmente haciendo algunas consideraciones sobre los Estudios Definitivos sus Etapas Consolidación y Proyecto Básico cuya utilización en la elaboración de Estudios Definitivos tienen condiciones puntuales que en el presente caso no se justificaban, indicando como causa de su inclusión eventuales dudas de la Entidad sobre la elaboración de los Estudios de Factibilidad, concluyendo que no estarían dadas las condiciones para que los Estudios de Factibilidad fuesen llevados a una etapa superior.

A continuación dice que un contrato a Suma Alzada es aplicable cuando las magnitudes y calidades de la prestación de servicios estén totalmente definidas en las especificaciones técnicas y en los términos de referencia: en el caso de obras en los planos y especificaciones técnicas respectivas, mencionando el numeral 1.2.28 del RULCOP que así lo reconocia y ahora el artículo 45 del Reglamento de la Ley de Contrataciones y Adquisiciones del Estado.

c) El Perito, citando algunas consideraciones respecto del análisis que ha efectuado para la elaboración del peritaje encomendado por el Tribunal, dice que las soluciones de los Estudios Definitivos aprobadas por el **DEMANDADO** fueron diferentes a las soluciones propuestas por los Estudios de Factibilidad que también habían sido aprobados en su oportunidad por la propia Entidad; y, por lo tanto debían considerarse correctos y concluidos; dice también que: En la elaboración de una propuesta para la ejecución de Estudios Definitivos, el dimensionamiento de los recursos y el cálculo de los costos por los servicios a ejecutar, se realizan sobre la base de las conclusiones y soluciones planteadas por el Estudio de Factibilidad, únicos documentos disponibles para esta finalidad y que el cambio de soluciones propuestas en un Estudio de Factibilidad, por otras que obedecen a planteamientos hidráulicos diferentes, no está contemplado como trabajo a ser realizado en Estudios Definitivos de esta naturaleza, conforme se puede entender en las definiciones de ambos estudios dados en los numerales 1.1 y 1.2, de este capítulo.

Después de lo expuesto el Perito concluye que: el Contrato de Servicios de Consultoría para la Elaboración de los Estudios Definitivos de la Primera Etapa de Inversión de los Planes de Expansión de Mínimo Costo de los Servicios de Agua Potable y Alcantarillado de las Localidades del Grupo 2, objeto del Informe Pericial encomendado por el Tribunal Arbitral no reunía las condiciones necesarias, de acuerdo a lo señalado en la ley de Contrataciones y Adquisiciones del Estado, ni en la práctica internacional institucionalizada por los Organismos Multilaterales de Crédito, para que se contratase la Elaboración de los Estudios Definitivos por el sistema de "Suma Alzada".

Resaltando que el Volumen I, es resultado consecuente del análisis que desarrolla en los documentos alcanzados por el Tribunal, que registra en los demás volúmenes del Informe Pericial, el Perito observa que es en este Volumen que responde a las preguntas formuladas por el Tribunal; a continuación se hace un resumen de sus respuestas en el Volumen I del Informe Pericial:

23

**A la pregunta:**

**1.-** Si las soluciones propuestas en los Estudios de Factibilidad, resultaban consistentes con las soluciones finalmente desarrolladas y aceptadas de los Estudios Definitivos; o, si por el contrario las soluciones de los Estudios Definitivos modificaron sustancialmente aquellas propuestas por los Estudios de Factibilidad.

**Responde:**

Las soluciones propuestas por los Estudios de Factibilidad para la realización de los Estudios Definitivos, no fueron consistentes con las soluciones finalmente desarrolladas por este último; Expone a continuación concluyendo esta respuesta en el Volumen I, las razones que fundamentan su conclusión al Objetivo 1.

**A la pregunta:**

**2.-** Si las soluciones propuestas en los Estudios de Factibilidad, podían ser consolidadas en los Estudios Definitivos a través de ajustes razonables en la práctica de la ingeniería o si la consolidación realizada en los Estudios Definitivos, en realidad involucró la búsqueda de nuevas soluciones, sustancialmente distintas, que excedían de cualquier margen normal de consolidación y ajuste.

**Responde:**

Las soluciones propuestas en los Estudios de Factibilidad, no pudieron ser consolidadas por los Estudios Definitivos, conforme se comenta en el numeral anterior, ya que estos últimos desarrollaron planteamientos hidráulicos propios y diferentes, abarcando sus soluciones hasta el horizonte del proyecto, final de la Segunda Etapa. Plantear soluciones, para Segunda Etapa del proyecto no era objeto del contrato, sin embargo fueron necesarios para un planteamiento integral del sistema, ya que las obras de la Primera Etapa deben ser complementadas con las de la Segunda etapa para que sus soluciones puedan ser sustentables hasta el horizonte del proyecto;
Expone a continuación concluyendo esta respuesta en el Volumen I, las razones que fundamentan su conclusión al Objetivo 2.

**A la pregunta:**

**3.-** Establecer los motivos y sustentos utilizados para las modificaciones, de existir estas, en el Estudio de factibilidad; y, en base a ello pronunciarse sobre:

    a) ¿Cual seria la evaluación técnica, económica y de confiabilidad de los Estudios de Factibilidad?

    b) La repercusión de los Estudios de Factibilidad al servir como base a Figueiredo Ferraz, para la elaboración de su propuesta económica y el

24

dimensionamento de los recursos asignados para llevar a cabo los Estudios Definitivos.

**Responde:**

A la primera parte de esta pregunta, responde haciendo un resumen de las respuestas anteriores en que considera los motivos y sustentos que resultaron en las modificaciones que muestran las soluciones desarrolladas por los Estudios Definitivos en relación a las propuestas por los Estudios de Factibilidad.

A continuación, se formula un resumen de las respuestas del Perito a la segunda parte de la pregunta 3:

**Evaluación Técnica de los Estudios de Factibilidad:** Estos en general no mostraron la solución adecuada y no solucionaban las deficiencias establecidas en los Sistemas de agua potable y Alcantarillado de las localidades del Grupo 2, identificadas con anterioridad al inicio de estos estudios.

**Evaluación Económica de los Estudios de Factibilidad:** Sus documentos analizados muestran obras que perteneciendo a un mismo sistema y que son definidas en sus planos para su implantación en la Primera Etapa del Proyecto de Inversión, son obviadas del sistema y mostradas en los presupuestos de obras para ser implantadas en la Segunda Etapa del proyecto, imposibilitando la operación del sistema respectivo y en consecuencia la imposibilidad que sea atendida la población o el área para el que fuera diseñada.

**Evaluación de la Confiabilidad de los Estudios de Factibilidad:** No pueden ser considerados confiables porque sus planteamientos hidráulicos y soluciones no se mostraron técnicamente adecuados, fueron desarrollados sobre información básica inconsistente, faltó identificar fuentes, deficiencias de topografía, inexistencia de catastros de la infraestructura, etc.

Respondiendo a la segunda parte de la pregunta sobre la repercusión de los Estudios de Factibilidad de servir como base al **DEMANDANTE** para la elaboración de su propuesta económica y dimensionamiento de los recursos asignados para los trabajos a ser contratados, el Perito señala una serie de deficiencias constatadas en el análisis de los documentos de los Estudios de Factibilidad, concluyendo que estos estudios fueron elaborados sin contar plenamente con las trabajos señalados a ser realizados en sus Términos de Referencia, servicios que por su magnitud no estaban contemplados ser realizados integralmente durante los Estudios Definitivos, concluyendo que ni el **DEMANDANTE** ni los otros postores tuvieron, al elaborar sus propuestas, las condiciones necesarias para prever todos los recursos que fueron realmente empleados en la ejecución de los Estudios Definitivos.

25

**A la pregunta:**

4)    Considerando los alcances de los puntos precedentes, determinar el valor que de ser el caso debe abonarse por los Estudios Definitivos realizados por Figueiredo Ferraz, teniendo en cuenta el plazo en que han sido ejecutados y la magnitud de las labores realizadas.

**Responde:**

Haciendo previamente una serie de consideraciones entre las que se pueden mencionar que en los Estudios Definitivos tuvieron que desarrollar soluciones diferentes a las propuestas por la Factibilidad, lo que no estaba dentro de las obligaciones contractuales del **DEMANDANTE**, señala que el CONSULTOR realizó una serie de actividades necesarias y no previstas desde el Primer Informe, desarrollando los trabajos de acuerdo a los términos de referencia hasta que tuvo las condiciones de realizar las simulaciones hidráulicas, al final del Tercer Informe Proyecto Básico, cuando se constató plenamente que las soluciones propuestas por la Factibilidad no eran viables, surgiendo en consecuencia la necesidad de realizar nuevos planteamientos hidráulicos y desarrollar otras soluciones que fuesen técnica y económicamente factibles, lo que no era objeto del contrato, para la Primera Etapa del Proyecto de Inversión y para la Segunda Etapa, observando que esta última tampoco era objeto del contrato. También refiere y señala una serie de etapas que no estaban indicadas en los Términos de Referencia.

A continuación, señala que como resultado del análisis de los documentos consultados, de acuerdo a lo señalado en la Resolución No. 28, ha podido apreciar factores importantes que afectaron el normal desarrollo de los trabajos de la Consultora como: a) La metodología aplicada por PRONAP de condicionar la aprobación de los Informes de los Estudios Definitivos a la aprobación previa de empresas que eran ajenas al contrato entre las partes; que en la ejecución de los Estudios de Factibilidad no se consideraron los planes maestros de Agua potable y Alcantarillado de las Empresas Prestadoras de Servicios (EPS); b) La exigencia de PRONAP y la SMS en la permanencia de su equipo técnico y profesional hasta la aprobación final del último Informe Final de los Estudios Definitivos (Ampliación Pericial); c) Otros motivos señalados por el **DEMANDANTE** en sus medios probatorios No. 2 – Anexo 1-D, respecto a los que no había encontrado respuesta técnica adecuada por parte de la **DEMANDADA**; dando a continuación una serie de consideraciones que fundamentan la valorización que responde a esta pregunta formulada por el Tribunal.

Finaliza diciendo que considera la forma más adecuada de elaborar la valorización solicitada realizando su cálculo en el que utiliza los precios contractuales estipulados aplicados al equipo de profesionales previstos y los correspondientes gastos de logística e infraestructura, durante el tiempo

26

real que demandó la elaboración de los Estudios definitivos, informando que los valores utilizados son los que señala el Detalle de Costos del Presupuesto Consolidado que forma parte de la Propuesta Económica de la Consultora y por ende del contrato, señalando como resultado de sus cálculos, la valorización Pericial a los Estudios Definitivos en el importe siguiente:

**Veinticuatro millones quinientos sesenta y un mil doscientos veinte con 13/100 Nuevos Soles (S/. 24, 561,220.13), Más Tres millones seiscientos veintinueve mil setecientos y uno con 70/100 Dólares Americanos (US $ 3, 629,771.70).**

Observando que los valores citados incluyen los Impuestos del I.G.V. y están referidos a la fecha del contrato.

**A la Pregunta:**

5)    Así mismo, como parte del peritaje, el Perito deberá informar, considerando su compatibilidad a la luz de los resultados de los numerales precedentes y tomando como base el cuadro comparativo de las metas programadas en los Estudios de Factibilidad y las desarrolladas en los Estudios definitivos de las siete localidades materia del contrato, a fin de corroborar o rectificar dicho cuadro referido en el numeral 7 del rubro medios probatorios de la contestación de la demanda efectuada por el PRONAP (hoy PARSSA).

A)    El valor de los trabajos realizados en los Estudios Definitivos que no estaban expresamente previstos en los Estudios de Factibilidad.

B)    El valor de los trabajos que estando previstos en los Estudios de Factibilidad, no fueron efectivamente realizados en los Estudios definitivos.

C)    Establecer la comparación y balance entre ambos.

**Responde:**

Haciendo un análisis de los cuadros presentados, observando que las metas físicas que debían de ser llevadas al detalle en los Estudios Definitivos eran parte de la solución propuesta por la Factibilidad, que se demostró ser irrealizable y en consecuencia fueron desechadas; de otro lado las metas físicas detalladas por los Estudios Definitivos formaban parte de las nuevas soluciones factibles que el Consultor tuvo que desarrollar en sustitución a las de la Factibilidad, lo que demandó tiempo y recursos que no están considerados en los cuadros referidos; en razón de lo expuesto concluye el Perito que es incompatible realizar la valorización solicitada en este ítem, así como cualquier comparación o balance de metas que fueron desechadas por formar parte de una solución propuesta no factible, con metas pertenecientes a las nuevas soluciones desarrolladas por el Consultor durante y a efectos de realizar los Estudios Definitivos.

## VI. 2  OBSERVACIONES A LA PERICIA

Solicitada la ampliación de la Pericia, el Tribunal Arbitral dispuso que el Perito designado proceda a formular el informe ampliatorio respondiendo y analizando debidamente el punto cinco del objeto de la pericia, indicado en la Resolución Nº 25 con la modificación ordenada en la Resolución No. 28, conforme se señala a continuación:

## VI. 3 BREVE RESEÑA DE LA AMPLIACIÓN PERICIAL

Tomando como base el cuadro comparativo de las metas programadas en los Estudios de Factibilidad y las desarrolladas en los Estudios Definitivos de las siete localidades materia del contrato, a fin de que corrobore o rectifique dicho cuadro referido en el numeral 7 del Rubro Medios probatorios de la contestación de la demanda efectuada por PRONAP, hoy **PROGRAMA DE APOYO A LA REFORMA DEL SECTOR SANEAMIENTO – PARSSA**, se pidió al Perito que determine:

a)   El valor de los trabajos realizados en los Estudios Definitivos que no estaban expresamente  previstos en los Estudios de Factibilidad.
b)   El valor de los trabajos que estando previstos en los Estudios de Factibilidad, no fueron efectivamente realizados en los Estudios Definitivos.
c)   Establecer la comparación y balance entre ambos".

El Perito responde esta pregunta de acuerdo a lo solicitado por el Tribunal, para lo que la divide en dos partes:

a)   La primera  parte en la que responde presentando el cuadro del Anexo 7, en el que la Entidad muestra su valorización de Metas Adicionales (sub ítem **a**) y Metas no Efectuadas (sub ítem b), de los Sistemas de Agua Potable y Alcantarillado para cada localidad del Grupo 2, y el balance entre ambas valorizaciones.

El Anexo citado se fundamenta en los Anexos de No. 8 al 14, del Rubro Medios Probatorios de la contestación a la demanda, por lo que el Perito cita lo que representaría, cada una de las columnas de los cuadros referidos, en el entender de la Entidad.

A continuación el Perito después de algunas consideraciones, dice que utilizó los criterios e índices adoptados por la Entidad para realizar en el mismo ámbito el balance de las metas de ambos estudios teniendo como resultado las mismas metas que se señalan en los cuadros referidos; después aplicando a estas los mismos índices de la Entidad, ha verificado y confirmado que los valores encontrados para las Metas así como el balance entre los mismos coinciden con los resultados que se señalan en los cuadros citados, para/finalmente concluir que en el ámbito que expone , es decir asumiendo los criterios adoptados por PARSSA, corrobora el Cuadro

28

Resumen del Anexo 7, así como los cuadros presentados en los anexos de No. 8 al 14.

**b)** En la segunda parte el Perito pasa a realizar el análisis respectivo, de acuerdo a lo solicitado expresamente en la Resolución No. 64 del Tribunal Arbitral, haciendo una serie de consideraciones sobre la óptica asumida por la Entidad, concluyendo que los valores registrados en los cuadros citados no muestran o no corresponden debidamente a lo que se pretende representar ya que en los cuadros de los Anexos de No. 8 al 14, la columna denominada Definitivo muestran las Metas Físicas del Estudio Definitivo finalmente ejecutado, la columna Factibilidad muestra las obras de la solución propuesta por el Estudio de Factibilidad y de la comparación de ambas se obtienen las Metas Adicionales y las Metas no Efectuadas; al respecto, dice el Perito que es su opinión que el balance presentado no procede por no ser posible hacer el comparativo de las obras del Estudio de Factibilidad con las obras del Estudio Definitivo finalmente desarrollado por el Consultor sobre la base de una solución que tuvo que ser determinada durante la ejecución del propio estudio, como si este fuese el estudio definitivo que fue contratado para ser ejecutado sobre la base de las soluciones propuestas por el Estudio de Factibilidad; ambos estudios definitivos resultan diferentes tanto en su concepto como en sus costos.

En dicho orden de ideas, sostiene que es incorrecto también valorizar las Metas Alcanzadas, por ser resultado de un balance que no procede; a continuación hace una serie de consideraciones que reiteran lo expuesto en el sentido que los estudios finalmente ejecutados son diferentes de los previstos originalmente, los que requirieron de recursos que no pudieron ser previstos y en consecuencia, ambos estudios tienen valores diferentes y fundamenta lo expuesto en lo comprobado a lo largo del Informe Pericial.

Finaliza el análisis solicitado por el Tribunal Arbitral, señalando que respecto al balance final también se tiene que considerar además de lo expuesto, que las exigencias de la Entidad: en someter los Informes de los Trabajos contratados a la aprobación previa de terceras empresas ajenas al contrato, así como la exigencia de la Entidad de que el Consultor mantuviese su equipo de profesionales hasta el final de los trabajos y otras que han sido señaladas en el Informe Pericial, son factores concluyentes en su opinión, de que el balance referido para ser correcto y el más adecuado, debe ser resultado de la comparación del valor de los trabajos contratado entre las partes con la valorización citada en el párrafo anterior, de todos los trabajos realizados para la elaboración de los Estudios Definitivos finalmente ejecutados por el Consultor para las Localidades del Grupo 2, la que fue solicitada en el Objetivo 04 de la Resolución No. 28.

A continuación presenta los siguientes cuadros: Valorización Pericial a los Estudios Definitivos; Valor Total del contrato entre las partes; Balance Final entre la Valorización de los Estudios Definitivos y del Contrato, de donde

29

concluye como resultado del balance final correspondiente el valor de

US $ 7' 713, 019. 62, Incluye el ~~IGV, sin~~ reajustes.

Observando que el valor en dólares americanos esta referido a la fecha de la propuesta económica del Consultor, 18.09.97, con el cambio oficial de US$ 1.00 = S/. 2.644 (valor venta).

## VII. BREVE RESUMEN DE LA PERICIA CONTABLE PRACTICADA

Habiendo dispuesto el Tribunal Arbitral la realización de la pericia contable que fuera solicitada por el **DEMANDANTE** respecto de la "forma en que debe entenderse la aplicación de los intereses a que se refiere el artículo 94° del Reglamento General de Actividades de Consultoría" (según la Resolución N° 71), el perito designado procedió a explicar que si bien esta norma hace referencia a la obligación de la entidad de reconocer los intereses y comisiones iguales a las máximas establecidas por el Banco Central de Reserva del Perú para los préstamos bajo cualquier modalidad que realicen los Bancos Comerciales; y a la fecha el Banco Central de Reserva del Perú ya no fija las tasas máximas de intereses para préstamos bajo cualquier modalidad que realicen los Bancos Comerciales, ello no significa que no existan este tipo de tasas de interés; es decir tasas para prestamos que realizan los Bancos Comerciales.

En tal sentido el perito explica que estas tasas han sido sustituidas por la tasa de interés TAMN y TAMEX que por disposición del BCR publica la Superintendencia de Banca y Seguros en el Diario Oficial "El Peruano" bajo el titulo de "Tasas de Interés Promedio por Tipo de Crédito Realizadas en los últimos 30 días útiles" referidas a las operaciones de préstamos otorgadas por Bancos Comerciales, siendo la más alta la que corresponde a las operaciones de sobregiro.

Continuando dice el perito que, teniendo en cuenta que: (i) el BCRP fijó las tasas directamente hasta JUL.1990 y, a partir de AGO.1990 dispuso que las operaciones del Sistema Financiero con usuarios finales sean fijadas por las entidades financieras, de acuerdo a las señales del mercado sin exceder los límites máximos dispuestos por el BCRP; (ii) que, a partir de la vigencia del D. Leg. N° 770 (03-11-93) lo dispuesto en el primer párrafo del artículo 1243° del Código Civil no alcanza a la actividad de intermediación financiera; y (iii) que, la liquidación de intereses solicitada en el PROCESO ARBITRAL FIGUEIREDO FERRAZ/PARSSA es posterior al 12-11-1997, resulta incuestionable que las Tasas (TAMN y TAMEX) aplicables para el caso que nos ocupa, son las que por disposición del BCRP publica la Superintendencia de Banca y Seguros en el diario oficial "El Peruano" bajo el titulo de "Tasas de Interés Promedio por Tipo de Crédito Realizadas en los últimos 30 días útiles", referidas a las diversas modalidades de préstamos otorgadas por los Bancos

30

Comerciales, llámese: "Avances en Cuenta", "Sobregiros" [1], "Descuentos y Préstamos hasta 30 días", "Descuentos y Préstamos de 31 a 90 días", "Descuentos y Préstamos de 91 a 180 días", "Descuentos y Préstamos de 181 a 360 días", y Descuentos y Préstamos más de 360 días" y de estas tasas extraer las tasas más altas.

Expone en su informe sobre la metodología a seguir de la siguiente manera:

El Departamento de Normatividad y Análisis Financiero del BCRP, ha difundido un documento denominado "FORMA DE CALCULO DE INTERESES COMPENSATORIOS, LEGALES Y MORATORIOS LEGALES" (ver ANEXO 01), el cual precisa que en el sistema financiero se utiliza la siguiente fórmula para el cálculo de intereses:

$$Fie = \{ [ ( 1 + \tfrac{TE1}{100} )^{N1/M} \times ( 1 + \tfrac{TE2}{100} )^{N2/M} \times \ldots \times ( 1 + \tfrac{TEn}{100} )^{Nn/M} ] - 1 \}$$

Donde:

| | | |
|---|---|---|
| C | = | Capital o deuda |
| Fie | = | Factor con la Tasa de Interés Efectiva |
| TE | = | Tasa Efectiva (para aplicar el Art. 94° del REGAC la tasa más alta de las operaciones de préstamos de los Bancos Comer.) |
| N | = | Número de días de vigencia de la tasa |
| M | = | 360 ó 30, según se trate de tasas de interés anual o mensuales. |

En consecuencia, el monto de interés sería: $\boxed{C \times Fie}$.

El penúltimo párrafo del referido documento (Anexo 01) dice: "Para el cálculo de los intereses referidos a la TAMN y TAMEX, se divide el factor acumulado a la fecha en que se hace efectivo el pago del capital o deuda (o fecha de término del periodo a liquidar)[2] entre el factor acumulado al vencimiento del capital o deuda (o fecha de inicio del período a liquidar)[3]. Al resultado de la división de dichos factores se le procederá a suprimir la unidad para aplicarlo al capital o la deuda".

De tal manera que, para aplicar los intereses de conformidad con el Art. 94° del "REGAC", se debe proceder de la siguiente manera:

1°.    Obtener para el periodo materia de la liquidación de intereses, las tasas más altas del mercado que bajo la modalidad de préstamo hayan realizado los Bancos Comerciales.

---

[1] En la mayoría de los casos los "SOBREGIROS", se otorgan con las tasas más alta del mercado.
[2] Lo escrito entre paréntesis pertenece al suscrito
[3] ..Lo escrito entre paréntesis pertenece al suscrito

31

2°      Hallar los Factores Acumulados (FA) aplicables para el período; para ello existen dos (2) formas:

(i)     Aplicar la Fórmula antes referida, procedimiento que no es recomendable para períodos largos, teniendo en cuenta que la variación de la tasa escogida puede producirse diariamente o en períodos muy cortos, lo cual motivaría una fórmula con infinidad de operaciones aritméticas que imposibilitaría la verificación de los cálculos.

(ii)    Crear una Tabla de Factores Acumulados, cortada mes a mes, para un uso fácil, demostrable y comprobable. (ver ejemplo ANEXO 03, Informe Contable).

## CONCLUSIONES DE LA PERICIA CONTABLE

1.   Teniendo en cuenta que por disposición del Banco Central de Reserva del Perú, desde AGO.90 las Tasas de Interés son libres; es decir, fijadas por las entidades financieras de acuerdo a las señales del mercado, la aplicación actual del artículo 94° del Reglamento General de Actividades de Consultoría "REGAC", importa que se tenga que observar la tasa máxima que fijan los Bancos Comerciales para operaciones activas, publicadas por la Superintendecia de Banca y Seguros en el diario oficial "El Peruano" bajo el título de "Tasas de Interés Promedio por Tipo de Crédito Realizadas en los últimos 30 días útiles", referidas a las diversas modalidades de préstamos otorgadas por los Bancos Comerciales; y, dentro de ellas, utilizar aquella a la que se le aplica la mayor.

2.   El procedimiento para la aplicación de la referida tasa es el mismo que fuera establecido ya por la Superintendencia de Banca y Seguros mediante su Circular N° B-1712-85 de fecha 12-AGO-85, vigente a partir del 26-AGO-85.

3.   La metodología para la aplicación final de los intereses sujetos al artículo 94° del Reglamento General de Actividades de Consultoría "REGAC", teniendo en cuenta que se trata de deudas generadas desde el año 1991, sería de la manera siguiente:

a)     Determinar el Factor Acumulado por todo el período sujeto a liquidación (aplicando la Fórmula difundida por el BCRP, referida en la parte C. de esta pericia, o creando tablas de Factores Acumulados cortadas en forma mensual a fin de permitir una rápida comprobación) y a dicho factor se le resta la unidad; y,

b)     El resultado hallado en a) multiplicarlo por el capital o deuda obteniendo de esa manera los intereses generados por dicho capital durante el período sometido a liquidación.

## VIII. PUNTOS CONTROVERTIDOS

La Audiencia de Acuerdo  Pre Arbitral se realizó el día 11 de Noviembre del 2002 con la asistencia  del representante legal de la **DEMANDADA**  y del **DEMANDANTE**, asistidos por sus respectivos Abogados.

El Tribunal Arbitral procedió a sanear el proceso; propició la conciliación,  la cual no prosperó; admitió los medios probatorios ofrecidos y conjuntamente  con las partes procedió a enumerar los siguientes puntos controvertidos que van a ser  materia de laudo:

1. Determinar si procede reconocer a favor de la **DEMANDANTE** el pago de la suma de U.S. $ 3'557,369.60 (Tres millones quinientos cincuenta y siete mil trescientos sesenta y nueve y 60/100 Dólares Americanos), incluido I.G.V.; y, la suma de S/. 3'982,950.00 (Tres millones novecientos ochenta y dos mil  novecientos cincuenta y 00/100 Nuevos Soles), mas I.G.V., por concepto de honorarios profesionales por servicios complementarios a aquellos que fueron materia del contrato.

2. Determinar si procede reconocer a favor de la  **DEMANDANTE,** la actualización de la suma de S/. 3'982,950.00 (Tres millones novecientos ochenta y dos mil  novecientos cincuenta y 00/100 Nuevos Soles), mas I.G.V., de acuerdo con la Cláusula Cuarta, numeral 01 del contrato suscrito entre las partes; y, si procede tomar como base el Índice de Precios al Consumidor para Lima Metropolitana, determinándose entre qué fechas corresponde su aplicación.

3. Determinar si procede reconocer a favor de la **DEMANDANTE**, el pago de los intereses devengados por las sumas demandadas en el primer punto controvertido precedente, desde la fecha en que se originó la obligación de su abono, hasta la fecha real de pago, determinándose si procede tomar en cuenta la tasa de interés bancaria máxima para operaciones comerciales establecida por el Banco Central de Reserva.

4. Determinar si procede reconocer a favor de la **DEMANDANTE** el pago de la suma de U.S. $ 15,628.05 (Quince mil seiscientos veintiocho y 05/100 Dólares Americanos); y, la suma de S/. 134,388.92 (Ciento treinta y cuatro mil trescientos ochenta y ocho y 92/100 Nuevos Soles), por concepto de gastos y comisiones bancarias por el mantenimiento de las cartas fianza, a partir de la fecha en que venció el contrato.

5. Determinar si procede reconocer la eficacia o ineficacia de la Resolución Directoral N° 233-2001/PRES/VMI/PRONAP/DE de fecha 10 de Octubre del 2001, emitida por la Dirección Ejecutiva del PRONAP, aprobando la liquidación del contrato.

Habiéndose formulado alegatos escritos e informe oral por los Abogados de las partes, el estado de la causa el de emitir Laudo Arbitral, a cuyo efecto, el Tribunal Arbitral considera conveniente exponer previamente algunas precisiones en torno a los siguientes temas:

33

## SOBRE LA NATURALEZA DEL PRESENTE PROCESO Y EL MARCO LEGAL APLICABLE

1. Con relación a la naturaleza del presente proceso arbitral, obra en autos la Resolución N° 07 y la Resolución N° 14, que contienen el criterio del Tribunal Arbitral en el sentido que el presente Arbitraje es uno nacional y de conciencia.

2. Siendo ello así, debe tenerse presente que de conformidad con lo establecido en el artículo 3° de la Ley General de Arbitraje, el Tribunal debe resolver conforme a sus conocimientos, leal saber y entender; es decir, lo que en doctrina se conoce como arbitraje de equidad.

3. Como sabemos, el Arbitraje de Equidad es una institución ideada como alternativa a los procedimientos jurisdiccionales de solución de controversias y mediante el cual se trata justamente de flexibilizar en su conjunto los procedimientos resolutorios sin perder de vista el pacto contractual y el marco legal que lo contiene, de tal manera que la posibilidad de soluciones que la equidad conlleve, se presenta como un complemento particularmente apropiado de la flexibilidad en los cauces formales de actuación, consustancial a la figura del arbitraje.

4. Conforme lo explicara García Maynes[1] citando a Aristóteles, "lo equitativo y lo justo son una misma cosa y siendo buenos ambos, la única diferencia que hay entre ellos es que lo equitativo es mejor aún. La dificultad está en que lo equitativo siendo justo, no es lo justo legal, sino una dichosa rectificación de la justicia rigurosamente legal. Fallar en equidad implica que el juez o el árbitro puedan crear el derecho aplicable al caso particular y abandonar la solución estrictamente legal".

5. En razón a lo expuesto, este colegiado debe resolver de acuerdo a su leal saber y entender, aún cuando reconoce que el contrato suscrito entre las partes se rige por (i) el contrato de préstamo N° 847/OC-PE y sus Anexos suscrito entre el Gobierno Peruano y el Banco Interamericano de Desarrollo, (ii) las Bases del Concurso, (iii) los términos de referencia del concurso, (iv) la oferta del consultor y los acuerdos adoptados en la negociación del contrato y en la propuesta económica negociada final; y (v) las leyes peruanas fundamentalmente la Ley General de Actividades de Consultoría – Ley N° 23554 y su Reglamento aprobado por el Decreto Supremo 208-87-EF (con rango de Ley en virtud del Decreto Legislativo N° 608) en lo que no contravengan las normas del contrato de préstamo, y las demás normas y principios del ordenamiento nacional.

## CONFIRMACIONES OBJETIVAS

Antes de entrar a analizar cada uno de los puntos controvertidos, corresponde confirmar lo siguiente: (i) que, este Tribunal se constituyó de conformidad con lo dispuesto en la Ley General de Arbitraje – Ley N° 26572, y al pronunciamiento emitido por el Poder Judicial a través de la Resolución N° 08 del 12 de abril del

---

[1] Eduardo García Maynes. Introducción al Derecho. Vigésimo Segunda Edición. México. Editorial Porrúa, pp. 49.

34

2002 recaída en el Expediente N° 6336-2002 seguido ante el Vigésimo Cuarto Juzgado Especializado en lo Civil de Lima, mediante la cual se designó como árbitro de conciencia de la **DEMANDADA** al Ing. Héctor Becerra Martínez; (ii) que, en momento alguno se recusó a algún miembro del Tribunal Arbitral; (iii) que, **FIGUEIREDO FERRAZ ENGENHERIA DE PROJETO** presentó su demanda dentro del plazo establecido; (iv) que, **PRONAP (hoy PARSSA)** fue debidamente emplazada con la demanda, contestó la misma y ejerció plenamente su derecho de defensa; (v) que, las partes tuvieron plena oportunidad para ofrecer y actuar sus medios probatorios, así como ejercer la facultad de presentar alegatos e inclusive, de informar oralmente; y, (vi) que, este Tribunal ha procedido a Laudar dentro del plazo legalmente fijado en las Resoluciones N° 81 y 82.

## IX. CONSIDERACIONES Y VALORACION DE LOS MEDIOS PROBATORIOS

Del análisis de los argumentos y pruebas ofrecidas por las partes, se observa lo siguiente:

**PRIMERO:** Que, fluye de autos, que el carácter y ámbito invocado por el **DEMANDANTE** al postular su demanda, ha sido ratificado por la **DEMANDADA** mediante la contestación de la misma, oportunidad en la cual no dedujo reconvención ni planteó defensas previas;

**SEGUNDO:** Que, en el sentido indicado, corresponde al Tribunal Arbitral, como una cuestión previa al análisis de fondo, identificar los temas propuestos por las partes en abono de sus respectivas pretensiones o defensa, a los efectos de circunscribir la secuencia lógica del presente Laudo, mediante la exposición ordenada del criterio del Tribunal Arbitral respecto a cada uno de dichos temas, atendiendo no sólo a la argumentación propuesta por cada una de las partes, si no también a la convicción y certeza que construyen las pruebas ofrecidas y actuadas;

**TERCERO:** Que, el **DEMANDANTE** sostiene como fundamento de las pretensiones que postula, que la **DEMANDADA ha violentado el principio elemental de la buena fe**, en tanto pilar básico de toda contratación, al proporcionar información para la elaboración de sus propuestas, asumiendo aspectos técnicos que cuando fueron contrastados en la práctica, resultaron sustancialmente distintos, originándole mayores actividades que las previstas en función a la información proporcionada y que ha conllevado a que un contrato pactado a 315 días, se extienda en términos reales prácticamente a 984 días, (hasta el 23 de Agosto del año 2000, fecha en que entregó su Informe Final, después de subsanadas las últimas observaciones del Supervisor); sin que la **DEMANDADA** se muestre dispuesta a compensar por esta situación totalmente ajena al **DEMANDANTE** y originada en la conducta que la propia **DEMANDADA** ha demostrado; motivo por el cual, sostienen que carece de toda justicia y equidad, así como el derecho que el Estado pretenda obtener una posición ventajosa derivada de la ejecución de un contrato, aún cuando este fuera a suma alzada, si se advierte que ello obedece a una flagrante inobservancia del principio elemental de la buena fe;

35

**CUARTO:** Que, en base a lo expuesto, **EL DEMANDANTE** propone que el análisis que el Tribunal Arbitral debe realizar en torno a este extremo, es si resulta acorde a la Buena Fe Contractual que la **DEMANDADA** pretenda beneficiarse de las mayores labores que han tenido que realizar como consecuencia de haberse ampliado el plazo de ejecución del contrato en cerca del triple del plazo pactado, por causas que no le pueden ser imputables y que se han originado por la **información deficiente proporcionada** por la **DEMANDADA** y que como demostrará a través de los medios probatorios de la demanda, resultaba en muchos casos sustancialmente distinta con la observada en el campo; es decir, mas allá de cualquier margen razonable que permita un simple ajuste de los Estudios de Factibilidad.

**QUINTO :** Que, de otro lado, el **DEMANDANTE** destaca la dependencia **insoslayable** entre el Estudio Definitivo y el Estudio de Factibilidad que le **sirve de sustento;** para explicar que a fin de realizar un proyecto a nivel definitivo, es indispensable que exista previamente el proyecto a nivel de factibilidad, de modo que quien realice el Estudio Definitivo, debe basarse esencialmente en la revisión del Estudio de Factibilidad para poder delinear y/ o tener una visión general de los aspectos principales que éste debe abarcar, en la medida que el Estudio de Factibilidad sustenta además la extensión y características del Estudio Definitivo, sirviéndole de base para dimensionar la cantidad de servicios requeridos y calcular su costo global; por lo cual deben ser idóneos y confiables, así como completos y concluidos con relación a lo que se pretende que se haga en los Estudios Definitivos; de modo que la metodología para su realización la señalan sus términos de referencia y los propios Estudios de Factibilidad.

**SEXTO :** Que, El **DEMANDANTE** expone sin embargo, que la situación que encontró al momento de proceder a la consolidación de las soluciones propuestas en los Estudios de Factibilidad, fue totalmente distinta, dado que al analizar las soluciones que proponía, contrastándolas con la realidad en base a los resultados de los trabajos de campo, **ha tenido que rehacer completamente o diseñar de forma adecuada, por primera vez, los componentes de los sistemas,** concluyendo que esto no puede ser entendido simplemente como consolidar las soluciones que señalaba la Factibilidad, **sino como la elaboración completa de una nueva solución factible, que debe ser debidamente remunerada por la DEMANDADA, en los importes que pretende;**

**SÉPTIMO:** Que, atendiendo a los temas propuestos por el **DEMANDANTE**, corresponde al Tribunal Arbitral, establecer si en efecto, (I) la **DEMANDADA** ha violentado el principio elemental de Buena Fe; (II) si ha proporcionado información deficiente induciendo a error al **DEMANDANTE**; (III) si los Estudios de Factibilidad sirven de base o sustento para la elaboración de los Estudios Definitivos; (IV) si las mayores actividades o servicios prestados que refieren, se encontraban dentro de su ámbito de obligaciones o responsabilidades; y, (V) si deben o no ser remunerados los honorarios demandados, en el tiempo que requirió la prestación de dichos servicios;

36

**OCTAVO:** Que, por su parte, la defensa de la **DEMANDADA** se sustenta en la intangibilidad del pacto a suma alzada, en virtud del cual, el Contrato de Servicios de Consultoría de fecha 12 de Noviembre de 1997 que lo vincula al **DEMANDANTE**, obliga a éste a la elaboración de un proyecto específico, tangible, en tanto fruto concreto de determinados trabajos, por una suma fija, a todo costo;

**NOVENO :** Que, la **DEMANDADA** sostiene como otro fundamento de su defensa, que las demoras ocasionadas por errores o deficiencias en los Estudios de Factibilidad denunciados por el **DEMANDANTE**, carecen de sustento en el contrato, pues refiere que la lectura íntegra del mismo ofrece convicción en el sentido que en momento alguno se ha estipulado que el contratista **DEMANDANTE** tuviera que limitarse a desarrollar el proyecto conforme a los Estudios de Factibilidad, **en tanto que éstos son meramente referenciales; enfatizando que mucho menos se ha estipulado que si el contratista DEMANDANTE realizaba algún replanteo o modificación del proyecto con relación a alguno de los Estudios de Factibilidad, debía por ello recibir una retribución adicional;**

**DECIMO :** Que, en abundamiento de su defensa, la **DEMANDADA** sostiene que en los Términos de Referencia, numeral III.2.1, se estipuló expresamente que El Consultor (**DEMANDANTE**), debía realizar un Informe de Consolidación con la consolidación de las soluciones propuestas y el replanteo de los sistemas existentes, el cual debía contemplar la revisión y mejora de las alternativas recomendadas en los Estudios de Factibilidad, incluyendo modificaciones a los diseños previos contenidos en dichos estudios, a los efectos de dar una solución consolidada y definitiva, para utilizarla en el desarrollo de los planos del proyecto y de la construcción de la obra; de modo que no puede ahora aducir que tuvo que hacer replanteos o cambios a las soluciones propuestas en los Estudios de Factibilidad; toda vez que la revisión de éstas y la búsqueda y desarrollo de mejores alternativas, eran parte de las obligaciones asumidas en el contrato por las que no puede reclamar una mayor retribución, en la medida que se obligó a realizar todo el trabajo a suma alzada; vale decir, por una retribución fija e invariable, previamente convenida;

**DECIMO PRIMERO :** Que, atendiendo a los temas propuestos por la **DEMANDADA**, corresponde al Tribunal Arbitral revisar y pronunciarse (I) sobre la intangibilidad del pacto a suma alzada; (II) si los Estudios de Factibilidad eran meramente referenciales; y, (III) si eventualmente constituía obligación del **DEMANDANTE** ejecutar las tareas que ésta refiere, sin recibir por ello una retribución adicional;

**DECIMO SEGUNDO:** Que, para mejor resolver, el Tribunal estima conveniente agrupar en un primer enfoque de análisis, los siguientes temas propuestos por el **DEMANDANTE** en torno a; (I) si la **DEMANDADA** ha violentado el principio elemental de Buena Fe; (II) si ha proporcionado información deficiente induciendo a error al **DEMANDANTE**; (III) si los Estudios de Factibilidad sirven de base o sustento para la elaboración de los Estudios Definitivos; interrelacionando todos

37

estos temas en el desarrollo del análisis con el tema propuesto por la **DEMANDADA** cuando sostiene (II) que los Estudios de Factibilidad son meramente referenciales;

**DECIMO TERCERO:** Que, en relación al tema relativo a si la **DEMANDADA** ha violentado el principio elemental de Buena Fe, procede realizar un análisis previo de dicha institución jurídica, precisando que la Buena Fe es un principio elemental del ordenamiento legal que reviste una gran importancia en el ámbito contractual, de tal manera que una conducta que resulte violatoria de este principio no debería ser amparada por el derecho y la justicia.

**DECIMO CUARTO:** Que, conforme lo indica el tratadista argentino Guillermo Borda, **"el principio de la buena fe significa que el hombre cree y confía que una declaración de voluntad surtirá en un caso concreto sus efectos usuales, los mismos efectos que ordinaria y normalmente ha producido en casos iguales".[2]**; lo que en el ámbito contractual presupone que desde la gestación del contrato hasta su conclusión, vale decir durante la etapa pre contractual, contractual y de ejecución, las partes deben actuar, una respecto de la otra, de manera honesta y correcta.

**DECIMO QUINTO:** Que, conforme al atinado criterio expuesto por Elvira Martínez Coco y Cecilia Espiche Elías, **"La buena fe se encuentra presente en forma expresa o implícita en todos los ordenamientos jurídicos, pues en esencia recogen lo que son los valores del plexo axiológico correspondiente al Derecho. La buena fe es un concepto unitario que se manifiesta preponderantemente en sus dos facetas: buena fe subjetiva – creencia, y buena fe objetiva – lealtad, sin que ello signifique que la otra faceta no se encuentre también presente. No puede pretenderse tener buena fe creencia sin una conducta conforme a la buena fe, ni la corrección y rectitud que exige la buena fe es una formalidad externa, vacua de contenido".[3]**

**DECIMO SEXTO:** Que, en la legislación peruana, este principio se encuentra contemplado de manera expresa en el articulo 1362 del Código Civil, sin embargo esta norma trasciende el ordenamiento civil, y es aplicable a cualquier relación contractual, incluso a los celebrados por el Estado, en cuyo contexto, (contratos celebrados por el Estado al amparo de reglamentos administrativos), cabe citar al autor Eduardo García de Enterría, cuando expresa que: **"modernamente se entiende para afirmar la validez de un Reglamento (entiéndase reglamento administrativo) debe éste superar la confrontación con otras reglas de carácter sustancial, estos límites son: el respeto a los Principios Generales del Derecho y en especial la Interdicción de la**

---

[2]    BORDA A. GUILLERMO. Tratado de Derecho Civil. Parte General II. Novena Edición. Editorial Perrot. Buenos Aires. pp. 143

[3]    MARTINEZ COCO, Elvira y ESPICHE ELIAS, Cecilia. "América Televisión Vs. Alianza Lima, un clásico ejemplo de abuso de derecho en la resolución del contrato". Revista Diálogos con la Jurisprudencia Tomo 6.

38

Arbitrariedad. La tesis central es la siguiente: un reglamento no puede aplicarse válidamente si, se opone de alguna manera a los Principios Generales del Derecho.

De esta forma quedan excluidos del ámbito de validez los reglamentos que infrinjan los Principio Generales de Derecho, ... . que partan de una apreciación inexacta de los hechos o que impongan medidas desproporcionadas o incongruentes con la finalidad que persigan.... o contrarios en sus regulaciones a la naturaleza de las cosas... u objetivamente irrazonables o que se avoquen a resultados manifiestamente injustos o contrarios a la buena fe y a un trato justo"[4]

**DECIMO SEPTIMO;** Que, el conocido administrativista argentino Héctor Mairal menciona en este mismo orden de ideas que "Parece difícil considerar al Estado excluido de la obligación de respetar un principio básico del derecho y de la moral como lo es la buena fe. Esta conclusión, señala Alberti, "parece la única compatible con el estado de derecho". El hecho que la administración persiga el bien común no autoriza a liberarla de ataduras morales: el fin no justifica los medios".

Por otra parte, tan intensa y múltiple es la intervención estatal en la vida cotidiana de los particulares, que la no vigencia del principio respecto de la Administración significaría que un vasto sector de las relaciones jurídicas quedarían fuera del amparo de una regla tan cardinal. Poco avanzaría el derecho si paralelamente a los progresos del derecho privado al incorporar pautas cada vez más elevadas de comportamiento, se operara la continua expansión de un derecho público que no respetara tales pautas.

No se trata aquí de la mera aplicación analógica del derecho civil en el ámbito del derecho administrativo que la jurisprudencia ha admitido reiteradamente, si bien con las discriminaciones impuestas por la naturaleza propia de lo que constituye la sustancia de esta última disciplina".[5]

A su vez el autor español Diez Picazo manifiesta: "La buena fe domina todo el tráfico jurídico, no sólo en la órbita estricta del derecho privado, sino incluso en el derecho público. Beitzke .... señala cómo el funcionamiento y en las vicisitudes de los negocios jurídicos celebrados por los entes públicos han de preponderar también como norma fundamental, los postulados de fidelidad y de buena fe. La buena fe es exigible, por tanto, no sólo en las relaciones de derecho privado estricto, sino también en las de derecho administrativo o en las de derecho procesal".[6]

---

[4]    GARCIA DE ENTERRIA; Eduardo. Curso de Derecho Administrativo.

[5]    MAIRAL A. Héctor. La Doctrina de los Propios Actos y la Administración Pública. Desalma Buenos Aires. 1994. pp. 52 y 53.

[6]    DIEZ PICAZO PONCE DE LEÓN. Luis. La doctrina de los Actos Propios. Barcelona. 1963 pp. 135.

39

**DECIMO OCTAVO:** Que, en atención a lo expuesto, este Tribunal Arbitral arriba a la convicción que el principio de la Buena Fe es uno que debe respetarse en todos los contratos que se celebren, incluso en los que sea parte el Estado, no pudiendo sus regulaciones interpretarse de una manera que resulte abiertamente violatoria o contradictoria con este principio, ni tampoco admitirse que una de las partes de determinada relación contractual pretenda obtener un beneficio en caso se demuestre que para ello ésta no ha respetado el elemental principio de buena fe contractual. La inexistencia de buena fe, no importa necesariamente la presencia de dolo, ya que esta es una figura distinta, lo que se analiza es si la confianza que de manera razonable una de las partes de una relación contractual deposita en la misma y en las afirmaciones de su contraparte, se ha visto afectada por la conducta de ésta última. Si ello ha sido así, se concluye que la contraparte no ha actuado acorde con este principio y en consecuencia debe asumir la responsabilidad que se derive de esta situación.

**DECIMO NOVENO:** Que, conforme a las conclusiones del Informe Pericial y demás documentos del expediente técnico (Volumen I pp. 12 al 20 y 23 al 25), está debidamente acreditado en autos que el Estudio de Factibilidad proporcionado por la **DEMANDADA** al **DEMANDANTE**, resultaba deficiente y que no reunía las condiciones necesarias para funcionar como base para realizar los Estudios Definitivos; hecho que este colegiado no puede admitir que era desconocido por la **DEMANDADA**; habida cuenta que, su condición de empresa especializada en la materia objeto del Estudio de Factibilidad, responsable de los estudios que antecedieron dicha fase técnica y su condición de destinatario final de éste, cuya supervigilancia siempre tuvo a cargo, aunado al hecho debidamente comprobado en el Informe Pericial encomendado al Ingeniero Álvaro Flores Boza, que los Estudios de Factibilidad de los que también fue responsable y que había proporcionado a los postores, ni siquiera habían cumplido con los requisitos de sus propios términos de referencia; hacen imposible admitir el desconocimiento aludido; dado que lo contrario configuraría una negligencia inexcusable, que le sería igualmente imputable; pues si conforme a lo dispuesto en el artículo 1314 del Código Civil, "**Quien actúa con la diligencia ordinaria requerida, no es imputable por la inejecución de la obligación o por su cumplimiento parcial, tardío o defectuoso**", en tanto que habría obrado de buena fe; a contrario sensu de este artículo y en aplicación rigurosa del artículo 1362 del Código Civil antes citado, procede con negligencia quien no imprime la diligencia debida al cumplimiento de sus obligaciones, hecho que se ha configurado exactamente en el presente caso y que conduce al Tribunal Arbitral a la certeza y convicción de que en efecto, la **DEMANDADA** no ha actuado acorde al principio elemental de la buena fe en esta relación contractual, de cuyas consecuencias no se puede sustraer;

**VIGESIMO:** Que, en abono del criterio de certeza antes expuesto, obran en autos seis Cláusulas Adicionales, (la primera sin numerar) de las que fluye la sucesiva ampliación de plazos hasta la Cláusula Adicional Quinta, que dispone la vigencia del contrato, hasta la liquidación final del mismo, sin reconocimiento de mayores gastos a la empresa **DEMANDANTE**, por ningún concepto, lo que es

40

indicativo de un ejercicio abusivo del derecho que la Ley no ampara; en cuyo contexto, la entidad **DEMANDADA** sostuvo enfáticamente el incumplimiento del contrato por parte de la empresa **DEMANDANTE**, cuando la anuencia que fluye de las citadas Cláusulas Adicionales antes mencionadas, es mas bien demostración de un reconocimiento implícito a la forma como se venia ejecutando el contrato, que en modo alguno merecia observaciones o imputaciones de incumplimiento, si no por el contrario, la aceptación de un proceder correctivo que la empresa **DEMANDANTE** venía ejecutando de acuerdo a los intereses de la entidad **DEMANDADA**;

**VIGÉSIMO PRIMERO:** Que, en lo relativo a si la **DEMANDADA** ha proporcionado información deficiente induciendo a error al **DEMANDANTE**; especialmente en lo que concierne a la formulación de su propuesta técnico – económica y del dimensionamiento de los recursos asignados para el desarrollo de las actividades orientadas a la elaboración de los Estudios Definitivos contratados, el Tribunal Arbitral reitera el criterio expuesto precedentemente, cuya certeza y convicción emana del análisis razonado del resultado del Informe Pericial que en el volumen I, página 24,25 y 26, concluye que los Estudios de Factibilidad no eran confiables; en criterio concordante con lo que señala en el mismo informe, Volumen I pp. 6 donde sostiene: "en la elaboración de una propuesta para la ejecución de Estudios Definitivos en saneamiento, el dimensionamiento de los recursos y cálculo de los costos por los servicios a ejecutar, se realizan sobre la base de las conclusiones y soluciones planteadas por el Estudio de Factibilidad"

**VIGÉSIMO SEGUNDO:** Que, en lo que concierne al tema relativo a si los Estudios de Factibilidad sirvieron de base o sustento para la elaboración de los Estudios Definitivos como lo sostiene la empresa **DEMANDANTE**; o si por el contrario, éstos eran meramente referenciales como lo sostiene la **DEMANDADA**, fluye de autos que en el presente caso, la **DEMANDADA** contrató los servicios del **DEMANDANTE** bajo la modalidad a suma alzada, a efectos de que éste proceda a la elaboración de los Estudios Definitivos de la Primera Etapa de Inversión de los Planes de Expansión de Mínimo Costo de los Servicios de Agua Potable y Alcantarillado de las localidades de Tacna, Juliaca, Puno, Ayaviri, Ilave, Cusco y Sicuani.

De igual manera, fluye de las **Bases del Concurso, ANEXO 1 GLOSARIO DE TERMINOS, LITERAL F) LA DEFINICIÓN DE ESTUDIO DE FACTIBILIDAD (pp. 15):**

**"Análisis con detenimiento de las variables que inciden en el proyecto, con el fin de estimar los costos y beneficios esperados y definir la alternativa óptima de un proyecto de inversión.**

**El estudio de factibilidad es la culminación de la formulación de un proyecto, y constituye la base para la decisión respecto de su ejecución"**

Asimismo, la Cláusula Quinta del Contrato de Consultoría, rubro Obligaciones de las Partes Contratantes, numeral II. DEL PROYECTO ESPECIAL; sub numeral 03, pp. 9, contiene el texto literal siguiente:

"El PRONAP proporcionará al CONSULTOR todos los documentos previos, informes u otros documentos relacionados a los servicios de agua potable y alcantarillado de las EPS, cuyas recomendaciones serán solo referenciales para fines de los análisis que debe desarrollar el CONSULTOR. En el caso de los Estudios de Factibilidad de los Planes de Expansión de Mínimo Costo que han sido aprobados por el PRONAP, para las localidades que comprenden el presente contrato y que cuentan con la no – objeción del BID, éstos documentos se tomarán como base para el desarrollo de los Estudios Definitivos".

Por su parte el Perito, al absolver las observaciones al Peritaje realizado, señala en la página 3 del Volumen **RESPUESTAS A LAS OBSERVACIONES REALIZADAS POR FIGUEIREDO FERRAZ**, lo siguiente:

" es claro que en el proceso de un Proyecto de Inversión, el Estudio de Factibilidad es la Base real para el inicio y la realización de un Estudio Definitivo, no habiendo sustento que pueda justificar denominarlo de simple referencia"; criterio compartido por este Tribunal Arbitral, no sólo por el análisis integrado de las Bases y el resultado del informe Pericial, si no fundamentalmente, porque la calidad de ser documento base para la realización de los Estudios Definitivos, fluye de manera clara y expresa del propio contrato; de modo que no resulta admisible el argumento de la **DEMANDADA** cuando sostiene que los Estudios de Factibilidad eran meramente referenciales a los efectos de la realización de los Estudios Definitivos;

**VIGÉSIMO TERCERO:** Que, teniendo en cuenta lo expuesto precedentemente, el Tribunal Arbitral llega a la convicción que los Estudios de Factibilidad proporcionados por la **DEMANDADA** a los postores y entre ellos, al **DEMANDANTE** fueron efectivamente base fundamental para la elaboración de sus propuestas, incluyendo el dimensionamiento de sus recursos, tiempos y cálculo de costos, así como para el desarrollo de sus actividades, asumiendo el **DEMANDANTE** y demás postores, de buena fe, que las soluciones planteadas en ellos se encontraban esencialmente conformes en su integridad, salvo precisiones y/o adecuaciones no sustanciales que debían ser realizadas por éste; lo que explica el desarrollo de un proceso de selección bajo la modalidad a suma alzada; el mismo que si no hubiera sido propuesto conforme se ha descrito precedentemente, no hubiese tenido sentido el proceso de selección bajo la modalidad asuma alzada, tal y como este Tribunal analiza y expone más adelante.

**VIGESIMO CUARTO:** Que, en lo relativo al tema propuesto por la **DEMANDADA** en torno a (l) la intangibilidad del pacto a suma alzada; no cabe duda para este Tribunal que el contrato que las partes suscribieron fue uno bajo la modalidad a Suma Alzada; y, que es un principio reconocido el que los contratos son

42

obligatorios en cuanto se haya expresado en ellos, tal como lo reconoce expresamente el artículo 1361 del Código Civil Peruano.

**VIGESIMO QUINTO:** Que, un contrato bajo la modalidad "A Suma Alzada" implica que las partes han fijado de antemano el precio definitivo total que comprende la obra (entendiéndose como tal al resultado de una actividad determinada) [7], estableciéndose así que dicho precio no sufrirá variaciones por ningún concepto en tanto que se mantengan las condiciones que enmarcan el objeto del contrato. En otras palabras, en un contrato a suma alzada, se contrata una "obra determinada" por un precio ya determinado.

Sin embargo lo que cabe preguntarse es si ante un supuesto en el cual el Tribunal arriba a la convicción que una de las partes (en este caso la **DEMANDADA**) no ha actuado acorde con el elemental principio de buena fe conforme se ha concluido precedentemente, puede ella escudarse o ampararse en los alcances del pacto "a suma alzada" para eximirse de toda obligación adicional derivada de la deficiencia de los Estudios de Factibilidad que proporcionó a su contraparte.

**VIGESIMO SEXTO:** Que, conforme se reconoce prácticamente de manera uniforme, para que funcione un contrato bajo la "modalidad a suma alzada", es requisito que las partes conozcan de antemano el presupuesto, los planos y las especificaciones técnicas, de suerte que sea factible fijar por anticipado el precio del resultado querido. [8] No escapa a criterio del Tribunal que obviamente estos presupuestos podrán ser materia de ajustes en la realización de la obra (entiéndase nuevamente como "resultado querido"), pero dichas variaciones si lo hubieren no deben ser sustanciales ya que de lo contrario, la información proporcionada no habría cumplido su objeto. Tratándose de una obra que consiste en la elaboración de los Estudios Definitivos, obviamente la base para los mismos lo constituyen los Estudios de Factibilidad, tal y como ha sido ampliamente explicado por el informe pericial y por lo citado en los puntos precedentes, estos fueron deficientes y sus soluciones irrealizables; hechos que conforme ha quedado establecido, no eran desconocidos por la demandada.

**VIGESIMO OCTAVO:** Que, lo expuesto fue recogido de manera clara en nuestra legislación cuando según lo dispuesto en el numeral 1.2.28 del **RULCOP** y hasta hace poco, por el artículo 45 del Reglamento de la Ley de Contrataciones y Adquisiciones del Estado (TUO aprobado por el Decreto Supremo N° 013-2001-PCM) que establecían que el sistema a "Suma Alzada" resultaba aplicable cuando las magnitudes y calidades de la prestación estaban totalmente definidas

---

[7]  En este sentido, el Tribunal comparte la idea expresada por la **DEMANDADA** en el sentido que en el presente caso la contratación de servicios para la elaboración de un Estudio Definitivo, importa en esencia lo que civilmente se conoce como un contrato de obra, es decir un resultado, siendo obviamente distinto de un contrato de obra constructiva.

[8]  Esto significa en otros términos que para que un pacto A Suma Alzada sea efectivo, vinculante y exigible, las especificaciones técnicas y los planos (en este caso los Estudios de Factibilidad) proveídos por el comitente deberían de carecer de defectos de magnitud o relevancia sustancial.

43

en las especificaciones técnicas y en los términos de referencia. Si bien ello no estaba así de claro en las disposiciones de la Ley 23554 y en Decreto Supremo Nº 208-87-EF (REGAC), esto no significa en forma alguna que dicho requisito sea ajeno a un contrato celebrado bajo los alcances de esa o de cualquier otra disposición, ya que es consustancial al uso de esta modalidad de contratación.

**VIGÉSIMO NOVENO:** Que, por lo regular un contrato a suma alzada es usado cuando el locatario o dueño de la obra tiene una concepción muy precisa de qué es aquello que quiere mandar a hacer, ya sea un diseño o sea una construcción, contando para ello, previamente con un presupuesto detallado, suficiente y valorizado de todas y cada una de las partes que comprende la obra a efectuarse de modo que la responsabilidad de esas condiciones previas es del dueño de la obra. El autor nacional Emilio Cassina Rivas, explica:

**"La diferencia entre el sistema de precio a suma alzada y el de precios unitarios a que se refiere el artículo 45 del Reglamento, es sustancial ya que en el primero, el precio es fijo puesto que las magnitudes y calidades están definidas en las especificaciones técnicas y términos de referencia así como en los planos en el caso de obras, mientras que en el segundo sabemos que los precios son solo referenciales, en tanto que las partidas y presupuestos, así como los planos son también referenciales y se tienen que valorizar en función de su ejecución real en base al precio pactado por cada unidad",[9]**

**TRIGÉSIMO:** Que, en el presente caso, este requisito básico no se ha observado. pero no sólo se ha incumplido por que se ha acreditado la deficiencia de los Estudios de Factibilidad y sus consecuencias, sino que además éste Tribunal considera que no ha existido Buena Fe por parte de la **DEMANDADA** al haber desarrollado un proceso de selección para la celebración de un contrato bajo esta modalidad, cuando estaba en aptitud de conocer que no estaban dadas las condiciones para celebrar un contrato "A Suma Alzada", y de lo cual era sumamente difícil que los postores se puedan percatar, no solo por la limitación de las bases en el sentido que si bien se tenía acceso a los Estudios de Factibilidad éstos eran irreproducibles[10], limitando no sólo la posibilidad de un examen más detallado de los mismos; sino por que además, tal como se indica en el Informe Pericial: la magnitud de las deficiencias de los Estudios de Factibilidad hizo necesario que el CONSULTOR **DEMANDANTE** tuviese que determinar otras soluciones que las que señalaba el primero y sobre las que se debía de ejecutar los Estudios Definitivos; estas deficiencias solo pudieron ser

---

[9]    CASSINA RIVAS, Emilio. Contrataciones y Licitaciones Públicas. Imprenta del Ejército. Año 2003. pp. 80.

[10]    V.    INFORMACION PARA LAS EMPRESAS CONSULTORAS B. Información disponible para las empresas consultoras (pp. 6)

"El Proyecto Especial PRONAP y/o las EPS pondrán a disposición de la empresa consultora y/o asociación de ellas la información referencial señalada en el numeral IV.D (VALE DECIR LOS ESTUDIOS DE FACTIBILIDAD), constituida principalmente por documentos y/o archivos irreproducibles".

44

detectadas durante el desarrollo de los Estudios Definitivos previstos, agravando esta situación la metodología de trabajo impuesta que resultó en que lo expuesto sucediese no al inicio de éstos, sino al final del tercer informe (de cuatro previstos) cuando ya se habría pasado más de un año del inicio de los trabajos; de modo que resulta reñido a la equidad, ponerle un sello de conformidad o de juridicidad a la pretensión de hacer valer un pacto al cual se ha accedido de mala fe;

**TRIGÉSIMO PRIMERO:** Que, sobre el particular, cabe recordar lo que afirma Josserand (citado por CIFUENTES) respecto a esta figura: "un acto cumplido **de conformidad con determinado derecho subjetivo puede estar en conflicto con el derecho general, con el derecho objetivo, con la juridicidad (...) La finalidad del abuso del derecho es justamente la de limitar el "ejercicio" de las facultades de los sujetos de derecho para evitar los excesos y los males que en virtud de ellos se producen".[11]**

**TRIGÉSIMO SEGUNDO:** Que, cuando se ha evidenciado que no se han observado los elementos básicos para que funcione un pacto a Suma Alzada y adicionalmente se ha demostrado una conducta negligente, carente de buena fe como principio elemental del derecho y en particular del derecho contractual, éste Tribunal no puede considerar exigible o aplicable el pacto a Suma Alzada cuya esencia, de acuerdo a lo expuesto, ha quedado desnaturalizada. Pretender que acceda a respetar dicho pacto en estas circunstancias, importaría aceptar un claro abuso del derecho por parte de la **DEMANDADA** situación que no es amparada por la equidad, la justicia, el derecho ni por nuestra legislación de acuerdo al artículo 103º de la Constitución y el artículo II del Título Preliminar del Código Civil, cuando expresamente indica que: "la Ley no ampara el abuso del derecho".

**TRIGÉSIMO TERCERO:** Que, en el orden de ideas expuesto, no se trata de que el Tribunal Arbitral desconozca que los contratos deben ser cumplidos conforme a lo establecido en ellos y al acuerdo de las partes, o de saber que un contrato a suma alzada tiene por esencia la característica de fijar de antemano el valor de la compensación que se va a recibir por todo concepto; de lo que se trata en el presente caso es establecer si ese pacto puede oponerse o no cuando se ha verificado de manera fehaciente y ostensible por las pruebas actuadas en el presente proceso, que la entidad contratante conocía de las deficiencias de sus Estudios de Factibilidad; conocía que ellos no habían cumplido con sus propios términos de referencia; conocía que era evidente que los mismos se debían tomar como base para el dimensionamiento de las propuestas de los postores y para el desarrollo de las actividades a realizar por el consultor ganador de la buena pro.

**TRIGÉSIMO CUARTO:** Que, a mayor abundamiento, cabe mencionar incluso que la entidad **DEMANDADA** conocía perfectamente de estos hechos en la medida

---

[11]     CIFUENTES, Santos. Elementos de Derecho Civil. Parte General. Astrea. Buenos Aires. 1988. pp. 17.

45

que el contrato se expandió de 315 días a 984 días, es decir por más del triple del plazo convenido, tiempo en el cual la empresa **DEMANDANTE** realizó una serie de trabajos con conocimiento y consentimiento expreso de la Supervisión y de la entidad **DEMANDADA** que supervisó, observó, aprobó y finalmente aceptó los Estudios Definitivos, diferentes de los contratados previamente, como ha quedado claramente demostrado en el peritaje realizado y su ampliación.

**TRIGÉSIMO QUINTO:** Que, de otro lado, durante el desarrollo del presente proceso no se ha demostrado que la Entidad **DEMANDADA** objetara el trabajo que venía realizando la empresa **DEMANDANTE**; es más, trabajó conjuntamente con ella durante todo el tiempo que fue necesario; y, si la **DEMANDADA** hubiera tenido fundadas razones para establecer un incumplimiento del contrato por la empresa **DEMANDANTE**, bien pudo resolver el contrato conforme a la facultad que le estaba reconocida; de modo que, al no haber procedido así, tal hecho constituye prueba plena de una conformidad que ahora no puede negar aduciendo contradictoriamente un incumplimiento de contrato que durante la vigencia de éste, nunca invocó; por ende, a criterio del Tribunal Arbitral, la conducta de la **DEMANDADA** ha convalidado de manera expresa lo realizado por el Consultor **DEMANDANTE**, incluyendo los mayores tiempos que ha tenido que invertir para el desarrollo de los mismos.

**TRIGÉSIMO SEXTO:** Que, tal como lo reconoce el tratadista argentino Guillermo Borda:

**"cuando las mismas partes con su conducta posterior han revelado inequívocamente cuál es el significado y alcance del contrato, no podrán luego ampararse en una cláusula de interpretación dudosa para desviarse de lo que ellas mismas han demostrado querer.**

**Es necesario sin embargo advertir que la conducta posterior sólo puede ser tomada en consideración cuando perjudica a la parte que la ha seguido; pero en principio no puede ser considerada cuando la beneficia, por que de lo contrario sería muy fácil a los contratantes desviarse de la recta interpretación de un convenio, realizando actos que la otra parte tal vez ignore y que más tarde serán pruebas a favor suyo si la cuestión se lleva a los tribunales"[12]**

**TRIGÉSIMO SEPTIMO:** Que, en el orden de ideas expuesto y a lo acreditado abundantemente en autos, el Tribunal Arbitral reitera su convicción en el sentido que la **DEMANDADA** no ha actuado respetando el elemental principio de buena fe contractual, y que por tanto, no puede ahora escudarse o ampararse en los alcances de un pacto "a suma alzada", que se ha comprobado no ser oponible al Consultor **DEMANDANTE**, para pretender eximirse de toda obligación adicional derivada de la deficiencia de los Estudios de Factibilidad que proporcionó a su

---

[12]     BORDA A. GUILLERMO. Tratado de Derecho Civil. Parte General II. Novena Edición. Editorial Perrot. Buenos Aires. pp. 151.

46

contraparte, habiéndose por ende desnaturalizado el pacto " a suma alzada", sin que ello haya conllevado a la nulidad del contrato celebrado, si no sólo a la imposibilidad de oponerlo en equidad, pues lo contrario supondría que en aras de un mal entendido ritualismo jurídico, se le ponga un sello de legalidad a un ostensible abuso, que conforme se ha señalado precedentemente, la Ley no ampara;

**TRIGÉSIMO OCTAVO:** Que, respecto al tema (IV) si las mayores actividades o servicios prestados que refiere la **DEMANDANTE** se encontraban dentro de su ámbito de obligaciones o responsabilidades; y, al tema **(V)** si deben o no ser remunerados los honorarios demandados, en el tiempo que requirió la prestación de dichos servicios; el Tribunal Arbitral considera conveniente analizar estos temas, conjuntamente con el propuesto por la **DEMANDADA** en torno al tema (III) si eventualmente constituía obligación del **DEMANDANTE** ejecutar las tareas que ésta refiere, sin recibir por ello una retribución adicional;

**TRIGÉSIMO NOVENO:** Que, por el mérito de lo analizado con toda amplitud a lo largo de la parte Considerativa del presente Laudo, en este punto expositivo el Tribunal Arbitral tiene absoluta convicción y certeza en el sentido que las mayores actividades o servicios prestados efectivamente por la empresa **DEMANDANTE**, al desarrollar soluciones diferentes a las señaladas en los Estudios de Factibilidad para la mayoría de las localidades, no se encontraban expresamente dentro de su ámbito de obligaciones; de modo que tiene expedito su derecho a que le sean reconocidos y remunerados los honorarios demandados, en el tiempo que requirió la prestación de tales servicios extra contractuales; sin que resulte posible amparar la alegación de la Entidad **DEMANDADA**, en el sentido que tales tareas adicionales, constituían obligación de la empresa **DEMANDANTE** por la que no le asiste ningún derecho a recibir retribución adicional alguna;

**CUADRAGÉSIMO:** Que, en mérito a la conclusión precedente y a la necesidad de proceder a valorizar las actividades adicionales ejecutadas por la empresa **DEMANDANTE**, es necesario revisar la alegación de la **DEMANDADA** quien ha sostenido que en caso que este Tribunal Arbitral no ampare su posición respecto a que no corresponde efectuar ajuste alguno al monto contratado por tratarse de un contrato "A Suma Alzada", cualquier valorización de las actividades que reclama el **DEMANDANTE** debe efectuarse teniendo en cuenta los trabajos que sí estaban previstos en los Estudios de Factibilidad y que el **DEMANDANTE** no realizó (a lo que denomina "deductivos"), comparativamente con los trabajos que éste diseñó en los Estudios Definitivos y que no estaban previstos en los Estudios de Factibilidad (a los que denomina "adicionales"); a cuyo efecto, la **DEMANDADA** al contestar la demanda, ha presentado un cuadro mediante el cual realiza un balance final de metas, el mismo que se muestra a continuación:

## RESUMEN DEL BALANCE FINAL DE METAS ALCANZADAS

47

| LOCALIDADES | UBICACIÓN | VALORIZACIÓN EN DOLARES AMERICANOS US $ | | |
|---|---|---|---|---|
| | | POR METAS ADICIONALES | POR METAS NO EFECTUADAS | RESULTADO |
| Ayaviri | Anexo 3-D | 38.821 | (19.972) | 18.849 |
| Ilave | Anexo 3-D | 35.700 | (30.959) | 4.743 |
| Sicuani | Anexo 3-D | 26.838 | (26.463) | 374 |
| Tacna | Anexo 3-D | 58.669 | (75.770) | (17.101) |
| Juliaca | Anexo 3-D | 93.995 | (177.753) | (83.759) |
| Puno | Anexo 3-D | 102.108 | (56.172) | 45.936 |
| Cusco | Anexo 3-D | 65.659 | (234.924) | (169.265) |
| TOTAL | | | | (200.222) |

Las cifras no incluyen IGV ni ajustes

**CUADRAGÉSIMO PRIMERO:** Que, dicho cuadro ha sido objeto de análisis en el Informe Pericial Ampliatorio, habiendo expresado el perito designado que utilizando los mismos criterios e índices adoptados por la Entidad **DEMANDADA**, ha efectuado el balance de las metas de ambos Estudios; (entiéndase los de Factibilidad proporcionados por la **DEMANDADA** y los Estudios Definitivos ejecutados por el **DEMANDANTE**), teniendo como resultados las mismas "Metas Adicionales" y "Metas no Efectuadas" que se señalan en los cuadros referidos en la contestación de la demanda; en mérito a lo cual indica que luego de aplicar a ellas los valores que la **DEMANDADA** asigna para las "Metas" así como el balance entre éstos, el resultado coincide con los cuadros citados por la **DEMANDADA**. Posteriormente el Perito en el análisis solicitado por el Tribunal Arbitral, no considera la pretendida valorización del cuadro anterior, por no retratar la realidad, explicando también en su sustentación oral que los resultados de los cálculos numéricos realizados y que resultan coincidentes con los que presenta la **DEMANDADA**, están referidos a obras que corresponden a estudios diferentes; y, que en el caso de las señaladas en los Estudios Definitivos incluyen recursos significativos que no están comprendidos en el cuadro referido, concluyendo por lo expuesto, que el balance y la valorización así presentada, no procede.

**CUADRAGÉSIMO SEGUNDO:** Que, este Tribunal Arbitral coincidiendo con el resultado del Informe Pericial, concluye que no resulta válida la comparación valorativa presentada por la entidad **DEMANDADA** por que no se estaría teniendo en cuenta (I) que el **DEMANDANTE** tuvo que desechar en la mayoría de las ciudades del Grupo 2, las soluciones previstas en los Estudios de Factibilidad, (II) que tuvo que buscar sus propias soluciones que abarcaron incluso no solo una primera etapa sino ir hasta el horizonte final del Proyecto (es decir, que incluyó la Segunda Etapa), (III) que no era obligación del **DEMANDANTE** buscar nuevas

48

soluciones para la Primera Etapa y si consolidar las que determinó el Estudio de Factibilidad, lo que como ha quedado debidamente expuesto en el peritaje, no fue posible (respuesta a la Observación No. 2 al peritaje, por parte del Demandante); **(IV)** que tampoco le correspondía determinar nuevas soluciones para la Segunda Etapa, lo que fue necesario por su vinculación fundamental con las soluciones de la Primera Etapa para un funcionamiento adecuado de los Sistemas hasta el horizonte del Proyecto; **(V)** que la metodología de trabajo establecida por la **DEMANDADA**, comprendía la participación de empresas ajenas al contrato como requisito previo a la aprobación de informes[13]; **(VI)** que la **DEMANDADA** exigió que el **DEMANDANTE** mantenga a todo su personal profesional y técnico hasta la presentación del informe final conforme consta de la Carta SMS 664-99 del 20 de abril de 1999, prueba documental que no se aprecia que la **DEMANDADA** haya tachado o desvirtuado; y, **(VII)** que los Estudios Definitivos debían ser presentados según contrato en 4 informes, lo que posteriormente en virtud de la Tercera Cláusula Adicional se desagregó en 22 informes siendo el correspondiente a la ciudad del Cusco el último que debía presentarse, lo que efectivamente se aprecia de los informes de liquidación practicados por ambas partes, oportunidad hasta la que el consultor **DEMANDANTE** tuvo que mantener a su personal profesional y técnico, según lo exigido por la entidad **DEMANDADA**;

**CUADRAGÉSIMO TERCERO:** Que, a los efectos de la valorización a la que se aboca el Tribunal Arbitral a continuación, es importante tener en cuenta que no es amparable lo expuesto por la Entidad **DEMANDADA** en el sentido que ella no se encontraba obligada a proporcionar la información con que contaban las EPS con quienes mantenía convenios para tal efecto, sino que era responsabilidad de la empresa **DEMANDANTE** conseguir dicha documentación; habida cuenta que el contrato ha sido suscrito entre el Consultor **DEMANDANTE** y la Entidad **DEMANDADA**; de modo que los plazos fijados en éste son vinculantes sólo para las partes, sin que resulte posible derivar responsabilidades a terceros que son ajenos al contrato, máxime si quienes habían suscrito los convenios fueron las EPS y la Entidad **DEMANDADA**, sin intervención de la empresa **DEMANDANTE**;

**CUADRAGÉSIMO CUARTO:** Que, siendo ello así, lo que corresponde es efectuar una valorización que tenga en cuenta básicamente los tiempos y recursos involucrados recogiendo para ello los datos que obran en los documentos contractuales, tales como la propuesta económica del Consultor **DEMANDANTE** el Anexo del propio contrato denominado Presupuesto Consolidado – Detalle de Costos;

---

[13]    En efecto, el perito señala en la pp. 27 de su Informe que entre los factores que afectaron el normal desarrollo de las actividades de la consultora, también se encuentra "la metodología aplicada por el PRONAP en condicionar la aprobación de los informes de los Estudios Definitivos, a la aprobación de los proyectos de suministro eléctrico por las respectivas empresas de servicio, ajenas al contrato, también fue motivo para la extensión de los plazos contractuales (ver correspondencia N° SMS-07-2001 de fecha 11/01/01, anexo X del Informe de Liquidación de la consultora y Oficio N° 010-2000/PRES/VMI/PRONAP/DE/DPED, de fecha 20/01/2000, anexo de la demanda, volumen I-L, documentos adicionales, K.11 aprobación de informes).

49

**CUADRAGÉSIMO QUINTO:** Que, al respecto, cabe mencionar que el Perito explica con detenimiento en su Informe Ampliatorio (pp. 3, 4 y 5) las razones por las que no resulta viable efectuar una valorización en función de lo señalado por la **DEMANDADA** en torno al balance final de metas alcanzadas; criterio que el Tribunal Arbitral hace suyo, cuando éste expresa que las exigencias de la entidad de someter los Informes de los trabajos contratados a la aprobación previa de empresas ajenas al contrato, así como la exigencia de que el Consultor **DEMANDANTE** mantuviese su equipo de profesionales hasta el final de los trabajos y otras que se han señalado en el Informe Pericial, son factores concluyentes para que en su opinión la valorización de los Estudios Definitivos, para ser correcta y la más adecuada, sea la efectuada pericialmente y que presenta en la respuesta al punto 4 de su Informe Pericial solicitado a través de la Resolución N° 28, y el balance correspondiente el que indica en la página 8 de su Informe Pericial Ampliatorio solicitado en la Resolución de N° 64, el mismo que arroja un valor de **US$ 7'713,019.62 incluido IGV.**

**CUADRAGÉSIMO SEXTO:** Que, sin perjuicio de lo expuesto sobre el balance que arroja la ampliación de la Pericia; este Tribunal no puede dejar de reconocer que en el presente caso el **DEMANDANTE** ha circunscrito su pretensión a un monto inferior ascendente a la suma de **US$ 3'557,369.60 incluido IGV y S/. 3'982,950.00 más IGV** por concepto de honorarios profesionales por servicios complementarios a aquellos que fueron materia del contrato.

**CUADRAGÉSIMO SEPTIMO:** Que, en este contexto, el Tribunal Arbitral tampoco puede dejar de reconocer que a través de diversas adendas suscritas por el propio Consultor **DEMANDANTE**, éste renunció expresamente a "mayores gastos" en pacto que le resulta vinculante pese a que de una evaluación de las causas que motivaron dichas ampliaciones de plazo no se aprecia una justificación para tal renuncia[14]; lo cierto es que el consultor estuvo de acuerdo con ello; sin embargo, también es exacto que esta renuncia debe entenderse en función a los conceptos expresados en el contrato, es decir en concordancia con los documentos contractuales y del cual forma parte la propuesta económica del Consultor **DEMANDANTE**, así como del Anexo del contrato "Presupuesto Consolidado – Detalle de Costos", en los que claramente se diferencia el rubro "gastos" del rubro "honorarios", comprendiendo las pretensiones de la **DEMANDANTE** sólo este último rubro.

**CUADRAGÉSIMO OCTAVO:** Que, finalmente, le queda claro al Tribunal Arbitral que la demanda del Consultor **DEMANDANTE** se circunscribe al ámbito del valor de

---

[14]    Según se ha podido apreciar, la Cláusula Adicional del 29 de diciembre de 1997 se motivo es aspectos externos debido a las dificultades propias de fin de año; la Segunda cláusula adicional debido al 21 de abril de 1998 se originó por la falta de entrega en su oportunidad de los Estudios Hidrogeológicos (correspondencia Ferraz 042/98 del 23.02.98) de las zonas de Chusco y Viñani (Tacna), así como por la demora en la entrega del terreno en el caso del pozo de Ayaviri, el atraso de SEDACUSCO para entregar el expediente técnico referido a la línea de impulsión de Piñipampa, entre otros; la Tercera cláusula adicional del 01.09.98 se suscribió por la demora de los estudios hidrogeológicos elaborado por la firma Hidroconcult (correspondencia SMS 679/98 del 07.05.98) de las aguas subterráneas de la ciudad de Tacna, no siendo imputable al Consultor, la Cuarta cláusula adicional se suscribió por factores que se detallan en los propios documentos que la sustentan.

los honorarios de su equipo de técnicos y profesionales, los que por exigencia de la Entidad **DEMANDADA** permanecieron en obra hasta el final de los trabajos adicionales, conforme a lo expuesto anteriormente, hecho que la **DEMANDADA** no ha refutado ni alegado en contrario, pues ha basado su defensa en la alegación de que el presente era un Contrato A Suma Alzada, lo que ha quedado debidamente desvirtuado en las Consideraciones precedentes;

**CUADRAGÉSIMO NOVENO:** Que, en razón de lo expuesto, la valorización de los trabajos adicionales se efectúa, asumiendo parcialmente el criterio habilitado por el Perito, al que se deducen los importes renunciados por la empresa **DEMANDANTE**, en los importes siguientes:

Los gastos generales que constan del balance realizado por el perito, que utilizó en su cálculo los valores del presupuesto consolidado ascienden a: S/. 2'809,056,67 más IGV, más US$. 76,457.14 más IGV

Equivalentes en dólares americanos, a:          **US$. 1'343,833,14 (Inc. IGV)** [15]

Para los efectos del pronunciamiento del Tribunal este valor debe de ser deducido del valor del balance realizado por el perito que es de:
                                                 **US$ 7'713,019.62 (Inc. IGV);**

Resultando como valor final del balance deducido el valor correspondiente a los gastos generales antes mencionados, ítem al que el **DEMANDANTE** renunció:

                                                 **US$ 6'369,136.48 (Inc. IGV).**

El valor de la Demanda corresponde a:           **US$  3'557,369.60 (Inc. IGV).más**
                                                 **S/.   3'982,950.00 más IGV**

Equivalentes en dólares americanos a:           **US$  5'063,780.34 (Inc. IGV);** monto menor al balance determinado por el Perito, deducido el correspondiente a los gastos generales a los que el **DEMANDANTE** renunció expresamente.

**QUINCUAGÉSIMO:** Que, como resultado del análisis precedente, el Tribunal Arbitral concluye que el valor pretendido por el **DEMANDANTE** por concepto de honorarios profesionales por servicios complementarios que han sido desarrollados y su forma de cálculo, no ha sido cuestionado específicamente por la **DEMANDADA**; toda vez que su defensa ha versado esencialmente respecto a la inexistencia de una obligación a su cargo de reconocer suma alguna por haber suscrito un contrato "a Suma Alzada", y que en todo caso cualquier valorización debería efectuarse en base a los criterios de "Metas" que conforme se ha expuesto precedentemente, no resulta pertinente amparar por las razones ya expresadas;

**QUINCUAGÉSIMO PRIMERO:** Teniendo en cuenta el marco conceptual y el análisis contenido en las consideraciones expuestas precedentemente, el Tribunal Arbitral,

---
[15]     Utilizándose para ello la tasa de cambio oficial de fecha 18.09.97:  1 US$. = S/. 2.644

procede a continuación a exponer los fundamentos de su decisión respecto a cada uno de los puntos controvertidos:

**QUINCUAGÉSIMO SEGUNDO:** Que, respecto al primer punto controvertido, el Tribunal Arbitral estima procedente aprobar el valor de los honorarios profesionales por servicios complementarios prestados por el **DEMANDANTE** y que deben ser pagados por la **DEMANDADA** en la suma de US$ 3'557,369.60 (Tres millones quinientos cincuenta y siete mil trescientos sesenta y nueve y 60/100 dólares americanos) incluido IGV y S/. 3'982,950.00 (Tres millones novecientos ochenta y dos mil novecientos cincuenta con 00/100 Nuevos Soles) más IGV por concepto de honorarios profesionales por los servicios complementarios a aquellos que fueron materia del contrato;

**QUINCUAGÉSIMO TERCERO:** Que, en lo relativo al segundo punto controvertido, el Tribunal Arbitral, teniendo en cuenta que conforme a la Cláusula Cuarta numeral 01 del contrato suscrito entre las partes, los montos fijados en Nuevos Soles deben ser actualizados en función al Índice de Precios al Consumidor de Lima Metropolitana con relación a precios del 18 de Septiembre de 1997, y habiéndose determinado en el punto controvertido anterior que la **DEMANDANTE** tiene derecho a un pago en Nuevos Soles, estima procedente declarar fundado el pedido formulado.

Para estos efectos debe tenerse en cuenta que para hallar el Factor de Actualización a través de los números Índices de los Precios al Consumidor para Lima Metropolitana, se divide el número Índice Promedio Mensual al cierre del período a liquidarse (31.12..2004)[16] entre el número Índice Promedio Mensual del mes inicial del periodo a liquidar (setiembre de 1997). El factor obtenido se multiplica por el capital y el resultado es el monto actualizado.

En consecuencia, recogiendo los Índices que han sido publicados para los referidos meses por el Instituto Nacional de Estadística e Informática (INEI), según se aprecia de la página web de dicho organismo público, se tiene lo siguiente:

$$\frac{IPC\ 31.DIC.04}{IPC\ 30.SET.97} = \frac{107.658867}{87.026541} = 1.237081$$

**Actualización:**          S/. 3,982,950.00 x 1.237081 = S/. 4, 927,231.76

**Capital Actualizado:**                                S/. 4, 927,231.76

**Diferencia con el capital inicial:**

S/. 4, 927,231.76 – S/. 3,982,950 =          **S/. 944,281.76 más IGV**

Por tanto, este Tribunal considera que se debe reconocer al **DEMANDANTE** la suma de S/. 944,281.76 (Novecientos cuarenta y cuatro mil, doscientos ochenta y uno

---

[16]     El Tribunal Arbitral a efectos de poder determinar la actualización y posteriormente la liquidación de intereses ha adoptado como fecha de corte para sus cálculos el 31 de diciembre del 2004

52

76/100 Nuevos Soles), más IGV, como consecuencia de la actualización al 31 de diciembre del 2004.

**QUINCUAGÉSIMO CUARTO:** Que, en lo que respecta al tercer punto controvertido, esto es, "determinar si procede reconocer a favor de la **DEMANDANTE**, el pago de los intereses devengados por las sumas demandadas en el primer punto controvertido, desde la fecha en se originó la obligación de su abono, hasta la fecha real de pago, determinándose si procede tomar en cuenta la tasa de interés bancaria máxima para operaciones comerciales establecida por el Banco Central de Reserva del Perú"; el Tribunal Arbitral considera que su análisis debe comprender (i) si corresponde o no el reconocimiento de intereses, y de ser así, determinar desde qué fecha, y (ii) determinar la forma de calculo y el monto de los mencionados intereses.

Así, respecto del primer aspecto a analizar, el Tribunal Arbitral llega a la consideración que al haberse declarado fundado el primer punto controvertido, esto es el derecho del **DEMANDANTE** a recibir el pago de los honorarios por servicios complementarios que se ha reclamado, también procede el reconocimiento de intereses por su no pago oportuno, debiendo generarse los mismos desde el momento de presentación de su demanda, esto es a partir del 25 de julio del 2002; toda vez que a esa fecha recién fue requerida la **DEMANDADA** para efectuar el pago.

Con relación al segundo aspecto a analizar, éste Tribunal Arbitral aprecia de las pruebas actuadas y en especial del Peritaje Contable practicado, que se ha expuesto de manera concluyente la forma en que corresponden determinarse los intereses conforme al criterio expuesto en el artículo 94 del REGAC.

Sobre este extremo, es de tener en cuenta que el artículo 94 del REGAC establece textualmente:

> "En el caso que la entidad consultante no cumpliese con efectuar la devolución de los fondos retenidos dentro del plazo señalado en el artículo 93 de este reglamento, el consultor tendrá derecho al pago de intereses y comisiones iguales a las máximas que establezca el Banco Central de Reserva del Perú para los préstamos bajo cualquier modalidad que realicen los Bancos Comerciales".

Por su parte el artículo 93 establece que:

> "La entidad consultante, concluido el servicio, practicará la liquidación final del contrato debiendo proceder a la devolución de los saldos y garantías retenidos que corresponden al consultor a más tardar sesenta días calendario después de la conclusión".

En este contexto el Tribunal concluye que siendo el presente proceso uno de conciencia, debe entenderse por ser equitativo, que lo que busca el artículo 94 (al

53

igual que el 104 del mismo cuerpo normativo)[17] es resarcir a la parte afectada, en este caso al **DEMANDANTE** por la suma que al no habérsele pagado oportunamente le quedó retenida y/o adeudada; supuestos ante los cuales la entidad **DEMANDADA** está obligada a reconocer los intereses y comisiones iguales a las máximas tasas establecidas por el Banco Central de Reserva del Perú para los préstamos bajo cualquier modalidad que realicen los Bancos Comerciales.

Sobre el particular, conforme se explica en el informe pericial realizado por el Sr. CPC Félix Aquije Soler, a la fecha el Banco Central de Reserva del Perú ya no fija las tasas máximas de intereses para préstamos bajo cualquier modalidad que realicen los Bancos Comerciales, ello no significa que no existan este tipo de tasas de interés, las que ahora las determina el mercado bajo la denominación de TAMN y TAMEX.

Siendo ello así, éste Tribunal considera que procede reconocer la tasa de interés TAMN y TAMEX que por disposición del BCR publica la Superintendencia de Banca y Seguros en el Diario Oficial "El Peruano" bajo el título de "Tasas de Interés Promedio por Tipo de Crédito Realizadas en los últimos 30 días útiles" referidas a las operaciones de préstamos en sobregiros otorgados por Bancos Comerciales, desde la fecha de presentación de la demanda, cuyo cálculo deberá efectuarse en ejecución de Laudo.

**QUINCUAGÉSIMO QUINTO:** Que, respecto al cuarto punto controvertido, el Tribunal Arbitral es de opinión que si bien como se ha analizado en los puntos precedentes, la extensión del plazo del contrato suscrito más allá del inicialmente fijado ha obedecido esencialmente a razones que escapan al **DEMANDANTE**; al reconocerse vía el presente Laudo el derecho de éste a obtener una compensación por los servicios brindados hasta la presentación de su último informe, no corresponde efectuar ningún pago por concepto de gastos y comisiones bancarias por el mantenimiento de las cartas fianzas emitidas; en consecuencia, la presente pretensión debe declararse infundada;

**QUINCUAGÉSIMO SEXTO:** Que, en lo que respecta al quinto punto controvertido, el Tribunal Arbitral luego de haber revisado la liquidación del contrato efectuada por la **DEMANDADA** así como aquella efectuada por el **DEMANDANTE**, observa que la única diferencia existente esta relacionada con el pago de los honorarios

---

[17]    Artículo 104.- "A partir del vencimiento del plazo del pago establecido en el artículo 103 de este Reglamento, el consultor tendrá derecho a percibir intereses y comisiones iguales, a las máximas que establezca el Banco Central de Reserva del Perú, para los préstamos bajo cualquier modalidad que realicen los Bancos Comerciales. El pago de estos intereses y comisiones se efectuará en las facturaciones siguientes".

Artículo 103.- "La fecha máxima de aprobación de las facturaciones presentadas por el consultor a la entidad consultante, será a los ocho días calendario de presentada la factura respectiva. Si no es aprobada dentro de este plazo se tendrá por aprobada.

Las facturas por concepto de contrato principal, reajustes por alzas adicionales u otros, serán cancelados en el plazo de treinta días calendario contados desde la fecha en que la factura quede aprobada".

demandados por servicios complementarios y demás a que se refiere el presente arbitraje, por lo que al haberse declarado fundado lo solicitado por el **DEMANDANTE** según se ha dispuesto en los puntos controvertidos anteriores, y siendo que la liquidación de contrato aprobada por la **DEMANDADA** a través de la Resolución Directoral Nº 223-2001/PRES/VMI/PRONAP/DE no considera los importes aquí aprobados, debe dejarse sin efecto dicha liquidación, la que resulta no oponible a la **DEMANDANTE**, debiendo proceder al pago de los importes que ordena el presente Laudo Arbitral; sin perjuicio de incorporar éstos en la liquidación final de contrato que oportunamente se practique.

Estando a las consideraciones precedentes, el Tribunal Arbitral de conformidad con la Ley General de Arbitraje; Lauda por mayoría, con el voto singular del Ing. Héctor Becerra Martínez; que se adjunta:

<u>**LAUDO:**</u>

1  **Respecto a la primera pretensión:** Determinar si procede reconocer a favor de la **DEMANDANTE** el pago de la suma de U.S. $ 3'557,369.60 (Tres millones quinientos cincuenta y siete mil trescientos sesenta y nueve y 60/100 Dólares Americanos), incluido I.G.V; y, la suma de S/. 3'982,950.00 (Tres millones novecientos ochenta y dos mil novecientos cincuenta y 00/100 Nuevos Soles), mas I.G.V., por concepto de honorarios profesionales por servicios complementarios a aquellos que fueron materia del contrato.
    **Declarando Fundada la demanda; en consecuencia ordena que la Entidad DEMANDADA pague a favor de la empresa DEMANDANTE la suma de U.S. $ 3'557,369.60 (Tres millones quinientos cincuenta y siete mil trescientos sesenta y nueve y 60/100 Dólares Americanos), incluido I.G.V; y, la suma de S/. 3'982,950.00 (Tres millones novecientos ochenta y dos mil novecientos cincuenta con 00/100 Nuevos Soles) más IGV, por concepto de honorarios profesionales por servicios complementarios a aquellos que fueron materia del contrato.**

2  **Respecto a la segunda pretensión:** Determinar si procede reconocer a favor de la **DEMANDANTE**, la actualización de la suma de S/. 3'982,950.00 (Tres millones novecientos ochenta y dos mil novecientos cincuenta y 00/100 Nuevos Soles), mas I.G.V., de acuerdo con la Cláusula Cuarta, numeral 01 del contrato suscrito entre las partes; y, si procede tomar como base el Índice de Precios al Consumidor para Lima Metropolitana, determinándose entre qué fechas corresponde su aplicación.
    **Declarando fundada la demanda; en consecuencia ordena que la DEMANDADA pague a favor de la DEMANDANTE, el valor de S/. 944,281.76 (novecientos cuarenta y cuatro mil doscientos ochenta y uno y 76/100 Nuevos Soles) más IGV, como consecuencia de la actualización al 31 de diciembre del 2004, de la suma de S/. 3'982,950.00 (Tres millones novecientos ochenta y dos mil novecientos cincuenta con**

00/100 Nuevos Soles) más IGV, conforme a lo indicando el quincuagésimo tercer considerando.

3  **Respecto a la tercera pretensión:** Determinar si procede reconocer a favor de la **DEMANDANTE**, el pago de los intereses devengados por las sumas demandadas en el primer punto controvertido precedente, desde la fecha en que se originó la obligación de su abono, hasta la fecha real de pago, determinándose si procede tomar en cuenta la tasa de interés bancaria máxima para operaciones comerciales establecida por el Banco Central de Reserva.

**Declarando fundada la demanda; en consecuencia ordena que la DEMANDADA pague a favor del DEMANDANTE los intereses correspondientes a la tasa TAM para moneda nacional; y, TAMEX para moneda extranjera, los que deberán ser calculados en ejecución de Laudo, desde el 25 de Julio del 2002, hasta la fecha real de pago, cálculo que deberá efectuarse sobre los montos establecidos en el primer punto resolutivo del presente Laudo, aplicando la metodología de cálculo indicada en la pericia contable elaborada por el CPC Félix Aquije Soler, obrante en autos.**

4  **Respecto a la cuarta pretensión:** Determinar si procede reconocer a favor de la **DEMANDANTE** el pago de la suma de US $ 15,628.05 (Quince mil seiscientos veintiocho y 05/100 Dólares Americanos); y, la suma de S/. 134,388.92 (Ciento treinta y cuatro mil trescientos ochenta y ocho y 92/100 Nuevos Soles), por concepto de gastos y comisiones bancarias por el mantenimiento de las cartas fianza, a partir de la fecha en que venció el contrato.

**Declarando infundada la demanda y el pedido del DEMANDANTE para que se le reconozca la suma de US $ 15,628.05 (Quince mil seiscientos veintiocho con 05/100 Dólares Americanos); y, la suma de S/. 134,388.92 (Ciento treinta y cuatro mil trescientos ochenta y ocho con 92/100 Nuevos Soles), por concepto de gastos y comisiones bancarias por el mantenimiento de las cartas fianza a partir de la fecha en que venció el contrato.**

5  **Respecto a la quinta pretensión:** Determinar la eficacia o ineficacia de la Resolución Directoral N° 233-2001/PRES/VMI/PRONAP/DE de fecha 10 de Octubre del 2001, emitida por la Dirección Ejecutiva del PRONAP, aprobando la liquidación del contrato.

**Declarando dejar sin efecto la liquidación aprobada con la Resolución Directoral N° 233-2001/PRES/VMI/PRONAP/DE de fecha 10 de Octubre del 2001, emitida por la Dirección Ejecutiva del PRONAP; acto administrativo que también pierde sus efectos, disponiendo DISPONIENDO que la DEMANDADA apruebe una nueva liquidación que a diferencia de la contenida en la citada Resolución Directoral, incorpore únicamente como punto adicional, los montos establecidos en los puntos precedentes de la parte resolutiva del presente Laudo, sin perjuicio del pago que se le ha ordenado efectuar.**

56



6.  No habiéndose amparado en su totalidad las pretensiones demandadas; y, habiendo tenido la DEMANDADA suficientes motivos para litigar, se dispone que cada parte asuma en proporciones iguales, los gastos (costas y costos) originados en el presente arbitraje.

7.  Disponer que la entidad DEMANDADA reintegre a la DEMANDANTE, la suma de U.S.$ 10,500.00 (Diez mil quinientos Dólares Americanos) correspondiente a los honorarios de los Árbitros y los gastos administrativos y secretariales que fueran asumidos por ésta, en defecto de aquella.

Víctor Palomino Ramírez
Presidente
CERTIFICACION NOTARIAL AL DORSO

Álvaro González Peláez
Árbitro

Luís Ubillas Ramírez
Secretario

57

Republic of Peru              )
Province and City of Lima     )   ss:
Embassy of the                )
United States of America      )


I certify that the official named below, whose true
signature and official seal are, respectively, subscribed
and affixed to the annexed document, was, on this day,
empowered to act in the official capacity designated in
the annexed document, to which faith and credit are due:

**MARIBEL DEL ROSARIO LUYO JAVIER**

This Embassy assumes no responsibility for the contents of
the attached document.

**Lee A. Belland**
**VICE-CONSUL**
**U.S. EMBASSY, LIMA**

October 3, 2007
(Date)

Hector Becerra Martinez

FUNDAMENTOS DE CONCIENCIA DEL ARBITRO ING HECTOR BECERRA
MARTINEZ PARA PRONUNCIARSE Y VOTAR EN DISCORDIA SOBRE LOS
PUNTOS CONTROVERTIDOS EN EL PROCESO ARBITRAL FIGUEIREDO
FERRAZ CONSULTORIA E ENGENIERIA DE PROJETO LTDA Y EL
PROGRAMA DE APOYO A LA REFORMA DEL SECTOR SANEAMIENTO
(PARSSA)

I    **Hechos**

El árbitro que suscribe coincide con la relación de hechos de la parte expositiva
del Laudo.

II    **Fundamentos para Mejor Resolver**

Con la finalidad de formar un criterio de conciencia este árbitro fundamenta su
análisis para pronunciarse sobre los puntos controvertidos, en lo pertinente y
que sea de aplicación a:

-    las condiciones contractuales pactadas entre las partes;
-    el alcance y metodología para el desarrollo de los servicios
-    la naturaleza del servicio motivo del contratos;
-    la asignación de los recursos y costos de los servicios; y
-    el desarrollo del trabajo contratado.

Ambas partes, Figueiredo Ferraz Consultoria e Engenieria de Projeto Ltda, en
adelante como la Demandante (FF), y el Programa de Apoyo a la Reforma del
Sector Saneamiento- PAARSA (ex - Proyecto Especial - Programa Nacional de
Agua Potable y Alcantarillado), en adelante como el Demandado (Pronap); con
respecto a los puntos materia de la controversia, a lo largo del proceso arbitral,
han establecido en sus escritos, sus posiciones y puntos de vista, exponiendo
ante los miembros del Tribunal Arbitral sus correspondientes alegatos.

Para el presente análisis, este árbitro ha tomado debidamente en cuenta lo
manifestado por las partes en sus escritos y considerado los resultados de las
pruebas periciales llevadas a cabo como parte del proceso.

Fundamentos para Pronunciarse  Puntos Controvertidos
Arbitro: Ing. Héctor Becerra Martinez

1

Héctor Becerra Martínez

## II.1    De las condiciones contractuales pactadas entre las partes

El Contrato entre partes que se firma el 12 de noviembre de 1998, esta regulado por el Reglamento General de Actividades de Consultoría (REGAC),en lo que no se oponga a las condiciones dispuestas en el Contrato de Préstamo N° 847/OC-PE y sus anexos, suscrito entre el Gobierno Peruano y el Banco Interamericano de Desarrollo (BID).

El Contrato en su Cláusula Primera establece que la Demandante (FF) asume la responsabilidad técnica de velar por el fiel cumplimiento del contrato suscrito con el Pronap y da por establecido que se obliga a respetar los correspondientes términos de referencia y bases del concurso formuladas por el Pronap, que cuentan con la conformidad del BID.

El Objeto del Contrato según su Cláusula Segunda, compromete los servicios de la Demandante (FF) para elaborar los Estudios Definitivos de la Primera Etapa de Inversión de los Planes de Expansión de Mínimo Costo de los Servicios de Agua Potable y Alcantarillado de las localidades de Tacna, Juliaca, Puno, Ayaviri, Ilave, Cuzco y Sicuani. Deja establecido que esta labor la desarrollará la Demandante de acuerdo a los Términos de Referencia, Propuestas Técnica y Económica Negociada, así como a los acuerdos adoptados por las partes en documentos complementarios.

El Contrato según su Cláusula Tercera, fija el plazo de ejecución de los servicios en 315 días naturales y establece su vigencia por 390 días naturales. Asimismo establece que cualquier ampliación autorizada del periodo de ejecución de los servicios que prorrogue la vigencia del contrato deberá contar con la no objeción o conformidad del BID.

Héctor Becerra Martínez

El Contrato según su Cláusula Cuarta se pacta a Suma Alzada en Nuevos Soles (S/.) 8, 677,750.00 y Dólares Americanos (US $) 984,720.00 más Gastos Reembolsables que reconocen un monto referencial de S/.384,000.00, por conceptos tipificados. Los montos en Nuevos Soles son actualizables aplicando el IPC de Lima Metropolitana. El IGV esta considerado aparte. El Contrato señala que esos montos cubren íntegramente los servicios que debe brindar la Demandante (FF), en su calidad de Consultor, de acuerdo a lo establecido en sus propuestas técnica y económica negociada, la estructura de costos establecida en las bases, así como a los acuerdos adoptados por las partes en el periodo de negociación y lo solicitado en los términos de referencia.

Como parte de las obligaciones de la Demandante por el Contrato, de acuerdo a su Cláusula Quinta, cabe señalar que asume total responsabilidad por el cumplimiento del contrato y sus partes integrantes; por la instalación de oficinas previstas en sus propuestas técnica y económica negociada, y por la permanencia en ellas del personal correspondiente durante la duración de los servicios, en las diferentes localidades y según lo programado, debiendo justificar cualquier cambio en su equipo de profesionales.

Como parte de las obligaciones que asume el Demandado por el Contrato, de acuerdo a su Cláusula Quinta, cabe señalar que se reserva el derecho de objetar aquellos trabajos que se efectúen por el contrato, que eventualmente considere que son defectuosos. Considerando como trabajos defectuosos aquellos no ejecutados de acuerdo con los términos de referencia, que sean incompletos y deficientes o que no cumplan los objetivos previstos.

Por estas mismas obligaciones el Demandado (Pronap) se obliga a proporcionar a la Demandante (FF) los documentos e informes previos disponibles en las empresas (EPS) a cargo de los servicios de agua potable y alcantarillado en las localidades.

Fundamentos para Pronunciarse Puntos Controvertidos
Arbitro: Ing. Héctor Becerra Martínez

3

Héctor Becerra Martínez

Para esas obligaciones del Pronap en el contrato se señala que las recomendaciones en los documentos e informes previos serán solo referenciales para los fines de la labor que debe desarrollar el Consultor (FF). Remarcando específicamente que en el caso de los Estudios de Factibilidad de los Planes de Expansión de Mínimo Costo que han sido aprobados por el Pronap, con la no objeción del BID, éstos se tomarán como base para el desarrollo de los diseños definitivos.

En relación a las garantías y penalidades a que se sujeta la Demandante (FF) por el contrato, de acuerdo a su Cláusula Sexta, estas se ciñen mayormente a lo estipulado en el REGAC que en este caso señala entre otras, que el Consultor (FF), por ningún motivo puede eximirse de realizar los servicios contratados, a excepción de lo estipulado en el Artículo 105 del REGAC.

Respecto de la conclusión del contrato, de acuerdo a su Cláusula Séptima, establece que concluirá cuando el Consultor (FF) haga entrega del informe final de actividades de consultoría y se culmine con la liquidación del mismo. Así mismo expresamente establece que las opiniones y recomendaciones del Consultor (FF) no obligan al Pronap ni al BID, los que se reservan el derecho de formular las observaciones o salvedades que consideren apropiadas.

De acuerdo a la Cláusula Décima, forman parte integrante del contrato:

- Contenido de los Informes
- Las Bases y sus anexos
- Términos de Referencia y sus anexos
- Propuesta Técnica
- Propuesta Económica Negociada
- Nomina de personal profesional asignado al estudio.

Todos documentos listados ,que han estado a disposición de los miembros del Tribunal, han sido analizados por este árbitro, en lo que consideró pertinente a los puntos de la controversia.

Fundamentos para Pronunciarse Puntos Controvertidos
Arbitro: Ing. Héctor Becerra Martínez

4

Héctor Becerra Martínez

Cabe señalar que con respecto al contenido de los informes, en el Anexo 1 del contrato, se especifican los siguientes:

- Primer Informe, abarcando programación de actividades y Plan de Trabajo a través de Diagrama PERT-CPM y GANTT. Consolidación de la solución propuesta y replanteo de los sistemas de agua potable y alcantarillado existente en las localidades.
- Segundo Informe, abarcando trabajos de campo, topografía, mecánica de suelos y análisis de laboratorio.
- Tercer Informe: Proyecto Básico
- Informe Final: Estudios Definitivos Completos

En este Anexo 1, se distingue que por el contenido de los informes, el marco del contrato generaliza los servicios requeridos en las localidades como si éstas fueran un conjunto integrado e indivisible, globalizando inclusive para una misma fecha el cronograma de presentaciones secuencial de los grupos de informes.

Durante el desarrollo de los servicios las partes de mutuo acuerdo suscribieron siete cláusulas adicionales al Contrato (una sin numerar y seis numeradas).

Cláusula Adicional (s/n) del 29.12.1997: modifica el contrato original al introducir al numeral 04 en la Cláusula Sexta, precisiones que se refieren a reducir la multa por demora en la entrega de los informes de 2 a 1.5/10,000 y a relacionar esta multa al monto que le corresponde a cada informe parcial, envés del monto contractual actualizado.

Primera Cláusula Adicional del 19.01.1998: modifica los numerales 01 y 03 en la Cláusula Tercera y Anexo1; relacionando a partir de la vigencia del contrato la fecha de entrega de los informes. Por esta cláusula adicional se modifica asimismo el numeral 1 de la Cláusula Cuarta, introduciendo precisiones en los porcentajes de los pagos, sobre la entrega de los informes.

Héctor Becerra Martínez

Segunda Cláusula Adicional del 21.04.98: modifica los numerales 01 y 03 de la Cláusula Tercera incrementando el plazo de entrega de Primer Informe de 68 a 106 días naturales y del Segundo Informe, de 98 a 116 días naturales. También reprograma la Consolidación de Soluciones de las localidades de Cuzco, Sicuani, Tacna, Juliaca y Puno, para que se presenten en el Primer Informe y las correspondientes a Ayaviri e Ilave para que se presenten en el Segundo Informe. Las partes dejan expresamente establecido que el plazo de ejecución y la entrega del Informe Final permanecen invariables, en 323 días naturales.

Tercera Cláusula Adicional del 01.09.98: nuevamente modifica los numerales 01 y 03 de la Cláusula Tercera incrementando los plazos de entrega de los informes En esta cláusula adicional las partes introducen el concepto de informes por etapa de desarrollo y por localidades, así por esta cláusula la integración acordada originalmente en el cronograma para la entrega de los grupos de informes, se desagrega en 17 Informes Iniciales y 5 Informes Finales, todos con sus correspondientes pagos relacionados como un porcentaje sobre el monto contractual. El plazo de ejecución del contrato pasa de 323 a 446 días naturales y se establece que este mayor plazo no irroga gasto alguno al Pronap por ningún concepto.

Cuarta Cláusula Adicional del 22.09.98: modifica el numeral II de la tercera cláusula adicional, introduciendo el concepto de informes de proyecto básico y finales reagrupados siempre por localidades, los que originalmente abarcaban todas las localidades. Modifica los plazos de entrega de los informes de proyecto básico establecido en la tercera cláusula original y mantiene el plazo final del contrato en 446 días naturales y su vigencia se extiende hasta 521 días naturales.

En esta Cuarta Cláusula Adicional, las partes nuevamente a manera de aceptación dejan constancia, que ninguna de las modificaciones por esta cláusula originará el reconocimiento a FF por parte del Pronap, de mayores gastos por ningún concepto.

Hector Becerra Martinez

Quinta Cláusula Adicional del 04.11.99: acuerda dejar abierto el plazo de ejecución de la Cláusula Tercera (03 y 04) hasta que la Demandante (FF) culmine sus servicios, no requiriendo la previa conformidad del BID y respecto de la Cláusula Séptima deja establecido que el contrato concluirá cuando el Consultor (FF) haga entrega del último informe final  y las partes liquiden el contrato a la no objeción del BID del último informe final.

Sexta Cláusula Adicional del 15.05.2001: las partes reafirman los montos originales en Nuevos Soles y en Dólares Americanos y por esta cláusula adicional acuerdan incrementar solo el monto correspondiente a los gastos reembolsables hasta S/. 435,581.57

## II.2    Sobre el alcance y metodología de los servicios contratados

Los Términos de Referencia, sirvieron a la Demandante (FF)  así como a los otros postores que intervinieron en el concurso de meritos convocado por el Pronap, para la elaboración de sus propuestas técnicas y económicas. Esos Términos de Referencia[1] establecen claramente el alcance de los servicios por contratar y no dejan lugar a duda sobre la amplitud, tipo de servicios y metodología de entrega de los informes que se requieren como producto de los servicios que son materia del contrato.

Se señala que en la metodología de trabajo los términos de referencia propusieron que los servicios se desarrollen enmarcados en etapas que culminen en los siguientes cuatro grupos de informes que constituyen finalmente el producto del servicio contratado N° Consolidación de la Solución Propuesta y Replanteo Sistemas Existentes. Estudios Hidrogeológicos; N° 2: Servicios de Campo. N° 3: Proyecto Básico. N° 4: Proyecto Final.

---

[1] Se aprecia que estos términos de referencia, salvo contadas precisiones, son generales y podrían ser de aplicación para  cualquier servicio que se hubiera deseado contratar con el objetivo de desarrollar estudios definitivos y expedientes técnicos de ejecución de obras para sistemas de agua potable y alcantarillado de localidades con poblaciones intermedias.

Hector Becerra Martinez

Los términos de referencia dentro de sus generalidades sobre el alcance de los estudios, establecen como requerimiento revisar la ingeniería básica del estudio de factibilidad para la alternativa recomendada (se entiende, en dicho estudio de factibilidad. Asimismo estos términos de referencia establecen para la entrega de los trabajos y con respecto al Informe N° 3, que se refiere al Proyecto Básico, que éste sea desarrollado a partir del ajuste necesario a los Estudios de Factibilidad[2] y de los resultados de los servicios de campo.

Para las 7 localidades, Tacna, Juliaca, Puno, Ayaviri, Ilave, Cuzco y Sicuani, que en este caso se integraron como un conjunto para efectos del contrato, Pronap encargó en una etapa previa de su programa de inversiones, la realización de estudios de factibilidad a tres diferentes compañías consultoras internacionales de ganado prestigio a nivel mundial y con una amplia y reconocida experiencia en el desarrollo de este tipo de estudios.

La aprobación por parte del Pronap de los estudios de factibilidad que realizaron esas compañías consultoras y que sirvieron de base a los estudios definitivos a cargo de la Demandante (FF); mereció la no objeción por parte de los funcionarios del BID.

La Demandante (FF), argumenta que el Pronap desde un principio tenía entendido que los estudios de factibilidad, que son documentos básicos para la elaboración de los estudios definitivos, necesitaban ser revisados,

---

[2] Es práctica usual en los trabajos de ingeniería, que el alcance y profundidad de un trabajo a realizar a nivel de estudio definitivo se apoye en gran parte en los esquemas de obras de abastecimiento y distribución de agua potable y de recolección y disposición de aguas servidas, que están definidos y planteados por los estudios de factibilidad; sobre todo cuando estos son de reciente realización, como lo fue en este caso. Sobre este aspecto procede precisar que es correcto considerar que para desarrollar propiamente estudios definitivos es menester que los estudios de factibilidad propongan esquemas de obras bastante definidos que no estén sujetos a cambios sustanciales producto de datos o informaciones que se obtengan con posterioridad, durante la realización de los estudios definitivos.

Héctor Becerra Martínez

Sin embargo aduce que por la metodología impuesta por el contrato para la ejecución de los trabajos, esta revisión solamente se hizo posible después de culminados los Proyectos Básicos que correspondían a la etapa cubierta por el Informe N° 3 y no en la etapa cubierta por el Informe N° 1 que correspondía a Consolidación de las Soluciones Propuestas y Replanteo de los Sistemas Existentes, tal como era lo previsto en los términos de referencia y por ende en el contrato.

La Demandante (FF), también aduce que las deficiencias de los estudios de factibilidad las fue apreciando durante el desarrollo de los trabajos cuando fue verificando que la mayor parte de las soluciones propuestas para los esquemas de obras en esos estudios, no eran factibles de ser consolidadas y por esa razón tuvo que ejecutar servicios complementarios no previstos para el planteamiento de las nuevas soluciones que fueron finalmente las desarrolladas a nivel de los estudios definitivos.

Sobre su imposibilidad de poder cumplir con el requerimiento contractual de consolidar en la etapa 1, al inicio de los trabajos, las soluciones planteadas a nivel de los estudios de factibilidad, la Demandante (FF) argumenta, entre otras, las siguientes causales:

- La ejecución de los estudios definitivos fue desarrollada sin que pudiera concluir con cada una de las etapas previas previstas, antes de dar inicio a la etapa siguiente;
- La mala calidad de los estudios de factibilidad, la fue constatando a medida que desarrollaba las etapas iniciales de los estudios definitivos;
- La indefinición de las fuentes de agua, la casi inexistencia de catastros de los sistemas existentes y la dificultad para definir la confiabilidad de los servicios de campo a ser ejecutados; y
- La falta de un reconocimiento oportuno por parte del Pronap, de las deficiencias de los estudios de factibilidad que se iban constatando.

Héctor Becerra Martínez

La Demandante (FF), admite que tuvo dificultades en la toma de las decisiones necesarias para el avance de las actividades, durante el desarrollo de los trabajos; debido principalmente; a:

- La necesidad de cumplir con los plazos contractuales.
- Las imprecisiones generadas por las discrepancias que se iban incrementando con relación a las soluciones planteadas en los estudios de factibilidad.
- La necesidad de contratar y dar inicio a los servicios de campo en aquellos lugares que los estudios de factibilidad presumían su necesidad, con riesgo de perder esos trabajos; lo que finalmente terminó por ocurrir cuando las soluciones propuestas no fueron confirmadas en las etapas de consolidación de soluciones planteadas y posteriores.

La Demandante (FF), a lo largo de sus argumentos y alegatos en este proceso arbitral aduce en sus varios enfoques, que siempre aceptó en base al principio primigenio de la buena fe contractual, que los documentos conformados por los estudios de factibilidad tuviesen la suficiente consistencia para ser base de desarrollo de los estudios definitivos y para determinar los recursos de consultoría y tiempos de profesionales a ser empleados en la consecución de los estudios finalmente contratados.

Finalmente la Demandante (FF), manifiesta que intentó sin resultados convencer al Pronap, de la necesidad de ordenar en forma diferente y adecuada la secuencia de actividades de ejecución de los estudios definitivos comprendidos en los informes previstos contractualmente.

También manifiesta que estos cambios propuestos en el alcance de los informes y desarrollo de las actividades, de haber sido autorizados por el Pronap en una etapa más temprana de los estudios definitivos, habrían posibilitado a la Demandante (FF), reordenar el planeamiento de sus trabajos y reubicar a sus profesionales y asignarles el tiempo de participación correcto..

Fundamentos para Pronunciarse Puntos Controvertidos
Arbitro. Ing. Héctor Becerra Martínez

10

Héctor Becerra Martínez

Miraflores
Teléfs.: 4464582
4468717 - 4460373
4460239

### II.3   De la naturaleza del servicio contratado

Los estudios definitivos y expedientes técnicos de ejecución de obra contratados por las partes, se refieren a componentes de obras de:

- Captación de fuentes de agua, conducciones para abastecimiento de agua, tratamientos para potabilización de agua y sistemas de distribución de agua potable;

- Redes de recolección de aguas servidas, tratamiento de aguas servidas y sistemas de disposición final de efluentes.

La finalidad de esas obras, cuyos diseños definitivos llevó a cabo el Consultor (FF) y que fueron objeto de su contrato con el Pronap, fue mejorar, ampliar y rehabilitar los sistemas existentes y operativos de abastecimiento de agua potable y alcantarillado sanitario en las localidades, de Tacna, Juliaca, Puno, Ayaviri, Ilave, Cuzco y Sicuani.

Por consiguiente cuando en el contrato se trata de las soluciones planteadas o seleccionadas, éstas se refieren a soluciones de mejora o ampliación o rehabilitación o combinaciones de las mismas según aplique para los sistemas existentes de abastecimiento de agua potable y alcantarillado en cada una de las localidades.[3]

Es así que por tratarse de obras diseñadas para sistemas existentes que estaban en operación en cada localidad durante el desarrollo de los servicios; no procedería tipificar de manera general como malas o impracticables a nivel de los estudios definitivos, todas las soluciones que fueron planteadas a nivel de los estudios de factibilidad.

---

[3]Se podría calificar con mas propiedad que algunas de las soluciones desarrolladas por el Consultor (FF) resultaron mejores en mayor o menor grado con respecto de aquellas correspondientes en los estudios de factibilidad, ya sea, entre otros, por el menor costo de obra involucrado o por el mayor horizonte en la cobertura de los servicios mejorados de abastecimiento de agua potable y/o del alcantarillado, en las localidades



Héctor Becerra Martínez

Al respecto, este árbitro considera que, el enfoque contractual que propició una metodología generalizada de desarrollo de los servicios contratados aplicable a todas las localidades y que fuera aceptado plenamente por ambas partes, posiblemente constituye el origen de los problemas que han derivado en los puntos materia de la presente controversia.

Este árbitro considera también que la tendencia sesgada a generalizar los problemas se aprecia inclusive en las interrogantes de carácter conceptual que hacen las partes y que ofrecen como medio probatorio por la pericia técnica llevada a cabo. Estas interrogantes como era de esperarse merecieron un pronunciamiento del perito enmarcado en respuestas de ámbito general, cuya incidencia directa al desarrollo de los estudios definitivos en cada una de las localidades, resulta de muy difícil apreciación.

Es así que el perito asevera que todas las soluciones en los estudios de factibilidad no fueron consistentes con las soluciones finalmente desarrolladas en los estudios definitivos y sustenta su pronunciamiento en aspectos aislados que no reflejan la magnitud de su incidencia para el caso particular de cada localidad. No siendo así posible apreciar si esta magnificando problemas que finalmente fueron menores y que pudieron o debieron haberse resuelto dentro del alcance de los servicios contratados.

Respecto de si las soluciones en los estudios de factibilidad pudieron ser consolidadas en los estudios definitivos a través de ajustes razonables, el perito prosigue con un pronunciamiento generalizado afirmando que no pudieron ser consolidadas en los estudios definitivos ya que estos últimos desarrollaron planteamientos hidráulicos propios y diferentes. [4]

---

[4] Este árbitro a manera de ejemplo hace notar que en contrario a esta generalidad manifiesta, el perito menciona como sustento que el planteamiento hidráulico del sistema de alcantarillado de las localidades de Ayaviri y Juliaca desarrollado por el Consultor (FF), es el mismo que en los estudios de factibilidad.

Héctor Becerra Martínez

A juicio de este árbitro, las generalidades que abundan en las pronunciamientos del perito no contribuyen a dilucidar los puntos en controversia. Es así que el perito en su informe principal no es consistente con sus afirmaciones, cuando, respecto a la consolidación de las soluciones llevadas a cabo por el Consultor (FF); menciona lo siguiente:

- Para los sistemas de agua potable los ajustes resultaron en propuestas hidráulicas diferentes que dieron lugar a nuevas soluciones que fueron finalmente las consolidadas para los estudios definitivos. Para las localidades de Cuzco, Ilave, Ayaviri y Juliaca, esas diferencias fueron de gran magnitud; para las localidades de Sicuani, Puno y Tacna, esas diferencias fueron de menor magnitud.

- Para los sistemas de alcantarillado, los planteamientos de los estudios definitivos son sustancialmente diferentes y corresponden a nuevos planteamientos para el caso de las localidades de Cuzco Juliaca y Sicuani. Para el caso de las localidades de Puno y Tacna las diferencias son de menor magnitud y para Ilave y Ayaviri se puede considerar que la consolidación se tradujo en ajustes razonables.

Un razonamiento en base a los resultados de la pericia que se resaltan en los párrafos que anteceden y en base a una apreciación objetiva de los esquemas planteados en los estudios de factibilidad y en los esquemas consolidados de los estudios definitivos que desarrollo el Consultor (FF); establece, que los pronunciamientos del perito no aplican plenamente a todo el alcance de los servicios contratados.

Para entender mejor el pronunciamiento del perito, este árbitro deduce que:

- las soluciones planteadas en los estudios de factibilidad de las localidades de Puno y Tacna permitieron cambios de menor magnitud que resultaron en ajustes razonables que estaban dentro del alcance de los servicios contratados al Consultor (FF).

Héctor Becerra Martínez

- las soluciones planteadas en los estudios de factibilidad, permitieron ajustes razonables que estaban dentro del alcance de los servicios contratados al Consultor (FF): en la localidad de Sicuani, sólo en su sistema de agua potable y no en el de alcantarillado; y en las localidades de llave y Ayaviri, sólo en sus sistemas de alcantarillado, y no en los de agua potable.

- las soluciones planteadas para las localidades de Cuzco y Juliaca fueron diseñadas a nivel definitivo por el Consultor (FF), con cambios de gran magnitud, fuera de todo ajuste razonable respecto de las soluciones planteadas en los estudios de factibilidad.

En consecuencia respecto de la consolidación de las soluciones propuestas en los estudios de factibilidad, que son en gran medida el origen de la presente controversia, este árbitro concluye su análisis estableciendo los servicios complementarios que aduce la Demandante (FF), aplican plenamente para las localidades de Cuzco y Juliaca; sólo aplican en parte para las localidades de llave, Ayaviri y Sicuaní; y no aplican para las localidades de Puno y Tacna.

En este punto es preciso considerar si la Demandante (FF) cumplió con el objeto del contrato, que en última instancia fue la elaboración de diseños definitivos y realización de expedientes técnicos para la ejecución de obras de la llamada Primera Etapa de Inversión de los Planes de Expansión de Mínimo Costo de los Servicios de Agua Potable y Alcantarillado de las 7 localidades en cuestión.

Al respecto la Demandada (Pronap), reconoce que ciertos trabajos ejecutados para poder llevar a cabo esos diseños definitivos, no estaban previstos en los estudios de factibilidad pero que tuvieron que ser realizados por la Demandante (FF), por exigencias de la realidad que encontró al revisar esos estudios y compararlos con el terreno.

Fundamentos para Pronunciarse Puntos Controvertidos
Arbitro: Ing. Héctor Becerra Martínez

14

Héctor Becerra Martínez

En este sentido fija una posición aceptable al establecer que si la Demandante (FF), pretende alegar que realizó trabajos complementarios no previstos en los estudios de factibilidad, también es necesario que considere si realizó menores trabajos ( o no alcanzó las metas previstas en los diseños definitivos), de los que estaban previstos en esos estudios.

## II.4    El desarrollo de los servicios contratados

Primeramente este árbitro considera procedente hacer la precisión que las 7 localidades se integraron como un conjunto solo para efectos del contrato y que Tacna, Juliaca, Puno, Ayaviri, Ilave, Cuzco y Sicuani, bajo el punto de vista de los diseños definitivos, no mantienen ningún tipo de semejanza para tratar a sus sistemas de abastecimiento de agua potable y/o alcantarillado como si fueran similares.

Al respecto este árbitro aprecia en todos los documentos contractuales, desde el nivel de los términos de referencia hasta el mismo contrato suscrito por las partes, que los servicios requeridos se generalizaron y uniformizaron para todas esas localidades, posiblemente con el mejor ánimo por parte del Pronap, de lograr una simplificación administrativa para efectos del seguimiento contractual

En este sentido este árbitro hace notar que por la metodología impuesta por el contrato cada informe de los estudios definitivos debía tener condiciones de ser concluido sin necesidad de datos a ser obtenidos de resultados correspondientes a actividades incluidas en informes posteriores.

Esta percepción de obtener informes intermedios válidos por si mismos no se produjo finalmente pues los datos se fueron cambiando, dentro de un proceso de retro alimentación, conforme se desarrollaba la ejecución de los diseños definitivos.[5][6]

---

[6] Respecto de este punto es pertinente señalar que en la práctica no se han obtenido resultados contractuales satisfactorios cuando se ha pretendido que los estudios de ingeniería se desarrollen a través de informes secuenciales válidos por si mismos.

Fundamentos para Pronunciarse Puntos Controvertidos
Árbitro: Ing. Héctor Becerra Martínez

15

Héctor Becerra Martínez

En opinión de este árbitro, un aspecto que incidió sobremanera propiciando desde el inicio del contrato un inadecuado desarrollo de los estudios definitivos, es el haber generalizado los servicios requeridos en las localidades como si estas conformaran un todo[7].

Al respecto aprecia claramente que las partes aceptaron plenamente este hecho de integración forzada de los servicios en todos los documentos contractuales[8], abarcando por extensión bajo este criterio generalizado, los contenidos de los informes y su cronograma de presentación y lo pertinente al cronograma general de los estudios definitivos y al periodo de participación del personal asignado, lo que directamente incide en el monto de la propuesta económica negociada; conformando de esta manera todos ellos la base contractual fundamental para la definición del producto de los servicios contratados y del periodo de ejecución y costo de dichos servicios. Es recién con la suscripción de la tercera y cuarta cláusulas, ambas complementarias, que las partes acuerdan distinguir informes por tipo de trabajo y localidades.

Es también por las indicadas cláusulas adicionales que las partes acuerdan desdoblar el cronograma de entrega de informes incrementando el plazo total de los servicios hasta 446 días naturales y aceptan ponerle un valor a cada uno de los informes, referido en porcentaje al monto total del contrato.[9]

---

[6] En la mayoría de los casos estos informes tienden a ser modificados con información más precisa que se obtiene de etapas posteriores en el desarrollo de los estudios y finalmente solo sirven para el propósito de justificar los pagos contractuales y servir de herramienta administrativa para el seguimiento del desarrollo del contrato.

[7] Estas localidades que se integraron forzadamente por el contrato, no mantienen ningún tipo de semejanza que amerite tratar a sus sistemas de abastecimiento de agua potable y/o alcantarillado como si fueran similares. Por el contrario cada uno de estos sistemas locales, requirió de su propio enfoque y revistió su propio grado de dificultad en el desarrollo de los estudios definitivos que fueron materia del contrato.

[8] Es así que adoptada y aceptada como hecho ineludible esta inaplicable metodología de trabajo generalizada, ambas partes no quisieron distinguir y aceptar hasta una etapa contractual tardía que se produce con el acuerdo de la Tercera y Cuarta Cláusulas Adicionales, la particularidad que era requerida en la prestación de los servicios necesarios para el desarrollo de los estudios definitivos en cada una de las localidades

Héctor Becerra Martínez

Este árbitro aprecia que inclusive, tanto la Demandante (FF), como el Demandado (Pronap), a lo largo del proceso arbitral, mantienen esta distorsión producida en el desarrollo de los servicios contratados al aceptar criterios generalizados, como base fundamental de sus escritos y alegatos.

Este árbitro distingue también como un aspecto que fue significativo y que afectó desfavorablemente el normal desarrollo del contrato, la participación de las EPS que finalmente fueron las beneficiarias directas de las obras a ser ejecutadas como producto de los diseños definitivos.[10]

Finalmente esté árbitro no puede dejar de tomar en cuenta la incidencia en el cumplimiento del contrato de la mala relación manifiesta que mantuvo la Demandante FF con el Consorcio Inspector SMS a cargo de la supervisión de los estudios definitivos y de los aspectos contractuales en general.

## II.5    De la asignación de recursos y costos de los servicios

El desagregado de los recursos asignados para llevar a cabo los servicios y el costos de los mismos, sirvió de base a la Demandante (FF) para establecer el monto de los servicios de su propuesta económica y para la posterior negociación de ésta con el Pronap, que determinó como montos contractuales a Suma Alzada, Nuevos Soles 8'677,750.00 y US $ 984,720.00 más Gastos Reembolsables que reconocen un monto referencial de S/.384,000.00.

---

[9] Abundando en el concepto, se podría aceptar que el contrato suscrito por las partes abarcó dentro de un amplio marco contractual, la ejecución de 7 encargos diferentes, uno por localidad, integrados forzadamente bajo una metodología impracticable de etapas secuenciales de desarrollo de estudios definitivos que eran disímiles en cuanto a los requerimientos de enfoques y planteamientos de soluciones.

[10] Se puede decir que en la práctica el Pronap actuó como un intermediario entre la EPS y el Consultor (FF). Es mas, el Pronap a través de la correspondiente EPS aceptaba o admitía trabajos de terceros que tenían incidencia directa en el desarrollo de los estudios definitivos a cargo de FF. Sobre este aspecto y por citar algunos, esta la intervención de la empresa Seureca en estudios relacionados con la localidad de Cuzco, y de entidades como el PELT y KFW, en los estudios relacionados con la localidad de Puno. También interfirieron, entre otros, las obras de emergencia llevadas a cabo por las EPS, en varias localidades, con fondos del FONAVI.

Fundamentos para Pronunciarse Puntos Controvertidos
Arbitro: Ing. Héctor Becerra Martínez                                                                              17

Héctor Becerra Martínez

Este desagregado en resumen, incluye:

| Rubro | Costo en Nuevos Soles | Costo en US $ |
|---|---|---|
| Honorarios (1) | 4'211,200 | 948,720 |
| Gastos Directos (2) | 4'466,550 | 36,000 |
| Total Suma Alzada (3) | 8'677,750 | 984,720 |
| Gastos Reembolsables (4) | 384,000 | ------------ |

(1)    Se refiere a tarifas que incluyen costo del personal, sus cargas y beneficios sociales, costos generales y utilidades del consultor.

(2)    Incluye como un mayor rubro (S/:3'000,000) los trabajos específicos o de campo, como topografía y  mecánica de suelos; viáticos, movilidad (único rubro en ambas monedas), comunicaciones, oficinas de campo, vehículos y material de oficina.

(3)    Coincide con los montos contractuales pactados a suma alzada.

(4)    Computadoras y vehículos ( por devolver al Pronap a la culminación de los servicios).

La Demandante (FF) por carta de fecha 6 de marzo del 2001 presentó su Informe Final de Liquidación, según consta en la Resolución Directoral del Pronap N° 223-2001/Pres/VMI/Pronap/DE, de fecha 10 de octubre del 2001. En esa misma resolución consta que el mencionado informe de liquidación no fue encontrado conforme por el Supervisor Consorcio Inspector SMS; debido a que la Demandante (FF) había incluido "....el valor de mano de obra adicional por un monto de S/: 3'982,950.00 y US $ 3'014,720.00, los mismos que no han sido solicitados en su oportunidad y no cuentan con autorización ni resolución que los apruebe" sic.

Analizando esa planilla de mano de obra que practicó la Demandante (FF) en el informe de liquidación, y que al no ser aceptada por parte del Pronap motiva el primer punto controvertido que se resuelve por el presente proceso arbitral; se aprecia que:

-        El desagregado del costo adicional solo abarca el rubro honorarios de profesionales extranjeros y peruanos; personal asesor peruano y personal de apoyo

Fundamentos para Pronunciarse Puntos Controvertidos
Árbitro: Ing. Héctor Becerra Martínez

18

Héctor Becerra Martínez

- El costo adicional incluye los montos de US $ 3'014,720 y Nuevos Soles 3'982,950. En este costo adicional no se considera el rubro gastos directos.

- Hay un cambio prácticamente total en la nómina del personal asignado originalmente a los estudios definitivos. Sólo 3 de ellos figuran en la nómina de los 43 personales extranjeros adicionales y sólo 1 en la nómina de los 18 personales peruanos adicionales.

- Las tarifas del personal extranjero adicional mantienen los rangos entre US $9,300 y US $7,800 por hombre-mes, de la negociación original. Las tarifas del personal nacional se uniformizan en S/.9,500 por hombre-mes:

Finalmente este árbitro establece que al momento de negociar la tercera y cuarta cláusulas adicionales, para acordar extender hasta 446 días naturales el plazo de ejecución de los diseños definitivos, ambas partes ya disponían de un amplio conocimiento de las dificultades y problemas que presentaba la ejecución de los diseños definitivos en las 7 localidades del contrato.[11]

El problema que se presenta para formar criterio, después de apreciar la estructura de costos adicionales a que se hace mención, es que resulta sumamente difícil aplicarla a las posiciones atendibles que han sido expuestas por las partes en sus escritos y alegatos a lo largo del proceso arbitral.

---

[11] En los cuadros que se adjuntan este árbitro hace un recalculo a manera de estimado de los costos adicionales que han debido demandar los estudios complementarios que fueron requeridos para llevar a cabo los diseños definitivos, admitiendo para esto que las partes acordaron por la tercera cláusula adicional, una prorroga para extender el plazo del contrato hasta 446 días naturales y aceptando que no hay manera de verificar en que tipo de trabajo efectivo se consumió todo el monto a suma alzada del contrato original.

Fundamentos para Pronunciarse Puntos Controvertidos
Árbitro: Ing. Héctor Becerra Martínez

19

Héctor Becerra Martínez

Como una apreciación final sobre los aspectos económicos involucrados en los puntos controvertidos, este árbitro siente que por su parte la Demandante (FF) parece orientar su petitorio de demanda a una situación de extremos: o todo o nada. Por su parte el Pronap también orienta su contestación a la demanda en este sentido, pero al contrario. [12]

---

[12] Por el razonamiento que precede este árbitro amerita hacerse las siguientes interrogantes; para pronunciarse sobre los montos de dinero en los puntos en controversia.

- ¿Cuando fue la oportunidad propicia para que ambas partes discutieran y acordaran si procedían estos costos adicionales por el plazo que finalmente demandarían los servicios contratados?

- ¿Hubo una complacencia por parte del Supervisor al permitir que los trabajos continuaran en extenso mas allá de los plazos y alcances contratados, sin mediar un acuerdo de negociación de partes?

- ¿Por que se cambia toda la nómina para asignar al personal adicional si es de suponer que los de la nómina original ya tenían un conocimiento previo del tema; o por el contrario, no fue ese personal asignado originalmente el idóneo para llevar a cabo los trabajos?

- ¿Se debe admitir que todo el monto contractual pactado originalmente se consumió en consolidar las solucionas planteadas y trabajos de campo que no fueron de utilidad?



Costo adicional de F.FERRAZ - TABLA 5

Arbitro Ing. Héctor Becerra M.

## CALCULO DEL COSTO ADICIONAL DE F.FERRAZ EN MONEDA EXTRANJERA, POR SERVICIOS COMPLEMENTARIOS

| POS. | ITEM | CANTIDAD hombres/mes | UNIDAD | COSTOS DEMANDA M.E. UNITARIO (US$) | COSTOS DEMANDA M.E. PARCIAL (US$) | COSTO ADICIONAL M.E. CANTIDAD H.M | COSTO ADICIONAL M.E. PARCIAL (US$) |
|---|---|---|---|---|---|---|---|
| | **HONORARIOS** | | | | | | |
| 1.1 | **Profesionales Extranjeros** | | | | | | |
| 1 | Director de Proyecto | 22.30 | HM | 12,500.00 | 278,750.00 | 4.10 | 51,250.00 |
| 2 | Hidraulica | 2.80 | HM | 9,300.00 | 26,040.00 | 2.80 | 26,040.00 |
| 3 | Hidraulica | 10.00 | HM | 7,800.00 | 78,000.00 | 4.10 | 31,980.00 |
| 4 | Hidraulica | 2.80 | HM | 7,800.00 | 21,840.00 | 2.80 | 21,840.00 |
| 5 | Hidraulica | 4.80 | HM | 7,800.00 | 37,440.00 | 4.10 | 31,980.00 |
| 6 | Hidraulica | 9.50 | HM | 7,800.00 | 74,100.00 | 4.10 | 31,980.00 |
| 7 | Hidraulica | 3.70 | HM | 9,300.00 | 34,410.00 | 3.70 | 34,410.00 |
| 8 | Hidraulica | 7.20 | HM | 9,300.00 | 66,960.00 | 4.10 | 38,130.00 |
| 9 | Hidraulica | 7.20 | HM | 9,300.00 | 66,960.00 | 4.10 | 38,130.00 |
| 10 | Tratamiento de Agua | 15.10 | HM | 9,300.00 | 140,430.00 | 4.10 | 38,130.00 |
| 11 | Tratamiento de desague | 13.10 | HM | 9,300.00 | 121,830.00 | 4.10 | 38,130.00 |
| 12 | Tratamiento de desague | 3.10 | HM | 9,300.00 | 28,830.00 | 3.10 | 28,830.00 |
| 13 | Tratamiento de desague | 4.70 | HM | 9,300.00 | 43,710.00 | 4.10 | 38,130.00 |
| 14 | Hidrología e Hidrogeología | 2.90 | HM | 9,300.00 | 26,970.00 | 2.90 | 26,970.00 |
| 15 | Hidrología e Histrogeología | 12.30 | HM | 7,800.00 | 86,940.00 | 4.10 | 31,980.00 |
| 16 | Hidrología e Hidrogeología | 4.90 | HM | 7,800.00 | 38,220.00 | 4.10 | 31,980.00 |
| 17 | Redes de Agua y Alcantarillado | 6.10 | HM | 7,800.00 | 47,580.00 | 4.10 | 31,980.00 |
| 18 | Redes de Agua y Alcantarillado | 2.30 | HM | 7,800.00 | 17,940.00 | 2.30 | 17,940.00 |
| 19 | Redes de Agua y Alcantarillado | 13.60 | HM | 7,800.00 | 106,080.00 | 4.10 | 31,980.00 |
| 20 | Redes de Agua y Alcantarillado | 9.20 | HM | 7,800.00 | 71,760.00 | 4.10 | 31,980.00 |
| 21 | Redes de Agua y Alcantarillado | 16.00 | HM | 7,800.00 | 124,800.00 | 4.10 | 31,980.00 |
| 22 | Redes de Agua y Alcantarillado | 1.00 | HM | 7,800.00 | 7,800.00 | 1.00 | 7,800.00 |
| 23 | Redes de Agua y Alcantarillado | 11.00 | HM | 9,300.00 | 102,300.00 | 4.10 | 38,130.00 |
| 24 | Redes de Agua y Alcantarillado | 22.30 | HM | 7,800.00 | 173,940.00 | 4.10 | 31,980.00 |
| 25 | Redes de Agua y Alcantarillado | 10.60 | HM | 7,800.00 | 82,680.00 | 4.10 | 31,980.00 |
| 26 | Redes de Agua y Alcantarillado | 16.80 | HM | 7,800.00 | 131,040.00 | 4.10 | 31,980.00 |
| 27 | Estructuras | 22.30 | HM | 7,800.00 | 173,940.00 | 4.10 | 31,980.00 |
| 28 | Estructuras | 22.30 | HM | 7,800.00 | 173,940.00 | 4.10 | 31,980.00 |
| 29 | Estructuras | 0.50 | HM | 7,800.00 | 3,900.00 | 0.50 | 3,900.00 |
| 30 | Estructuras | 14.00 | HM | 7,800.00 | 109,200.00 | 4.10 | 31,980.00 |
| 31 | Estructuras | 3.00 | HM | 7,800.00 | 23,400.00 | 3.00 | 23,400.00 |
| 32 | Estructuras | 2.50 | HM | 7,800.00 | 19,500.00 | 2.50 | 19,500.00 |
| 33 | Estructuras | 0.10 | HM | 7,800.00 | 780.00 | 0.10 | 780.00 |
| 34 | Estructuras | 1.10 | HM | 7,800.00 | 8,580.00 | 1.10 | 8,580.00 |
| 35 | Estructuras | 0.20 | HM | 7,800.00 | 1,560.00 | 0.20 | 1,560.00 |
| 36 | Estructuras | 22.30 | HM | 7,800.00 | 173,940.00 | 4.10 | 31,980.00 |
| 37 | Estructuras | 5.60 | HM | 7,800.00 | 43,680.00 | 4.10 | 31,980.00 |
| 38 | Mecanica de Suelo | 1.30 | HM | 9,300.00 | 12,090.00 | 1.30 | 12,090.00 |
| 39 | Mecanica de Suelo | 0.50 | HM | 7,800.00 | 3,900.00 | 0.50 | 3,900.00 |
| 40 | Mecanica Electrica | 0.10 | HM | 7,800.00 | 780.00 | 0.10 | 780.00 |
| 41 | Mecanica Electrica | 7.20 | HM | 7,800.00 | 56,160.00 | 4.10 | 31,980.00 |
| 42 | Arquitectura | 17.70 | HM | 7,800.00 | 138,060.00 | 4.10 | 31,980.00 |
| 43 | Costos y Presupuesto | 3.20 | HM | 7,800.00 | 24,960.00 | 3.20 | 24,960.00 |

| | | | |
|---|---|---|---|
| Costo en Moneda Extranjera. | | 3,014,720.00 | 1,150,920.00 |
| IGV (18%) | | 542,649.60 | 207,167.40 |
| Total Costo Adicional en Moneda Extranjera. | | 3,557,369.60 | 1,358,087.40 |



Arbitro Ing. Hector Becerra M.

**CALCULO DEL COSTO ADICIONAL DE F.FERRAZ EN MONEDA NACIONAL POR SERVICIOS COMPLEMENTARIOS**

| POS. | ITEM | CANTIDAD hombres/mes | UNIDAD | COSTOS DEMANDA - M.N. UNITARIO (Soles) | PARCIAL (Soles) | COSTO ADICIONAL M.N. CANTIDAD H.M. | PARCIAL (Soles) |
|---|---|---|---|---|---|---|---|
| 1.2 | Profesionales Peruanos | | | | | | |
| 44 | Tratamiento de Agua | 6.00 | HM | 9,500.00 | 57,000.00 | 4.10 | 38,950.00 |
| 45 | Tratamiento de Desague | 10.00 | HM | 9,500.00 | 95,000.00 | 4.10 | 38,950.00 |
| 46 | Hidrologia e Hidrogeologia | 15.00 | HM | 9,500.00 | 142,500.00 | 4.10 | 38,950.00 |
| 47 | Redes de Agua y Alcantarillado | 10.00 | HM | 9,500.00 | 95,000.00 | 4.10 | 38,950.00 |
| 48 | Redes de Agua y Alcantarillado | 22.30 | HM | 9,500.00 | 211,850.00 | 4.10 | 38,950.00 |
| 49 | Redes de Agua y Alcantarillado | 14.00 | HM | 9,500.00 | 133,000.00 | 4.10 | 38,950.00 |
| 50 | Redes de Agua y Alcantarillado | 4.00 | HM | 9,500.00 | 38,000.00 | 4.10 | 38,950.00 |
| 51 | Redes de Agua y Alcantarillado | 5.00 | HM | 9,500.00 | 47,500.00 | 4.10 | 38,950.00 |
| 52 | Redes de Agua y Alcantarillado | 0.00 | HM | 9,500.00 | 0.00 | 0.00 | 0.00 |
| 53 | Redes de Agua y Alcantarillado | 17.00 | HM | 9,500.00 | 161,500.00 | 4.10 | 38,950.00 |
| 54 | Redes de Agua y Alcantarillado | 22.30 | HM | 9,500.00 | 211,850.00 | 4.10 | 38,950.00 |
| 55 | Estructuras | 6.00 | HM | 9,500.00 | 57,000.00 | 4.10 | 38,950.00 |
| 56 | Mecánica de Eléctrica | 13.00 | HM | 9,500.00 | 123,500.00 | 4.10 | 38,950.00 |
| 57 | Mecánica de Eléctrica | 22.30 | HM | 9,500.00 | 211,850.00 | 4.10 | 38,950.00 |
| 58 | Costo y Presupuesto | 22.30 | HM | 9,500.00 | 211,850.00 | 4.10 | 38,950.00 |
| 59 | Costo y Presupuesto | 13.00 | HM | 9,500.00 | 123,500.00 | 4.10 | 38,950.00 |
| 60 | Hidraulica | 22.30 | HM | 9,500.00 | 211,850.00 | 4.10 | 38,950.00 |
| 81 | Hidraulica | 10.00 | HM | 9,500.00 | 95,000.00 | 4.10 | 38,950.00 |
| 1.3 | Personal Asesor (Coordinacion) | | | | | | |
| 1.3.2 | Coordinador Peruano | 10.20 | HM | 10,000.00 | 102,000.00 | 4.10 | 41,000.00 |
| 1.4 | Personal de Apoyo | | | | | | |
| 1.4.1 | Profesionales de Apoyo Medio | 22.30 | HM | 5,500.00 | 122,650.00 | 4.10 | 22,550.00 |
| 1.4.2 | Profesionales Juniors y Tecnicos | 166.50 | HM | 4,000.00 | 766,400.00 | 36.00 | 144,000.00 |
| 1.4.3 | Acompañadoras | 28.00 | HM | 4,500.00 | 126,000.00 | 4.10 | 18,450.00 |
| 1.4.4 | Secretarias | 32.00 | HM | 1,500.00 | 48,000.00 | 4.10 | 6,150.00 |
| 1.4.5 | Digitadores | 67.30 | HM | 1,500.00 | 100,950.00 | 12.30 | 18,450.00 |
| 1.4.6 | Dibujantes | 283.90 | HM | 1,500.00 | 425,700.00 | 48.50 | 72,750.00 |
| 1.4.7 | Choferes | 15.00 | HM | 900.00 | 13,500.00 | 4.10 | 3,690.00 |
| 1.4.8 | Otros | 40.00 | HM | 750.00 | 30,000.00 | 6.15 | 4,612.50 |

Costo en Moneda Nacional: 3,982,950.00 — 883,902.50

IGV (18%): 716,931.00 — 178,982.45

Total Costo Adicional en Moneda Nacional: 4,699,881.00 — 1,172,888.95



Héctor Becerra Martínez



## III    Sobre los Puntos Controvertidos

Por los fundamentos que ha expuesto en los párrafos precedentes y por sus consideraciones finales, este árbitro resuelve sobre los puntos controvertidos, como sigue:

**III.1    Primer Punto Controvertido Determinar si procede reconocer a favor de la Demandante el pago de la suma de US $ 3'557,369.60, incluido IGV y la suma de S/. 3'982,950.00, más IGV; por concepto de honorarios profesionales por servicios complementarios a aquellos que fueron materia del contrato.**

Sobre este punto controvertido cabe establecer que los servicios contratados no estaban limitados a ejecutar los trabajos incluidos en los estudios de factibilidad, pues incluían la revisión de dichos estudios de factibilidad en un informe de consolidación de las soluciones planteadas en los mismos. En este sentido contractual consolidar significaba dar solidez o confirmar la solución planteada pero esto no implicaba arribar a soluciones distintas a las originalmente planteadas.

Sobre el particular este árbitro expuso su criterio en las Referencias (2) y (3) del presente documento y establece también que los servicios complementarios, cuya realización aduce la Demandante, sólo aplican plenamente para las localidades de Cuzco y Juliaca; sólo aplican en parte para las localidades de Ilave, Ayaviri y Sicuani; y no aplican para las localidades de Puno y Tacna.

La Demandante alega que la demora y mayor trabajo se debieron a no contar con información de terceros. Es correcto que dentro de la obligación contractual del Pronap no estaba dar y/o asegurar la información que debían entregar los terceros - principalmente las EPS y Municipalidades - a la Demandante para que realizara propiamente los diseños contratados.

Sobre el particular, este árbitro implícitamente admite que Pronap por contrato estaba en capacidad de no aceptar los informes de la Demandante en caso hubieran omitido la información de terceros por no haber estado disponible en la oportunidad requerida para cumplir con los plazos contractuales de entrega de informes.

Lo que resulta claro para este árbitro es que en la oportunidad de negociar los términos y fechas de la tercera y cuarta cláusulas adicionales, ambas partes ya disponían de trabajos de campo, de resultados de los informes de consolidación de soluciones planteadas por los estudios de factibilidad y de proyectos básicos en proceso bastante avanzado. Es entonces, en esta oportunidad, en que prácticamente ya se había consumido el plazo contractual original de 10 meses, que ambas partes (entiéndase también al Supervisor por la parte del Pronap) ya disponían de un amplio conocimiento y estaban concientes de los problemas y dificultades que revestía la realización de los diseños definitivos en las 7 localidades del contrato y cuando debían de presentarse en informes finales, como producto de los servicios contratados.

Por las señaladas cláusulas adicionales este árbitro puede entender que hubo necesidad de realizar servicios complementarios o adicionales como resultado del desarrollo de soluciones diferentes a aquellas planteadas en los estudios de factibilidad y que por ello las partes acordaran extender el plazo de ejecución de los estudios definitivos de 323 a 446, días naturales.

Este arbitro puede entender también que Pronap al suscribir las referidas cláusulas adicionales estaba conciente que la Demandante (FF) incurría en mayores gastos por haber transcurrido a esa fecha, el plazo original pactado para desarrollar los estudios definitivos y supuestamente haber consumido ya sus recursos asignados por el contrato en la consolidación de las soluciones y los trabajos de campo complementarios que motivaban la extensión del plazo en la tercera cláusula adicional; a pesar que en ella dejaban establecido que Pronap no reconoce gastos por ningún concepto por efecto de la extensión acordada.

Héctor Becerra Martínez

En atención a los fundamentos expuestos y consideraciones finales arriba expresadas, este árbitro considera declarar fundada en parte la pretensión de la Demandante en el Primer Punto Controvertido y reconocerle un pago por la suma de US $ 1'358,097.40 (Un millón trescientos cincuenta y ocho mil, novena y siete y 40 /100 Dólares Americanos), incluido IGV y la suma de S/. 993,802.50 (Novecientos noventa y tres mil, ochocientos dos y 50 /100 Nuevos Soles), más IGV; por concepto de sus honorarios profesionales por servicios complementarios a aquellos que fueron materia del contrato. De este pago debe deducirse la suma de US $ 200,222.00 (Doscientos mil, doscientos veintidós y 00/100 Dólares Americanos), más IGV por concepto de los trabajos correspondientes previstos en los Estudios de Factibilidad, que no fueron ejecutados por la Demandante.

**III.2  Segundo Punto Controvertido: Determinar si procede reconocer a favor de la Demandante, la actualización de la suma de S/. 3'982,950.00, mas IGV, de acuerdo con la Cláusula Cuarta, numeral 01 del Contrato suscrito entre las partes; y si procede tomar como base el Indice de Precios al Consumidor para Lima Metropolitana, determinándose entre qué fechas corresponde su aplicación.**

Por el contrato se establece una actualización de los pagos en Nuevos Soles en base al índice de precios al consumidor de Lima Metropolitana. En virtud al espíritu del contrato y de acuerdo a los procedimientos operativos que apliquen para la aplicación del referido índice; este árbitro considera que procede la actualización de la suma reconocida de S/. 993,802.50 (Novecientos noventa y tres mil, ochocientos dos y 50 /100 Nuevos Soles), más IGV, a partir de febrero del 2001, fecha que este arbitro considera como reconocida por el Pronap para la entrega del Informe Final de Liquidación del Consultor.

**III.3  Tercer Punto Controvertido: Determinar si procede reconocer a favor de la demandante, el pago de los intereses devengados por las sumas demandadas en el primer punto controvertido precedente, desde la fecha en que se originó la obligación de su abono, hasta la fecha real de pago, determinándose si procede tomar en cuenta la tasa de interés bancaria máxima para operaciones comerciales, establecida por el Banco Central de Reserva.**

El Reglamento General de las Actividades de Consultoría DS Nº 208-87-EF que regula las disposiciones de la Ley de Consultoría Nº 23554, del 29 de diciembre de 1983 y que es citado como supletorio en el contrato suscrito entre las partes; establece en su Artículo 94° el derecho del Consultor al pago de intereses iguales a los máximos que establece el Banco Central de Reserva del Perú, para los pagos que efectué la Entidad vencido el plazo de sesenta días calendario después de concluido los servicios materia del Contrato.

Como ya consideró este árbitro en sus fundamentos, durante la negociación de la tercera y cuarta cláusulas adicionales la Demandante tuvo la oportunidad de poner a consideración del Pronap cualquier monto adicional que considerara en ese momento por la ejecución de los servicios complementarios a los materia del contrato, que había o venia realizando y que eran motivo de la extensión de plazo hasta 446 días naturales que estaba acordando y obligándose a cumplir con la suscripción de esas cláusulas adicionales. El caso fue que ningún monto por ese concepto fue puesto a consideración del Pronap para su reconocimiento como pago hasta que en el Informe de Liquidación la Demandante presenta como un *fait accompli*, la "Planilla de Mano de Obra Adicional " que finalmente sustenta los montos del Primer Punto Controvertido

En relación a este Tercer Punto Controvertido y en concordancia con lo acotado, este árbitro considera como infundada la pretensión de la Demandante de reconocer a su favor el pago de los intereses devengados por cualquier suma que se resuelva en relación con el petitorio a que se refiere el Primer Punto Controvertido.

**III.4   Cuarto Punto Controvertido: Determinar si procede reconocer a favor de la demandante el pago de la suma de U.S. $ 15,628.05); y la suma de S/. 134,388.92, por concepto de gastos y comisiones bancarias por el mantenimiento de las cartas fianza, a partir de la fecha en que venció el contrato.**

Examinando los rubros de Gastos Directos de la propuesta económica negociada se aprecia que los ítems no señalan el concepto de gastos y comisiones bancarias por el mantenimiento de las cartas fianza.

Tribunal Arbitral Proceso Arbitral Figueiredo Ferraz – PAS
Víctor Palomino Ramírez
Álvaro González Peláez
Héctor Becerra Martínez

En consecuencia se acepta que cualquier gasto y comisión por ese concepto esta incluyéndose dentro de los Gastos Generales de Apoyo, que forman parte de las tarifas de honorarios de profesionales del Consultor.

En relación a este Cuarto Punto Controvertido y en concordancia con lo acotado, este árbitro considera como infundada la pretensión de la Demandante de reconocer a su favor un pago por concepto de gastos y comisiones bancarias por el mantenimiento de las cartas fianza.

### III.5   Determinar la eficacia o ineficacia de la Resolución Directoral N° 2332001/Pres/VMI/PRONAP/DE, de fecha 10 Octubre del 2001.

Este árbitro considera que carece de competencia para emitir un pronunciamiento válido sobre el tema de la eficacia o ineficacia de la resolución directoral del Pronap. Como consecuencia de lo expresado este árbitro se adhiere a los fundamentos y consideraciones técnicas y legales de los otros miembros del Tribunal al laudar sobre la materia de este punto controvertido.

### III.6   Con relación al Pago de Costas y Costos del Proceso

Sobre este particular, este arbitro primeramente quiere dejar establecido que en su opinión, por los documentos e información puestos a consideración de los árbitros por la Demandante y por la Demandada, sobre el desarrollo del contrato y por su comportamiento observado durante el proceso arbitral, ambas partes han actuado de buena fe basadas en sus razones atendibles y convencidas de sus posiciones para discrepar sobre los puntos en controversia. Por ello este árbitro considera que las costas, costos y demás gastos que generó el presente proceso arbitral, deben ser asumidos por ambas partes.

Lima, 19 de Enero del 2005

Ing. Héctor Becerra Martínez
Árbitro

Dr. Luis Ubillas Ramírez
Secretario del Tribunal

Fundamentos para Pronunciarse Puntos Controvertidos
Árbitro: Ing. Héctor Becerra Martínez

25

CERTIFICACION NOTARIAL AL DORSO

| Republic of Peru | ) | |
|---|---|---|
| Province and City of Lima | ) | ss: |
| Embassy of the | ) | |
| United States of America | ) | |

I certify that the official named below, whose true signature and official seal are, respectively, subscribed and affixed to the annexed document, was, on this day, empowered to act in the official capacity designated in the annexed document, to which faith and credit are due:

**MARIBEL DEL ROSARIO LUYO JAVIER**

This Embassy assumes no responsibility for the contents of the attached document.

**Lee A. Belland**
**VICE-CONSUL**
**U.S. EMBASSY, LIMA**

October 3, 2007
(Date)

# EXHIBIT B

**MAIRA SAWAYA HARB**
*Traductora Pública Juramentada*
*CTP 0149 - JVT 54*

# OFFICIAL TRANSLATION

MAIRA SAWAYA - HARB
**Sworn Public Translator**
**Register N° 54**

*Estados Unidos # 982 - Lima 11 - PERU*
*Teléfonos: (511-1) 463-2368 / 261-8793 / 9965-9717 - Fax: 461-6571*
*e-mail: msawaya@terra.com.pe*

### EX AEQUO ET BONO ARBITRATION AWARD

Lima, January 20th, 2005.

I.- THE PARTIES      :   FIGUEIREDO FERRAZ CONSULTORIA E

ENGENHAR1A DE  PROJETO   LTDA

Hereinafter the PLAINTIFF

PROGRAMA DE APOYO A LA REFORMA DEL

SECTOR SANEAMIENTO - PARSSA (EX -

PRONAP) *SUPPORT   PROGRAM TO THE*

*REFORM OF SANITATION SECTOR – PARSSA*

*(FORMERLY PRONAP)}*

Hereinafter the DEFENDANT

ARBITRATION COURT:  Víctor PALOMINO RAMÍREZ, PRESIDENT;

Hector BECERRA MARTÍNEZ, ARBITRATOR;

Alvaro GONZÁLEZ PELÁEZ, ARBITRATOR;

Luis UBILLAS RAMÍREZ, SECRETARY

II.- BACKGROUND.-

By letter N° T- 811-01/97043-007/01 dated October 29th, 2001, the
PLAINTIFF submits its arbitration request to the DEFENDANT for the definitive
resolution of controversies related to the Consulting Services Agreement signed
by the parties and dated November 12th, 1997, for the preparation of the
Definitive Studies of the First Investment Stage of the Minimum Cost Expansion
Plans for Drinking Water and Sewerage Services located at Tacna, Juliaca,
Puno Ayaviri, Ilave, Cusco and Sicuani.

In the referenced communication, the PLAINTIFF appointed   Sergio

MAICA  SAWAYA  HARO
Sworn Public Translator
Register N° 54

6

TAFUR SÁNCHEZ as Party Arbitrator, granting the DEFENDANT a period of ten days in which to proceed to designate its own Party Arbitrator.

After expiration of this period, and in agreement with the term set by law for the party Arbitrator's appointment, with no designation having been made, the PLAINTIFF requested to the Judiciary that a Judge Specializing in Civil Affairs in the City of Lima designate the DEFENDANT'S Arbitrator by default: this designation took place with the intervention of the Twenty Fourth Specialized Court for Civil Affairs of the City of Lima, File N° 6336-2002, which by means of Court Order N° 8 dated April 12th, 2007, appointed Hector BECERRA MARTÍNEZ as ex aequo et bono arbitrator.

By letter N° T- 811- 01- 97043- 001-02 dated April 23rd, 2002, the PLAINTIFF reports that the arbitrator it appointed has declined to accept this role and the PLAINTIFF designates Mr. Alvaro GONZÁLEZ PELÁEZ as his replacement.

The Arbitrators thus appointed proceeded to designate Mr. Victor PALOMINO RAMÍREZ as the third arbitrator and President of the Arbitration Court, and it should be noted that the appointment of these Arbitrators was not questioned by either of the parties.

The Arbitration Court was set up on June 24th, 2002, as stated in the corresponding Minutes, designating Mr. Luis Emilio UBILLAS RAMÍREZ as Secretary on that occasion. Procedural Rules were approved in the same Minutes of installation and the DEFENDANT was granted a period of ten days to submit its claim. Both parties were notified of the referenced minutes on July 11th, 2002.

MAIRA SAWAYA HARB
Sworn Public Translator
Register N° 54

7

The PLAINTIFF complied with the presentation of the claim on July 25th, within the established deadline, and the claim was admitted by Resolution N.° 04 dated July 31st, 2002, attaching documentary evidence and serving due notice to the DEFENDANT for a period of 10 work days. The DEFENDANT was notified on August 2nd, 2002.

At the same time, on July 25th, 2002, the DEFENDANT filed petition N° 1, requesting that the potential error of rating the current arbitration as an ex aequo et bono arbitration be corrected, claiming that the correct form is to process it as an Arbitration in Law, since it refers to an international arbitration.

By resolution N° 5 dated 31st July, 2002, notice was served to the PLAINTIFF regarding this application, and this notice was dated August 2nd, 2002.

Through petition N° 02 dated August 7th, 2002, the PLAINTIFF answers the service of notice, and the application remains unhindered for the pertinent decision, issued by resolution N° 07 dated August 12th, 2002, dismissing as groundless the petition to modify the ex aequo et bono nature conferred on the current arbitration, in view of the reasons stated therein; the parties were duly notified of this resolution on August 13, 2002.

Through petition N° 02 dated August 16th, 2002, the DEFENDANT filed an appeal for reconsideration, which is notified to the PLAINTIFF by means of Resolution N° 08 dated August 19th, 2002, notifying both parties on August 21st, 2002.

Through petition N° 3 dated August 26, 2002, the PLAINTIFF answers the service of notice; and, after analyzing the proposed matters, the Arbitration

Court issued Resolution N° 14 dated October 15th, 2002, declaring the appeal for reconsideration ill founded for the reasons stated therein; this resolution was notified to both parties on the same date.

Having concluded the incident, the court proceeds to deal with the discharge of the answer to the claim; this reply was formalized on August 16th, 2002, and at this time the DEFENDANT presented its answer to the claim within the period granted by resolution N° 04; notwithstanding, on observing that no proof of payment of arbitration fees and administrative expenses were attached, the court issued Resolution N° 09, considering the reply to the claim filed within the prescribed deadline, and suspending its admission and processing until payment was made according to procedural rules, granting a term of five days to that end, a period which was extended repeatedly at the request of the DEFENDANT.

On October 15th, 2002, the DEFENDANT complied with the payment of arbitration fees and administrative expenses, expediting the continuation of the arbitration process.

By resolution N° 15, dated October 15th, 2002, the Arbitration Court dealt with the answer to the claim, admitted it, considered the attached documentary evidence as filed and indicated that the date for the Pre-Arbitration agreement hearing was to be October 29th, 2002, at 9.30 a.m., subsequently rescheduled to take place on November 11th, at the same time.

On the aforementioned date, the Pre-Arbitration Agreement Hearing took place, and during this hearing the process was deemed to be remedied, the parties were exhorted to reach a Conciliation and, none of the representatives

having reached an agreement, the Court identified the issues of controversy and admitted the evidence offered by the PLAINTIFF and DEFENDANT parties in their claim brief and answer to the claim, respectively, stipulating that it was left to the criteria of the Arbitration Court to designate the pertinent Experts; indicate date and time for the testimonial declarations; and expedite the processing of the duly filed proofs.

In view of the complexity of the case, the abundant proof offered by the parties and the foreseeable event that proceedings would exceed the evidence period established by Procedural Rules, the Arbitration Court issued Resolution N° 24 dated January 17th, 2003, by which it ordered the extension of the evidence period for as long as required for the processing of all evidence formally filed and admitted by the Court.

By resolution N° 25 dated January 17th, 2003, the Arbitration Court appointed Engineer Armando ALVA KATAN as Expert and established the object and scope of the appraisal report; the parties were notified of this Resolution on January 30th, 2003.

Through petition N° 6 dated February 4th, 2003, the PLAINTIFF lodged an appeal for reconsideration against Resolution N° 25, questioning the object and scope of the appraisal report; informed through Resolution N° 26 dated February 6th, 2003; the summons having been answered by the DEFENDANT through petition N° 10, the motion was settled through Resolution N° 28 dated February 27th, 2003, which declared there were grounds for the Reconsideration appeal lodged by the PLAINTIFF and proceeded to modify the object and scope of the appraisal report, under terms compatible with the



MAIRA SAWAYA - HARE
Sworn Public Translator
Register N° 54

10

unified investigative evidence, requested by both parties.

On the other hand, the appointed expert, Armando ALVA KATAN, having declined to accept said appointment, by majority vote, the Arbitration Court proceeded to designate Alvaro Horacio FLORES BOZA, a civil engineer, as his replacement, with the single vote of the Arbitrator Hector BECERRA MARTINEZ, by resolution N° 30 dated March 11th, 2003.

The acceptance of this appointment having been formalized, the Arbitration Court issued Resolution N° 32, approving expert fees in the amount of US$ 15,000.00 U.S. Dollars, setting the term of completion of the appraisal report at 90 calendar days, calculated as of the day following receipt in custody of the totality of the information required for the execution of the work and which is detailed in said Resolution.

Documentation required for the preparation of the Appraisal report was delivered by the parties on different occasions, the last acknowledgment of receipt of documents by the Expert having been dated June 28th, 2003; by reason of which, the period for execution of the Appraisal report expired on September 28th, 2003, was extended to the 30th of the same month and year, at the request of the Expert.

On September 30, the Expert informed the Arbitration Court that his work was concluded, attaching invoices for professional fees made out to each one of the parties.

The PLAINTIFF proceeded to pay the expert's fees within the term established by the Arbitration Court; and the DEFENDANT, due to diverse problems of an administrative nature, only complied with the respective



MAIRA SAWAYA - HARE
Sworn Public Translator
Register N° 54

11

payment on January 20th, 2004, expediting the delivery of the Appraisal Report, which was filed with the Arbitration Court on January 26th, 2004.

By resolution N° 51 dated January 28th, 2004, the Arbitration Court made the results of the appraisal report known to the parties, in order for them to state their rights, within a period of ten days, extended by Resolution N° 56 dated February 27th, 2004, until March 9th, 2004.

On the abovementioned date, the parties complied with the presentation of their observations, which were duly informed to the Expert by resolution N° 57 dated March 15th, 2004, in order for the Expert to reply to the observations within a period of ten days, subsequently extended for another ten days, by resolution N° 59, expiring on April 20th, 2004.

On April 20th, 2004, the Expert complied with the reply to observations made by the parties; and, at this stage of the case, May 12th, 2004, was designated by Resolution N° 60 dated April 27th, 2004 as the day to hold the Appraisal report Hearing, rescheduled by resolution N° 61 dated May 7th, 2004 to May 17th, 2004, at 10 a.m.

On the aforementioned date and time, the Appraisal report Hearing took place, and on this occasion Alvaro FLORES BOZA submitted the results of the appraisal report, with both parties participating: posing questions, making observations and requesting clarifications which the Expert immediately replied to; the members of the Arbitration Court did likewise; all of the above was recorded on a magnetic tape which was added to the file as a document.

Through petition N° 22, subsequently expanded by petition N° 23, the DEFENDANT requested the replacement of the Expert and the preparation of



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

12

an extended Appraisal report by another professional, claiming that the Expert had shown himself reluctant to reply to point N° 5 on the object and scope of the Appraisal report ordered by the Arbitration Court; this petition gave rise to Resolution N° 64 dated June 23rd, 2004, ordering the preparation of an extended appraisal report by appointed Expert Engineer Alvaro FLORES BOZA, specifying its scope and range of influence, as well as the term for its completion; additionally, the Court declared that the proposed request for subrogation was unfounded.

Resolution N° 64, was the subject of an Appeal for reconsideration filed by the DEFENDANT through petition N° 25 received on June 30th, 2004; said petition was answered by Resolution N° 69 dated August 6th, 2004, which declared that the requested Reconsideration was unfounded, thus concluding the incident.

On July 23rd, 2004, the Expert filed the extended appraisal report, which gave rise to Resolution N° 70 dated August 13th, 2004, and resolved: the order having been complied with, it should be added to the files and made known to the parties; and, subsequently, by resolution N° 72 dated September 8th, 2004, the Court designated September 17th at 11.00 a.m. as the day for the Extended Appraisal Report Hearing, subsequently modified by Resolution N° 74 dated September 14th, 2004, to take place on September 20th, 2004, at 10.00 a.m.

On the set date and time, the Extended Appraisal Report Hearing took place, with the parties and Arbitrators intervening by posing questions or making observations, and recording the details of the meeting on a magnetic

MAIRA  SAWAYA - HARB
Sworn Public Translator
Register N° 54

13

tape which was added as a document to the arbitration records.

On the other hand, by resolution N° 77 dated October 14th, October 21st was set as the date for the Accounting Appraisal Report Hearing ordered by Resolution N° 71, dated September 8th, 2004 and on this occasion CPA Félix Daniel AQUIJE SOLER was appointed to prepare said appraisal report, requested as evidence by the PLAINTIFF.

On the abovementioned date, the Accounting Appraisal Report Hearing was duly held, under the terms that appear in the minutes.

The DEFENDANT, having abandoned the testimonies offered as evidence at the time the claim was filed and duly accepted by the Arbitration Court by resolution N° 58 dated March 26th, 2004; and, there being no evidence pending examination, the Arbitration Court issued Resolution N° 78 and declared that the weighing of evidence stage was closed, granting the parties a period of five days in which to file their written pleas, and this decision was duly notified to the parties on November 4th, 2004.

On November 11th, 2004, the parties complied with the filing of their written pleas, giving rise to Resolution N° 79, which set November 30th, 2004 at 10.00 a.m. as the date and time for the oral report requested by both parties.

On the aforementioned date and time, the Oral Report Hearing took place under the terms established in the respective minutes and the magnetic tape recording included in the file as a component document of said file.

By resolution N° 81 dated December 2nd, 2004, this being the status of the case, the Court decides to: award, setting the respective deadline within twenty days calculated as of the day following notification of this resolution,



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

14

which was verified on December 2nd, 2004.

Subsequently, by resolution N° 82 dated December 27th, 2004, having notified the parties on the same day, the deadline to Award was extended by fifteen days, and the date of expiration was set for January 21st, 2005.

## III.  BRIEF SUMMARY OF THE CLAIM

Through a petition dated July 25th, 2002, the PLAINTIFF filed a claim setting several claims related to the Consulting Services Agreement signed by the parties on November 12th, 1997.

The claims are the following:

1. Order the DEFENDANT to pay the amount of US$ 3,557,369.60 (Three million five hundred fifty-seven thousand three hundred sixty-nine and 60/100 U.S. dollars) including the IGV (General Sales Tax) and S/. 3,982,950.00 (Three million nine hundred eighty-two thousand nine hundred fifty and 00/100 Nuevos Soles) plus IGV (General Sales Tax), as fees for the services of the PLAINTIFF'S professional and technical staff, derived from supplementary services to those contracted, and the direct consequence of increased duties that had to be performed due to an almost threefold extension of the original duration, included in the Consulting Services Agreement, for the preparation of the Definitive Studies for the First Investment Stage of the Minimum Cost Expansion Plans for Drinking Water and Sewerage Services located at Tacna, Juliaca, Puno, Ayaviri, Ilave, Cusco and Sicuani, signed on November 12th, 1997.

2. Order the DEFENDANT to pay the amount resulting from adjusting the sum of S/. 3,982,950.00 based on the Consumer Price Index for Metropolitan



MAIRA  SAWAYA · HARB
Sworn Public Translator
Register N° 54

15

Lima – the Lima CPI, as of September 18, 1997 (in compliance with Clause Four, paragraph 01 of the signed agreement), plus IGV (General Sales Tax). This adjustment should be calculated up to the date of issue of the Award in the current arbitration process.

3. Order the DEFENDANT to pay all interests accrued on the unpaid amounts as of the date on which payment obligation originated, taking into account the maximum banking interest rate for commercial operations established by the Central Reserve Bank. These interests are accrued up to the actual date of payment.

4. Order the DEFENDANT to pay the amount of US $ 15,628.05 and S/.134,388.92 for expenses and bank commissions originating from the need to maintain the guarantee letters granted by the PLAINTIFF and caused by reasons not attributable to the PLAINTIFF, accrued as of the signing date of the Agreement until the present date.

5. Declare that the provisions contained in Director's Resolution N° 233-2001/PRES/VMI/PRONAP/DE dated October 10th, 2001, issued by the DEFENDANT's Executive Director, are not enforceable against the PLAINTIFF, approving the Settlement of the Agreement, to the extent that it rules out and does not take into consideration the items indicated in points 1 to 4 of the body of the claim.

As the grounds for the filed claims, the PLAINTIFF sustains that the DEFENDANT has violated the elementary principle of good faith, the pillar on which every agreement rests, providing information for the development of the proposals, assuming technical aspects that in practice turned out to be

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

16

substantially different, originating more tasks that those provided for in view of the information supplied and that has led to an agreement signed for a 315-day period being extended in real terms to practically 984 days (to August 23rd, 2000), date in which the Final Report was delivered, after the last observations of the Supervisor were corrected); without the DEFENDANT proving to be willing to compensate for this situation not attributable to the PLAINTIFF and originated in the conduct demonstrated by the DEFENDANT itself.

In addition, the PLAINTIFF maintains that in its review of the proposal it clearly states that, for the technical portion, a specific number of man-hours were estimated, which in actual fact were increased excessively.

Likewise, the PLAINTIFF states that on the basis of this man-hours relation, it had estimated the delivery of approximately 1,644 drawings, due to the number of professionals proposed and the international times accepted by Consulting Engineering; notwithstanding, they maintain they have had to make 7,109 drawings, as stated on page 28 of the settlement report, an aspect that, as made manifest, was not unknown to the DEFENDANT.

The PLAINTIFF states that, although the facts described could lead one to think that this situation was the result of an undue proposal made by it, given the objective and indisputable fact that all Consultants hired by the DEFENDANT by virtue of the same Bid Tender for the development of the Definitive Studies for the First Investment Stage of the Minimum Cost Expansion Plans for the Drinking Water and Sewerage Services in several cities, have had the same problem and some of them are undergoing arbitration due to the same reason, as is the case of Asociación Parsons — Cesel; in view



MAIRA SUMAYA - HARB
Sworn Public Translator
Register N° 44

of what they indicate, one could ask: Where did the problem originate, in the PLAINTIFF or in the Feasibility Studies provided by the DEFENDANT?.

Abounding in its arguments regarding the manner in which, as the PLAINTIFF maintains, the DEFENDANT has violated the principle of good faith, it indicates that there are some particular circumstances, objective and relevant, that explain such a statement; thus, it reflects on the singular relevance of the fact that the SMS Supervisor (Sondotecnica – Multiservice – Seroconsult Inspection Consortium), was the same one that had previously been in charge of the Supervision of the Feasibility Studies of the Minimum Cost Expansion Plan for the Drinking Water and Sewerage Systems of the 07 cities they were responsible for, thus verifying a possible conflict of interest as they are involved in the preparation of these studies, which would hinder, if not render impossible, the acceptance by said Supervision of any deficiency identified by the PLAINTIFF in the Feasibility Studies, in view of the fact that they would be accepting their own deficient preparation of the referenced studies, which served as the basis for the development of its proposal and the execution of the Definitive Studies.

On the other hand, the PLAINTIFF indicates that the extension of the duration of the Consultancy it was responsible for, does not constitute an isolated occurrence that can be attributed to it; rather, and to the contrary, it has been a constant factor that has also been verified with two other internationally renown Consultants that won the bid tender for the same project ordered for other cities, which also elaborated their proposals on the basis of the technical information (basically the Feasibility Studies) for the respective cities assigned


MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

18

to each one of them, similarly furnished by the DEFENDANT.

Based on the aforementioned, the PLAINTIFF proposes that the analysis the Arbitration Court must perform in this regards, should be to determine if it is in agreement with Contractual Good Faith that the DEFENDANT should benefit from the increased work that had to be done as a consequence of the term of completion of the contract having been extended to almost triple the agreed duration, due to causes that cannot be attributed to the PLAINTIFF and that originated in the deficient information provided by the DEFENDANT and which, as stated by the PLAINTIFF, in many cases turned out to be substantially different from that observed on site; that is, over and beyond any reasonable margin that would enable a simple adjustment to be made to the Feasibility Studies.

The PLAINTIFF states that this lacks both justice and equity, and is not pursuant to its rights that the state should seek to obtain an advantageous position arising from the execution of a contract, even if this agreement is on a lump sum basis, if it is evident that this derives from a flagrant lack of observance of the elementary principles of good faith.

Subsequently, the PLAINTIFF holds forth on the inevitable dependency between the Definitive Study and the Feasibility Study which serves as its foundation; to explain that, in order to complete a project at a definitive level, a feasibility study level is the first requirement, and whosoever attempts to develop a Definitive Study must essentially use the review of the Feasibility Study as the basis for this project, in order to outline or obtain an overall view of the principal aspects the project should contain.



MAIRA  GAWAYA - HARO
Sworn Public Translator
Register N° 54

19

The PLAINTIFF maintains that the Feasibility Study supports the scope and features of the Definitive Study, serving as the foundation to gage the quantity of services required and estimate their global cost; therefore, these must be qualified and trustworthy, as well as exhaustive and conclusive regarding what is supposed to be accomplished in the Definitive Studies; thus, the methodology for their execution must be indicated by its terms of reference and the Feasibility Studies themselves.

The PLAINTIFF states that its proposal for the development of the Definitive Studies was executed on the basis of these documents, primarily in order to estimate the resources needed for their completion.

The PLAINTIFF indicates that the Feasibility Studies and their own terms of reference permit a clear knowledge of the tasks performed during their execution and indicate a starting point for the tasks to be performed by the Definitive Studies; as well as for the evaluation and estimate of the necessary resources; thus, when the Feasibility Studies fail to comply with indications (contained in the terms of reference) and these are irrefutably found to lack qualifications and completeness, and what could be even more serious, that the solutions proposed therein are not feasible; then they will have failed in their primary intent and the calculation of resources will also have failed, in order to complete the Definitive Studies, based on those deficient and unqualified documents.

The PLAINTIFF maintains that, in the present case, the referenced verification was only possible during execution of the contracted works, thus the data contained in the Feasibility Studies was considered exact and conclusive

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 34

20

on the basis of an elementary principle of good faith; but, quite to the contrary, their verification had been inescapable, through field work and other tasks required to evaluate the necessary resources for the proposed work.

The PLAINTIFF also states that the methodology indicated in the terms of reference for the development of the Definitive Studies, in which the data necessary for the completion of the reports had to be gathered through activities included in stages that were subsequent to those serving as a foundation, when prevented from rescheduling the activities in an adequate manner, resulted in a much longer, delayed and costly process the PLAINTIFF cannot be held accountable for.

Based on the aforementioned, the PLAINTIFF states that when the Feasibility Studies are deficient, incomplete or erroneous, the Definitive Studies based on these studies will share the same burden; emphasizing that this assertion is so true that it is even apparent in the Fifth Clause, paragraph II 03 of the agreement celebrated with the DEFENDANT, which literally states: "In the case of the Feasibility Studies for the Minimum Cost Expansion Plans approved by the PRONAP for the sites included in this agreement and meeting with no objection from the IDB (Inter-American Development Bank), these documents will be taken as the basis for the development of the definitive designs".

The PLAINTIFF nevertheless states that the situation encountered at the time of consolidating the solutions proposed in the Feasibility Studies, was completely different, since after analyzing the proposed solutions and comparing them against the actual situation, based on the results of field work,

MAIRA SAWAYA HARB
Sworn Public Translator
Register N° 94

21

the PLAINTIFF was forced to completely re-do, or adequately redesign, for the first time, the systems components, concluding that this cannot be simply understood to be the consolidation of the solutions contained in the Feasibility Studies, but rather the complete development of a new, feasible solution.

The PLAINTIFF maintains that the majority of the errors originated in the plans and Basic information obtained from the EPS for urban development and the land registry systems, with deficiencies that were not adequately corrected or compared against the real situation during development of the Feasibility Studies, as has been verified at completion of all the field services.

For the aforementioned reasons, the PLAINTIFF mentions that the minimum cost solution, the actual consolidated solution that was completely redesigned by the PLAINTIFF, could only be concluded after it was proved that the proposed solutions were not feasible, towards the end of the basic project, when the PLAINTIFF had to return to the field with its professional team to devise new solutions and re-do field work detailing these solutions.

The PLAINTIFF also refers to paragraph II.5, regarding the selection process, bases, terms of reference and the relevance of the Feasibility Studies in the preparation of the PLAINTIFF'S proposal for the Definitive Studies, indicating that these will be prepared in accordance with the information provided by the entity, basically contained in the Feasibility Studies.

The abovementioned is supported by referring to the terms and conditions of the bid tender and terms of reference, which are determined according to the Feasibility Studies and the Definitive Studies, among others, and the former are prior to, and the basis for, the development of the Definitive


MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

Studies (ANNEX 1, GLOSSARY, item F), as established in Clause Five, paragraph II 03 (3, Page 25, Claim) of the Consulting Agreement signed by the parties; and that the Definitive Studies must outline the technical file (detail design engineering, budget plans, polynomial formula, technical specifications, work schedule, among others), for the completion of the work for the improvement and expansion of the Drinking Water and Sewerage Systems for the First Investment Stage, identified in the Feasibility Studies, of the minimum cost expansion plans.

Subsequently, the PLAINTIFF remarks that although it was obliged to make the necessary adjustments to the Feasibility Studies, this in no way means that it attempted to consider that said obligation virtually entailed the additional obligation of re-doing those studies; since, as it maintains, making changes does not mean that the original studies and specific solutions are discarded, in order to seek new solutions that were more feasible and executable, mandatorily including, because of their primary relationship, the planning and development of solutions for the Second Stage, which was not provided for in the contract, as is clearly evidenced in the Consulting Services Agreement signed by the parties on November 12th, 1997, for the preparation of the Definitive Studies for the First Investment Stage of the Minimum Cost Expansion Plans for the Drinking Water and Sewerage Services for the cities included in Group 2.

The PLAINTIFF goes into great detail while stating its claim and presenting supporting evidence of the filed claims, which will also be the subject of analysis and evaluation in the chapter that corresponds to the present



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 34

23

Arbitration Award.

The PLAINTIFF states that the facts described and others included in the claim (documentary evidence, referenced correspondence, and official verification letters), explain why the assumptions on which it constructed its technical and economic proposal, and which served as the basis to establish the amount of the contract were completely distorted during execution of the agreement.

On the other hand, the PLAINTIFF, defining the specific arguments that support each of its claims, maintains that, regarding the payment of US$3,557,369.60 U.S. Dollars including IGV (General Sales Tax); and S/.3,982,050.00 Nuevos Soles, plus IGV (General Sales Tax) for fees for the services of the PLAINTIFF'S professional and technical staff, that those rightfully belong to it, in view of the greater amount of services provided to the DEFENDANT, originated by activities in addition to those included in the agreement, and that, the PLAINTIFF maintains, it was forced to perform due to the extension in the duration of the works, which almost tripled the originally agreed period, for reasons directly accountable to the excessive deficiency of the Feasibility Studies provided by the DEFENDANT; the PLAINTIFF argues that said payment is appropriate, for the following reasons:

a)    Because of the inconsistency detected in the Feasibility Studies that served as the foundation for the preparation of the PLAINTIFF'S technical and economic proposal, and for the start-up of activities.

The PLAINTIFF states that, in effect, its technical and economic bid was based on the analysis of the Terms of Reference that were included in the



MAIRA  SAWAYA - HARS
Sworn Public Translator
Register N° 54

24

agreement and in the Feasibility Studies; it indicates that it was only after commencement of its activities that it became aware that the SMS Supervisor began to systematically reject the PLAINTIFF's partial reports, requesting the execution of services that altered the project design and characteristics and what had been expressly offered in the technical proposal, discovering that it was obliged to accept such requirements for the respective reports to be approved, and refers to the correspondence and official notices that reassigned tasks and complicated the relations between the companies involved in these works.

b)      Due to the existence of substantial changes between what was established in the Definitive Studies developed by the PLAINTIFF, regarding the Feasibility Studies, and which have been accepted by the Supervisor and the DEFENDANT, identifying them in Summary Charts for the Identification of Differences discovered between the solutions proposed by the Feasibility Studies and the new solutions developed in the Definitive Studies pertaining to each one of the cities, as well as the individual and comparative designs of the hydraulic plans, zoning and the respective solutions for Drinking Water and Sewerage System for each city included in group 2, which are attached to their claim as documentary evidence 2, Annex 1D, and clearly demonstrate the new solutions that had to be developed to replace those proposed in the Feasibility Studies. In this regard, the PLAINTIFF maintains that it is clear that due to this situation, the assumptions on which the technical and economic bid were founded, and on the basis of which the amount of the agreement was fixed, were completely distorted during the execution of the agreement.



MAIRA SAVANA · MARÉ
Sworn Public Translator
Register Nº 84

25

c) Due to the plans for the new hydraulic zoning in the cities included in group 2, which would demonstrate the total change in the proposed hydraulic conception; that the preparation of the Feasibility Study did not respond to its own terms of reference, indicating the necessary execution of several activities to add to their respective qualifications and reliability, and, as a consequence of not having been performed, turned out to be documents which did not prove to be a reliable basis for the execution of the Definitive Studies, forcing the PLAINTIFF to undertake a series of activities during the execution of the Feasibility Study and therefore not included in the scope of its proposal and the agreement that, in the end, practically tripled the originally estimated time for its completion.

d)    Since it was proved that the Entity was responsible for the Pre-Feasibility and Feasibility Studies, and that the Supervisor (SMS) that monitors them is also responsible and supervisor, respectively, in the development of the Definitive Studies, it is clear that both companies were perfectly aware of the failings of the Feasibility Studies, which proved to be deficient, unqualified and failed in their main product, presenting plans whose proposed and pending solutions where found to be "unfeasible", and therefore the Consultant is free of any responsibility for overtime and related costs that exceeded the budget and were necessary as a consequence of the aforementioned, to develop and consolidate new hydraulic approaches and solutions to replace those contained in the Feasibility Study, which were found to be unfeasible, involving tasks referring to the search and establishment of solutions, not only for the First Investment Stage of the Minimum Cost Expansion Plans for Drinking Water and



MAIRA  SAWAYA · HARB
Sworn Public Translator
Register N° 54

26

Sewerage Services in the cities of Group 2, but also for the Second Stage, due to the need to develop a perfect conceptual identity between them, in every aspect, particularly in the hydraulic aspect that is directly dependent upon the sources and topography.

e)    The PLAINTIFF also says, regarding the DEFENDANT'S obligation    to admit its obligation to pay the claimed amounts related to fees for the services of professional and technical staff, rendered as a consequence of the extension of deadlines for reasons not attributable to the consultant, and on the implications of the lump-sum contract; that when the contract was signed on November 12th, 1997, Executive Order No. 208-87-EF-REGAG was in force and was applicable in this case, and Article 117 enables the Entity (PRONAP) to pay the contractor directly for the execution of supplementary services, in duly justified cases, which in the present case are justified by all the deficiencies in the Feasibility Studies and their consequences, which were already commented in the previous paragraph, highlighting in the present paragraph the obligation of PRONAP and the Supervisor, in accordance with Official Notice 458-99/PRES/VMI/PRONAP/PDES    and    SMS    correspondence    664-99, respectively, of keeping all professional and technical staff readily available in these cities, pending approval of the final report, as well as obtaining a No Objection from the IDB (Inter-American Development Bank).

f)    The PLAINTIFF also alleges that the DEFENDANT Entity and the Supervisor were aware of and satisfied in their acceptance of the Definitive Studies, which, had they been strictly based on the indications contained in the Feasibility Studies, would have been deficient, incomplete and even unfeasible



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

27

in the field.

g) The PLAINTIFF continues to argue that, in the present case, the fact that it had to deal with aspects that the terms of reference and, essentially, the supporting Feasibility Studies considered valid, that is, supplementary services that were not foreseen in the technical or economic proposal, proves that one can no longer talk about the concept of a lump sum, purporting to deny a payment that is not only rightful, but logical, just and equitable, which is what, in the end, this Arbitration Court should evaluate, even more so when it refers to an ex aequo et bono arbitration.

Regarding the determination of fees for the increased supplementary services, the PLAINTIFF maintains that, having demonstrated beyond a shadow of doubt that it has rendered services over and above those offered and contracted, it considers that the Value of these services should be determined in view of the increased duration that, due to the situations that arose and the demands of the DEFENDANT, forced it to have its professional and technical staff perform activities and remain at the permanent disposal and requirement of the Entity, in order to complete the Definitive Studies to the DEFENDANT'S satisfaction.

In view of the aforementioned, the PLAINTIFF states that it would not be valid for the amount of its compensation to be determined by a simple addition to its proposal for the preparation of the Definitive Studies, plus the cost of the Feasibility Studies, since, due to the work methodology imposed on the PLAINTIFF, it was forced to perform excessive additional tasks, before finally arriving at the definitive results; the PLAINTIFF exhibits comparative examples



MAIRA SAWAYA · HARB
Sworn Public Translator
· Register N° 54 ·

28

and finally repeats that its economic proposal was presented on the basis of inaccurate information provided by the very same Entity that sponsored the Bid Tender, as a basis for the development of its contracted activities, and it is for this reason that said unscheduled activities have had to be performed during periods of time that never could have been calculated for the work they were contracted to do.

The PLAINTIFF finally comments that through the appraisal report to eventually be performed in regards to the Feasibility and Definitive Studies executed to the entire satisfaction of the Supervisor and the DEFENDANT, the existence of substantial changes will be clearly noticed and fully demonstrate that new solutions had to be developed to replace those proposed in the Feasibility Studies, and discarded because it was proved that they were not feasible or practicable, and evidently not part of the PLAINTIFF'S contractual obligations.

In what concerns the adjustment of the payment in Nuevos Soles claimed in the aforementioned point, the PLAINTIFF maintains that the contract established an amount in U.S. Dollars and an amount in Nuevos Soles, and in Clause Four, paragraph 01, it establishes that these sums must be adjusted up until the date of issue of the Award, applying the Consumer Price Index for Metropolitan Lima, regarding the prices as of September 18th, 1997.

Regarding the interests accrued by the DEFENDANTs amounts, it indicates that, according to Article 94 of the REGAG the very same agreement mentions that "in the event that the consulting entity does not comply with payment of the amounts withheld within the period of time indicated in Article 93



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

29

(60 days after the services were concluded), the Consultant will have the right to the payment of interests and commissions equal to the maximum rates established by the Banco Central de Reserva del Perú"; additionally, it states that since PRONAP did not cancel the supplementary services performed during execution of the agreement, and refused to recognize these services, the PLAINTIFF is entitled to receive payment of the respective interests according to the aforementioned regulation, and requests the Court to issue an express decision regarding the manner in which these interests should be calculated, and the date as of which they are generated.

In reference to the payment claimed for expenses and banking commissions arising from the need to maintain letters of guarantee beyond the estimated date, for reasons not attributable to the PLAINTIFF, this is a consequence of the term for completion of the agreement having extended beyond the initially established duration, for reasons not attributable to the PLAINTIFF and that, essentially, have been shown to be attributable to the fact that the PLAINTIFF was obliged to perform supplementary services to those proposed and that, in view of the DEFENDANT's refusal to submit payment as claimed, it has had to maintain the Letters of Guarantee, beyond the term initially estimated in the agreement, both in Nuevos Soles and in U.S. Dollars. Said amounts are US $ 15,628.05 and S/. 134,388.92, as can be seen in Annex 1P and that amount only pertains to costs for the extended periods of time during which these guarantees have had to be kept up.

Finally, regarding the rejection of the final settlement effected by the DEFENDANT    and    approved    by    Director's    Resolution    No.    233-

MAIRA  SAWAYA - HARB
Sworn Public Translator
~ Register N° 54

30

2001/PRES/VMI/PRONAP/DE, the PLAINTIFF requests the Arbitration Court - to the extent that the measure of said settlement does not include the DEFENDANTs sums, duly detailed in the preceding points-, to reject only that point, as it is precisely for this reason that this arbitration has been requested. The PLAINTIFF also requests the Court -in view of the fact that both parties have agreed on all the other points of the settlement, and only the aspects subject to this arbitration are in dispute-, order that the Final Settlement to be made be identical and only incorporate the aspects determined by this arbitration, in order to avoid the Entity from subsequently attempting to make a different settlement.

Finally, and alleging the reasons contained herein, the PLAINTIFF requests that its claim be declared to be justified in every point.

## V. BRIEF SUMMARY OF THE ANSWER TO THE CLAIM

The DEFENDANT, through a petition submitted to the Secretary on August 16th, 2002, replies to the proceedings to file an answer to the claim, to deny and contradict it in each and every claim raised, for the reasons explained in said petition.

Arguing its position, the DEFENDANT expounds at length on the work contract and the lump sum concept.

Regarding the work contract, the DEFENDANT maintains that the first aspect to be considered by the Arbitration Court and on which it should take a stance, is that in this case we are undoubtedly faced with what our Civil Code terms and typifies as a work contract, in its Article 1771; the kind that constitutes a perfectly precise and typified species of the contracts whose genre

MARTA GALANA – PARC
Sworn Public Translator
Register Nº 59

31

is identified as a rendering of services, in Article 1751 of the referenced Code.

The DEFENDANT indicated that Article 1771 of the Civil Code defines the Work Contract as one in which the contractor takes on the obligation to perform certain work and the contracting party agrees to pay him compensation.

It explains that in this definition, an essential element for the contractor in this contract, is that he promises and takes on the obligation of achieving a result, which is precisely the work; whereas the contracting party or client's obligation is to pay the agreed price, naming a civil construction contract as a typical example of a work contract and emphasizing that the work contract is characterized by the obligation assumed by the businessman to provide the proprietor of the job with the result of services rendered, against the payment of compensation.

The DEFENDANT indicates that, although a civil construction contract has been used as an example of a work contract, the work is not always necessarily tangible, and it states that it is perfectly feasible for the work to be artistic, architectural, intellectual, scientific; to sum it up, any task of which a certain result is expected and demanded, can be the subject of a work contract.

The DEFENDANT says that, when dealing with the execution of architectural, engineering or similar projects, the work will involve the preparation of all the designs, plans, sketches and their respective explanations (reports or technical specifications); to the extent that the businessman or contractor will deliver, as the completed work, a full set of technical documents that will enable the future constructor to execute the respective building, facility, structure or complex project.

MAIRA SAWAYA · HARE
Sworn Public Translator
Register N° 34

32

Regarding the concept of a lump sum, the DEFENDANT states that the contractor's compensation in a work contract can be stipulated in several ways that result in types or variables; therefore, the contract will always be a work contract, but the manner in which the compensation is calculated, stipulated and paid for, will differ.

The DEFENDANT indicates that the Civil Code, in Article 1776, mentions two types of compensation payment: lump sum adjustment work and work by piece and measure; notwithstanding, it mentions there are other types, some of them significant, adopted in the construction sector by custom and usage, particularly unit price work and controlled management work, and other types allowed by contracting freedom, established in Article 1354 of the Civil Code, to those hiring the contractor's services.

It specifies that the concept of a lump-sum contract is identical to the concept that our Civil Code calls a lump adjustment, and both of these are similar to the usual concept of "inclusive of all costs".

The DEFENDANT maintains that a lump sum payment means that the contractor takes on the obligation of performing the work in its entirety, just as agreed, specifying and defining all details and specifications, until full completion and delivery; and that, in compensation, the Contractor will receive a lump sum agreed on by both parties.

In this lump adjustment, the parties agree to establish an equivalence between the value of the completed work and the agreed price or compensation, in such a way that the contractor will not be able to collect any additional amount for anything he might have to do to complete the work, with



MAIRA SAWAYA · HASS
Sworn Public Translator
Register Nº 54

33

no exceptions, because the costs of the work are at the Contractor's own expense and risk.

The DEFENDANT maintains that the purpose of the parties on agreeing to such a lump adjustment or lump sum – that is, all costs to be borne by the contractor-, is to ensure in advance a total and single sum to be disbursed by the contracting party, proprietor of the work, in exchange for the full and completed work, with all the features and accessories agreed in the contract. In this respect, the DEFENDANT maintains that the contractor is responsible for calculating or estimating the total resources to be invested in the work and its costs, with a margin contemplated to cover unforeseen circumstances and to be added to his own profit or income.

The DEFENDANT states that, in the event that the contractor manages, through his own efficiency and activity, to perform the work at a lower cost that estimated, his profit would be increased; if the contrary occurs, his profit would decrease; and, in extreme cases, he could also suffer some losses.

The DEFENDANT indicates that this is the essence of the lump adjustment or lump sum, where the contractor has the opportunity of earning more if he acts efficiently and diligently; he runs the risk of suffering losses or earning less if he incurs in inefficiencies, negligence, arrears, or errors. For the owner or contracting party, his acceptance of the lump sum implies his acceptance that the work may cost him more than it would cost if it were performed in accordance with its real cost plus a profit calculated for the contractor; in exchange, he is assured that there will be no unfavorable cost fluctuations and this cost will be stable and unaltered.



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

34

The DEFENDENT maintains that this claim of the parties, where each one of them faces a certain advantage and a certain risk, is the essence of the agreement, which must be complied with in accordance with the ruling of Article 1362 of the Civil Code.

Regarding the adjustments to the lump-sum contract, the DEFENDANT states that even after both parties have agreed to the lump-sum contract, this does not mean it is unalterable. The DEFENDANT states that what is unalterable and must be respected by the parties is the established equivalence or balance: agreed work -- agreed fixed price; notwithstanding, by law or agreement and by resorting to contractual freedom, it is possible to make some changes to the compensation during the execution of the work.

The DEFENDANT indicates that the legal grounds for increasing compensation are contemplated in Article 1776 of the Civil Code, in such a manner that, if the work increases through a written request from the proprietor or contracting party, there are reasons for an increase in compensation, due to the additional quantity or cost of the work.

Besides the legal grounds, the DEFENDANT indicates that the contract itself can and frequently does establish some circumstances that permit the contractor to demand an increase in his fees.

Regarding the legal nature of the contract signed by the parties, the Consulting Services Agreement, the DEFENDANT states that it is undeniably a lump-sum work contract; that is to say, a contract for the rendering of services in accordance with Article 1735 of the Civil Code, but not of the services type, but precisely of the work contract type, according to Article 1771 of the Civil



MAIRA S. MAYA - MAPS
Sworn Public Translator
Register N° 44 .

35

Code, for the development of a specific project for a fixed amount, inclusive of all costs.

The DEFENDANT emphasizes that it is a results agreement, by virtue of which the Contractor (PLAINTIFF) must deliver the specific fruits of certain tasks; the definitive project of the drinking water and sewerage works at the stipulated sites, with their plans, reports, etc.; the DEFENDANT maintains that it is a project, even though it is not a construction, of the intangible or technical type, but that, in the end, it considers that it is the obligation of the contractor - called a Consultant in the signed agreement-, to prepare, complete and deliver a specific result comprised of a series of plans of different types, reports and technical reports which, all together, make up the work including the technical details of the project to build a drinking water and sewerage network in each one of the stipulated sites.

The DEFENDANT maintains that the agreement signed by both parties is a lump-sum or adjusted-lump contract, because the total project includes a total agreed amount in Nuevos Soles and another in Dollars, where compensation is expressly agreed to be a lump sum, according to Clause Four, paragraph 01.

The DEFENDANT mentions that Clause Four, paragraph 01 of the contract, established that the amount of compensation in Nuevos Soles was to be readjusted during the course of the agreement, in accordance with the CPI for Metropolitan Lima, and the DEFENDANT states that it complied with this requirement. Other than this adjustment, the agreement only contemplates the case of force majeure, defined in the usual and traditional manner, and subject to a procedure for its identification.


MAIDA ZANAYA - ALOS
Sworn Public Translator
Register N° 34

36

The DEFENDANT maintains that, in the hypothetical case of any circumstance that might qualify as force majeure or unforeseeable event, such an occurrence should have been reported at the time by the Consultant PLAINTIFF to the Inspection and to the DEFENDANT Company, and duly filed together with the respective evidence.

In addition to the aforementioned, the DEFENDANT indicates that the agreement does not contain any other clause for adjusting or admitting increased costs or expenses.

On the other hand, the DEFENDANT reports that at no time was the PLAINTIFF ordered to perform any additional work; nor was it agreed to pay any additional sum for said work.

Regarding delays occasioned by errors or deficiencies in the Feasibility Studies, as claimed by the PLAINTIFF, the DEFENDANT maintains that such a declaration is not supported by the agreement, as the thorough reading of the contract will prove that at no time at all does it stipulate that the contractor PLAINTIFF was to limit the development of the project to the contents of the Feasibility Studies; emphasizing that this is even less so in the case that, if the contractor PLAINTIFF were to effect any restructuring or changes to the project, in keeping with any of the Feasibility Studies, he would receive additional compensation for this work.

The DEFENDANT states that the agreement says that PRONAP will provide the contractor "CONSULTANT" with all preliminary documents and reports (including the feasibility documents) related to the pertinent drinking water and sewerage, whose recommendations shall only serve as reference for



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

37

the performance of the analysis to be done by the Contractor "CONSULTANT". The Feasibility Studies that were granted the non-objection by the IADB (Inter-American Development Bank) will be taken as the basis for the development of the definitive designs by the CONSULTANT PLAINTIFF.

The DEFENDANT maintains that the PLAINTIFF was under the obligation to review the Feasibility Studies and develop the final project, modifications and different solutions that, at his criteria, were advisable, that the Feasibility Studies operated as the basis upon which the PLAINTIFF, would determine the definitive solutions; and prepare the final designs for the works, applying its own professional science.

The DEFENDANT maintains that these studies were not declared to be perfect and only needed the details to be developed; quite to the contrary, it states that it was stipulated that it was the CONSULTANT PLAINTIFF's obligation to prepare the Definitive Studies, in compliance with the terms of reference and annexes, and the agreed technical and economic proposal, in order to successfully meet the objectives of the Program. The Feasibility Studies and other preliminary documents are only the basis or reference data that will assist the contractor "CONSULTANT", but they do not exonerate him from his own responsibility and obligation to prepare the definitive projects at the construction level.

The DEFENDENT argues that the PLAINTIFF cannot now claim that it had to reframe or make changes to the solutions proposed in the Feasibility Studies, in view of the fact that the review of the solutions proposed in such studies, as well as the search for and development of the best alternatives was

part of the Plaintiff's assumed obligation, therefore it cannot claim additional compensation for this, as it took on the responsibility of completing the entire project for a lump sum, for a fixed and invariable, previously agreed compensation.

In summary, the DEFENDANT states that the contractor Plaintiff's obligation was and is the positive and complete work involving the "preparation of the Technical File" that is needed to build the drinking water and sewerage systems at the sites included in the agreement.

Regarding the delays caused by the lack of information regarding the land registry and others from the Municipalities and Service Companies in the cities included in the projects reported by the PLAINTIFF, the DEFENDANT argues in paragraph 1.9, that the above are not included in the contract as obligations of the DEFENDANT, emphasizing that they did comply with the obligation of providing the information they had available. That it is understood, because of the generic manner in which this clause is written (Clause Five, II, 03), that this documentation is the one that previously and actually is in the hands of PRONAP, therefore it could be understood that "THE CONSULTANT" would base his work on the existing documents, particularly the Feasibility Studies, but cannot demand any others.

The DEFENDANT relates that Clause Five II, 02 of the agreement, stipulates that the EPS are obliged to provide the "CONSULTANT" PLAINTIFF with all the information and documents available and related to the study; but that it merely reports that certain third parties, the EPS, have assumed the obligation before PRONAP to furnish information to the CONSULTANT. In



MAIRA SANAYA - HARB
Sworn Public Translator
Register N° 54

39

addition, it indicates that the commitment is only to deliver the available information and documents; in such a fashion that there is no set list or description of mandatory documents and information, the lack of which or the delay in its submission could be invoked by the PLAINTIFF as a pretext for not complying with its obligations.

THE DEFENDANT, replying specifically to the claims contained in the claim, says:

Regarding the payment of higher sums for services, THE DEFENDANT maintains that this claim is totally groundless, in view of the nature of the contract signed by the parties, according to which none of THE Plaintiff's professional and technical staff is hired by the DEFENDANT, in such a fashion that the payment of professionals and technicians employed by the contractor for the execution of the work and compliance with his obligation, are his exclusive responsibility and at his own cost and expense.

The DEFENDANT maintains that this point of the claim modifies the agreed lump-sum payment concept, for the purpose of claiming and receiving compensation in accordance with supported accounts, as in the case of managed contracts, which is not admissible once the contract is terminated, and grants the DEFENDANT no chance to prove the veracity of such expenses, as it could have done week by week, if the work had been contracted according to the management control system.

THE DEFENDANT claims that no supplementary services that would justify additional fees have been verified, because the PLAINTIFF limited itself to executing the tasks that it was hired to do; therefore, it has not performed any

MAICA SAWAYA - HARB
Sworn Public Translator
Register N° 54

40

services in addition to those that were the subject of its contractual obligations.

Regarding the Plaintiff's declaration regarding the extension that tripled the originally agreed term of the work, the DEFENDANT maintains that there is an evident conceptual confusion, given that all the tasks that were needed to reach the results agreed on in the project contract, are tasks to be borne solely by the contractor PLAINTIFF; therefore, the fact that performing such tasks involved additional days, does not imply that greater tasks or supplementary services were rendered.

The DEFENDANT claims that these are the same tasks and services, only that the contractor PLAINTIFF had taken longer to do them, which does not give it the right to charge more; rather, and to the contrary, it should be penalized for arrears as agreed in Clause Six, paragraph 02 of the contract.

Going into more detail regarding its statements, the DEFENDANT indicates that the PLAINTIFF cannot invoke its own delay in a generic and indiscriminate manner to demand greater compensation, given that it was not hired at a certain amount per day, but for a global sum called a lump sum, taking into account that the duration in the contractor's favor is only applicable in the event that due to force majeure the work is brought to a stand-still, originating an idle expense that must be supported by providing the proprietor with the appropriate documentation, which the PLAINTIFF never did.

Regarding the second claim regarding adjustment for inflation of the amount claimed in Nuevos Soles, the DEFENDANT maintains that this claim is groundless, since the claim to receive payment in Nuevos Soles for the first point in the list of claims is groundless, as there is no amount or sum to be



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 84

41

adjusted, it is logical to say that the claimed adjustment is not applicable; notwithstanding, the DEFENDANT indicates that, in the denied assumption that there were a sum to adjust, it is excessive to expect this adjustment to be done as of the beginning of the contract, and it should be calculated as of the date on which the expense was actually incurred.

Regarding the interests demanded in the third claim, the DEFENDANT maintains that such claim is groundless, because no sums are owed to the contractor and, in view of the fact that the amounts claimed in claims 1 and 2 are also groundless, there are no interests to be paid.

The DEFENDANT adduces that regarding this claim an excess is also being incurred, as the PLAINTIFF expects to receive the maximum banking rate of interest for commercial operations, because the contract does not establish an agreed interest rate and when this occurs, the only applicable interest is the legal rate stated in Article 1245 of the Civil Code.

As concerns the claim for the DEFENDANT to reimburse expenses for bank guarantees, the DEFENDANT states that the PLAINTIFF does not explain the grounds for its petition, since the costs for bank guarantees are to be borne by the contractor, therefore if the PLAINTIFF has had to keep current certain letters of guarantee, it is because the observations made by the Supervisor, regarding the PLAINTIFF'S compliance with its obligations, were not yet corrected, and they are the contractor's responsibility.

Finally, the DEFENDANT discusses the fifth claim relative to not applying R.D. N° 233-2001-PRES/VMI/PRONAP, manifesting that this subject is unrelated to the arbitration, because from what is resolved concerning the

MAIRA  SAWAYA · HARB
Sworn Public Translator
Register N° 54

42

Defendant's claims over several additional sums, amendments will or will not be made, by applying the above-mentioned Board resolution.

Forthwith, the DEFENDANT expounds at length and in detail on the other arguments of its defense, about the different subjects presented by the PLAINTIFF, to refute, deny and contradict them, and said items will be analyzed and evaluated in the pertinent chapter of this Arbitration Award.

The DEFENDANT finally requests that, in view of the reasons expressed, the claim should be declared groundless, with an express order to pay costs.

## VI.- THE EXPERT APPRAISAL, OBSERVATIONS MADE BY THE PARTIES AND EXPANSION OF THE EXPERT APPRAISAL:

On September 30, the Expert informs the Arbitration Court that his work is concluded, attaching the receipts for professional fees made out to each of the parties.

The PLAINTIFF proceeded to pay the appraisal fees in full within the term established by the Arbitration Court; and the DEFENDANT entity, due to several problems of an administrative nature, only complied with the respective payment on January 20th, 2004, only then expediting the delivery of the Expert Appraisal Report, and it was filed with the Arbitration Court on January 26th, 2004.

## VI.1 BRIEF SUMMARY OF THE TECHNICAL APPRAISAL

After reviewing the technical file and documents received from the Arbitration Court, through Resolutions N° 25 and N° 28, the Expert prepares his appraisal and delivers the results in four(04) volumes;

Volume I        Principal Report: Replies to questions asked by the Arbitration



MAISA TAWAYA - HARB
Sworn Public Translator
Register N° 54

43

Court.

Volume II       Solutions for the Drinking Water and Sewerage Systems: Description, evaluation and comparison of engineering solutions in the Feasibility and the Definitive Studies.

Volume III      Summary of the Existing Systems and the Solutions adopted; study and comparative analysis of the solutions in both studies, applied to the sites included in the agreement

Volume IV       Plans in two volumes: of the sites with the solutions in both studies for Drinking Water and Sewerage, designed on slides to be able to compare them by superimposing one over the other.

The Expert designated by the Arbitration Court, Engineer Alvaro H. FLORES BOZA, began his work by presenting the conceptual outline within which he has performed the requested appraisal; he reports that the referenced outline has been structured on the basis of the definitions of the principal concepts that were utilized, which are found in the documents of the agreement, highlighting that these very same concepts are handled and understood in this manner by public and private sector entities, and by the foremost multilateral credit entities. Among the conclusions he reaches and points out in this outline are the following:

a) After considering the case on the basis of the principal definitions indicated in the documents of the contract regarding the Feasibility and Definitive Studies, he concludes that: there is an undeniable dependence, primarily regarding sanitation, between the Feasibility Study and its sequential Definitive Study.



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

44

b) Likewise making some considerations about the Definitive Studies and their Consolidation Stages and Basic Project, the utilization of which, for the preparation of the Definitive Studies, has specific conditions that were not justified in the present case, indicating as the reason for their inclusion, the Entity's potential doubts regarding the preparation of the Feasibility Studies, concluding that conditions did not warrant taking the Feasibility Studies up to a higher level.

He subsequently says that a lump-sum contract is applicable when the magnitude and quality of the services to be rendered are totally defined in the technical specifications and in the terms of reference: in the case of the works in the plans and respective technical specifications, mentioning paragraph 1.2.28 of RULCOP which so recognizes it, and now Article 45 of the Ruling of the State Contracting and Acquisitions Law.

c) The Expert, citing some considerations regarding the analysis he has performed for the preparation of the appraisal ordered by the Court, states that the solutions of the Definitive Studies approved by the DEFENDANT were different to those proposed in the Feasibility Studies, which had also been approved by the Entity itself; and they should therefore be considered correct and conclusive; he also says that: In the preparation of a proposal for the execution of Definitive Studies, the sizing of the resources and calculation of costs for the different services to be performed, are made on the basis of the conclusions and solutions contained in the Feasibility Study, the only documents available to this end and that the replacement of solutions proposed in a Feasibility Study by others that respond to different

hydraulic plans, are not contemplated as work to be performed in Definitive Studies of this nature, as can be understood from the definitions of both studies which appear in paragraphs 1.1 and 1.2 of this chapter.

Following his statements, the Expert concludes that: the Consulting Services Agreement for the Preparation of the Definitive Studies of the First Investment Stage for the Minimum Cost Expansion Plans of the Drinking Water and Sewerage Services in the cities of Group 2, the object of the Expert Appraisal Report ordered by the Arbitration Court, did not meet the necessary conditions, as indicated in the State Contracting and Acquisitions Law, nor according to international practice institutionalized by the Multilateral Credit Entities, for contracting the Preparation of the Definitive Studies through the "Lump Sum" system.

Stressing that Volume I is the sequential result of the analysis developed on the documents delivered by the Court, which are recorded in the other volume of the Expert Appraisal Report, the Expert comments that it is in this Volume that he responds to the questions asked by the Court; the following is a summary of his answers in Volume I of the Appraisal Report:

Question:

1.-    If the solutions proposed in the Feasibility Studies turned out to be consistent with the solutions finally developed and accepted in the Definitive Studies; or, if to the contrary, the solutions of the Definitive Studies substantially modified those proposed in the Feasibility Studies.

Answer:

The solutions proposed by the Feasibility Studies for the preparation of the



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

Definitive Studies were not consistent with the solutions finally developed in the latter; the Expert subsequently expounds on the reasons that support his conclusion to Objective 1, concluding this answer in Volume I.

Question:

2.- If the solutions proposed in the Feasibility Studies could have been consolidated in the Definitive Studies or through reasonable adjustments to the engineering practice, or if the consolidation made in the Definitive Studies actually involved the search for new, substantially different solutions, that exceeded any normal margin of consolidation and adjustment.

Answer:

The solutions proposed in the Feasibility Studies could not be consolidated by the Definitive Studies, as commented in the preceding paragraph, since the latter developed their own and different hydraulic plans, encompassing solutions for the full scope of the project, at the end of the Second Stage. To design solutions for the Second Stage of the project was not the object of the contract, they were nevertheless necessary for the comprehensive plans for the systems, since the works of the First Stage have to be supplemented with those of the Second Stage in order for the solutions to be sustainable for the full scope of the project;

The Expert subsequently expounds on the reasons that support his conclusion to Objective 2, concluding this answer in Volume I.

Question:

3.- Establish the reasons and supporting factors used for the modifications, if these exist, in the Feasibility Studies; and based on the aforementioned, reach



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

47

a decision on:

a) Which would be the technical, economic and reliability evaluation of the Feasibility Studies?

b) The repercussion of the Feasibility Studies while serving as the basis for Figueiredo Ferraz's preparation of his economic proposal and the sizing of the resources assigned to undertake the Definitive Studies.

Answer:

The Expert replies to the first part of this question, summarizing the previous answers in which he considered the reasons and supporting factors that resulted in the modifications made to the solutions developed by the Definitive Studies regarding those proposed in the Feasibility Studies.

A summary of the Expert's reply to the second part of question 3 follows below:

Technical Appraisal of the Feasibility Studies:

In general, these did not show an adequate solution and did not resolve the deficiencies identified in the Drinking Water and Sewerage Systems in the cities included in Group 2, previously identified at the beginning of these studies.-

Economic Appraisal of the Feasibility Studies:

The documents analyzed show works pertaining to the same system and defined on the plans for their implementation during the First Stage of the Investment Project; they are ignored in the system and shown in the budget for the works to be established during the Second Stage of the project, preventing the operation of the respective system and, as a consequence, make it



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

48

impossible to serve the population or area for which it was designed.

Reliability Appraisal of the Feasibility Studies: The studies cannot be considered reliable because their hydraulic plans and solutions were not shown to be technically adequate, they were developed using inconsistent basic information, some sources were not identified, there were topographical deficiencies, inexistent infrastructure land registries (cadastres), etc.

Replying to the second part of the question on the repercussion of the Feasibility Studies serving as the PLAINTIFF'S basis for the preparation on its economic proposal and sizing of the resources assigned to the works to be contracted, the Expert indicates a series of deficiencies identified in the analysis of the documents of the Feasibility Studies. He concludes that these studies were elaborated without fully including the works indicated for execution in the Terms of Reference, which due to their magnitude were not contemplated for full development during the Definitive Studies, and that neither the PLAINTIFF nor the other bidders had, on preparing their proposals, the necessary conditions to foresee all the resources that were finally employed in the execution of the Definitive Studies.

Question:

4) Considering the scope of the preceding points, determine the value that, if the case were to arise, should be paid for the Definitive Studies performed by Figueiredo Ferraz, taking into account the period of time in which they have been completed and the magnitude of the task performed.

Answer:

Making some prior considerations, among which we could mention that in



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54 -

49

the Definitive Studies they had to develop solutions that were differed from those proposed in the Feasibility Studies, and were not included in the Plaintiff's contractual obligations, the Expert indicates that the CONSULTANT performed a series of activities that were needed and not provided for in the First Report, developing the tasks in accordance with the terms of reference until the conditions for the hydraulic simulation runs were reached, at the end of the Third Basic Project Report, when it was clearly proved that the solutions proposed by the Feasibility Studies were not viable, and as a result the need arose to develop new hydraulic plans and develop other solutions that were technically and economically feasible, which was not the object of the contract, for the First Stage of the Investment Project and for the Second Stage, observing that the latter was, similarly, not the object of the contract.

The Expert also refers to and indicates a series of stages that were not indicated in the Terms of Reference.

Subsequently, he indicates that as a result of the analysis of the consulted documents, and according to Resolution Nº 28, he has been able to verify important factors that affected the normal development of the Consultant's works, such as: a) the methodology applied by PRONAP to condition the approval of the Definitive Studies Reports to the prior approval of companies that were not part of the agreement between the parties; that, in the execution of the Feasibility Studies, the master plans for Drinking Water and Sewerage of the Service Provider Companies (EPS) were not taken into consideration; b) PRONAP and the Sims's demands regarding the Consultant's technical and professional team remaining on site until final approval of the

MAIRA SAMAYA - HARB
Sworn Public Translator
Register Nº 54 -

Definitive Studies Final Report (Extended Expert's Appraisal); c) other reasons indicated by the PLAINTIFF in its evidence No. 2 - Annex 1-D, regarding which it had not obtained an adequate technical response from the DEFENDANT; adding a series of considerations that support his valuation, in reply to this question posed by the Court.

He closes by saying he considers that the most adequate way to prepare the requested valuation is to make his calculations, utilizing the stipulated contractual prices applied to the estimated team of professionals and expenses for logistics and infrastructure, by the actual period of time required for the preparation of the Definitive Studies, reporting that the values used are those indicated in the Detail of Costs in the Consolidated Budget included in the Consultant's Economic Proposal, and therefore of the agreement, indicating that the result of his calculations, the Expert Appraisal of the Definitive Studies, is the following amount:

Twenty-four million, five hundred sixty-one thousand two hundred twenty and 13/100 Nuevos Soles (S/. 24,561,220.13), plus Three million six hundred twenty-nine thousand one and 70/100 U.S. Dollars US $3,629,771.70).

He observes that the quoted values include the General Sales Taxes and refer to the date of the contract.

Question:

5) Likewise, as part of the expert valuation, the Expert should consider the compatibility -in view of the results of the preceding paragraphs and taking as a basis the comparative table of programmed objectives contained in the Feasibility Studies and those developed in the Definitive Studies for the seven

MAIL─ ... ·RAPP
Sworn Public Translator
Register N° 54 ·

locations included in the agreement-, in order to corroborate or rectify this table, as mentioned in paragraph 7 under the body of evidence chapter of the answer to the claim filed by the PRONAP (now known as PARSSA).

A)    The value of the works performed in the Definitive Studies which were not expressly provided for in the Feasibility Studies.

B)    The value of the works that, although provided for in the Feasibility Studies, were not actually developed in the Definitive Studies.

C)    Establish a comparison and balance between the two of them.

Answer:

Analyzing the tables, observing that the physical goals that had to be detailed in the Definitive Studies were a part of the solutions proposed in the Feasibility Study, which were proved to be unattainable and as a consequence, discarded; and, on the other hand, the physical goals detailed in the Definitive Studies were a part of the new, feasible solutions that had to be developed by the CONSULTANT to replace the ones in the Feasibility Studies, which took up time and resources that were not considered in the referenced tables; in view of the aforementioned, the Expert concludes that the valuation requested in this item is incompatible, as is any comparison or balance of goals that were discarded, because they were part of an unfeasible proposed solution, with goals pertaining to the new solutions developed by the CONSULTANT during and for preparation of the Definitive Studies.

## VI. 2 OBSERVATIONS TO THE APPRAISAL

Having requested the extension of the Appraisal, the Arbitration Court ordered the appointed Expert to develop the extended report duly answering

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

52

and analyzing point five of the object of the appraisal, indicated in Resolution N° 25 with the modification ordered in Resolution No. 28, as indicated in the following:

## VI. 3 BRIEF SUMMARY OF THE EXTENDED APPRAISAL

Based on the comparative table of the goals programmed in the Feasibility Studies and those developed in the Definitive Studies for the seven locations that were the object of the contract, in order to corroborate or rectify said table, referred to in paragraph 7 of the Evidence Chapter of the answer to the claim prepared by PRONAP, currently known as *PROGRAMA DE APOYO A LA REFORMA DEL SECTOR SANEAMIENTO – PARSSA* (SUPPORT PROGRAM FOR THE REFORM OF THE SANITATION REFORM – PARSSA), the Expert was requested to determine:

a)   The value of the works performed in the Definitive Studies that were not expressly provided for in the Feasibility Studies.

b)   The value of the works that were included in the Feasibility Studies, and were not actually reached in the Definitive Studies.

c)   Establish a comparison and balance between both of the above.

The Expert answers this question as requested by the Court, dividing it in two parts:

a)   The first part in which he replies submitting the table in Annex 7, in which the Entity shows its appraisal of the Additional Goals (sub item a) and Unachieved Goals (sub item b), of the Drinking Water and Sewerage Systems for each location in Group 2, and the balance between both valuations.

The quoted Annex is based on Annexes No. 8 through 14, under the

MAIRA  SAWAYA - HARB
Sworn Public Translator
Register N° 54

53

Evidence Chapter in the answer to the claim, thus the Expert explains what each of the columns of the referenced tables represents, in the opinion of the Entity.

Subsequently, the Expert, after a few considerations, says that he employed the criteria and indexes adopted by the Entity to perform, in the same environment, the balance of goals of both studies, obtaining as a result the same goals indicated in the referenced tables; subsequently, by applying the same indexes used by the Entity, he has verified and confirmed that the values encountered for the Goals, as well as the balance between them, coincide with the results indicated in the aforementioned tables, to finally reach the conclusion that, in the environment which he refers to, that is, assuming the criteria adopted by PARSSA, he corroborates the Summary Table in Annex 7, as well as the tables shown in annexes No. 8 through No.14.

b)    In the second part, the Expert performs the respective analysis, as expressly requested in the Arbitration Court's Resolution No. 64 making a series of remarks about the perspective assumed by the Entity, concluding that the values registered in the referenced tables do not show or do not adequately reflect what they are intended to represent, since in the tables in Annexes No. 8 through No.14, the Definitive column shows the Physical Goals of the finally executed Definitive Study; the Feasibility column shows the works in the solution proposed by the Feasibility Study, and from the comparison of both, the Additional Goals and Unachieved Goals are obtained; in this respect, the Expert states that, in his opinion, the submitted balance does not apply, since it is impossible to compare the works in the Feasibility Study with those in the



MAIRA  SAWAYA · HARB
Sworn Public Translator
Register N° 54

54

Definitive Study finally developed by the CONSULTANT on the basis of a solution that had to be determined during the preparation of the study itself, as if this were the definitive study contracted for execution of the basis of the solutions proposed by the Feasibility Study; both Definitive Studies are different, both in concept and in costs.

Following this line of thinking, he maintains that it is incorrect to appraise the Achieved Goals, since they are the result of a non-applicable balance; he subsequently makes a series of considerations that reiterate the aforementioned, in the sense that the studies which were finally completed are different to those originally scheduled, which required resources that could not be calculated in advance and, as a consequence, both studies have different values, and he supports his statements with what was proved throughout the Expert Appraisal.

He ends the analysis requested by the Arbitration Court, indicating that, regarding the final balance, in addition to the aforementioned, the Court must consider that the demands of the Entity: in subjecting the contracted Work Reports to prior approval by third parties not included in the contract, as well as the Entity's demand that the CONSULTANT keep his team of professionals available until completion of the works and other requirements indicated in the Expert Appraisal Report, are conclusive factors, in his opinion, that for the referenced balance to be correct and the most adequate, it should be the result of the comparison of the value of work contracted by the parties, with the valuation quoted in the abovementioned paragraph, of all the work performed for the preparation of the Definitive Studies, finally completed by the

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

55

CONSULTANT for the cities included in Group 2, as requested in Resolution No. 28, Objective 04 of Resolution No. 28.

He subsequently presents the following tables:  Expert Valuation of the Definitive Studies; Total Value of the contract between the parties; Final Balance between the Valuation of the Definitive Studies and the Agreement, from which he concludes, as a result of the final balance, that the corresponding value is:

US $7,713,019.62 including the General Sales Tax, with no adjustments.

Observing that the value in U.S. dollars refers to the date of the Consultant's economic proposal at 18-Sep-97, with an official rate of exchange of US$ 1.00 = S/. 2.644 (selling rate).

## VII. BRIEF SUMMARY OF THE ACCOUNTING APPRAISAL PERFORMED

Having the Arbitration Court ordered the preparation of the accounting appraisal requested by the PLAINTIFF concerning the "manner in which the application of interests referred to in Article No.94 of the General Ruling for Consultants Activities (according to Resolution No.71), should be interpreted", the appointed Expert proceeded to explain that, although this regulation refers to the entity's obligation to acknowledge interests and commissions equal to the maximum ones established by the Central Reserve Bank of Peru for Commercial Bank loans of any type, and to date the Central Reserve Bank of Peru no longer sets the maximum interest rates for Commercial Bank loans of any type; this does not mean that this type of interest rate does not exist, that is, rates for Commercial Bank loans.

In this respect, the Expert explains that these rates have been replaced

MAIRA  SAWAYA - HARB
Sworn Public Translator
Register N° 54

56

by the TAMN (Average Nominal Annual Rate) and TAMEX (Average Annual Foreign Currency Rate) rates that, as ordered by the Central Reserve Bank, are published by the Banks and Insurance Superintendence in the Official Newspaper "El Peruano", under the heading "Average Interest Rates by Type of Credit for the past 30 work days" concerning loan operations granted by Commercial Banks, and the highest rate is the one that corresponds to overdraft operations.

The Expert goes on to say that, taking into account that: (i) the BCRP (Central Reserve Bank of Peru) fixed the rates directly up until July 1990, and as of August 1990 ordered that the Financial System operations with end-users should be fixed by the financial entities, according to market indicators, without exceeding the maximum limits ordered by the BCRP (Central Reserve Bank of Peru); (ii) that once Legal Decree N° 770 (03-Nov-93) became effective, the contents of the first paragraph of Article No. 1243 of the Civil Code no longer cover financial intermediation activities; and (iii) that the settlement of interests requested in the FIGUEIREDO FERRAZ/PARSSA ARBITRATION PROCEEDINGS is dated after 12-Nov-1997, it is without question that the rates (TAMN and TAMEX) applicable in the case under study, are the ones ordered by the BCRP and published by the Banks and Insurance Superintendence in the official newspaper "El Peruano", under the heading "Average Interest Rates by Type of Credit for the past 30 work days", and, in reference to the different types of loans granted by Commercial Banks, whether: "Account Advances", "Overdrafts"[1], "Discounts and Loans up to 30 days", "Discounts and Loans from

---

[1] In the majority of cases, the "OVERDRAFTS" are given with the highest rates in the market.

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

31 to 90 days", "Discounts and Loans from 91 to 180 days", "Discounts and Loans from 181 to 360 days", and "Discounts and Loans for over 360 days", the highest rate should be obtained from these rates.

In his report, the Expert explains the methodology to be followed in this way:

The BCRP's Regulations and Financial Analysis Department has published a document called "WAYS TO CALCULATE DEFAULT, LEGAL AND ARREARS INTERESTS" (see ANNEX 01), which explains that in the financial system the following formula is used for the calculation of interests:

$$Fie = \{[(1+\tfrac{TEI}{100}) \times (1+\tfrac{TE2}{100})^{N2/M} \times \ldots\ldots \times (1+\tfrac{TEn}{100})^{Nn/M}] -1\}$$

Where:

C  = Capital or debt

Fie = Factor with Effective Interest Rate

TE = Effective Interest Rate (to apply Article N°. 94 of the REGAC the

highest interest rate for Commercial Banks loan operations)

N  = The Number of days for which interest rate is effective

M  = 360 or 30, whether they are annual or monthly interest rates.

Therefore, the amount of interest would be: $\boxed{C \times Fie}$

The second last paragraph in the referenced document (Annex 01) says: "For the calculation of interest referring to TAMN and TAMEX, divide the cumulative factor at the date of payment of principal or debt is made effective

58

(or the closing date of the period to be settled)[2] by the cumulative factor on the maturity date of the principal or debt (or the starting date of the period to be settled)[3]. Subtract the unit from the result of the division of these factors, to apply it to the principal or debt".

Thus, to apply the interests in accordance with Art. N° 94 of the "REGAC", one must do the following:

1° For the period that interest has to be settled, obtain the highest market rates for Commercial Bank loans.

2° Find the Cumulative factors (FA) applicable to the period; for this purpose, there are two (2) procedures:

(i)    Apply the aforementioned Formula, a procedure that is not recommended for lengthy periods, taking into account that the chosen rate can vary from day to day o in very short periods, which would originate a formula with infinite arithmetic operations that would make verification of the calculations impossible.

(ii)    Create a Table of Cumulative factors, cut off month by month, for easy, demonstrable and verifiable use, (see example-ANNEX 03. Accounting Report).

## CONCLUSIONS OF THE ACCOUNTING APPRAISAL

1.    Taking into account that, as ordered by the Central Reserve Bank of Peru, as of August 1990, Interests Rates are free; that is, they are fixed by the financial entities in accordance with market indications, the current application of Article No. 94 of the General Ruling for Consulting Activities "REGAC", entails observation of the maximum rates fixed by

---

[2] The text in parenthesis belongs to the undersigned.
[3] The text in parenthesis belongs to the undersigned.

MAIRA SAWAYA · HARB
Sworn Public Translator
Register N° 54

59

Commercial Banks for active operations, published by the Banks and Insurance Superintendence in the official newspaper "El Peruano" under the heading "Average Interest Rates by Types of Credit for the last 30 work days", in reference to the different types of loans offered by Commercial Banks; and, of these, use the one to which the highest interest rate is applied.

2.    The procedure for applying the aforementioned rate is the same as the one that was already established by the Banks and Insurance Superintendence in its Circular N° B-1712-85 dated 12-AUG-85, in effect as of 26-AUG-85.

3.    The methodology for the final application of interests subject to Article No. 94 of the General Ruling for Consulting Activities, "REGAC", taking into consideration that these are debts generated as of 1991, would be the following:

a)    Determine the Cumulative factor for the entire period to be settled (applying the Formula published by the BCRP, mentioned in part C. of this appraisal, or creating tables of Cumulative factors cut off monthly, in order to permit a swift verification) and subtract the unit from said factor; and,

b)    Multiply the result obtained from a) by the principal or debt, thus obtaining the interests generated by this principal during the period to be settled.

## VIII. CONTROVERSIAL ISSUES

The Pre-Arbitration Hearing took place on November 11th, 2002 and was



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

60

attended by the legal representatives of the DEFENDANT and the PLAINTIFF, assisted by their respective Attorneys.

The Arbitration Court proceeded to guarantee the process; it propitiated conciliation, which did not prosper; it admitted the evidence filed and together with the parties proceeded to enumerate the following controversial issues that will be subject to arbitration:

1.   Determine if it is right to recognize in favor of the PLAINTIFF the payment of the sum of U.S. $ 3,557,369.60 (three million five hundred fifty-seven thousand three hundred sixty nine and 60/100 U.S. Dollars), including General Sales Tax; and the sum of S/. 3,982,950.00 (Three million nine hundred eighty-two thousand nine hundred fifty and 00/100 Nuevos Soles), plus General Sales Tax, as professional fees for supplementary services to those included in the contract.

2.   Determine if it is right to recognize in favor of the PLAINTIFF, the adjustment of the sum of S/. 3,982,950.00 (three million nine hundred eighty-two thousand nine hundred fifty and 00/100 Nuevos Soles), plus General Sales Tax, in accordance with Clause Four, paragraph 01 of the agreement signed by the parties; and, if it is right to take as basis the Consumer Price Index for Metropolitan Lima, establishing between what dates this Index should be applied.

3.   Determine if it is right to recognize in favor of the PLAINTIFF, the payment of interests accrued by the DEFENDANT sums in the first aforementioned point of controversy, since the date on which the payment obligation originated, until the actual date of payment, determining if it is right to

MAIRA  SAWAYA - HARB
Sworn Public Translator
Register N° 54

61

take into account the maximum banking interest rate for commercial operations established by the Central Reserve Bank.

4.    Determine whether it is right to recognize in favor of the PLAINTIFF the payment of the sum of U.S.$ 15,628.05 (Fifteen thousand six hundred twenty-eight and 05/100 U.S. Dollars); and, the sum of S/. 134,388.92 (One hundred thirty four thousand three hundred eighty-eight and 92/100 Nuevos Soles), for banking expenses and commissions for the maintenance of letters of guarantee, as of the date of expiration of the agreement.

5.    Determine the effectiveness or ineffectiveness of Board Resolution N° 233-2001/PRES/VMI/PRONAP/DE dated October 10th, 2001, issued by the PRONAP'S Executive Board, approving the settlement of the contract.

The Attorneys for the parties having presented written declarations and oral reports, the case has reached the point of the Arbitration Award and, to this effect, the Arbitration Court considers it convenient to previously express some considerations regarding the following subjects:

## THE NATURE OF THE CURRENT PROCESS AND THE APPLICABLE LEGAL FRAMEWORK

1. Regarding the nature of the present arbitration process, Resolution No. 07 and Resolution No. 14 have been filed, that contain the criteria of the Arbitration Court, in the sense that this Arbitration is a domestic, ex aequo et bono arbitration.

2. This being so, it must be remembered that, as established in Article No.3 of the General Arbitration Law, the Court must resolve in good faith and to the best

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

62

of its knowledge; that is, what in doctrine is known as an ex aequo et bono arbitration.

3. As we know, the ex aequo et bono arbitration is an institution created as an alternative to jurisdictional procedures for the resolution of controversies and by means of which it is intended to flexibilize overall proceedings, without losing sight of the contractual agreement and the legal framework that contains it, in such a way that the possibility of solutions assisted by equity, appears as a particularly appropriate complement for flexibility in the formal course of proceedings, consubstantial with the arbitration concept.

4. As explained by Garcia Maynes[4] quoting from Aristotle, "what is equitable and what is just is the same thing, and since they are both good, their difference is that what is equitable is even better. The difficulty is that if what is equitable is just, what is just is not legal, but a happy correction of rigorously legal justice. To rule on equity implies that the judge or arbitrator can create the applicable law in a particular case and abandon the strictly legal solution".

5. In view of the above, this court must resolve in good faith and to the best of its knowledge, even when it acknowledges that the agreement signed by the parties is ruled by (i) loan contract N° 847/OC-PE and its Annexes, signed by the Government of Peru and the Inter-American Development Bank, (ii) the Bid Tender Terms and Conditions, (iii) the terms of reference of the bid tender, (iv) the Consultant's offer and the agreements adopted in the negotiation of the contract and the final negotiated economic proposal; and (v) the Peruvian laws, primarily the General Law for Consulting Activities, - Law N° 23554 and its

---

[4] Eduardo Garcia Maynes, *Introducción al Derecho* (Introduction to Law), 22° edition, Mexico. Editorial Porrua, pp. 49)

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

63

Ruling approved through Supreme Decree 208-87-EF (with the status of Law by virtue of Legislative Decree N° 608)inasmuch as they do not contradict the rules of the loan contract and other standards and principles of national regulations.

## OBJECTIVE CONFIRMATIONS

Before analyzing each one of these controversial issues, the following should be confirmed: (i) that this Court was set up in accordance with the General Arbitration Law -- Law N° 26572, and with the court decision issued by the Judiciary by means of Resolution N° 08 of April 12th, 2002, the case assigned to the Twenty Fourth Court Specialized in Civil Affairs in the City of Lima, Docket N° 6336-2002, which appointed Hector BECERRA MARTÍNEZ as ex aequo et bono arbitrator for the DEFENDANT; (ii) that, at no time was any member of the Arbitration Court challenged; (iii) that, FIGUEIREDO FERRAZ ENGENHERIA DE PROJETO filed its claim within the prescribed term; (iv) that, PRONAP (currently known as PARSSA) was duly summoned, answered the claim and freely exercised its right to defense; (v) that, the parties had a full opportunity to file and act on evidence, and exercise their faculty of presenting declarations and additionally, to inform orally; and (vi) that, this Court has proceeded to Award within the legally prescribed term set in Resolutions N° 81 and 82.

## IX. CONSIDERATIONS AND WEIGHING OF THE EVIDENCE

Through the analysis of the arguments and evidence offered by the parties, the following observations are made:

FIRST:   Whereas, arising from the records, the character and scope invoked by the PLAINTIFF on filing its claim has been ratified by the

DEFENDANT through its answer to the claim, an occasion in which no counterclaim was either alleged or prior defense established:

SECOND: Whereas, in the indicated sense, it is up to the Arbitration Court, as a preliminary issue to an in-depth investigation, to identify all matters proposed by the parties to further their respective claims or defense, for the purpose of circumscribing the logical sequence of this Award, through the orderly presentation of the Arbitration Court's criteria regarding each one of these matters, attending not only to the arguments proposed by each one of the parties, but also to the conviction and certainty built up by the filed and examined proofs;

THIRD: Whereas, the PLAINTIFF maintains as the grounds for the claims filed, that the DEFENDANT has violated the elementary principle of good faith, the basic pillar of every contract, on providing information for the preparation of its proposals, assuming technical aspects that compared in practice, turned out to be substantially different, originating more activities for the PLAINTIFF than those contemplated in accordance with the information provided and which has led to a 315- day contract extending in real terms to practically 984 days (until August 23rd, 2000, the date of delivery of the Final Report, after correcting the last observations from the Supervisor); without the DEFENDANT showing itself willing to offer compensation for this situation the PLAINTIFF was not accountable for, and was originated in the conduct demonstrated by the DEFENDANT itself; for this reason the PLAINTIFF maintains that the fact that the State is attempting to achieve a favorable position derived from the execution of a contract, even if it were a lump-sum

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

65

contract, is entirely lacking in justice and equity, and protection rights, if it is noted that this responds to the flagrant inobservance of the elementary principle of good faith.

FOURTH:    Whereas, based on the aforementioned, THE PLAINTIFF proposes that the analysis to be made by the Arbitration Court concerning this point, is if Contractual Good Faith is met, if it is the Defendant's purpose to benefit from the greater tasks that had to be performed as a consequence of the extension of the agreement's deadline to close to triple the agreed duration, for reasons that cannot be attributed to the PLAINTIFF and that originated in the deficient information provided by the DEFENDANT, and as the PLAINTIFF will prove with the evidence attached to the claim, in many cases turned out to be substantially different from what was verified in the field; that is, beyond any reasonable margin that would allow a simple adjustment to be made to the Feasibility Studies.

FIFTH    :Whereas, on the other hand, the PLAINTIFF highlights the undeniable dependency between the Definitive Study and the Feasibility Study which serves as its support; to explain that in order to perform a project at a definitive level, it is paramount that there should be a prior project at a feasibility level, thus whosoever performs the Definitive Study, should be essentially based on the review of the Feasibility Study, to be able to outline and/or have an overall view of the principal aspects that should be encompassed, to the extent that the Feasibility Study also supports the extension and characteristics of the Definitive Study, serving as a base for sizing the required quantity of services and calculating their global cost; therefore they should be apt and



MAIRA  SAWAYA - HARB
Sworn Public Translator
Register N° 54

66

reliable, exhaustive and conclusive regarding what is supposed to be done in the Definitive Studies; therefore the methodology for its execution is indicated by its terms of reference and by the Feasibility Studies themselves.

SIXTH:  Whereas, THE PLAINTIFF nevertheless states that the situation it encountered at the time of proceeding to consolidate the solutions proposed in the Feasibility Studies, was totally different, since, on analyzing the proposed solutions and contrasting them with reality on the basis of the results of field work, the PLAINTIFF was forced to completely re-do or design in an adequate manner, for the first time, the components of the systems, reaching the conclusion that this cannot simply be understood as consolidating the solutions indicated in the Feasibility Studies, but rather as the complete preparation of a new, feasible solution, which should be duly remunerated by the DEFENDANT, in the amounts intended;

SEVENTH: Whereas, in attention to the matters proposed by the PLAINTIFF, it is the Arbitration Court's responsibility to determine if, in effect, (I) the DEFENDANT has violated the elementary principle of Good Faith; (II) if it has provided deficient information, inducing the PLAINTIFF to error; (III) if the Feasibility Studies serve as a basis or support for the preparation of the Definitive Studies; (IV) if the referenced increased activities or services rendered were within the PLAINTIFF'S scope of obligations or responsibilities; and, (V) if the fees claimed for the time that it took to render such services, should be paid or not;

EIGHTH: Whereas, in turn, the Defendant's defense relies on the intangibility of the lump sum agreement, by virtue of which, the Consulting

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

67

Services Agreement dated November 12th, 1997 that ties it to the PLAINTIFF, obliges the latter to elaborate a specific, tangible, project, the concrete result of certain work, for a lump sum, inclusive of all costs;

NINTH: Whereas, the DEFENDANT, as another argument for its defense, maintains that the delays caused by errors or deficiencies in the Feasibility Studies, as filed by the PLAINTIFF, are not supported by the agreement, as the full reading of the contract will prove, in the sense that on no occasion does it stipulate that the contractor PLAINTIFF had to limit its action to developing the project in accordance with the Feasibility Studies, as these are to be taken merely as a reference; the DEFENDANT emphasizes that much less does the agreement stipulate that, if the contractor PLAINTIFF performed any reframing or modification to the project regarding any of the Feasibility Studies, he should receive additional compensation;

TENTH: Whereas, to further its defense, the DEFENDANT maintains that in the Terms of Reference, paragraph III.2.1, it is expressly stipulated that THE CONSULTANT (PLAINTIFF), should prepare a Consolidation Report with the consolidation of the proposed solutions and the reframing of the existing systems, which was to contemplate the review and improvement of the alternatives recommended in the Feasibility Studies, including modifications to the previous designs contained in those studies, to the effect of providing a consolidated and definitive solution, to be used for the development of plans for the project and construction of the work; therefore the PLAINTIFF cannot now claim that he had to reframe or make changes to the solutions proposed in the Feasibility Studies; inasmuch as the review of these solutions and the search

MAIRA  SAWAYA · HARB
Sworn Public Translator
Register N° 54

68

for and development of better alternatives was a part of the obligations assumed in the agreement, for which more compensation cannot be claimed, to the extent that he was obliged to perform all the work for a lump sum; that is to say, for a previously agreed, fixed and invariable compensation;

ELEVENTH:  Whereas, in attention to the matters proposed by the DEFENDANT, it is the responsibility of the Arbitration Court to review and award regarding (I) the intangibility of the lump sum agreement; (II) whether the Feasibility Studies were merely for reference; and (III) if it was actually the Plaintiff's obligation to execute the tasks this referred to, without receiving additional compensation for this work;

TWELFTH: Whereas, to better resolve, the Court estimates that, for a first analytical approach, it is convenient to group the following matters proposed by the PLAINTIFF regarding; (I) if the DEFENDANT has violated the elementary principle of Good Faith; (II) if it has provided deficient information, leading the PLAINTIFF to error; (III) if the Feasibility Studies serve as the basis or support for the preparation of the Definitive Studies; interrelating all these matters for the development of the analysis of the matter proposed by the DEFENDANT when it maintains (II) that the Feasibility Studies were merely for reference;

THIRTEENTH: Whereas, regarding if the DEFENDANT has violated the elementary principle of Good Faith, a prior analysis of that legal institution is necessary, specifying that Good Faith is an elementary principle of the legal system, of paramount importance in the contractual environment, in such a manner that any conduct that violates this principle should not be protected by



MAIRA  SAWAYA - HARB
Sworn Public Translator
Register N° 54

69

law and justice.

FOURTEENTH: Whereas, as indicated by Argentine writer Guillermo BORDA, "the principle of good faith means that Man believes and trusts that a declaration of will shall produce, in a concrete case, its usual effects, the same effects that it has ordinarily and normally produced in similar cases".[5]; what in the contractual environment presupposes that, from the inception of the contract until its conclusion, that is, during the pre-contractual, contractual and execution stages, the parties should act in an honest and correct manner, regarding each other.

FIFTEENTH:  Whereas, according to the sound criteria expressed by Elvira MARTÍNEZ COCO and Cecilia ESPICHE ELIAS, "Good faith is present in an express or implicit form in every legal system, because in essence they gather what are the values of the backbone of the Law.  Good faith is a single concept that is made manifest primarily in two aspects: subjective good faith – belief, and objective good faith – loyalty, without this meaning that the other aspect is not also present.  One cannot expect to have good faith belief, without a conduct that reflects good faith, nor are the correction and rectitude demanded by good faith, an external formality, devoid of content".[6]

SIXTEENTH:  Whereas, in Peruvian law, this principle is expressly contemplated in Article 1362 of the Civil Code, notwithstanding, this regulation transcends civil law, and is applicable to any contractual relationship, including

---

[5] BORDA A. GUILLERMO. *Tratado de Derecho Civil. Parte General II* (Civil Law Treaty. General Part II). 9ª Edition. Editorial Perrot, Buenos Aires, pp. 143

[6] MARTINEZ COCO, Elvira and ESPICHE ELIAS, Cecilia, *América Televisión vs. Alianza Lima, un clásico ejemplo de abuso de derecho en la resolución del contrato* (America Television vs. Alianza Lima, a classical example of abuse of right in the resolution of the contract. Revista *Diálogos con la Jurisprudencia, Tomo 6*

those entered into by the State, and within this context (contracts entered into by the State and protected by administrative regulations), we should quote author Eduardo GARCÍA DE ENTERRÍA, when he states that: "it is currently understood that, to affirm the validity of a Regulation (to be understood as an administrative regulation), this regulation must overcome confrontation with other rules of a substantial nature, and these limits are: the respect for the General Principles of the Law and, particularly, Arbitrary Interdiction.

The main thesis is as follows: a ruling cannot be legally applied if it opposes, in some manner, the General Principles of the Law.

Thus, we exclude from the range of validity all rulings that infringe upon the General Principles of the Law, ... that stem from an inexact appreciation of the facts or that impose measures that are out of proportion or incongruent regarding the goal they pursue... or contrary in their regulations to the nature of things... or objectively irrational or dedicated to the pursuit of results that are manifestly unjust or contrary to good faith and to a fair treatment".[7]

SEVENTEENTH: Whereas, renowned Argentine administrative specialist Héctor Mairal mentions -along this same line of thinking-, that "It seems difficult to consider that the State is excluded from the obligation to respect a basic principle of law and morality such as good faith." This conclusion, Alberti indicates, "appears to be the only one that is compatible with a state of law". "The fact that the administration pursues the common good does not authorize it to be free of moral bindings: the end does not justify the means".

On the other hand, State intervention in the daily life of private individuals

---

[7] GARCIA DE ENTERRIA: Eduardo. *Curso de Derecho Administrativo* (Administrative Law Course)

**MAIRA SAWAYA · HARB**
**Sworn Public Translator**
**Register N° 54**

71

is so intense and varied, that the lack of validity of this principle as it relates to the Administration could mean that a vast sector of legal relations would be devoid of the protection of such a cardinal rule. The progress of Law would be slow if, along with the advances of private law as it incorporates increasingly high standards of behavior, public law continued to expand in its lack of respect for such guidelines.

This does not imply the mere analogical application of civil law in the administrative law environment, which jurisprudence has repeatedly admitted, although with the discriminations imposed by the nature inherent to what constitutes the substance of the latter discipline".[8]

In turn, Spanish author DIEZ PICAZO expresses: "Good faith dominates all legal traffic, not only in the strict sphere of private law, but also in the field of public law. Beitzke ... points out how in the operation and in the vicissitudes of legal business celebrated by public entities, importance shall be given, as a fundamental rule, to the assumptions of fidelity and good faith. Good faith is enforceable, therefore, not only in strict private law relations, but also in those ruled by administrative or procedural law ".[9]

EIGHTEENTH: Whereas, in view of aforementioned, this Arbitration Court, reaches the conclusion that the principle of Good Faith is one that should be respected in all agreements celebrated, including those in which the State is one of the parties, and their regulations cannot be interpreted in a manner that openly violates or contradicts this principle, nor accept that one of the parties in

---

[8] MAIZAL A. Hector. *La Doctrina de los Propios Actos y la Administración Pública* (The Doctrine of Own Acts and the Public Administration ). Desalma Buenos Aires. 1994, pp 52 and 53.
[9] DIEZ PICAZO PONCE DE LEON, Luis. *La Doctrina de los Actos Propios* (The Doctrine of Own Acts). Barcelona, 1963, pp. 135

MAIRA SAWAYA · HARB
Sworn Public Translator
Register N° 54

72

a certain contractual relationship intends to profit, in the case it is proven that this party has not respected the elementary principle of good contractual faith. The inexistence of good faith does not necessarily entail fraud, since this is a different concept, and what is being analyzed here is if the reasonable trust deposited by one of the parties in a contractual relation and in the assurances of its counterpart, has been affected by the latter's conduct. If this is so, we conclude that the counterparty has not acted in accordance with this principle and, in consequence, must assume the responsibility arising from this situation.

NINETEENTH: Whereas, according to the conclusions of the Appraisal Report and other documents of the technical file (Volume I pages 12-20 and 23-25), it is duly proven that the Feasibility Study provided by the DEFENDANT to the PLAINTIFF, was deficient and did not meet the requirements needed to function as the basis for the preparation of the Definitive Studies; a fact that this Court cannot accept the DEFENDANT was unaware of; considering that, as a company specializing in the matter addressed by the Feasibility Study, responsible for the preliminary studies for the technical phase, and the end-recipient of the study, whose monitoring it was always in charge of, added to the fact, duly proven in Engineer Alvaro FLORES BOZA's Appraisal Report, that the Feasibility Studies for which the DEFENDANT was also accountable and provided to the bidders, did not even comply with the requirements of the DEFENDANT'S own terms of reference, make it impossible to admit the unawareness they claim, given that the opposite would constitute inexcusable negligence, which would be equally imputable; since – as determined by Article 1314 of the Civil Code, "Whosoever acts with the required ordinary diligence



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

73

cannot be charged for the lack of execution of the obligation or partial, tardy or defective compliance", inasmuch as he has acted in good faith; *a contrario sensu* of this article and rigorously applying Article 1362 of the aforementioned Civil Code, he who does not give the necessary diligence to the execution of his obligations acts with negligence, a fact that has occurred precisely in this case and leads the Arbitration Court to the certainty and conviction that, in effect, the DEFENDANT has not acted in accordance with the elementary principle of good faith in this contractual relation, and therefore cannot evade its consequences;

TWENTIETH: Whereas, giving sustenance to the aforementioned certainty criteria, six Additional Clauses (the first unnumbered) are on record and evidence the successive extensions to the deadlines* up to the Fifth Additional Clause, that determines the duration of the contract, until its final settlement, without recognizing the PLAINTIFF/company's increased expense for any item, which is indicative of an abusive exercise e of rights that is not protected by Law; in this context, the DEFENDANT emphatically argued that the PLAINTIFF company had not complied with the contract, when the acceptance stemming for the aforementioned Additional Clauses appear to be the implicit recognition of the manner in which the contract was developing, and in no way merited observation or non-compliance charges, but, quite to the contrary, it is the acceptance of the PLAINTIFF company's corrective behavior, performed in the DEFENDANT entity's best interests;

TWENTY FIRST: Whereas, as to whether the DEFENDANT had provided deficient information, leading the PLAINTIFF to error, particularly in


MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

what concerns its technical-economic proposal and the sizing of the resources assigned to the activities for the preparation of the contracted Definitive Studies, the Arbitration Court reiterates the aforementioned criteria, the certainty and conviction that issue the reasoned analysis of the result of the Appraisal Report, which in volume I, pages 24, 25 and 26, concludes that the Feasibility Studies were unreliable, based on the same criteria mentioned in that report, Volume I, page 6, where it states: "in the preparation of a proposal for the execution of Definitive Studies in sanitation, the assessment of resources and calculation of costs for services to be performed, are made on the basis of the conclusions and solutions proposed in the Feasibility Study"

TWENTY SECOND: Whereas, as to whether the Feasibility  Studies served as a basis or support for the preparation of the Definitive Studies, as the PLAINTIFF company maintains, or if, to the contrary, they serve merely as a reference, as the DEFENDANT maintains, in the present case, it stems from the record that the  DEFENDANT contracted the services of the PLAINTIFF under the lump sum mode, in order for the latter to proceed with the preparation of the Definitive Studies of the First Investment Stage of the Minimum Cost Expansion Plans for the Drinking Water and Sewerage Services located at Tacna, Juliaca, Puno, Ayaviri, Ilave, Cusco and Sicuani.

Likewise, in the Bid Tender Terms and Conditions, ANNEX 1, GLOSSARY, LITERAL F) THE DEFINITION OF FEASIBILITY STUDY (PAGE-15), it states:

"The detailed analyses of the variables have an incidence on the project, for the purpose of estimating the costs and benefits expected, and define the



MAIRA  SAWAYA · HARB
Sworn Public Translator
Register N° 54

75

best alternative for an investment project. The feasibility study is the culmination of the outlining of a project, and constitutes the basis for decision regarding its execution"

Likewise, Clause Five of the Consulting Agreement, Obligations of the Contracting Parties chapter, paragraph II. REGARDING THE SPECIAL PROJECT; sub-paragraph 03, page 9, contains the following literal text:

"The PRONAP will provide the CONSULTANT with all preliminary documents, reports and other documents related to the Drinking Water and Sewerage services of the EPS, whose recommendations will serve as reference only for the analysis to be developed by the CONSULTANT. In the case of the Feasibility Studies for the Minimum Cost Expansion Plans approved by the PRONAP for the cities included in this contract, and were granted the non-objection from the IADB (Inter-American Development Bank), these documents will be taken as the basis for the development of the Definitive Studies".

In turn, the Expert, replying to the observations to the Appraisal, on page 3 of the Volume: ANSWERS TO THE OBSERVATIONS MADE BY FIGUEIREDO FERRAZ indicates the following:

" It is clear that in the process of an Investment Project, the Feasibility Study is the real Basis for the commencement and development of a Definitive Study, and there is nothing that can justify calling it a simple reference", a criteria which is shared by this Arbitration Court, not only because of the comprehensive analysis of the Basis and the results of the Appraisal Report, but fundamentally because the quality of being the Basic document for the preparation of the Definitive Studies, clearly and expressly flows from the



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

76

contract itself; therefore the DEFENDANT's argument is not admissible when it states that the Feasibility Studies were merely references for the development of the Definitive Studies;

THIRTEENTH: Whereas, taking the aforementioned into account, the Arbitration Court reaches the conclusion that the Feasibility Studies provided by the DEFENDANT to the bidders, among them the PLAINTIFF, were the fundamental basis for the development of their proposals, including the sizing of their resources, duration and cost calculations, as well as for the development of their activities, the PLAINTIFF and other bidders assuming in good faith that the solutions presented in these studies were essentially and entirely determined, except for precise details and/or non-substantial adjustments to be performed by the PLAINTIFF; which explains the development of a selection process of the lump sum type; since, if it had not been proposed as aforementioned, the lump sum type selection process would have made no sense, as this Court subsequently analyzes and determines.

TWENTY FOURTH: Whereas, as to the matter proposed by the DEFENDANT regarding (I) the intangibility of the lump sum agreement, the Court has no doubt that the agreement signed by the parties was of the Lump Sum type; and, that it is a recognized principle that everything that is stated in a contract is obligatory as is expressly acknowledged in Article 1361 of the Peruvian Civil Code.

TWENTY FIFTH: Whereas, an agreement of the "Lump Sum" type implies that the parties have anticipated a fixed definitive total price that

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

77

includes the work (identified as the result of certain activity)[10], thus establishing that this price will not suffer variations for any reason as long as the conditions that contain the object of the contract are maintained. In other words, in a lump sum agreement, a "certain work" is contracted, for a predetermined price.

Notwithstanding, the question that needs to be asked is whether, in the hypothetical case in which the Court arrives at the conclusion that one of the parties (in this case the DEFENDANT) has not acted according to the elementary principle of good faith, as was decided hereinabove, can this party hide behind or seek refuge in the scope of the "lump sum" contract, to free itself of any additional obligation derived from the deficiency of the Feasibility Studies it provided to its counterpart.

TWENTY SIXTH: Whereas, as acknowledged in a practically uniform manner, for a contract to function under the "lump sum mode", it is required that both parties have prior knowledge of the budget, the plans and the technical specifications, in order for it to be feasible to anticipated fix the price of the desired result.[11] The Court's criteria does not ignore that these budgets could obviously be subject to adjustments during the execution of the work (again understood as "desired result"), but these variations, if they exist, could not be substantial, otherwise the information provided would not have complied with its

---

[10]  In this regard, the Court shares the idea expressed by the DEFENDANT in the sense that in the present case the contracting of services for the preparation of a Definitive Study entails what in civil law is known as a work contract, that is, a result, and it is obviously different to a building contract.

[11]  In other words, this means that, for a Lump Sum agreement to be effective, binding and enforceable, the technical specifications and plans (in this case the Feasibility Studies) provided by the contracting party, should have no defects of a substantial magnitude or relevance.

objective. As it is work consisting in the preparation of the Definitive Studies, the obvious base for these studies are the Feasibility Studies, and, as has been extensively explained in the appraisal report and mentioned in the aforementioned points, these Feasibility Studies were deficient and their solutions unrealizable; and these facts, as has been established, were not unknown to the DEFENDANT.

TWENTY EIGHT: Whereas, the abovementioned was clearly stated in our legislation when, as provided for in paragraph 1.2.28 of the RULCOP and, until recently, in Article 45 of the Ruling of State Contracts and Acquisitions (TUO approved by Supreme Decree No 013-2001-PCM), which established that the "Lump Sum" system was applicable when the magnitude and quality of the service were totally defined.

In this regard, the Court shares the idea expressed by the DEFENDANT in the sense that in the present case the contracting of services for the preparation of a Definitive Study entails what in civil law is known as a work contract, that is, a result, and it is obviously different to a building contract.

In other words, this means that, for a Lump Sum agreement to be effective, binding and enforceable, the technical specifications and plans (in this case the Feasibility Studies) provided by the contracting party, should have no defects of a substantial magnitude or relevance in the technical specifications and in the terms of reference. Although this was not so clear in the rulings of Law 23554 and in Supreme Decree No. 208-87-EF (REGAC), this does not in any way mean that such a requirement is not included in an agreement celebrated under the scope of this or any other regulation, since it is consubstantial with the use



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

79

of this type of contract.

TWENTY NINTH: Whereas, a lump-sum contract is usually used when the leaser or proprietor of the work has a very precise conception of what has to be done, whether a design or a construction, and for that he has a prior, detailed, sufficient and valued budget of each and every one of the parts that make up the work to be done, thus the responsibility of these preliminary conditions lies with the proprietor of the work. Local writer Emilio CASSINA RIVAS, explains:

"The difference between the lump-sum-price system and the unit-price system referred to in Article 45 of the Ruling is substantial, since in the first system, the price is fixed because the magnitudes and qualities are defined in the technical specifications and terms of reference, as in the plans in the case of buildings, whereas in the second system we know that the prices only act as a reference, since the allocations and budgets, as well as the plans, are also for reference only and have to be valued in relation to their actual execution, on the basis of the price established for each unit".[12]

THIRTIETH: Whereas, in the present case, this basic requirement was not observed, but not only was it not complied with because the deficiency of the Feasibility Studies and their consequences have been verified, but additionally, this Court considers that Good Faith has not existed on the part of the DEFENDANT, as a selection process was developed for the celebration of an agreement of this type, when it must have known that all the conditions for a "Lump Sum" contract had not been met, and it was very difficult for the bidders

---

[12] CASSINA RIVAS, Emilio. *Contracting and Public Biddings* (Contrataciones y Licitaciones Públicas) . Imprenta del Ejército. 2003. page 80.

MAIRA SAWAYA · HARB
Sworn Public Translator
Register N° 54

to be aware of this, not only because of the limitations of the bid terms and conditions, because, although they did have access to the Feasibility Studies, these were not fit to be reproduced[13], limiting not only the possibility of a more detailed examination of these conditions; but, in addition, as indicated in the Appraisal Report: the magnitude of the deficiencies of the Feasibility Studies made it necessary for the CONSULTANT PLAINTIFF to have to determine other solutions, rather than the ones indicated in the Feasibility Studies and upon which he had to develop the Definitive Studies; it was only able to detect these deficiencies during the development of the estimated Definitive Studies, and this situation was aggravated by the work methodology imposed, that caused the aforementioned to occur, not at the start of the work, but at the end of the third report (of the four estimated reports) when over a year had elapsed since the commencement of the works; thus, it would not be equitable to stamp a seal of approval or legality on the claim of enforcing an agreement which has been obtained in bad faith;

THIRTY FIRST: Whereas, regarding the above, it is necessary to remember what Josserand (quoted by CIFUENTES) said about this: "an act performed in agreement with certain subjective rights can conflict with general rights, with objective rights, and with legality(...) The way to end rights abuse is simply to limit the "exercise" of the powers of those who have rights, to avoid

---

[13] V. *INFORMATION FOR CONSULTING FIRMS* (INFORMACIÓN PARA LAS EMPRESAS CONSULTORAS) B. Information available to consulting firms (page 6)

"The PRONAP Special Project and/or the EPS will be available to the Consultant company and/or association of consultants, the reference information indicated in paragraph IV.D (THAT IS TO SAY, THE FEASIBILITY STUDIES)- principally made up by documents and or files that cannot be reproduced".

MAIRA SAWAYA · HARB
Sworn Public Translator
Register N° 54

81

the excesses and evils that are produced by virtue of these".11

THIRTY SECOND: Whereas, as it is evident that the basic elements for a Lump-Sum agreement to function have not been observed and, in addition, that a negligent conduct has been demonstrated, lacking in good faith as an elementary legal principle, and particularly of contractual law, this Court cannot consider the Lump Sum agreement to be enforceable or applicable, when its essence, in accordance with the aforementioned, has been corrupted. To expect the PLAINTIFF to accept this agreement in these circumstances, would be equal to accepting a clear abuse of rights on the part of the DEFENDANT, a situation that is not protected by equity, justice, rights nor by our legislation, in accordance with Article No. 103 of the Constitution and Article II of the Preliminary Title of the Civil Code, when it expressly indicates that: "The Law does not protect the abuse of law".[14]

THIRTY THIRD: Whereas, along this line of thinking, it is not about the Arbitration Court ignoring that contracts must be complied with as established and as agreed by the parties, or that the essence of a lump sum is characteristic of anticipatedly fixing the value of compensation to be received for the entire work; what is intended in this case is to establish if this agreement can be opposed or not, when it has been clearly and ostensibly proved by the evidence weighed in this process, that the contracting entity was aware of the deficiencies of the Feasibility Studies; was aware that they had not complied with their own terms of reference; was aware that it was evident that these

---

[14] CIFUENTES, Santos. *Elementos de Derecho Civil. Parte General* (Elements of Civil Law. General Part). Astrea. Buenos Aires. 1988. page 17.



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

studies had to be undertaken as the basis for the sizing of the bidders proposals and the development of the activities to be performed by the CONSULTANT who was awarded the bid.

THIRTY FOURTH: Whereas, for further detail, it should be also mentioned that the DEFENDANT entity was perfectly aware of these facts, to the extent that the contract was extended from 315 days to 984 days, that is, more than tripling the agreed duration, and during that time the PLAINTIFF company performed a series of tasks, with the express consent and knowledge of the Supervisor and the DEFENDENT entity, which supervised, observed, approved and finally accepted the Definitive Studies, which differed from the previously agreed work, as has been clearly demonstrated by the Appraisal and its extension.

THIRTY FIFTH: Whereas, on the other hand, during the development of the current process it has not been demonstrated that the DEFENDANT objected to the work being done by the PLAINTIFF company; moreover, the DEFENDANT worked together with the PLAINTIFF company all the time it was necessary to do so; and, if the DEFENDANT had had a grounded reason to establish the PLAINTIFF's noncompliance with the agreement, it could have resolved the contract using its acknowledged powers; thus, not having acted in this manner, serves as full proof of an approval the DEFENDANT cannot now deny, contradictorily claiming noncompliance with a contract which, during its duration, the DEFENDANT never invoked; therefore, in the opinion of the Arbitration Court, the DEFENDANT's conduct has expressly validated what was done by the CONSULTANT PLAINTIFF, including the longer time it had to

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

83

invest in the development of this work.

THIRTY SIXTH: Whereas, as acknowledged by Argentine writer Guillermo BORDA:

'When the same parties, with their subsequent conduct, have revealed unequivocally what the significance and scope of the contract is, they will later not be entitled to seek protection in a clause of doubtful interpretation, to deviate from what they themselves have shown they wanted.

It is nevertheless necessary to warn that this conduct can only be taken into consideration when it damages the party that has acted that way; but, in principle, it cannot be considered when it benefits the party, because if it were to the contrary, it would be very easy for the parties to deviate from the correct interpretation of an agreement, performing acts that the other party may ignore and that will be later used as proof in its favor if the matter is taken before a Court" [15]

THIRTY SEVENTH: Whereas, along the line of thinking expressed and what has been abundantly proven on record, the Arbitration Court reiterates its conviction that the DEFENDANT has not acted respecting the elementary principle of contractual good faith, and therefore, cannot now shield itself or seek protection in the scope of the "Lump Sum" agreement, which has been proved not to oppose the CONSULTANT  PLAINTIFF, to expect to be exempt of any additional obligation derived from the deficiency of the Feasibility Studies that is provided to its  Counterpart, contrary to the nature of the "Lump-sum"

---

[15]  BORDA A. GUILLERMO. *Tratado de Derecho Civil. Parte General II* (Civil Law Treaty, General Part II. 9ᵗʰ Edition.  Editorial Perrot. Buenos Aires, page 151.

MAIRA  SAWAYA - HARB
Sworn Public Translator
Register N° 54

84

agreement, without that leading to the nullity of the signed agreement, but only to the impossibility of equitably opposing it, as the contrary would imply that, for the sake of a poorly understood legal ritualism, a stamp of legality is placed upon what is ostensibly abuse, which, as mentioned above, is not protected by Law;

THIRTY EIGHTH: Whereas, regarding the subject (IV) whether the increased activities or services rendered, as mentioned by the PLAINTIFF, where within its scope of obligations or responsibilities; and (V) whether or not the fees demanded should be paid, for the time spent in rendering such services, together with the DEFENDANT's proposal (III) regarding whether it eventually was the PLAINTIFF's obligation to perform the tasks referred to, without receiving any additional compensation;

THIRTY NINTH: Whereas, by virtue of what has been extensively analyzed throughout the Considerations section of this Award, in this point the Arbitration Court has absolute conviction and certainty that the increased activities or services duly provided by the PLAINTIFF company, to develop solutions different to those indicated in the Feasibility Studies for the majority of the locations, were not expressly within its scope of obligations; therefore its right is clear for the claimed fees to be acknowledged and paid for the time required to render such services outside the agreement; and it is not possible to support the DEFENDANT's declaration that those additional tasks were part of the PLAINTIFF Company's obligation and therefore it has no right to receive any additional compensation whatsoever;

FORTIETH: Whereas, in view of the preceding conclusion and the need



MAIRA  SAWAYA - HARB
**Sworn Public Translator**
Register N° 54

85

to appraise the additional activities performed by the PLAINTIFF company, it is necessary to review the DEFENDANT's declaration, which maintains that in the event that this Arbitration Court does not protect its position in regards to no adjustment being necessary to the contracted amount because it is a "Lump-Sum" contract, any valuation of the activities claimed by the PLAINTIFF should take into account any work not included in the Feasibility Studies, and which the PLAINTIFF did not perform (which it calls "deductible"), in comparison with the works that the PLAINTIFF designed in the Definitive Studies and were not provided for in the Feasibility Studies (which it calls "additional"); to this end, on answering the claim, the DEFENDANT has provided a table by means of which a final balance of these goals is prepared, as shown below:

### SUMMARY OF THE FINAL BALANCE OF ACHIEVED GOALS

| LOCATIONS | CONTAINED IN | VALUATION IN U.S. DOLLARS US$ | | |
|---|---|---|---|---|
| | | ADDITIONAL GOALS | GOALS NOT ACHIEVED | BALANCE |
| Ayaviri | Annex 3-D | 38,821 | (19,972) | 18,849 |
| Ilave | Annex 3-D | 35,700 | (30,959) | 4,743 |
| Sicuani | Annex 3-D | 26,838 | (26,463) | 374 |
| Tacna | Annex 3-D | 58,669 | (75,770) | (17,101) |
| Juliaca | Annex 3-D | 93,995 | (177,753) | (83,759) |
| Puno | Annex 3-D | 102,108 | (56,172) | 45,936 |
| Cusco | Annex 3-D | 65,659 | (234,924) | (169,265) |
| TOTAL | | | | (200,222) |

These amounts do not include IGV (General Sales Tax) or adjustments

FORTY FIRST: Whereas, the above table has been analyzed in the Extended Appraisal Report, and the designated expert states that, employing the same criteria and indexes adopted by the DEFENDANT, he has performed the balance of the goals contained in both Studies: (to be understood as the

MAIRA SAWAYA · HARB
Sworn Public Translator
Register N° 54

86

Feasibility Studies provided by the DEFENDANT and the Definitive Studies performed by the PLAINTIFF), resulting in the same "Additional Goals" and "Goals not Achieved" indicated in the tables that refer to the answer to the claim, by virtue of which he indicates that after applying the values the DEFENDANT assigns to the "Goals" as well as the balance between them, the results coincide with the tables cited by the DEFENDANT. Following which, the Expert, in the analysis requested by the Arbitration Court, does not take into account the alleged valuation in the above table, since it does not reflect the real situation, also explaining in his oral presentation, that the results of the numerical calculations performed, and which coincided with the ones presented by the DEFENDANT, refer to works that correspond to different studies; and that, in the case of those indicated in the Definitive Studies, they include significant resources not included in the referenced table, and he concludes, from all the above, that the balance and valuation presented in this table, are not appropriate.

FORTY SECOND: Whereas, this Arbitration Court, coinciding with the results of the Appraisal Report, concludes that the valuation comparison submitted by the DEFENDANT entity is not valid, because it would not be taking into account (I) that the PLAINTIFF, in most of the cities of Group 2, had to reject the solutions proposed in the Feasibility Studies; (II) that the PLAINTIFF had to find its own solutions, which encompassed not only a mere stage but the entire, final scope of the Project (that is, it included the Second Stage), (III) that it was not the obligation of the PLAINTIFF to search for new solutions for the Fist Stage, but to consolidate the solutions determined by the Feasibility Study, which, as duly



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

shown in the Appraisal, was impossible (reply to the PLAINTIFF'S Observation No 2 to the appraisal); (IV) neither did the PLAINTIFF have to determine new solutions for the Second Stage, necessary because of its fundamental relation with the solutions for the First Stage, for the adequate functioning of the Systems for the full scope of the Project;  (V) Whereas the work methodology established by the DEFENDANT included the participation of companies not included in the contract, as a preliminary requirement for the approval of reports[16];  (VI) Whereas the DEFENDANT demanded that the PLAINTIFF keep all its professional and technical staff until the presentation of the final report, in accordance with SMS Letter 664-99 dated April 20th, 1999, documentary evidence that the DEFENDANT did not delete or adulterate; and (VII) that, according to the agreement, the Definitive Studies should have been presented in 4 reports, which subsequently, by virtue of the Third Additional Clause, were subdivided into 22 reports,  and the one corresponding to the city of Cusco was the last one submitted, which can be appreciated from the settlement effected by both parties, the CONSULTANT PLAINTIFF  was forced to keep his professional and technical staff until that time, as demanded by the DEFENDANT entity;

FORTY THIRD: Whereas, for the valuation that the Arbitration Court deals with next, it is important to take into account that the DEFENDANT's

---

[16]    Indeed, the expert indicates on page 27 of his Report that, among that factors affecting the normal development of the CONSULTANT's activities, there is also "the methodology applied by the PRONAP, conditioning the approval of the Definitive Studies reports to the approval of the electric supply projects by the respective service companies not included in the contract, also caused the extension of the contractual terms (see correspondence No SMS-07-2001 dated 11/Jan/01, Annex/X a, the CONSULTANT's Settlement Report and Official Letter No. 010-2000/PRES/VMI/PRONAWDE/D»EDidMecha 20/Jan/2000, Annex to the claim, Volume I-L, additional documents, reports adopted).

MAIRA SAWAYA · HARB
Sworn Public Translator                                              88
Register N° 54

statements do not warrant protection, in the sense that it was not obliged to provide the information held by the EPS, with which the Entity had signed agreements to that effect, because it was the PLAINTIFF company's responsibility to obtain that documentation; in view of the fact that the contract was signed by the PLAINTIFF and the DEFENDANT, in such a manner that the terms of the agreement are only binding for the signing parties, and it is not possible to transfer responsibilities to third parties that are not part of it, particularly if those signing the agreements were the EPS and the DEFENDANT, without the intervention of the PLAINTIFF;

FORTY FOURTH: Whereas, this being so, is it necessary to prepare a valuation that basically considers the duration and resources involved, gathering data from the contractual documents, such as the CONSULTANT PLAINTIFF's economic proposal in the Annex of the agreement, designated as Consolidated Budget – Costs Detail;

FORTY FIFTH: Whereas, in this respect, it should be mentioned that the Expert explains in detail in his Extended Report (pages 3, 4 and 5) why it is not feasible to perform a valuation in view of what was indicated by the DEFENDANT concerning the final balance of goals achieved; a criterion which the Arbitration Court accepts as its own, when it expresses that the entity's demands regarding the submission of the Reports for contracted works, to the prior approval of companies not included in the contract, as well as the PLAINTIFF's obligation to keep his team of professionals until conclusion of the works and other requirements mentioned in the Appraisal Report, are conclusive factors for, in the Expert's opinion, the valuation of the Definitive



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

89

Studies to be correct and the most adequate, to be the one performed for the appraisal, which appears in the answer to point 4 in his Appraisal Report, requested through Resolution N° 28, and the corresponding balance statement included on page 8 of his Extended Appraisal Report, requested through Resolution N° 64, which show a value of US$ 7713,019.62 including IGV (General Sales Tax).

FORTY SIXTH: Whereas, notwithstanding the foregoing, regarding the balance shown by the extension to the Appraisal, this Court cannot fail to acknowledge that in this case, the PLAINTIFF has circumscribed his expectations to a lower sum, amounting to US$ 3,557,369.60, including IGV (General Sales Tax) and SI. 3,982,950.00, plus IGV (General Sales Tax) in professional fees for services to supplement the ones included in the agreement.

FORTY SEVENTH: Whereas, in this context, the Arbitration Court cannot also fail to acknowledge that, through several addenda signed by the PLAINTIFF itself, it expressly resigned "greater expenses" in agreements that are binding despite the fact that an evaluation of the reasons behind the extensions to the duration of the contract no justification is found for this resignation[17]; it is a fact that the CONSULTANT agreed to it; notwithstanding, it

---

[17] As we have been able to see, the Additional Clause dated December 29th, 1997 arose from external aspects, owing to the difficulties related to year-end; the Second additional clause of April 21st, 1998 originated in the delay in the delivery of the Hydro geological Studies (Ferraz correspondence 042/98 dated 23.Feb.98) for the areas of Chusco and Viflani (Tacna), and because of the delay in the delivery of the land, in the case of the Ayaviri well, SEDACUSCO's delay in delivering the technical file of the discharge line at Pifiipampa, among others; the Third Additional Clause of 01.Sep.98 was signed because of the delay in the hydroelectrical studies prepared by the Hidroconcult company (SMS correspondence 679/98 dated 07.May.98)

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

90

is also exact to say that this resignation should be understood in relation to the contents of the contract, that is, in agreement with the contractual documents, including the PLAINTIFF's economic proposal, as well as the Annex "Consolidate Budget – Costs Detail", in which "Expenses" are clearly different to "Fees", only encompassing the PLAINTIFF's claims in this last item.

FORTY EIGHTH: Whereas, finally, it is clear to the Arbitration Court that the CONSULTANT PLAINTIFF's claim is circumscribed to the sphere of the value of the fees of its team of technicians and professionals, who, at the demand of the DEFENDANT Entity, remained on site until conclusion of the additional Works, as mentioned above, a fact that the DEFENDANT has not refuted nor alleged the opposite, as it has based its defense on the declaration that this was a Lump Sum Agreement, which has been duly disproved in the preceding Considerations;

FORTY NINTH: Whereas, in view of the aforementioned, the valuation of additional works is determined, partially considering the criteria adopted by the Expert, deducting the amounts resigned by the PLAINTIFF Company, in the following amounts:

General expenses appearing in the balance prepared by the expert, who for his calculations utilized the values of the consolidated budget, amount to: S/. 2,809,056,67 plus IGV (General Sales Tax), plus US$. 76,457.14 plus IGV (General Sales Tax).

---

of the underground waters in the city of Tacna, and is not the responsibility of the CONSULTANT, and the Fourth Additional Clause was signed for reasons detailed in the supporting documents.

MAIRA SAWAYA · HARB
Sworn Public Translator
Register N° 54

91

Equivalent in U.S. dollars to:  US$. 1,343,833.14 (Including IGV)[18]

To the effects of the Court's decision, this amount should be deducted from the amount of the balance performed by the expert, which is:

US$ 7713,019.62 (Including IGV);

And the resulting final amount of the balance, after deducting the amount corresponding to aforementioned general expenses, item resigned by the PLAINTIFF:

US$ 6,369,136.48 (Including IGV).

The amount of the Claim is:  US$ 3,557,369.60 (Including IGV)plus

S/. 3,982,950.00 plus IGV

Equivalent in U.S. dollars to: US$ 5,063,780.34 (Including IGV); an amount lower that the balance determined by the Expert, after deducting the amount corresponding to general expenses to which the PLAINTIFF expressly resigned.

FIFTIETH: Whereas, as a result of the preceding analysis, the Arbitration Court concludes that the amount claimed by the PLAINTIFF for professional fees for supplementary services developed and the manner in which they were calculated, has not been specifically questioned by the DEFENDANT, since its defense has been essentially based on the inexistence of an obligation on its part to acknowledge any sum at all, having signed a "Lump-Sum" agreement, and that, in any event, any valuation should be performed on the basis of the "Goals" criteria, that, as mentioned above, it is not pertinent to protect for the reasons already stated;

FIFTY FIRST: Taking into account the conceptual framework and the

---

[18] Using for this calculation the official exchange rate on 18.Sept.97: 1 US$, = S/. 2,644

MAIRA  SAWAYA · HARB
Sworn Public Translator
— Register N° 54 —

92

analysis contained in the aforementioned considerations, the Arbitration Court, subsequently proceeds to explain the grounds for its decision in respect of each one of the controversial issues;

FIFTY SECOND: Whereas, regarding the first point of controversy, the Arbitration Court considers it appropriate to approve the value of the professional fees for supplementary services rendered by the PLAINTIFF and which must be paid by the DEFENDANT, in the amount of US$ 3,557,369.60 (Three million five hundred fifty-five thousand three hundred sixty nine and 60/100 U.S. dollars, including IGV (General Sales Tax) and S/. 3,982,950.00 (Three million nine hundred eighty-two thousand nine hundred fifty and 00/100 Nuevos Soles) plus IGV (General Sales Tax) for professional fees for supplementary services in addition to those included in the agreement;

FIFTY THIRD: Whereas, in regards to the second point of controversy, the Arbitration Court, taking into account that, according to Clause Four paragraph 01 of the agreement signed by the parties, the amounts set in Nuevos Soles must be adjusted by the Consumer Price Index for Metropolitan Lima, in relation to prices at September 18th, 1997, and having determined in the previous point of controversy that the PLAINTIFF has the right to a payment in Nuevos Soles, the Court considers appropriate to confirm the grounds for this request.

To this effect, it must be taken into account that to find the Adjustment Factor by means of the Consumer Price Index for Metropolitan Lima, the Average Monthly Index for the closing of the fiscal period to be settled



MAIRA SAWAYA · HARB
Sworn Public Translator
Register N° 54

93

(31.Dec.2004)[19] should be divided by the Average Monthly Index of the first month of period to be settled (September 1997). Multiply the factor obtained by the capital and the result is the adjusted amount.

As a consequence, taking the indexes published for the referenced months by the National Statistic and Technology Institute (INEI), as observed in the web page for that public entity, we obtain the following:

$$\frac{CPI\ 31.DEC.04}{CPI\ 30.SEP.97} = \frac{107.658867}{87.026541} = 1.237081$$

Adjustment:     S/. 3,982,950.00 x 1.237081 =   S/. 4,927,231.76

Adjusted Capital:                    S/. 4,927,231.76

Difference with initial capital:

S/. 4,927,231.76 - S/. 3,982,950 =            S/. 944,281.76 plus IGV

Therefore, this Court considers that the PLAINTIFF should be paid the sum of S/. 944,281.76 (Nine hundred forty four thousand two hundred eighty one and 76/100 Nuevos Soles, plus IGV (General Sales Tax) as a consequence of the adjustment to December 31st, 2004.

FIFTY FOURTH: Whereas, regarding the third point of controversy, that is, to "determine if it is appropriate to recognize, in favor of the PLAINTIFF, the payment of interests accrued by the DEFENDANT sums in the fist point of controversy, as of the date in which the obligation to pay originated, until the actual dated of payment, determining if it is appropriate to take into account the maximum banking interest rate for commercial operations established by the Central Reserve Bank of Peru, the Arbitration Court considers that its analysis

---

[19] The Arbitration Court, in order to be able to determine the adjustment and following that, the settlement of interests, has adopted December 31st, 2004 as the cut-off date for its calculations.

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

94

should include (i) if the recognition of interests is appropriate or not and, if so, determine as of what date, and (ii) determine the way the calculation should be made and the amount of these interests.

Thus, regarding the first aspect to be analyzed, the Arbitration Court reaches the conclusion that, having declared that the first point of controversy is well founded, that is, that the PLAINTIFF is entitled to collect payment for supplementary services fees as claimed, it is also appropriate to acknowledge the interests on arrears, and these interests must be generated as of the date the claim was filed, on July 25th, 2002, since it was the first date on which payment was demanded of the DEFENDANT.

In relation to the second aspect to be analyzed, this Arbitration Court weighed the evidence, particularly the Accounting Appraisal made, which has explained conclusively the way in which interests should be determined, as per the criteria contained in Article 94 of the REGAC.

On this point, it should be taken into account that Article 94 of the REGAC literally establishes:

"In the event that the consulting entity did not comply with the reimbursement of funds retained within the deadline indicated in Article 93 of this ruling, the CONSULTANT will have the right to the payment of interests and commissions equal to the maximum ones established by the Central Reserve Bank of Peru for Commercial Bank loans of any type".

Article 93 establishes that:

"The consulting entity, once the service is completed, will effect the final settlement of the agreement and must return the balances and guarantees



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

95

retained, which correspond to the CONSULTANT, no later than sixty calendar days after completion".

In this context, the Court /concludes that, since the present process is an ex aequo et bono one, it must be understood that to be equitable, as determined in Article 94 (and likewise in Article 104 of the same ruling)[20] is to reimburse the injured party, in this case the PLAINTIFF, in the amount that was not paid in due time and was retained and/or owed; assumptions in view of which the DEFENDANT is obliged to acknowledge interests and commissions equal to the maximum interest rates established by the Central Reserve Bank of Peru for Commercial Bank loans of any type.

On this point, as explained in the appraisal report made by CPA Felix Aquije Soler, to date the Central Reserve Bank of Peru no longer sets the maximum interest rates for Commercial Bank loans of any type, which does not mean that this type of interest rate no longer exists, as they are now determined by the market and called TAMN and TAMEX.

This being so, this Court considers that it is correct to acknowledge the TAMN and TAMEX interest rates, that, by order of the Central Reserve Bank of

---

[20] Article 104.– "As of the payment expiration date established in Article 103 of this Ruling, the CONSULTANT will have the right to receive interests and commissions equal to the maximum rates established by the Central Reserve Bank of Peru for Commercial Bank loans of any type. The payment of these interests and commissions will be included in the subsequent invoices".

Article 103.– "The maximum date for approval of the invoices submitted by the CONSULTANT to the consulting entity, will be eight calendar dates following presentation of the respective invoice. If the invoice is not approved within that period of time, it will be considered as approved.

Invoices related to the principal agreement, adjustments for additional increases or others, will be cancelled within thirty calendar days, as of the date on which the invoice is approved".



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

96

Peru are published by the Banks and Insurance Superintendence in the Official Newspaper "El Peruano", under the heading "Average Interest Rates by Type of Credit for the last 30 work days", and referring to overdraft loan operations offered by Commercial Banks, from the date on which the claim was filed, and the calculation should be made to process the Award.

FIFTY FIFTH: Whereas, regarding the fourth point of controversy, the Arbitration Court is of the opinion that although, as analyzed in the preceding points, the extension to the duration of the signed agreement beyond the original deadline, responded essentially to reasons the PLAINTIFF is not accountable for, on recognizing by this Award that the PLAINTIFF is entitled to receive compensation for services rendered until the presentation of its last report, no payment needs to be made for expenses and banking commissions for the maintenance of the letters of guarantee that were issued; as a consequence, this claim should be declared as groundless;

FIFTY SIXTH: Whereas, regarding the fifth point of controversy, the Arbitration Court, after reviewing the settlement of the contract prepared by the DEFENDANT as well as the one prepared by the PLAINTIFF, observes that the only existing difference is related to the payment of the fees claimed for supplementary services and others referred to in this Arbitration, therefore having found the PLAINTIFF claims well founded, as explained in the previous controversial points, and in view of the fact that the settlement of the contract approved by the DEFENDANT through Board Resolution N° 223-2001/PRES/VMI/PRONAP/DE does not take into account the amounts approved herein, said settlement should be disregarded, and shall not be

MAIRA SAWAYA · HARB
Sworn Public Translator
Register N° 54

97

binding upon the PLAINTIFF, and the amounts ordered in this Arbitration Award should be duly paid, without prejudice to incorporating these sums into the final settlement of the contract when it takes place. In view of the aforementioned considerations, the Arbitration Court, in compliance of the General Arbitration Law, Awards by majority vote, with the singular vote of Engineer Hector Becerra Martinez, attached herein:

**AWARD:**

1. Regarding the first claim: Determine whether it is appropriate to acknowledge in favor of the PLAINTIFF, the payment of U.S. $ 3,557,369.60 (Three million five hundred fifty-seven thousand three hundred sixty-nine and 60/100 U.S. Dollars), including I.G.V (General Sales Tax); and the amount of S/. 3,982,950.00 (Three million nine hundred eighty two thousand nine hundred fifty and 00/100 Nuevos Soles), plus I.G.V.(General Sales Tax), in professional fees for supplementary services in addition to those contained in the agreement. Declaring the claim well founded; in consequence, the Court orders the DEFENDANT entity to pay in favor of the PLAINTIFF Company the sum of U.S.$ 3,557,369.60 (Three million five hundred fifty-seven thousand three hundred sixty-nine and 60/100 U.S. Dollars),including I.G.V(General Sales Tax); and the sum of S/. 3,982,950.00 (Three million nine hundred eighty two thousand nine hundred fifty and 00/100 Nuevos Soles), plus IGV(General Sales Tax), in professional fees for supplementary services in addition to those contained in the agreement.

2.     Regarding the second claim: Determine if it is appropriate to acknowledge in favor of the PLAINTIFF, the adjustment of the sum of S/. 3,982,950.00 (Three



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

98

million nine hundred eighty two thousand nine hundred fifty and 00/100 Nuevos Soles), plus IGV(General Sales Tax) in agreement with Clause Four, paragraph 01 of the agreement signed by the parties; and if it is appropriate to take the Consumer Price Index for Metropolitan Lima as a base, determining between which dates it should be applied.    Declaring the claim well funded; in consequence, the Court orders the DEFENDANT to pay in favor of the PLAINTIFF, the amount of Sl. 944,281.76 (nine hundred forty four thousand two hundred eighty one and 76/100 Nuevos Soles) plus IGV (General Sales Tax), as a consequence of the adjustment to December 31st, 2004, of the amount of Sl. 3,982,950.00 Three million nine hundred eighty two thousand nine hundred fifty and 00/100 Nuevos Soles)  plus IGV (General Sales Tax), as indicated in the fifty-third whereas clause.

3.  Regarding the third claim: Determine if it is appropriate to acknowledge in favor of the PLAINTIFF, the payment of interests accrued by the DEFENDANT sums in the first abovementioned point of controversy, as of the date the payment obligation originated, until the actual date of payment, determining whether it is appropriate to take into account the maximum banking interest rate for commercial operations established by the Central Reserve Bank.  Declaring the claim well founded; as a consequence, the Court orders the DEFENDANT to pay in favor of the PLAINTIFF the interests corresponding to the TAM rate for local currency and TAMEX for foreign currency, which should be calculated for enforcement of the Award, as of July 21st, 2002, until the actual date of payment, a calculation that should be made on the amounts established in the first decision point of this Award, applying the calculation methodology indicated



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

in the Accounting Appraisal prepared by CPA Félix AQUIJE SOLER, on record.

4. Regarding the fourth intent: Determine if it is appropriate to acknowledge in favor of the PLAINTIFF the payment of a sum of US $ 15,628.05 (Fifteen thousand six hundred twenty eight and 05/100 U.S. Dollars); and the sum of S/. 134,388.92 (One hundred thirty four thousand three hundred eighty eight and 92/100 Nuevos Soles),in expenses and banking commissions for the maintenance of letters of guarantee, as of the date of expiration of the agreement.

Declaring ill founded both the claim and the request of the PLAINTIFF for the amount of US $ 15,628.05 (Fifteen thousand six hundred twenty eight and 05/100 U.S. Dollars); and the sum of S/. 134,388.92 (One hundred thirty four thousand three hundred eighty eight and 92/100 Nuevos Soles),in expenses and banking commissions for the maintenance of letters of guarantee, as of the date of expiration of the agreement.

5. Regarding the fifth claim: Determine the effectiveness or ineffectiveness of Board Resolution N° 233-2001/PRESA/MI/PRONAP/DE dated October 10th, 2001, issued by the PRONAP's Executive Board, approving the settlement of the agreement. Declaring null and void the settlement approved through Board resolution N° 233-2001/PRES/VMI/PRONAP/DE dated October 10th, 2001, issued by the PRONAP's Executive Board; an administrative act that also loses effectiveness, ordering that the DEFENDANT approve a new settlement, which, unlike the one contained in said Board resolution, should incorporate only, as an additional point, the amounts established in the preceding points of the decisions section of this Award, without prejudice to the payment it has

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

100

been ordered to perform.

6.    Not having protected the totality of the DEFENDANT's claims in their entirety, and the DEFENDANT having had sufficient reasons to proceed, it is determined that each party shall be equally accountable for expenses and costs originated in this arbitration.

7.    Order the DEFENDANT entity to reimburse to the PLAINTIFF, the sum of U.S.$ 10,500.00 (ten thousand five hundred U.S. Dollars) corresponding to the Arbitrators fees and administrative and secretarial expenses accepted by the latter, by default of the former.

[Signature: illegible]                        [Signature: illegible]
Victor PALOMINO RAMÍREZ              Álvaro GONZÁLEZ PELÁEZ
    President                                      Arbitrator


[Signature: illegible]
Luís Ubillas Ramírez
    Secretary

-----------------------------------

(running seal)

Notaria Sotomayor - Coronel Inclán 179, Miraflores
Telephones: 4464582  4466717  4460373  4460239

I hereby certify that the foregoing signature is the true and proper handwriting of Victor Wenceslao PALOMINO RAMIREZ, identified by National Identity Document N° 06704137.

Lima, August 1, 2007

(illegible signature)  Carlos Augusto SOTOMAYOR BERNOS, Notary in and for Lima

-----------------------------------



MAIRA  SAWAYA - HARB
Sworn Public Translator
Register N° 54

101

Oscar Leyton ZARATE, Vice-Dean of the Lima Notaries Association, hereby

that the signature and seals shown on the face of this page correspond to the

Notary in and for Lima, Carlos Augusto SOTOMAYOR BERNOS.

Receipt N° F/84947                    Date: August 23, 2007

No responsibility is assumed for the contents of the document.

(illegible signature) Oscar LEYTON ZARATE

                         Vice-Dean

_____

MINISTRY OF FOREIGN AFFAIRS OF PERU

GENERAL OFFICE OF CONSULAR AFFAIRS

AUTHENTICATION N° 047185

The preceding signature of Oscar LEYTON ZARATE is hereby authenticated

without judging the contents of the document.

Lima, September 04, 2007

(Seal and illegible signature)        Maribel del Rosario LUYO JAVIER

                                      Department of Authentication

                                      Office of Consular Formalities

_____

Republic of Peru              )

Province and City of Lima  )        ss:

Embassy of the              )

United States of America  )

MAIRA SAWAYA · HARB
Sworn Public Translator
Register N° 54

102

I certify that the official named below, whose true signature and official seal are, respectively, subscribed and affixed to the annexed document was, on this day, empowered to act in the official capacity designated in the annexed document, to which faith and credit are due:

MARIBEL DEL ROSARIO LUYO JAVIER

This Embassy assumes no responsibility for the contents of the attached document.

(signed)          Lee A. Belland

                      Vice-Consul

                      U.S. Embassy, Lima

                      October 3, 2007

MAIRA  SAWAYA - HARB
Sworn Public Translator
Register N° 54

103

EQUITABLE GROUNDS OF THE ARBITRATOR HECTOR BECERRA MARTINEZ TO ISSUE AN OPINION AND DISAGREE ON THE CONTROVERSIAL ISSUES UNDER THE ARBITRATION PROCEEDING FIGUEIREDO FERRAZ CONSULTORIA E ENGENIERIA DE PROJETO LTDA. AND PROGRAMA DE APOYO A LA REFORMA DEL SECTOR SANEAMIENTO (PARSSA)

I    **Facts**

The undersigned arbitrator agrees with the list of events included in the narrative section of the award.

II    **Grounds**

In order to have the best judgment, this arbitrator supports his analysis to issue his opinion on the controversial issues in relation to:

- contract conditions between the parties

- scope and methodology of the development of services

- nature of the service matter of contracts

- allocation of funds and costs of services

- development of the work contracted

Both parties, Figueiredo Ferraz Consultoria e Engenieria da Projeto Ltda, hereinafter the Plaintiff (FF), and the *Programa de Apoyo a la Reforma del Sector Saneamiento* – PAARSA (formerly known as *Proyecto Especial – Programa Nacional de Agua Potable y Alcantarillado*), hereinafter the Defendant (Pronap). In relation to the issues subject matter of controversy,

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

104

during the course of the arbitration proceeding, both presented their motions, positions and points of view, and presented before the Arbitration Court their declarations.

For this analysis, this arbitrator has duly taken into consideration what the parties stated in their motions and has considered the results of the examiner's report carried out as part of the proceeding.

### II.1    Contract Conditions Agreed by the Parties

The Agreement between the parties executed on November 12, 1998 is governed by the General Rules of Consulting Activities (REGAC), as long as it is not opposite to the Loan Agreement N° 847/OC-PE and its annexes, signed by the Peruvian Government and the Inter-American Development Bank (IDB).

The First Clause of the Agreement sets forth that the Plaintiff (FF) is technically responsible for supervising the full performance of the agreement signed with Pronap and undertakes to respect the terms of reference and the bidding conditions made by Pronap, as agreed by the IDB.

The Purpose of the Agreement, according to the Second Clause, provides for the services of the Plaintiff to prepare the Final Studies Final Studies for the First Investment Stage of the Minimum Cost Expansion Plans of the Drinking Water and Sewerage Systems in the cities of Tacna, Juliaca, Puno Ayaviri, Illave, Cusco and Sicuani. It is agreed that this work will be made by the Plaintiff according to the Terms of Reference, Technical and Economic Bids as well as the agreements adopted by the parties in supplementary documents.

MAIRA SAWAYA · HARB
**Sworn Public Translator**
**Register N° 54**

105

The Agreement, according to the Third Clause, sets the term for the execution of services in 315 calendar days and set the term for 390 calendar days. Furthermore, it sets forth that any extension authorized for the period of execution of services that extend the term of contract shall have the non refusal or consent by IDB.

The Agreement, in its Fourth Clause, is agreed on a Lum-Sum basis in Nuevos Soles (S/.) 8,677,750.00 and US$984,720.00 US Dollars plus Reimbursable Expenses with a referential amount of S/. 384,000.00 for classified items. The amounts in Nuevos Soles are restated using the IPC of Metropolitan Lima. The Sales Tax (IGV) is not included. The Agreement provides that these amounts fully cover the services to be supplied by the Plaintiff as Consultant, according to the negotiated technical and economic proposal, the cost structure in the bidding conditions and the agreements adopted by the parties during the negotiation and the items requested in the terms of reference.

As part of the obligations of the Plaintiff under the Agreement, as per the Fifth Clause, it indicates that it shall be responsible for the performance of the agreement and its integral parts, for the installation of offices provided for in the technical and economic bids and for keeping the personnel during the period of services in the different towns, and as scheduled, and that it must justify any change in its team of professionals.

As part of the obligations assumed by the Defendant under the Agreement, Fifth Clause, it reserves its right to object those works made by the contract that eventually may be considered defective. It provides that defective

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

106

works are those non executed according to the terms of reference, incomplete or deficient or that do not meet the goals planned.

Based on these obligations of Pronap in the agreement, it is provided that the recommendations in the previous documents and reports are referential only for the task to be developed by the Consultant (FF). In the case of the Feasibility of the Minimum Cost Expansion Plans approved by Pronap, with the non refusal by the IDB, they will be taken into consideration for the development of final designs.

In relation to the guaranties and penalties for the Plaintiff (FF), under the contract, according to the Sixth Clause, they are mostly according to the REGAC that in this case, among others, provides that the Consultant (FF) shall be released from the performance of the services contracted except as provided in the Article 105 of the REGAC.

In relation to the end of the contract, according to the Seventh Clause, it sets forth that it will end when the Consultant delivers a final report of the consulting activities and the settlement is completed. It is expressly stated that the opinions and recommendations of the Consultant (FF) do not bind Pronap or IDB, which reserve their right to make such observations or exceptions as they may deem appropriate.

According to the Tenth Clause, the following are part to the agreement:

- Content of the reports

- Bidding Conditions and Annexes

- Terms of reference and annexes

MAIRA SAWAYA · HARB
Sworn Public Translator
Register N° 54

107

- Technical bid

- Negotiated economic bid

- List of staff assigned to the study

All the documents listed, available to the members of the Court, were analyzed by this arbitrator, as related to the controversial issues.

In relation to the content of the reports, Annex 1 to the agreement specifies the following:

- First report, covering scheduling of activities and Working Plan through a PERT-CPM and GANTT Flow Chart. Consolidation of the solution proposed and redesign of the existing drinking water and sewerage systems in the cities.

- Second Report, covering in site works, surveying, soil mechanics and laboratory analysis.

- Third Report: Basic Project

- Final report: Complete Final Studies

In Annex I , it is observed based on the content of the reports that the contract makes a general reference to the services required in the cities like if they were a whole and non severable set, gathering all together even for the same date the schedule of presentations of the sets of reports.

During the performance of services, the parties mutually agree to sign seven additional clauses to the Contract (one without number and six numbered).



MAIRA  SAWAYA - HARB
Sworn Public Translator
Register N° 54

108

Additional Clause (w/n) dated 12.29.1997: It amends the original contract when inserting paragraph 04 of the Sixth Clause. These precisions refer to a reduction the fine for delay in the delivery of reports from 2 to 1.5/10,000 and to the establishment of a relationship of this fine to the corresponding amount to each partial report, instead of a restated contract amount.

First Additional clause dated 01.19.1998: It amends paragraph 01 and 03 of the Third Clause and Annex 1, establishing a relationship as from the effective date of the contract the date of delivery of reports. This additional clause amends the paragraph 1 of the Fourth Clause, inserting precisions in the percentage of payment and the delivery of reports.

The Second Additional Clause dated 04.21.98 amends the paragraphs 01 and 03 of the Third Clause by increasing the term of delivery of the First Report from 68 to 106 calendar days and the Second Report from 98 to 116 calendar days. It also reschedules the Consolidation of Solutions in the cities of Cuzco, Sicuani, Tacna, Juliaca and Puno, so that they are submitted in the First report and the ones corresponding to Ayaviri and Ilave so that they are submitted in the Second Report. The parties expressly establish that the term of execution and the delivery of the Final Report remain unchanged in 323 calendar days.

Third Additional Clause dated 09.01.98: again it changes the paragraphs 01 and 03 of the Third Clause by increasing the terms of delivery of the reports. In this additional clause the parties introduce the concept of reports by stage of development and by city. Thus, under this clause, the integration originally agreed in the schedule for the delivery of the sets of reports is separated into 17 initial reports and 5 final reports, all with the corresponding payments related as

MAIRA  SAWAYA · HARB
Sworn Public Translator
Register N° 54

a percentage on the contract amount. The term of execution of the contract changes from 323 to 446 calendar days and it is set forth that this longer term does not result in any expense to Pronap for any item.

Fourth Additional Clause dated 09.22.98: It amends the paragraph II of the third additional clause, and introduces the concept of basic project and final project reports by cities, which originally covered all the cities. It amends the terms of delivery of the basic project reports set in the third original clause and keeps the final term of agreement in 446 calendar days and its effective term is extended to 521 natural days.

In this Additional Fourth Clause, the parties one more time accept that any of the amendments to this clause shall result in the payment to FF by Pronap of further expenses on any item.

Fifth Additional Clause dated 11.04.99: It agrees to keep open the term for execution of the Third Clause (03 and 04) until the Plaintiff (FF) completes its services, and it does not require prior consent of the IDB and in relation to the seventh clause, it is set that the contract shall be completed when the Consultant (FF) delivers the final report and the parties terminate the agreement upon non refusal of the IDB of the last final report.

Sixth Additional Clause dated 05.15.2001: the parties confirm the original amounts in Nuevos Soles and in US Dollars and under this additional clause they agree to increase only the amount corresponding to reimbursable expenses up to S/.435,581.57.

## II.2    Scope and Methodology of Contracted Services



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

110

The Terms of reference were used by the Plaintiff (FF) and the other bidders participating in the bidding called by Pronap, for the preparation of their technical and economic bids. These Terms of reference[21] clearly set the scope of services to be contracted and there is no doubt at all on the extent, type of services, and methodology of delivery of the reports required as the result of services subject matter of the contract.

It is indicated that in the work methodology the terms of reference propose that the services be developed in stages that are completed in the four following groups of reports that finally are the product of service contracted Consolidation of Solution Proposed and Restatement of Existing Services, Hydrogeological Studies N° 2, Field Services N° 3, and Basic Project N° 4, Final project.

The terms of reference, in the scope of studies, set forth that it is required to examine the basic engineering of the feasibility study for the recommended alternative (i.e. in said feasibility study). Furthermore, these terms of reference set for the delivery of works and in relation to report N° 3, referred to the Basic Project, that it is developed based on the adjustment necessary for the Feasibility Studies[22], and the results of the in site services.

---

[21] These terms of reference, except for certain points, are general and may be apply to any service to be contracted with the purpose of developing final studies and technical files for the execution of Works for the drinking water and sewerage systems of cities with intermediate population.

[22] It is a usual practice in engineering, that the scope and depth of a work at a final stage be mostly supported on the schemes of drinking water supply and distribution scheme and the sewerage collection and disposal scheme, that are defined in the feasibility studies. In particular, when they are carried our recently, like in this case. It is to note that in order to develop appropriately the final studies, it is necessary that the feasibility studies propose schemes of work clearly defined, that are not subject to material changes as a result of data or information obtained thereafter, during the performance of final studies.

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

111

For the seven cities, Tacna, Juliaca, Puno, Ayaviri, Ilave, Cuzco and Sicuani, that in this case were taken together as a whole for the contract, Pronap required, in a previous stage of its investment program, feasibility studies to three different internationally renown consulting firms with a large and recognized experience in the preparation of these studies.

The approval by Pronap of the feasibility studies conducted by these consulting firms and used as a basis of the final studies in charge of the Plaintiff was no objected by the officers of the IDB.

The Plaintiff (FF) claims that Pronap from the very beginning knew that the feasibility studies, that are basic documents for the preparation of final studies, required to be reexamined.

However, it claims that based on the methodology proposed in the contract for the execution of works this examination was only possible after completion of the Basic Projects corresponding to the phase covered by report N° 3 and not the stage covered by the Report N° 1 corresponding to the Consolidation of the Proposed Solutions and the restatement of the Existing Systems, as it was provided for in the terms of reference and therefore the agreement.

The Plaintiff (FF) also claims that it observed the deficiencies of the feasibility studies during the development of works when it verified that most of the solutions proposed for the schedule of works in these studies could not be consolidated, and, it had to execute supplementary services not foreseen for



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

112

the restatement of new solutions that were finally developed at the level of final studies.

In relation to the impossibility to achieve the contract requirement of consolidating stage 1, at the beginning of works, the solutions proposed at the level of feasibility studies, the Plaintiff argues, among others, the following grounds:

- Non execution of final studies carried out without completing each of the prior stages provided for before the beginning of the following stage;

- The bad quality of the feasibility study, which was verified as long as it developed the initial phases of final studies;

- The lack of definition of water sources, the non existence of records of the existing systems and the difficulty to define the reliability of in site services to be executed; and

- The lack of prompt recognition by Pronap of the flaws in the feasibility studies that were being verified.

The Plaintiff (FF) accepts that it had problems when making up the decision necessary for the progress of activities during the development of works, mainly due to:

- The need to comply with the contract terms

- The inaccuracies caused by the differences that were increasing in relation to the solutions proposed in the feasibility studies.

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

113

- The need to contract and start field services in those places where the feasibility studies presumed there was a need, with the risk of loosing these works, which finally occurred when the proposed solutions were not confirmed in the consolidation stages of solutions proposed.

The Plaintiff (FF), in its arguments and declarations in this arbitration proceeding, claims, in its different approaches, that it always accepted based on the first principle of good faith, that the documents made up by the feasibility study had the sufficient consistency to be the basis for the development of final studies and to determine the consulting funds and time of professionals to be used in the completion of the studies finally contracted.

Finally, the Plaintiff (FF) stated that it tried without results to convince Pronap of the need to order differently and appropriately the sequence of activities for the execution of final studies involved in the reports provided for under the contract.

It also states that these changes proposed in the scope of the reports and development of activities, should have been authorized by the Pronap in a earlier stage of the final studies, they would have been allowed the Plaintiff (FF) to reorder the planning of works, and relocate the professionals and allocate the correct time of participation.

## II.3    Nature of the Service Contracted

The final studies and technical files for the execution of works contracted by the parties refer to the components of works that:

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

114

- Collection of water sources, conduction for water supply, water treatment and drinking water distribution;

- Sewerage collection networks, sewer water treatment and final disposal of effluents.

The goal of these works, which final designs were carried out by the Consultant (FF) and were the purpose of the contract with Pronap, was to improve, extent and renovate the existing and operating systems of drinking water supply and sewerage in the cities of Tacna, Juliaca, Puno, Ayaviri, Ilave, Ciuzco and Sicuani.

Therefore, when the contract says that the solutions proposed or selected, they refer to improvement or expansion or renovation or a combination of them as applicable for the water and sewerage system in each city.[23]

Since the works designed for existing systems that were operating in each city during the development of services, it would not be applicable to classify in general as bad or unforeseeable at the level of the final studies all the solutions proposed at the feasibility study.

In this connection, the arbitrator believes that the contract approach that caused a general methodology for the development of services contracted applicable to all the cities and that was accepted by both parties, it is possibly the origin of problems resulting from the issues subject matter of this dispute.

---

[23] Some of the solutions developed by the Consulting Firm (FF) were better to a higher or lower extent in relation to those corresponding to the feasibility study, due to, among others, the lower cost of work involved or the higher horizon in the coverage of the enhanced services of drinking water and/or sewerage in the cities

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

115

This arbitrator also believes that the biased trend to generalize problems is observed even in the conceptual questions made by the parties and that are offered as evidence by the technical examiner.  These questions as it was expected deserve an opinion on the examiner within the general scope, which directly effect on the development of the final studies in each of the cities is very hard to observe.

So the examiner indicates that all the solutions in the feasibility study were not consistent with the solutions finally developed in the final studies and supports his opinion on isolated aspects that do not show the size of the effect for the particular case of each city.  It is then not possible to observe if this problem is being magnified and that may or should be solved within the scope of the service contracted.

In relation to the fact whether the feasibility studies may be consolidated or not in the final studies through reasonable adjustments, the examiner continues with a general opinion indicating that they could not be consolidated in the final studies because the latter developed their different hydraulic proposals.[24]

In the opinion of this arbitrator, the general statements in the opinions of the examiner do not contribute to clarify the issues under dispute.  The examiner in his main report is not consistent with his statements when, in relation to the consolidation of solutions carried out by the Consultant (FF) states that:

-   For the drinking water systems, the adjustments resulted in different hydraulic proposals that resulted in new solutions that were finally

---

[24] As an example, this arbitrator observes that contrary to this express general statement, the examiner argues that the hydraulic planning of the sewerage system of Ayaviri and Juliaca developed by the Consultant (FF) is the same than in the feasibility studies.

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

116

consolidated for final studies. For the cities of Cuzco, Ilave, Ayaviri, and Juliaca these differences were significant, for the cities of Sicuani, Puno and Tacna these differences were of lesser magnitude.

- For sewerage systems, the proposals of the final studies are materially different and correspond to new proposals for the cities of Cuzco, Juliaca and Sicuani. In case of Puno and Tacna, the differences are of lesser magnitude and for Ilave and Ayaviri, it may be considered that the consolidation was translated into reasonable adjustments.

A reasoning based on the results of the examination highlighted in the previous paragraphs and based on an objective observation of the schedules proposed in the feasibility study and in the consolidated schemes of the final studies prepared by the Consultant (FF), it states that the opinion of the examiner do not apply completely to all the scope of service contracted.

In order to better understand the opinion of the examiner, this arbitrator understands that:

- the solutions proposed in the feasibility study of the cities of Puno and Tacna allowed smaller changes that resulted in reasonable adjustments within the scope of the services contracted to the Consultant (FF).

- The solutions proposed in the feasibility study allowed to make reasonable adjustments within the scope of the services contracted to the Consultant in the city of Sicuani, only in the drinking water system and not in the sewerage system, and in the cities of Ilave and Ayaviri, only in their sewerage system, not in the drinking water system.

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

117

- The solutions proposed for the cities of Cuzco and Juliaca were designed at the final level by the Consultant with huge changes, beyond any reasonable adjustment in relation to the solutions proposed in the feasibility study.

Therefore, in relation to the consolidation of the solutions proposed on the feasibility study, that are largely caused by this dispute, this arbitrator concludes an analysis determining the supplementary services that as argued by the Plaintiff (FF), completely apply for the cities of Cuzco and Juliaca; they only applied partially for the cities of Ilave, Ayaviri and Sicuani, and do not apply for the cities of Puno and Tacna.

It is necessary to consider that if the Plaintiff (FF) met the purpose of the contract, which finally was the preparation of final designs and the preparation of technical files for the execution of works of the so called First Stage of Investment for the Minimum Cost Expansion Plans of the Drinking Water and Sewerage of the 7 cities under issue.

In this connection, the Defendant (Pronap) admits that certain works performed in order to be able to carry out the final designs were not foreseen in the feasibility study but had to be carried out by the Plaintiff (FF), due to the requirements found when examining these studies and compared them with the land.

To this sense, he has an acceptable position when he said that if the Plaintiff (FF) seeks to claim that it carried out supplementary works not provided for in the feasibility study, it is also necessary to consider if it carried out minor works

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

118

(or did not reach the goals foreseen in the final studies), of the ones included in these studies.

## II.4     The Development of Contracted Services

First, this arbitrator believes it appropriate to point out that the 7 cities were gathered together as a whole for the contract only, and that Tacna, Juliaca, Puno, Ayaviri, Ilave, Cuzco and Sicuani, under the point of view of the final designs, do not keep any type of similarity to discuss the drinking water and sewerage systems as if the were similar.

To this respect, the arbitrator observes in all contract documents, as from the level of the terms of reference to the same contract signed by the parties, that the services required are general and standardized for all these cities, possibly with the best intention by Pronap for an administrative simplification for a contract follow-up.

This arbitrator points out that based on the methodology proposed by the contract, each report of the final studies should have the conditions to be completed without requiring data obtained from the results of the activities included in later reports.

This perception on obtaining intermediate reports valid by themselves did not occur because finally the data were changing, as part of a feedback process, as the final designs were prepared.[25][26]

---

[25] It is to note that in the practice, no satisfactory contract results were obtained when engineering studies were developed through valid sequence reports.

[26] In most of the cases, these reports tend to be changed with more accurate information obtained from later stages in the preparation of studies and finally, they may be used for justifying contract payments and as administrative tools for the follow up of the performance of the contract.

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

119

In the opinion of this arbitrator, a factor that particularly affected from the beginning of the agreement an inappropriate design of final studies was is to consider the services required in the cities in a general manner as if they were a whole.[27]

To this respect, he clearly observed that the parties fully accepted this forced integration of services in all contract documents[28], covering extension under this general approach, the content of reports and the schedule of presentation and the general schedule of the final studies and the period of participation of the staff allocated, which directly affects the amount of the negotiated economic bid. All of them are the contract basis for the definition of the product of contracted services and the term of execution and cost for said services. It is the execution of the third and fourth clauses, both supplementary, that the parties agree to distinguish reports by type of work and city.

Then, based on the additional clauses, the parties agree to separate the schedule of delivery of reports increasing the total term of services up to 446 calendar days and accept to put a value to each of the reports, as a percentage of the total amount of contract.[29]

---

[27] These cities were put together under the contract but they do not have any similarity that deserves to treat the drinking water and/or sewerage systems as if they were similar. On the contrary, each of these local systems required their own approach and had a particular degree of problems in the preparation of the final studies subject matter of the contract.

[28] It is clear that this inapplicable methodology was adopted and accepted by the parties. They did not accept until a later contract stage with the agreement of the Third and Fourth Additional Clauses, the particular nature required for the services necessary for the preparation of the final studies in each of the cities.

[29] It may be accepted that the agreement signed by the parties covered, as part of a conceptual framework, the execution of 7 different tasks, one by city, integrated as a whole based on an unfeasible methodology of sequence stages for the development of final studies that were different in terms of requirement of approaches and planning of solutions.

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

120

This arbitrator observes that both the Plaintiff (FF) and the Defendant (Pronap) along the arbitration proceeding keep this distortion in the development of the services contracted when accepting general criteria as the fundamental basis of their motions and declarations.

This arbitrator also highlights a significant aspect that unfavorably affected the normal course of the contract, the participation of EPS that finally were direct beneficiaries of the works to be executed as a product of the final designs.[30]

Finally, this arbitrator has to take into consideration the effect on the performance of the contract of the bad relationship it had with the Plaintiff and the Supervising Consortium SMS in charge of the supervision of the final studies and the contract aspects in general.

## II.5    Allocation of Funds and Cost of Services

The breakdown of funds allocated to perform the services and the costs thereof was used as a basis for the Plaintiff (FF) to set the amount of services of its economic bid and for further negotiation with Pronap, that determined as contract amounts on a lump- sum basis, Nuevos Soles 8'677,750.00 and US$984,720.00 plus reimbursable expenses that acknowledge a reference amount of S/.384,000.00.

This breakdown includes:

---

[30] In the practice, Pronap acted as an intermediary of the EPS and the Consultant (FF). Furthermore, Pronap. through the corresponding EPS, accepted works from thirds that have a direct influence in the development of final studies by FF. Just to mention some examples, this is the participation of the company Seurca in related studies in the city of Cuzco, and of institutions such as PELT and KFW in studies related to the city of Puno. It also interfered, among others, the emergency works carried out by EPOS in certain cities with funds from FONAVI.

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

121

| Item | Cost in Nuevos Soles | Cost in US$ |
|------|---------------------|-------------|
| Fees (1) | 4'211,200 | 948,720 |
| Direct Expenses (2) | 4'466,550 | 36,000 |
| Total Lump Sum (3) | 8'677,750 | 984,720 |
| Reimbursable Expenses (4) | 384,000 | ---------- |

(1)   It refers to the rates including cost of personnel, charges and social benefits, general expenses and profits of the consultant.

(2)   It includes a higher item (S/3'000,000) the specific or in site works such as surveying or soil mechanics, food, transportation (in both currencies) communications, in site offices, vehicles and office supplies.

(3)   It matches the lump-sum contract amounts agreed.

(4)   Computers and vehicles (to be returned to Pronap upon completion of services).

The Plaintiff (FF) on a letter dated March 6, 2001, submitted its Final Settlement Report, as provided for in Director Ruling Pronap Nº 223-2001/Pres/VMI/Pronap/DE, dated October 10, 2001. The same ruling provides that the same settlement report was not accepted by the Supervising Consortium SMS, because the Plaintiff (FF) had included "... the value of additional labor for S/.3'982,950.00 and US$3'014,720.00 which were not requested promptly and do not have an authorization or ruling approving them" sic.

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

122

By analyzing the payroll of the labor that made the Plaintiff (FF) in the settlement report, and since it was not accepted by Pronap, it resulted in the first disputed item resolved in this arbitration proceeding, it is observed that:

- The breakdown of the additional cost only covers fees of foreign and local staff, Peruvian consultants and assistants;

- The additional cost includes the amounts of US$3'014,720 and Nuevos Soles 3'982,950. This additional cost is not considered as direct expenses.

- There is almost total change in the list of payroll originally allocated to the final studies. Only three of them appear in the list of the 43 additional foreigners and only 1 in the list of the 18 Peruvian staff.

- The rates for additional foreign staff range from US$9,300 to US$7,800.00 man-month, of the original negotiation. The rates of the local staff are S/.9,500 per man-month:

Finally, this arbitrator sets that at the time of negotiating the third and fourth additional clauses to agree to extend up to 446 calendar days the term of execution of the final designs, both parties already had a large knowledge of the difficulties and problems of the final studies in the 7 cities of the contract.[31]

---

[31] In the tables enclosed, this arbitrator makes an estimate of the additional costs that should have been incurred in for the supplementary studies required to carry out the final designs. He accepts that the parties agreed upon, under the third additional clause, an extension of the term of contract up to 446 calendar days and accepts that it can not be verified the type of work that actually required all the lump sum amount of the original contract.

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

123

The problem is that after observing the additional cost structure referred to, it is hardly difficult to apply it to the positions presented by the parties in their motions and declarations along the arbitration proceeding.

As final observation on the economic aspects involved in the controversial issue, this arbitrator believes that the Plaintiff (FF) seems to orient its claim to a extreme situation: everything or nothing. While Pronap answers to the same extent, but in the opposite direction.[32]

---

[32] This arbitration believes that, upon the premises, it is appropriate to pose the following questions:
- When was the right time for the parties to discuss and agree upon whether these additional costs were applicable or not during the term that finally required the contracted services?
- Was the Supervisor lax when he allowed that the Works continue beyond the deadlines and scopes contracted, without negotiation between the parties?
- Why all the payroll is changed to allocate additional personnel if the ones in the original payroll already know about the subject? Or, on the contrary, was the staff originally assigned not inappropriate to carry out works?
- Should it be accepted that any contract amount originally agreed was used in consolidating the solutions proponed and site Works that were not useful?

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

124

## COMPUTATION OF THE ADDITIONAL COST OF F. FERRAZ IN FOREIGN

## CURRENCY FOR SUPPLEMENTARY SERVICES

| POS | ITEM | AMOUNT Month/man | UNIT | COST REQUIREMENT F.C. UNIT (US$) | ADDITIONAL COST F.C. | | |
|---|---|---|---|---|---|---|---|
| | | | | | PARTIAL (US$) | QUANTITY M-M | PARTIAL (US$ |
| | FEES | | | | | | |
| 1.1 | Expatriates professional | | | | | | |
| 1 | Project Director | 22.30 | HM | 12,500.00 | 278,750.00 | 4.10 | 51,250.00 |
| 2 | Hydraulic | 2.80 | HM | 9,300.00 | 26,040.00 | 2.80 | 26,040.00 |
| 3 | Hydraulic | 10.00 | HM | 7,800.00 | 78,000.00 | 4.10 | 31,980.00 |
| 4 | Hydraulic | 2.80 | HM | 7,800.00 | 21,840.00 | 2.80 | 21,840.00 |
| 5 | Hydraulic | 4.80 | HM | 7,800.00 | 37,440.00 | 4.10 | 31,980.00 |
| 6 | Hydraulic | 9.50 | HM | 7,800.00 | 74,100.00 | 4.10 | 31,980.00 |
| 7 | Hydraulic | 3.70 | HM | 9,300.00 | 34,410.00 | 3.70 | 34,410.00 |
| 8 | Hydraulic | 7.20 | HM | 9,300.00 | 66,960.00 | 4.10 | 38,130.00 |
| 9 | Hydraulic | 7.20 | HM | 9,300.00 | 66,960.00 | 4.10 | 38,130.00 |
| 10 | Water treatment | 15.10 | HM | 9,300.00 | 140,430.00 | 4.10 | 38,130.00 |
| 11 | Sewerage treatment | 13.10 | HM | 9,300.00 | 121,830.00 | 4.10 | 38,130.00 |
| 12 | Sewerage treatment | 3.10 | HM | 9,300.00 | 28,830.00 | 3.10 | 28,830.00 |
| 13 | Sewerage treatment | 4.70 | HM | 9,300.00 | 43,710.00 | 4.10 | 38,130.00 |
| 14 | Hydrology and Hydrogeology | 2.90 | HM | 9,300.00 | 26,970.00 | 2.90 | 26,970.00 |
| 15 | Hydrology and Hydrogeology | 12.30 | HM | 7,800.00 | 95,940.00 | 4.10 | 31,980.00 |
| 16 | Hydrology and Hydrogeology | 4.90 | HM | 7,800.00 | 38,220.00 | 4.10 | 31,980.00 |
| 17 | Water and Sewerage Network | 6.10 | HM | 7,800.00 | 47,580.00 | 4.10 | 31,980.00 |
| 18 | Water and Sewerage Network | 2.30 | HM | 7,800.00 | 17,940.00 | 2.30 | 17,940.00 |
| 19 | Water and Sewerage Network | 13.60 | HM | 7,800.00 | 106,080.00 | 4.10 | 31,980.00 |
| 20 | Water and Sewerage Network | 9.20 | HM | 7,800.00 | 71,760.00 | 4.10 | 31,980.00 |
| 21 | Water and Sewerage Network | 16.00 | HM | 7,800.00 | 124,800.00 | 4.10 | 31,980.00 |
| 22 | Water and Sewerage Network | 1.00 | HM | 7,800.00 | 7,800.00 | 1.00 | 7,800.00 |
| 23 | Water and Sewerage Network | 11.00 | HM | 9,300.00 | 102,300.00 | 4.10 | 38,130.00 |
| 24 | Water and Sewerage Network | 22.30 | HM | 7,800.00 | 173,940.00 | 4.10 | 31,980.00 |
| 25 | Water and Sewerage Network | 10.60 | HM | 7,800.00 | 82,680.00 | 4.10 | 31,980.00 |
| 26 | Water and Sewerage Network | 16.80 | HM | 7,800.00 | 131,040.00 | 4.10 | 31,980.00 |
| 27 | Structures | 22.30 | HM | 7,800.00 | 173,940.00 | 4.10 | 31,980.00 |
| 28 | Structures | 22.30 | HM | 7,800.00 | 173,940.00 | 4.10 | 31,980.00 |
| 29 | Structures | 0.50 | HM | 7,800.00 | 3,900.00 | 0.50 | 3,900.00 |
| 30 | Structures | 14.00 | HM | 7,800.00 | 109,200.00 | 4.10 | 31,980.00 |
| 31 | Structures | 3.00 | HM | 7,800.00 | 23,400.00 | 3.00 | 23,400.00 |
| 32 | Structures | 2.50 | HM | 7,800.00 | 19,500.00 | 2.50 | 19,500.00 |
| 33 | Structures | 0.10 | HM | 7,800.00 | 780.00 | 0.10 | 780.00 |
| 34 | Structures | 1.10 | HM | 7,800.00 | 8,580.00 | 1.10 | 8,580.00 |
| 35 | Structures | 0.20 | HM | 7,800.00 | 1,560.00 | 0.20 | 1,560.00 |
| 36 | Structures | 22.30 | HM | 7,800.00 | 173,940.00 | 4.10 | 31,980.00 |
| 37 | Structures | 5.60 | HM | 7,800.00 | 43,680.00 | 4.10 | 31,980.00 |
| 38 | Soil Mechanics | 1.30 | HM | 9,300.00 | 12,090.00 | 1.30 | 12,090.00 |
| 39 | Soil Mechanics | 0.50 | HM | 7,800.00 | 3,900.00 | 0.50 | 3,900.00 |
| 40 | Electrical Mechanics | 0.10 | HM | 7,800.00 | 780.00 | 0.10 | 780.00 |
| 41 | Electrical Mechanics | 7.20 | HM | 7,800.00 | 56,160.00 | 4.10 | 31,980.00 |
| 42 | Architecture | 17.70 | HM | 7,800.00 | 138,060.00 | 4.10 | 31,980.00 |
| 43 | Costs and Budgets | 3.20 | HM | 7,800.00 | 24,960.00 | 3.20 | 24,960.00 |
| | Cost in Foreign Currency | | | | 3,014,720.00 | | 1,150,930.00 |
| | IGV (18%) | | | | 542,649.6 | | 207,167.40 |
| | Total Additional Cost in Foreign Currency | | | | 3,557,369.60 | | 1,358,097.40 |

MAIRA SAWAYA - HARB
Sworn Public Translator
Register Nº 54

## COMPUTATION OF THE ADDITIONAL COST OF F. FERRAZ IN LOCAL CURRENCY FOR SUPPLEMENTARY SERVICES

| POS | ITEM | AMOUNT Month/man | UNIT | COST REQUIREMENT F.C. | | ADDITIONAL COST F.C. | |
|-----|------|------|------|------|------|------|------|
| | | | | UNIT (US$) | PARTIAL (US$) | QUANTITY M-M | PARTIAL (US$ |
| 1.2 | Peruvian professional | | | | | | |
| 44 | Water treatment | 6.00 | HM | 9,500.00 | 57,000.00 | 4.10 | 38,950.00 |
| 45 | Waste water treatment | 10.00 | HM | 9,500.00 | 95,000.00 | 4.10 | 38,950.00 |
| 46 | Hydrology and hydrogeology | 15.00 | HM | 9,500.00 | 142,500.00 | 4.10 | 38,950.00 |
| 47 | Water and sewerage network | 10.00 | HM | 9,500.00 | 95,000.00 | 4.10 | 38,950.00 |
| 48 | Water and sewerage network | 22.30 | HM | 9,500.00 | 211,850.00 | 4.10 | 38,950.00 |
| 49 | Water and sewerage network | 14.00 | HM | 9,500.00 | 133,000.00 | 4.10 | 38,950.00 |
| 50 | Water and sewerage network | 4.00 | HM | 9,500.00 | 38,000.00 | 4.10 | 38,950.00 |
| 51 | Water and sewerage network | 5.00 | HM | 9,500.00 | 47,500.00 | 4.10 | 38,950.00 |
| 52 | Water and sewerage network | 0.00 | HM | 9,500.00 | 0.00 | 0.00 | 0.00 |
| 53 | Water and sewerage network | 17.00 | HM | 9,500.00 | 161,500.00 | 4.10 | 38,950.00 |
| 54 | Water and sewerage network | 22.30 | HM | 9,500.00 | 211,850.00 | 4.10 | 38,950.00 |
| 55 | Structures | 6.00 | HM | 9,500.00 | 57,500.00 | 4.10 | 38,950.00 |
| 56 | Electrical Mechanical | 13.00 | HM | 9,500.00 | 123,500.00 | 4.10 | 38,950.00 |
| 57 | Electrical Mechanical | 22.30 | HM | 9,500.00 | 211,850.00 | 4.10 | 38,950.00 |
| 58 | Cost and Budget | 22.30 | HM | 9,500.00 | 211,850.00 | 4.10 | 38,950.00 |
| 59 | Cost and Budget | 13.00 | HM | 9,500.00 | 123,500.00 | 4.10 | 38,950.00 |
| 60 | Hydraulics | 22.30 | HM | 9,500.00 | 211,850.00 | 4.10 | 38,950.00 |
| 61 | Hydraulics | 10.00 | HM | 9,500.00 | 95,000.00 | 4.10 | 38,950.00 |
| 1.3 | Consultants (Coordination) | | | | | | |
| 1.3.2 | Peruvian Coordinator | 10.20 | HM | 10,000.00 | 102,000.00 | 4.10 | 41,000.00 |
| 1.4 | Assistance | | | | | | |
| 1.4.1 | Assistant professionals | 22.30 | HM | 5,500.00 | 122,650.00 | 4.10 | 22,550.00 |
| 1.4.2 | Juniors and technicians | 196.30 | HM | 4,000.00 | 786,400.00 | 36.00 | 144,000.00 |
| 1.4.3 | Administrator | 28.00 | HM | 4,500.00 | 126,000.00 | 4.10 | 18,450.00 |
| 1.4.4 | Secretaries | 32.00 | HM | 1,500.00 | 48,000.00 | 4.10 | 6,150.00 |
| 1.4.5 | Typist | 67.30 | HM | 1,500.00 | 100,950.00 | 12.30 | 18,450.00 |
| 1.4.6 | Designers | 283.80 | HM | 1,500.00 | 425,700.00 | 48.50 | 72,750.00 |
| 1.4.7 | Drivers | 15.00 | HM | 900.00 | 13,500.00 | 4.10 | 3,690.00 |
| 1.4.8 | Other | 40.00 | HM | 750.00 | 30,000.00 | 6.15 | 4,612.50 |

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

126

| | Cost in Local Currency | 3,982,950.00 | | 993,802.50 |
|---|---|---|---|---|
| | IGV (18%) | 716,931.00 | | 178,884.45 |
| | Total Additional Cost in Foreign Currency | 4,699,881.00 | | 1,172,686.95 |

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

## III    Controversial Issues

Based on the rationale presented in the foregoing paragraphs and the final considerations this arbitrator resolves on the disputed issues as follows:

**III.1    Determine whether or not  the Plaintiff has to be paid the sum of US$3'557,369.60, including IGV, and the sum of S/. 3'982,950.00 plus IGV for professional fees for supplementary services to those subject matter of the contract**

The services contracted were not restricted to the execution of works included in the feasibility studies, they included the review of said feasibility studies in a consolidation report of the solutions proposed.  In this connection, consolidate means to be sound and confirm the solution proposed but this did not involve to reach different solutions to the ones originally proposed.

On this matter, the arbitrator presented his criteria in References (2) and (3) of this document and also sets that the supplementary services which performance is also claimed by the Plaintiff only involve completely the cities of Cuzco and Juliaca and the cities of Ilave, Ayaviri and Sicuani, and do not apply the cities of Puno and Tacna.

The Plaintiff argues that the delay and further work were the result of not having information from thirds.  It is correct that the contract obligation of Pronap did not give and/or ensure the information to be delivered by thirds – mainly EPS and Municipalities – to the Plaintiff to carry out the contracted designs.

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

128

This arbitrator implicitly accepts that Pronap because of the contract had the capacity to not accept the reports of the Plaintiff if they omitted information by thirds because it was not available at the time required to comply with the contract terms of the delivery of report.

It is clear though for this arbitrator that when negotiating the terms and dates of the third and fourth additional clauses, both parties already had in field works, of the results of the ports of consolidations of the solutions proposed by the feasibility studies and the basic projects in progress already advanced, Then in this opportunity, when practically almost the original contract term has elapsed in 10 months, both parties (included also the Supervisor by Pronap) already had knowledge and were aware of the problems and difficulties of the final designs in the cities of the contract and when the final reports had to be submitted as a result of the contracted services.

Based on the additional clauses, this arbitrator believes that it might be necessary to carry out supplementary or additional services as a result of the development of solutions other than those proposed in the feasibility study, and therefore the parties agree to extend the term of execution of the final studies from 323 to 466 calendar days.

This arbitrator also understands that Pronap when executing said additional clauses was aware that the Plaintiff would incur in additional expenses for having elapsed the date, the original term agreed to develop the final studies and allegedly have consumed the funds allocated by the contract of the consolidation of the solutions and in field works supplementary that cause



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

the extension of the term in the third additional clause, despite it was set that Pronap does not recognize the expenses caused by the extension agreed.

Considering the grounds above mentioned  this arbitrator <u>accepts partially the claim filed by the Plaintiff to the First Controversial Issue</u> and recognizes that it should be paid the sum of US$1'358,097.40 (One Million Three Hundred Fifty Eight Thousand Ninety Seven and 40/100 US Dollars), including IGV and the sum of S/.993,802.50 (Nine Hundred Ninety Three Thousand Eight Hundred and Two and 50/100 Nuevos Soles) plus IGV for professional fees for additional services to those subject matter of the agreement.   Out of this payment, it must be deducted the sum of US$200,222.00   (Two Hundred Thousand two Hundred Twenty Two US Dollars) plus IGV for works corresponding to the Feasibility Studies which were not executed by the Plaintiff.

**III.2    Second Controversial Issue: Determine whether it is applicable or not to pay to the Plaintiff the restatement of the sum of S/. 3'982,950.00 plus IGV, according to the Fourth Clause, paragraph 01 of the Agreement entered into by the parties; whether it is applicable or not to use the Consumer Price Index for Metropolitan Lima, and as from which date it should be applied.**

The contract provides for a restatement of the payments in Nuevos Soles based on the consumer price index of Metropolitan Lima,  Under the contract and according to the operation procedures applicable to said index, this arbitrator believes that it is applicable to make a restatement of the sum of S/.993,802.50 (Nine Hundred Ninety Three Thousand Eight Hundred Two and

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

130

50/100 Nuevos Soles) plus IGV, starting in February 2001, when the arbitrator believes it is recognized by Pronap to deliver the Final Settlement Report to the Consultant.

**III.3    Third Controversial Issue: determine whether it is applicable or not to pay to the plaintiff interests accrued for the sums of money claimed in the first disputed issue above as from the date when the obligation of payment starts to the actual date of payment; determine whether it is applicable or not to take into consideration the maximum bank interest rate for business operations set by the Central Bank.**

The Regulations of the Consulting Activity DS N° 208.87 EF that rules the Consulting Act N° 23554 dated December 29, 1983 and is additional to the agreement signed by the parties, provides in its Article 94° for the right of the Consultant to the payment of interests equal to the maximum set by the Peruvian Central Bank for the payments made by the Company upon expiration of the sixty calendar day after completion of the services subject matter of the Contract.

As it was discussed by this arbitrator before, during the negotiation of the third and fourth additional clauses the Plaintiff had the opportunity to submit for approval of Pronap any additional amount for additional services to those subject matter of the contract that it had or was carrying out and that resulted in an extension of the term to 446 calendar days which it undertook to perform upon execution of these additional clauses. The case was that this amount was never submitted to Pronap for approval of payment until the Settlement Report

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

131

where the Plaintiff presents as a *fait accompli*, the Payroll of Additional Labor, finally supporting the amounts of the First Controversial Issue.

In relation to the Third Controversial Issue and consistent with the above mentioned, this arbitrator dismisses the claim of the Plaintiff to be paid interests accrued for any sum of money resulting from the claim referred to the First Controversial Issue.

**III.4  Fourth Controversial Issue:  Determine whether it is applicable or not to pay to the plaintiff the sum of US$15,628.05, and the sum of S/.134,388.92 for expenses and bank fees for keeping the letters of guaranty as from the date of expiration of the contract.**

Examining the item of Direct Expenses of the negotiated economic bid it is observed that the items do not indicate expenses and bank fees for keeping the letter of guaranty.

Therefore, it is accepted that any expense and fee for this item is included in General Expenses that are part of the professional fees of the Consultant.

In the relation to the Fourth Controversial Issue and consistent with the above, this arbitrator dismisses the claim of the Plaintiff to be paid the expenses and bank fees for keeping the letter of guaranty.

**III.5  Determine of the efficacy or non efficacy of the Director's Resolution N° 233201/Pres/VMI/PRONAP/DE dated October 10, 2001.**

This arbitrator believes that he has not competence to issue a valid opinion on the efficacy or not of Pronap director's resolution. Consequently, this arbitrator

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

132

agrees to the rationale and technical and legal considerations of the other members of the Court when issuing an award of the controversial issue.

### III.6  Payment of Legal and Court Costs

First of all, the arbitrator believes, based on the documents and information submitted to the arbitrators by the defendant and the plaintiff, on the development of the contract and based on their behavior along the arbitration proceeding, both parties acted in good faith and based on reasons to support their positions that disagree upon the controversial issues.  Therefore, the arbitrator believes that the costs and other expenses resulting from the arbitration proceeding must be borne by both parties.

Lima, January 19, 2005

(Illegible signature)                          (Illegible signature)
Hector BECERRA MARTINEZ              Luis UBILLAS RAMIREZ
Arbitrator                                        Secretary of the Court

———————————————

(running seal)

Notaria Sotomayor - Coronel Inclán 179, Miraflores
Telephones:  4464582  4466717  4460373  4460239

I hereby certify that the foregoing signature is the true and proper handwriting of Luis Emilio UBILLAS RAMIREZ, identified by National Identity Document N° 07243372.

Lima, September 17, 2007

(illegible signature)  Carlos Augusto SOTOMAYOR BERNOS, Notary in and for Lima

———————————————

MAIRA  SAWAYA - HARB
Sworn Public Translator
Register N° 54

133

Jose L. MONTOYA VERA, Secretary of the Lima Notaries Association, hereby

that the signature and seals shown on the face of this page correspond to the

Notary in and for Lima, Carlos Augusto SOTOMAYOR BERNOS.

Receipt Nº F/85674                    Date: September 17, 2007

No responsibility is assumed for the contents of the document.

(illegible signature) Jose L. MONTOYA VERA

                    Secretary

-------------------

MINISTRY OF FOREIGN AFFAIRS OF PERU

GENERAL OFFICE OF CONSULAR AFFAIRS

AUTHENTICATION Nº 060698

The preceding signature of Jose MONTOYA VERA is hereby authenticated

without judging the contents of the document.

Lima, September 18, 2007

(Seal and illegible signature)        Maribel del Rosario LUYO JAVIER

                    Department of Authentication

                    Office of Consular Formalities

-------------------

Republic of Peru               )
Province and City of Lima )          ss:
Embassy of the                  )
United States of America  )

I certify that the official named below, whose true signature and official seal are,

respectively, subscribed and affixed to the annexed document was, on this day,

empowered to act in the official capacity designated in the annexed document,

to which faith and credit are due:

MAIRA  SAWAYA - HARB
Sworn Public Translator
Register Nº 54

134

MARIBEL DEL ROSARIO LUYO JAVIER

This embassy assumes no responsibility for the contents of the attached document.

(signed)        Lee A. BELLAND
                Vice-Consul
                U.S. Embassy, Lima
                October 3, 2007

I, the undersigned Sworn Public Translator, do hereby certify that the foregoing is a true and correct translation of the original text in Spanish attached hereto. This translation shall not be considered as an acknowledgement of the authenticity of the original document.

In witness whereof, I set my hand and affix my seal in the city of Lima (Peru), this 27th day of November 2007

MAIRA SAWAYA - HARS
Sworn Public Translator
Register N° 54

135

# EXHIBIT C

MINISTERIO DE LA PRESIDENCIA
PROYECTO ESPECIAL
PROGRAMA NACIONAL DE AGUA POTABLE
Y ALCANTARILLADO

NOTARIA BARTRA
Av. JOSE PARDO 148
MIRAFLORES
TELFS.. 241-2168 / 445-7934

## CONTRATO DE SERVICIOS DE CONSULTORIA

Conste por el presente documento, el **Contrato de Servicios de Consultoría para la elaboración de los Estudios Definitivos de la Primera etapa de Inversión de los Planes de Expansión de Mínimo Costo de los Servicios de Agua Potable y Alcantarillado de las localidades de** Tacna, Juliaca, Puno, Ayaviri, Ilave, Qosqo y Sicuani, **pertenecientes al Grupo 2,** que celebran, de una parte, el PROYECTO ESPECIAL Programa Nacional de Agua Potable y Alcantarillado-**PRONAP** representado por el Ing. WENCESLAO URBINA MOSCOSO identificado con L.E. Nº 08783623, con domicilio contractual en la Av. A. Benavides Nº 2199-2ºpiso, Miraflores-Lima y de la otra parte la empresa consultora **FIGUEIREDO FERRAZ**-Consultoría e Engenharia de Projeto Ltda. y que en adelante se denominará el **CONSULTOR** representado por el Ing Antonio Carlos do Amaral Zaitune, identificado con Pasaporte Nº CF 010404, con domicilio contractual en Calle F No. 277-Urbanización Betelguese, San Borja-Lima, de acuerdo a los términos y condiciones siguientes:

## CLÁUSULA PRIMERA

## ANTECEDENTES

01. El **PRONAP**, convocó el Concurso Internacional de Méritos No.01-96-PRES-VMI-PRONAP, para la selección de empresas consultoras, que elaborarán los Estudios Definitivos de la Primera Etapa de Inversión de Planes de Expansión de Mínimo Costo, de conformidad con el programa de desarrollo del Sub-Programa C: **Preinversión y Estudios Definitivos**, del Programa de Apoyo al Sector de Saneamiento Básico.

El citado concurso de méritos se desarrolló en el marco del Convenio de Asistencia Técnica suscrito por el PRONAP y las **Empresas Prestadoras de Servicio (EPS)**, comprendidas en el Programa y se otorgó la buena pro a la empresa consultora Figueiredo Ferraz- Consultoría e Engenharia de Projeto Ltda., siendo procedente suscribir el contrato correspondiente.

El presente contrato se rige por:

a) Los términos y condiciones dispuestas en el Contrato de Préstamo Nº 847/ OC-PE y sus anexos, suscrito entre el Gobierno Peruano y el Banco



1

MINISTERIO DE LA PRESIDENCIA
PROYECTO ESPECIAL
PROGRAMA NACIONAL DE AGUA POTABLE
Y ALCANTARILLADO

Interamericano de Desarrollo-**BID**;

b)   Lo establecido en las bases del concurso, formuladas por el **PRONAP** y que cuentan con la conformidad del **BID**;

c)   Los términos de referencia específicos para el Concurso de Méritos formulados por el **PRONAP** y que cuentan con la conformidad del **BID**, la oferta del **CONSULTOR** (propuesta técnica y económica) y acuerdos adoptados en la negociación del contrato y en la propuesta económica negociada final.

d)   En general, por lo dispuesto en la Ley de Presupuesto vigente y Ley N° 23554-Ley de Consultoría y su Reglamento General, aprobado por Decreto Supremo N° 208-87-EF de fecha 05/11/87, Resolución Directoral 021-97/PRES/VMI/PRONAP/DE, en lo que no contravengan al Contrato de Préstamo N° 847/OC-PE, a las bases y términos de referencia, a las normas del BID y que el **CONSULTOR** declara conocer.

03.   Figueiredo Ferraz asume la responsabilidad técnica de velar por el fiel cumplimiento del contrato suscrito con el **PRONAP** cuya labor es materia del presente contrato.

**CLÁUSULA SEGUNDA**

**OBJETO DEL CONTRATO**

01.   El objeto del presente contrato es comprometer los servicios del **CONSULTOR** para elaborar los **Estudios Definitivos de la Primera Etapa de Inversión de los Planes de Expansión de Mínimo Costo de los Servicios de Agua Potable y Alcantarillado** de las localidades de **Tacna, Juliaca, Puno, Ayaviri, Ilave, Qosqo y Sicuani**, en el marco del Programa de Apoyo al Sector de Saneamiento Básico, y será financiado con recursos del BID del Préstamo N° 847/OC-PE y aportes del Gobierno.

Esta labor se desarrollará de acuerdo a los términos de referencia y anexos, propuesta técnica y económica negociada, así como a los acuerdos adoptados en la negociación del presente contrato y documentos complementarios.

02.   Queda entendido que el **CONSULTOR** está obligado a respetar los términos de referencia del Concurso, y los documentos establecido en el acápite 02 de la Cláusula Primera, de modo que se alcancen plenamente los objetivos del Programa, los mismos

2

MINISTERIO DE LA PRESIDENCIA
PROYECTO ESPECIAL
PROGRAMA NACIONAL DE AGUA POTABLE
Y ALCANTARILLADO

que el **CONSULTOR** declara conocer.

## CLÁUSULA TERCERA

## PLAZO DE EJECUCIÓN Y VIGENCIA

01.    El plazo de ejecución de los servicios de consultoría a prestar por el **CONSULTOR** será de 315 días naturales computados a partir de la vigencia del presente Contrato.

De acuerdo a lo establecido en las bases del concurso y en la propuesta técnica del consultor los servicios a contratarse incluyen el período de movilización, la presentación de tres informes de avance y un informe final, cuyos plazos de presentación al **PRONAP** son los siguientes:

Período de Movilización : Los primeros 15 días naturales

Primer Informe :      A los 60 días naturales de vigencia del contrato

Segundo informe:      A los 150 días naturales de vigencia del contrato

Tercer informe:       A los 210 días naturales de vigencia del contrato

Informe final  :      A los 315 días naturales de vigencia del contrato

El Consultor presentará inicialmente al PRONAP dos (2) ejemplares de los informes y 1 (uno) a las EPS. Una vez aprobados dichos Informes deberán, presentarse en cinco (5) ejemplares como sigue:

i)      al **PRONAP** deberán presentarse, en original, dos copias y la misma versión en medio magnético

ii)     a la EPS, una copia.

iii)     al BID, a través del **PRONAP**, una copia.

El **BID** ó el **PRONAP** podrán solicitar informes especiales cuyo contenido y alcances serán establecidos de común acuerdo sin que ello represente un incremento



3

NOTARIA BARTRA
Av. JOSE PARDO 1/8
MIRAFLORES

de costos para el **PRONAP**.

02.    Este contrato entrará en vigencia en la fecha de entrega del cheque de adelanto o a los tres (3) días naturales de la fecha en la que el PRONAP comunique al **CONSULTOR** que el monto del adelanto se encuentra a su disposición, lo que primero ocurra.

03.    El contrato estará vigente por el plazo de 390 días naturales que incluyen la terminación de los servicios y entrega de todos los documentos pertinentes, la aprobación del informe final por el **PRONAP**, la no objeción del **BID** y la liquidación del contrato.

04.    De ocurrir ampliación autorizada por el **PRONAP** del período de ejecución de los servicios de consultoría, se prorrogará de ser necesario la vigencia del presente contrato, requiriéndose para tal fin la no objeción o conformidad del **BID.**

05.    Transcurridos 30 días naturales desde la suscripción del contrato, sin que el consultor inicie sus servicios por causas a él imputables, se podrá resolver el mismo, ejecutándose la garantía de cumplimiento del contrato sin reconocimiento de gastos por ningún concepto al **CONSULTOR.**

### CLÁUSULA CUARTA

### MONTO Y FORMA DE PAGO

01.    El monto a suma alzada establecido en el presente Contrato, asciende en total, a la suma de Ocho Millones Seiscientos Setentisiete Mil Setecientos Cincuenta y 00/100 Nuevos Soles (S/.8,677,750) más Novecientos Ochenta y Cuatro Mil Setecientos Veinte y 00/100 Dólares Americanos (US$ 984,720) con precios al 18 de Setiembre de 1997. La parte correspondiente a nuevos soles, será actualizada durante la vigencia del contrato en base al Índice de precios al consumidor de Lima Metropolitana-IPC de Lima.

Para la parte correspondiente a gastos reembolsables se reconocerá un monto referencial de Trescientos Ochenticuatro Mil y 00/100 Nuevos Soles (S/.384,000.00) a precios del 18 de Setiembre de 1997.

Adicionalmente, se abonará al **CONSULTOR** en Nuevos Soles, el equivalente al 18% de los montos señalados correspondientes al impuesto general a las ventas

4



(IGV) que debe tributar el **CONSULTOR** en la fecha que corresponda tributar según Resolución de Superintendencia No. 006-95/SUNAT.

Estos montos cubren íntegramente los servicios que brindará el **CONSULTOR** de acuerdo a lo establecido en sus propuestas técnica y económica negociada, según la estructura de costos establecida en las bases, a los acuerdos adoptados durante el período de negociación y lo solicitado en los términos de referencia.

Las monedas de pago estarán sujetas a lo que establece el Contrato de Préstamo Nº 847/OC-PE.

**Se deja establecido que la tributación por concepto de impuesto a la renta de las firmas consultoras y del personal asignado para el servicio materia del presente contrato, son de entera responsabilidad del CONSULTOR.**

02.    El **PRONAP** abonará como adelanto hasta el **20%** del monto contractual el que se actualizará en la parte de nuevos soles de acuerdo a lo establecido en el Inciso 01 de esta Cláusula, para cuyo efecto el **CONSULTOR** deberá entregar una carta fianza por dicho monto.

03.    La carta fianza por el adelanto, deberá ser solidaria, irrevocable, incondicionada, sin beneficio de excusión y de realización automática al solo requerimiento del **PRONAP** y tener vigencia hasta la total recuperación del monto adelantado.

El monto de la referida carta fianza podrá ser reajustada por el **CONSULTOR** conforme vaya amortizando el adelanto, para cuyo efecto tendrá en cuenta la actualización del monto contractual previsto en el inciso 02 de esta cláusula.

El girador de la carta fianza, podrá ser cualquier institución bancaria o financiera que cuente con la autorización de la Superintendencia de Banca y Seguros y que no tenga asuntos pendientes en situación de conflicto con el **PRONAP** y entidades del Estado.

04.    Los pagos parciales correspondientes, serán abonados de conformidad con lo establecido en la Cláusula Tercera y al cronograma siguiente:

1er. Pago 35% del monto contractual luego de la aprobación por parte del **PRONAP** del primer Informe.

5

MINISTERIO DE LA PRESIDENCIA
PROYECTO ESPECIAL
PROGRAMA NACIONAL DE AGUA POTABLE
Y ALCANTARILLADO

2do. Pago 25% del monto contractual luego de la aprobación por parte del **PRONAP** del segundo Informe

3er. Pago 30% del monto contractual luego de la aprobación por parte del **PRONAP** del tercer Informe

4to. Pago 10% del monto contractual luego de la aprobación por parte del **PRONAP** y la no objeción del **BID** del informe final

Del monto de cada uno de los pagos antes indicados, el **PRONAP** efectuará una retención equivalente al porcentaje correspondiente al adelanto para su respectiva amortización.

Queda entendido que se pagará en US Dólares únicamente los honorarios de los profesionales extranjeros y pasajes desde y hacia el exterior, y otros gastos que se efectúe en dicha moneda, siempre que se hayan acordado en la negociación del Contrato.

Igualmente, de conformidad con la Propuesta Económica Negociada y acuerdos adoptados durante la negociación del contrato, los bienes que se señalan en el Anexo No. 5 y aquellos cuya adquisición eventualmente se apruebe para el desarrollo de los servicios que por el presente se contratan, quedarán en propiedad del **PRONAP** a quien serán transferidos por el **CONSULTOR** al término del servicio para el que fueron adquiridos.

05.    Los informes presentados por el **CONSULTOR** serán revisados y aprobados por el **PRONAP** en un plazo de quince(15) días naturales y las valorizaciones que ellos originen se pagarán dentro de los treinta (30) días naturales posteriores a su presentación, salvo que el **PRONAP**, no los apruebe, debiendo comunicar al **CONSULTOR** de manera puntual y específica cuales son las observaciones que le formula. En este último caso, el **CONSULTOR** deberá levantar las observaciones que hubiera lugar en un plazo de 15 días. De no existir pronunciamiento expreso del **PRONAP** en el plazo de quince (15) días naturales contados desde la recepción de los informes, se entenderá que estos han sido aprobados por el **PRONAP**.

El levantamiento de observaciones deberá ser revisado por el PRONAP en un plazo de cinco (5) días naturales, con base a lo cual:

a)    Aprobará el informe, procediéndose a la cancelación de la respectiva factura, en un plazo de 15 días.

b)    Desaprobará el informe, estando sujeto el **CONSULTOR** a la penalidad



6

MINISTERIO DE LA PRESIDENCIA
PROYECTO ESPECIAL
PROGRAMA NACIONAL DE AGUA POTABLE
Y ALCANTARILLADO

señalada en la Cláusula Sexta - inciso 04 del presente contrato. La penalidad se calculará desde la fecha de presentación del primer documento de levantamiento de observaciones, hasta la fecha de presentación del documento que subsane plenamente las observaciones efectuadas por el PRONAP.

De no existir pronunciamiento expreso del **PRONAP** al levantamiento de observaciones del **CONSULTOR**, en el plazo de cinco (5) días naturales, se entenderá que el informe correspondiente ha sido aprobado.

## CLÁUSULA QUINTA

## OBLIGACIONES DE LAS PARTES CONTRATANTES

### I.    DEL CONSULTOR

01.    El **CONSULTOR**, a la firma del contrato:

a)    Suscribirá el expediente técnico y demás documentos del Concurso.

b)    Entregará el compromiso de participación de los profesionales asignados al estudio y certificado de habilidad para el desempeño de los profesionales peruanos.

02.    El **CONSULTOR** asume total responsabilidad por el cumplimiento del contrato y sus partes integrantes, es decir, las bases, términos de referencia, propuesta técnica y económica negociada, acuerdos adoptados en las actas de negociación, aceptando las consecuencias derivadas de omisiones, pérdidas, daños y/o errores producidos por negligencia de su parte.

03.    El cumplimiento de las obligaciones establecidas en el presente contrato y sus anexos, es de carácter exclusivo del **CONSULTOR**, no pudiendo ser materia de sub-contrata, o transferencia en favor de terceros.

El Representante Legal será designado por el Consultor dentro de los funcionarios de la empresa líder. Dicho representante fijará su residencia en el Perú durante la vigencia del contrato.

04.    El **CONSULTOR** se compromete a asistir a las reuniones de coordinación regulares y extraordinarias, a solicitud del **PRONAP**, durante la vigencia del contrato. Los acuerdos que consten en las actas que ambas partes suscriban en dichas

7



MINISTERIO DE LA PRESIDENCIA
PROYECTO ESPECIAL
PROGRAMA NACIONAL DE AGUA POTABLE
Y ALCANTARILLADO

reuniones, formarán parte de las obligaciones del presente contrato, sin perjuicio de las disposiciones contractuales originales.

05.    El **CONSULTOR** se deberá someter a las disposiciones legales aplicables al presente contrato y efectuará las gestiones necesarias ante las autoridades e instituciones involucradas en la buena marcha y cumplimiento de los servicios contratados. Queda establecido que el presente contrato otorga al PRONAP todos los derechos legales sobre los documentos, equipos y demás medios utilizados y/o productos de los servicios brindados.

06.    El **CONSULTOR** instalará las oficinas previstas en sus propuestas técnica y económica negociadas, las cuales deberán implementarse adecuadamente, e iniciará sus servicios en ellas en un plazo máximo de 15 días naturales a partir de la vigencia del presente contrato, debiendo permanecer el personal correspondiente durante la duración de los servicios, en las diferentes localidades y según lo programado.

07.    El **CONSULTOR**, durante la prestación de sus servicios, se compromete a transferir conocimientos y tecnología al equipo profesional de contraparte que asignen las **EPS**.

08.    El **CONSULTOR** se compromete a tratar con la confidencialidad del caso los documentos y demás información que se le suministre y no podrá divulgarla sin expresa autorización del **PRONAP.**

09.    El **CONSULTOR** coordinará y/o informará al **PRONAP** todos los aspectos de sus servicios que requieran su pronunciamiento.

10.    El **CONSULTOR** deberá justificar ante el **PRONAP** cualquier cambio en su equipo de profesionales, respaldado en una comunicación explicativa por parte del profesional a cambiarse y la currícula del profesional a incorporarse, el cual deberá tener una calificación similar o superior del que sustituye. Dicho cambio requerirá aprobación previa del **PRONAP** y no le implicará mayor costo .

El **BID** ó el **PRONAP** podrán solicitar la sustitución de expertos o profesionales del **CONSULTOR**, cuando su desempeño sea insatisfactorio o muestren conducta inadecuada, asumiendo su costo el **CONSULTOR**. También este último podrá por las mismas causales, sustituir expertos previo consentimiento escrito del PRONAP.

Se señala específicamente que no existe vínculo laboral entre el personal del **CONSULTOR** y el **PRONAP**.



MINISTERIO DE LA PRESIDENCIA
PROYECTO ESPECIAL
PROGRAMA NACIONAL DE AGUA POTABLE

11.  Y **EL CONSULTOR** ofrecerá todas las facilidades necesarias para que el **PRONAP** realice las labores inherentes a sus funciones; igualmente brindará las facilidades del caso a los funcionarios del **BID.**

12.  El **CONSULTOR** está obligado a llevar contabilidad y registros documentados de todos los pagos que le efectúe el **PRONAP**, los que estarán disponibles para verificación y/o auditoría que efectúe el **PRONAP** y/o el **BID.**

## II. DEL PROYECTO ESPECIAL.

01.  El **PRONAP** por medio del **INSPECTOR**, asociación de empresas consultoras contratada por el **PRONAP**, efectuará la inspección de la ejecución del presente contrato, así como de la calidad de los servicios.

02.  El **PRONAP** efectuará visitas de seguimiento y asesoría técnica a las **EPS** para evaluar el cumplimiento de los objetivos del Programa . El **PRONAP** se reserva el derecho de objetar los trabajos que se efectúen, durante la vigencia del contrato, que eventualmente considere que son defectuosos, en cuyo caso notificará al **INSPECTOR** para que éste y el **CONSULTOR** tomen las medidas del caso en orden a subsanar las objeciones formuladas.

Se considera como trabajos defectuosos aquellos no ejecutados de acuerdo a los términos de referencia, métodos, procedimientos y normas vigentes o aquellos incompletos o deficientes o que no cumplan los objetivos previstos.

03.  **EL PRONAP** proporcionará al **CONSULTOR** todos los documentos previos, informes u otros documentos relacionados a los servicios de agua potable y alcantarillado de las **EPS**, cuyas recomendaciones serán sólo referenciales para fines de los análisis que debe desarrollar el **CONSULTOR**. En el caso de los Estudios de Factibilidad de los Planes de Expansión de Mínimo Costo que han sido aprobados por el **PRONAP**, para las localidades que comprenden el presente contrato y que cuentan con la no objeción del BID, estos documentos se tomarán como base para el desarrollo de los Diseños Definitivos.

04.  El **PRONAP** dispondrá el pago de las Facturas, previa aprobación de los Informes.

## III. DE LAS EPS
En virtud al Convenio suscrito con el **PRONAP**, las **EPS** entre otros aspectos están obligadas a:



9

NOTARIA BARTRA
Av. JOSE PARDO 148
MIRAFLORES
TELFS.: 241-2168 / 445-????

MINISTERIO DE LA PRESIDENCIA
PROYECTO ESPECIAL
PROGRAMA NACIONAL DE AGUA POTABLE
Y ALCANTARILLADO

01.    Designar a los funcionarios que integrarán el equipo de profesionales de contraparte del **PRONAP**, en la supervisión del Contrato.

Designar a los profesionales que serán contraparte del CONSULTOR.

02.    Proporcionar al **CONSULTOR** toda la información y documentos que dispongan, relacionados con el Estudio, así como facilitará un ambiente adecuado para las reuniones de trabajo necesarias durante el desarrollo de los servicios contratados.

03.    Revisar y opinar sobre los avances del Estudio y el Informe Final que el **CONSULTOR**, les hará llegar, en un plazo máximo de 08 días.

## CLÁUSULA SEXTA

## GARANTÍAS Y PENALIDADES

01.    Constituye garantía especial por el fiel cumplimiento del Contrato, una carta fianza por el equivalente al 10% del monto contractual (actualizado en la parte en Nuevos Soles), vigente durante la ejecución del contrato, solidaria, irrevocable, incondicionada y de realización automática, a nombre del **PRONAP**, la que el **CONSULTOR** entregará conjuntamente con la carta fianza por el adelanto.

    El **CONSULTOR** asume la total responsabilidad por los servicios a prestar y por las acciones de su personal.

    En caso de que alguno de los profesionales propuestos no pudiera incorporarse al equipo de trabajo, por razones de fuerza mayor debidamente justificadas, el **CONSULTOR** propondrá su reemplazo por otro profesional de igual especialidad, de acuerdo a lo establecido en la Cláusula Quinta, inciso 10, requiriendo la expresa aceptación previa del **PRONAP.**

    El incumplimiento del **CONSULTOR** en el inicio de sus servicios estará sujeto a una multa de 1.5/10,000 (uno y medio por cada diez mil) del monto contractual actualizado, por cada día natural de atraso después de la fecha límite señalada en la Cláusula Quinta - inciso 06.

    El incumplimiento del **CONSULTOR** en la presentación de sus Informes, dentro de los plazos establecidos en la Cláusula Tercera - inciso 01, dará lugar a la aplicación de una multa de 2/10,000 del monto contractual actualizado, por cada día natural de incumplimiento.

10

MINISTERIO DE LA PRESIDENCIA
PROYECTO ESPECIAL
PROGRAMA NACIONAL DE AGUA POTABLE
Y ALCANTARILLADO

El **CONSULTOR**, por ningún motivo puede eximirse de realizar los servicios contratados, a excepción de lo estipulado en el Artículo 105 del REGAC.

05.    Son causales de resolución administrativa del Contrato, las señaladas en el Artículo 143º del Reglamento General de Actividades de Consultoría - **REGAC-** y las previstas en el presente Contrato.

06.    **El PRONAP** podrá resolver administrativamente este Contrato, de encontrar causales para ello, y comunicará notarialmente al **CONSULTOR** este hecho con 15 días de anticipación, previa conformidad del **BID.**

07.    Además de las ya indicadas, son causales de resolución administrativa del contrato, la paralización por caso fortuito y/o fuerza mayor no atribuibles a ninguna de las partes por mas de 90 días naturales, originadas por desastres y/o emergencias a que se refiere el Art. No 119 del -REGAC.

En este caso el **PRONAP** valorizará los trabajos realizados por el **CONSULTOR** y formulará la liquidación correspondiente, en función de los Arts. No 90 y 119 (en lo aplicable) del REGAC.

Si causas de fuerza mayor o caso fortuito impidieran la continuación de los servicios y determinaran la suspensión parcial de su ejecución, las obligaciones del **CONSULTOR** se prorrogarán por un periodo idéntico al de la suspensión.

Para estos efectos, se entiende como causas de fuerza mayor o caso fortuito los terremotos, epidemias, aluviones, daños generados como consecuencia del fenómeno del Niño u otro similar, incendios, guerras, conflictos sociales y otros hechos graves ajenos a la voluntad de las partes y que afectan la normal ejecución de los servicios.

El **CONSULTOR** presentará a consideración del **PRONAP** la relación de gastos debidamente justificados en lo que hubiera incurrido durante la suspensión de los servicios para su correspondiente reembolso o pago, siempre que medie conocimiento del **PRONAP**, previo al pago, respecto de esta circunstancia.

El **CONSULTOR** presentará a consideración del **PRONAP** la relación de trabajos adicionales, que debe ejecutar como consecuencia de los daños y perjuicios ocasionados por las causas de fuerza mayor antes señaladas, que habiendo sido ya ejecutados sea menester volverlos a ejecutar o rehacer total o parcialmente por las

11

MINISTERIO DE LA PRESIDENCIA
PROYECTO ESPECIAL
PROGRAMA NACIONAL DE AGUA POTABLE
Y ALCANTARILLADO

mismas causas. Dichos trabajos adicionales serán debidamente valorizados y acordados entre ambas partes.

08.    En el caso que los pagos al **CONSULTOR** se excedan de los plazos previstos en el presente contrato, se aplicará lo dispuesto en los Arts.N° 104 y N° 105 del **REGAC**.

## CLÁUSULA SÉPTIMA

## CONCLUSIÓN DEL CONTRATO

01.    El presente Contrato concluirá cuando el **CONSULTOR** haga entrega del informe final de las actividades de consultoría y se culmine la liquidación del mismo. El informe final con la conformidad del **PRONAP** será puesto a consideración del **BID**.

02.    La liquidación del contrato se efectuará dentro de los treinta (30) días posteriores a la no objeción del Informe Final, por el **BID**.

03.    El **PRONAP** evaluará el desempeño del **CONSULTOR** e informará al **BID** y emitirá el correspondiente Certificado de Servicios de Consultoría.

**Queda establecido que las opiniones y recomendaciones del CONSULTOR no obligan ni al PRONAP ni al BID, los que se reservan el derecho de formular las observaciones o salvedades que consideren apropiadas.**

## CLÁUSULA OCTAVA

## COMPETENCIA JURISDICCIONAL

Para todo lo relacionado con el presente Contrato, las partes se someten a la competencia de los Magistrados y Tribunales de la ciudad de Lima, o a la Jurisdicción Arbitral, de ser el caso.

Queda establecido que si alguna de las disposiciones del contrato fuere declarada inválida, las demás no serán afectadas y permanecerán plenamente vigentes y aplicables, dado que el contrato es un instrumento legal orgánico.

## CLÁUSULA NOVENA

## ELEVACIÓN A ESCRITURA PUBLICA




12

MINISTERIO DE LA PRESIDENCIA
PROYECTO ESPECIAL
PROGRAMA NACIONAL DE AGUA POTABLE
Y ALCANTARILLADO

A petición de cualesquiera de las partes, el presente contrato podrá ser elevado a escritura pública, corriendo los gastos correspondientes a cargo de la parte interesada.

## CLÁUSULA DÉCIMA

### INTEGRACIÓN

El presente contrato deja sin efecto cualquier otro trato anterior entre las partes, verbal o escrito, que eventualmente pudiera existir.

### ANEXOS

Constituyen anexos y parte integrante del presente contrato los siguientes:

Anexo 1 :    Contenido de los Informes.

Anexo 2:    Las bases, y sus anexos.

Anexo 3 :    Términos de referencia, y sus anexos.

Anexo 4 :    Propuesta técnica.

Anexo 5 :    Propuesta económica negociada y acuerdos adoptados durante la negociación del contrato y otros que determinen expresamente las partes contratantes, incluyendo relación de equipos de cómputo y vehículos que serán adquiridos para el desarrollo del estudio.

Anexo 6 :    Nómina de personal profesional asignado al estudio.

Queda establecido que en caso de ambigüedad, duda o desacuerdo sobre la interpretación del contrato y sus documentos, anexos o apéndices, prevalecerá lo establecido en los términos de referencia, salvo lo acordado por escrito durante la ejecución de la presente consultoría.





13



MINISTERIO DE LA PRESIDENCIA
PROYECTO ESPECIAL
PROGRAMA NACIONAL DE AGUA POTABLE
Y ALCANTARILLADO

## FIRMAS

Se suscribe el presente Contrato, por triplicado, en la ciudad de Lima, Perú a los...12. días del mes de noviembre de mil novecientos noventisiete.

--------------------------------------  .......................  --------------------------------------

**Por el PRONAP**
Ing. Wenceslao Urbina Moscoso
**Director Ejecutivo**

Antonio Carlos Do Amaral Zaitune
Representante Legal
Por El Consultor

**CERTIFICO:** Que la firma que Antecede
corresponde a don **ANTONIO CARLOS DO AMARAL ZAITUNE**
identificado con **PASAPORTE BRASILERO No. C O 239293**
Legalizándose la firma, no el contenido.

Miraflores,   **11 SEP 2007**





**LEONARDO BARTRA VALDIVIESO**
ABOGADO · NOTARIO DE LIMA

14



Republic of Peru                    )
Province and City of Lima    )    ss:
Embassy of the                     )
United States of America     )


I certify that the official named below, whose true
signature and official seal are, respectively, subscribed
and affixed to the annexed document, was, on this day,
empowered to act in the official capacity designated in
the annexed document, to which faith and credit are due.

**MARIBEL DEL ROSARIO LUYO JAVIER**


This Embassy assumes no responsibility for the contents of
the document.

_____
**Landry J. Carr**
**Vice Consul**
**U.S. Embassy, Lima**


November 21, 2007
(Date)

# EXHIBIT D



*MAIRA SAWAYA HARB*
*Traductora Pública Juramentada*
*CTP 0149 – JVT 54*

# OFFICIAL TRANSLATION

# CONSULTANCY AGREEMENT

MAIRA SAWAYA - HARB
**Sworn Public Translator**
Register N° 54

*Estados Unidos # 982 – Lima 11 – PERU*
*Teléfonos: (51-1) 463-2368 / 261-8793 /9965-9717 - Fax: 461-6571*
*e-mail: msawaya@terra.com.pe*

## OFFICIAL TRANSLATION

*Nº 3127-07*

**THE REPUBLIC OF PERU)**
**MINISTRY OF THE PRESIDENCY**
**PROGRAMA NACIONAL DE AGUA POTABLE Y ALCANTARILLADO**
**(NATIONAL DRINKING WATER SUPPLY AND SEWERAGE PROGRAM)**

### CONSULTING AGREEMENT

Witnesseth hereby the **Consulting Agreement for the Elaboration of Definitive Studies for the First Investment Stage of the Minimum Cost Drinking Water Supply and Sewerage Expansion Plans** in Tacna, Juliaca, Puno, Ayaviri, Ilave, Qosqo and Sicuani, under Group 2, entered into by and between the SPECIAL PROJECT National Drinking Water Supply and Sewerage Program (PRONAP) acting by and through Wenceslao URBINA MOSCOSO, Engineer, identified with Voting Card 08783623, with domicile for the purpose hereof at Av. A. Benavides 2199-2°piso, Miraflores, Lima and the consulting company FIGUEIREDO FERRAZ – Consultoria e Engenharia de Projeto Ltda., hereinafter, THE CONSULTANT, acting by and through Antonio Carlos DO AMARAL ZAITUNE, Engineer, identified with Passport CF 010404, with domicile for the purpose hereof at Calle F 277 – Urbanización Betelguese, San Borja, Lima, in the following terms and conditions:

### ONE

### Background

1.-   PRONAP called the International Competitive Selection Process 01-96-PRES-VMI-PRONAP, for the selection of consulting companies to prepare the Definitive Studies for the First Investment Stage of the Minimum Cost Drinking Water Supply and Sewerage Expansion Plans, in line with the development

MAIRA SAWAYA - HARB
Sworn Public Translator
Register Nº 54

1

program of Sub-Program C: Preliminary Investment and Definitive Studies, of

the Basic Sanitation Sector Support Program.

The referred competitive selection process was held within the framework of the

Technical Assistance Agreement entered into by PRONAP and the Service

Providers (EPS) comprised in the Program and the contract was awarded to the

consulting company Figueiredo Ferraz- Consultoria e Engenharia de Projeto

Ltda., resulting in the execution of the respective agreement.

2.- This agreement is governed by:

   a) The terms and conditions provided in Loan Agreement 847/OC-PE and

      Annexes thereto, entered into by and between the Peruvian Government

      and the International Development Bank -- IDB;

   b) The provisions contained in the selection process conditions, prepared

      by PRONAP and approved by IDB;

   c) The specific terms of reference for the Competitive Selection Process,

      prepared by PRONAP and approved by IDB, the offer submitted by the

      CONSULTANT (technical and economic proposal) and the agreements

      adopted following the negotiation of the agreement and the final

      economic proposal negotiated.

   d) In general, by the provisions of the Budget Law in force and Law 23554,

      Consultancy Law and the Regulations thereof, approved by Supreme

      Decree 208-87-EF, dated November 5, 1987, Director's Resolution 021-

      97/PRES/VMI/PRONAP/DE, as long as they do not oppose the

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

2

provisions under Loan Agreement 847/OC-PE, the conditions and terms of reference and the provisions of IDB, which the CONSULTANT represents being aware of.

3.- Figueiredo Ferraz assumes the technical responsibility to safeguard the strict fulfillment of the agreement entered into with PRONAP, subject matter hereof.

## TWO:

### Purpose

1. The purpose of this agreement is to engage the services of the CONSULTANT to prepare the **Definitive Studies for the First Investment Stage of the Minimum Cost Drinking Water Supply and Sewerage Expansion Plans** in Tacna, Juliaca, Puno, Ayaviri, Ilave, Qosqo and Sicuani, within the framework of the Program for the Support to the Basic Sanitation Sector and shall be financed with funds provided by IDB under Loan 847/OC-PE and contributions from the Government.

This work shall be performed in line with the terms of reference and annexes thereto, the technical and economic proposal negotiated, and the agreements adopted following the negotiation of this agreement and supplementary documents.

2. It is agreed that the CONSULTANT shall abide by the terms of reference of the Competitive Selection Process and the documents set forth in

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

3

Sub-point 2 of Clause 1, towards the full achievement of the Program purposes, which the CONSULTANT represents to be aware of.

## THREE:

### Execution and Effective Term

1. The execution term for the consulting services to be rendered by the CONSULTANT shall be 315 calendar days, counted from the inception date hereof.

   Pursuant to the conditions set forth in the competitive selection process and in the technical proposal submitted by the CONSULTANT, the services to be rendered include the mobilization period, the submission of the three progress reports and a final report, submission dates to PRONAP are specified below:

   Mobilization Period: The first fifteen (15) calendar days

   First Report:      Sixty (60) calendar days following the inception date of the agreement

   Second Report:     One hundred and fifty (150) calendar days following the inception date of the agreement

   Third Report:      Two hundred and ten (210) calendar days following the inception date of the agreement

   Final Report:      Three hundred and fifteen (315) calendar days following the inception date of the agreement

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

4

The CONSULTANT shall initially submit two (2) copies of the reports to PRONAP and one (1) copy to the EPS. Upon approval thereof, the CONSULTANT shall submit five (5) copies as follows:

i)    to PRONAP, one original and two hard copies and the same version in magnetic means

ii)   to the EPS, one copy

iii)  to IDB, one copy through PRONAP

IDB or PRONAP may request special reports, the contents and extents of which shall be established by mutual agreement, without this representing an additional cost for PRONAP.

2. This agreement shall enter into full force and effect on the date of delivery of the check covering the advance amount or three (3) calendar days after the date when PRONAP gives notice to the CONSULTANT that the advance amount is available, whichever occurs first.

3. This agreement shall remain in full force and effect for a term of three hundred and ninety (390) calendar days, which include the completion of the services and the delivery of any and all pertinent documents, the approval by PRONAP of the final report, the non objection of IDB and the liquidation of the agreement.

4. If PRONAP should authorize an extension of the execution term of the consulting services, the effective term of this agreement shall be extended accordingly if necessary, subject to the non-objection or approval by IDB.

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

5

5. If after thirty (30) calendar days from the date of execution hereof, the CONSULTANT has not began to provide the services due to causes imputable to it, this agreement may be terminated, giving rise to the forthwith execution of the contract performance bond, without any recognition of expenses for the CONSULTANT.

## FOUR:

### Amount and Payment

- The lump sum agreed hereunder amounts to a total of S/.8,677,750 (Eight Million Six Hundred Seventy-seven Thousand, Seven Hundred Fifty Nuevos Soles) plus US$984,720 (Nine Hundred Eighty-four Thousand Seven Hundred Twenty US Dollars) based on prices as at September 18, 1997. The portion expressed in Nuevos Soles shall be updated throughout the effective term of the agreement based on the consumer price index for Metropolitan Lima (Lima CPI).

A referential amount of S/.384,000 (Three Hundred Eighty-four Thousand Nuevos Soles) shall be recognized for the portion concerning reimbursable expenses based on prices as at September 18, 1997.

In addition, the CONSULTANT shall be paid an amount in Nuevos Soles equivalent to 18% of the amounts set forth as value added tax (IGV) for ongoing payment by the CONSULTANT on the respective tax payment date fixed by Resolution 006-95/SUNAT of the National Superintendence of Tax Administration.

These amounts cover in full the services to be rendered by the CONSULTANT pursuant to its technical and economic proposals

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

negotiated, according to the cost structure established in the competitive selection process conditions, the agreements adopted during the negotiation period and the terms of reference.

The payment currencies shall be subject to the provisions of Loan Agreement 847/OC-PE.

It is hereby established that the income tax payment of the consulting companies and of the personnel assigned to provide the services subject matter hereof, are the sole responsibility of the CONSULTANT.

- PRONAP shall prepay an amount equivalent to twenty per cent (20%) of the contractual amount, the Nuevos Soles portion of which shall be updated as set forth in Sub-point 1 herein, to which effect the CONSULTANT shall submit a guarantee letter for such amount.

- The guarantee letter covering the prepayment shall be joint and several, irrevocable, unconditional, without benefit of excussio and of immediate execution upon the request of PRONAP and shall be effective until the prepaid amount has been recovered in full.

The amount of the above-mentioned guarantee letter may be adjusted by the CONSULTANT to reflect the gradual repayment of the prepaid amount, to which end it shall consider the updating of the contractual amount foreseen in Sub-point 2 herein.

The drawer of the guarantee letter may be any banking or financial institution with authorization from the Superintendence of Banking and Insurance Companies and which must not have any ongoing conflict situation with PRONAP or any other State entity.

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

7

- The respective partial payments shall be made pursuant to the provisions set forth in Clause 3 above and according to the following schedule:

First payment:     35% of the contractual amount, prior approval of the first report by PRONAP

Second payment:    25% of the contractual amount, prior approval of the second report by PRONAP

Third payment:     30% of the contractual amount, prior approval of the third report by PRONAP

Fourth payment:    10% of the contractual amount, prior approval of the final report by PRONAP and non-objection by IDB

PRONAP shall withhold an amount from each of the above-mentioned payments, for repayment of the prepaid amount.

The parties agree that the professional fees of foreign staff and travel tickets to and from abroad shall be paid in US Dollars, as well as any other expenses that may be incurred in that currency, provided they have been agreed to during the negotiation of this Agreement.

Furthermore, pursuant to the Negotiated Economic Proposal and other agreements adopted during the negotiation of this Agreement, the goods detailed in Annex 5 and any other goods, the acquisition of which may eventually be approved for the execution of the services hereunder, shall remain the property of PRONAP and shall be transferred by the CONSULTANT to PRONAP upon completion of the contracted services.

- The reports submitted by the CONSULTANT shall be reviewed and approved by PRONAP within a term of fifteen (15) calendar days and the

8

valuations stemming therefrom shall be paid within thirty (30) calendar days following their submission, unless not approved by PRONAP. In such event, PRONAP shall inform the CONSULTANT of its observations in a punctual and specific manner and the CONSULTANT shall have fifteen (15) days to correct such observations, if applicable. If PRONAP should not make any express observations within fifteen (15) calendar days after having received the reports, they shall be deemed approved by PRONAP.

Any correction to the observations made by PRONAP shall be reviewed by PRONAP within five (5) calendar days, based on which:

a)    PRONAP shall approve the report and shall pay the respective invoice within fifteen (15) days.

b)    PRONAP shall not approve the report and the CONSULTANT shall be subject to a penalty as set forth in Sub-point 4, Clause 6, hereinbelow. The penalty shall be calculated from the date of submission of the first document correcting the observations, to the date of submission of the document clearing in full the observations made by PRONAP.

If PRONAP should not make any express observations within five (5) calendar days after having received the correction to the observations, the report shall be deemed approved by PRONAP.

## FIVE:

### Obligations of the Parties

I.    The CONSULTANT

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

9

1. Upon execution of the Agreement, the CONSULTANT shall:

a) Sign the technical dossier and other documents of the Competitive Selection Process;

b) Submit the commitment to participate of the professionals assigned to the study and the qualification certificate indicating the performance qualification of the Peruvian professionals.

2. The CONSULTANT assumes full responsibility for the fulfillment of the agreement and the integral parts therewith, that is, the conditions, the terms of reference, the negotiated technical and economic proposal, the agreements adopted as recorded in the negotiation minutes, thus accepting the consequences that may arise from its omissions, losses, damages and/or errors caused by negligence on its part.

3. The fulfillment of the obligations set forth herein, including the annexes, is the sole responsibility of the CONSULTANT and may not be sub-contracted or transferred in favor of any third party.

The CONSULTANT shall appoint a Legal Representative from the staff of the leading company. Such representative shall fix residence in Peru for as long as this Agreement is in force.

4. The CONSULTANT undertakes to attend the regular and special coordination meetings as requested by PRONAP, throughout the life of this Agreement. The agreements adopted in such meetings, as recorded in the minutes signed by the parties, shall form part of the obligations hereunder, without prejudice to the original contractual provisions.

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

5. The CONSULTANT shall abide by the legal provisions applicable hereto and shall file the formalities that may be required before the authorities and institutions involved in the proper performance and fulfillment of the services engaged. It is hereby established that this Agreement grants PRONAP all the legal rights over the documents, equipment and other means used and/or resulting from the services rendered.

6. The CONSULTANT shall set up the offices foreseen in its technical and economic proposals negotiated, which shall be adequately implemented and shall to operate therein within fifteen (15) calendar days as from the inception date hereof. The respective personnel shall remain in place throughout the life of the service agreement, in the different locations and as programmed.

7. The CONSULTANT, while rendering its services, undertakes to transfer know-how and technology to the counterparty's professional team assigned by the EPS.

8. The CONSULTANT undertakes to handle the documents and all the information that may be provided with utmost confidentiality and shall not disclose it without the prior express authorization of PRONAP.

9. The CONSULTANT shall coordinate and/or inform PRONAP about all aspects of its services that may require the opinion of PRONAP.

10. The CONSULTANT shall justify before PRONAP any change in its staff of professionals, documenting it with an explanation from the professional that will be replaced and the resumé of the professional that will join the team, who shall be similarly or better qualified than the

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

11

previous one. Such change shall require prior approval by PRONAP and shall not entail higher costs.

IDB or PRONAP may request the replacement of any experts or professionals working for the CONSULTANT when they deem that their performance is not satisfactory or they evidence an inadequate behavior; any costs involved in such replacement shall be borne by the CONSULTANT. Furthermore, the CONSULTANT may replace any of its experts for the same reasons, prior approval by PRONAP in writing.

It is specifically stated that there is no labor relationship between the personnel under the CONSULTANT and PRONAP.

11. The CONSULTANT shall cooperate in whatever may be necessary for PRONAP to perform its duties; likewise, it shall cooperate with IDB officers.

12. The CONSULTANT shall keep accounting and documented records of all payments received from PRONAP, which shall be made available to PRONAP and/or IDB for verification and/or auditing.

## II. The SPECIAL PROJECT

1. PRONAP, through its INSPECTOR, an association of consulting companies engaged by PRONAP, shall supervise the execution of this Agreement, as well as the quality of the services rendered.

2. PRONAP shall make follow up and technical advisory visits to the EPS, to assess the fulfillment of the Program goals. PRONAP reserves the right to object the work being performed throughout the life of this Agreement, which it may eventually deem defective, in which case it

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

12

shall give notice to the INSPECTOR so that the INSPECTOR and the CONSULTANT may take the necessary steps towards correcting the objections raised.

Defective work is the work not performed in line with the terms of reference, the methods, procedures and provisions in force or work that is incomplete or deficient or which does not fulfill the foreseen objectives.

3. PRONAP shall provide the CONSULTANT with any previous documents, reports or other, related to the EPS drinking water supply and sewerage services, the recommendations of which shall only be used as reference for the analyses that the CONSULTANT must conduct. In the case of the Feasibility Studies of the Minimum Cost Expansion Plans approved by PRONAP, for the localities included in this Agreement, which have not been objected by IDB, these documents shall be taken as basis for the development of the Final Designs.

4. PRONAP shall order the payment of Invoices prior approval of the Reports.

## III.  The EPS

Pursuant to the Agreement entered into with PRONAP, the EPS shall, among other:

1. Designate the officers who shall form part of the professional team that will be the counterpart of PRONAP in the supervision of the Contract. Designate the professionals who will be the counterpart of the CONSULTANT.

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

13

2. Provide the CONSULTANT with all the information and documents in their hands, related to the Study, and offer an adequate venue for the work meetings that may be required throughout the development of the services engaged.

3. Review and express their opinion on the progress of the Study and the Final Report submitted by the CONSULTANT within eight (8) days after receiving them.

## SIX:

### Guarantees and Penalties

1. A special performance bond shall be issued in the form of a guarantee letter for an amount equivalent to 10% of the contractual amount (updated in the portion expressed in Nuevos Soles). This performance bond shall be issued in favor of PRONAP, shall be in force throughout the execution of the Agreement and shall be joint and several, irrevocable, unconditional and of immediate execution and the CONSULTANT shall deliver it together with the prepayment guarantee letter.

2. The CONSULTANT shall be fully responsible for the services to be rendered and for the actions of its personnel.

In the event that any of the professionals proposed should not be able to join the work team due to duly justified force majeure reasons, the CONSULTANT shall propose a replacement by another professional of the same line, as provided for in Clause 5, Sub-point 10 hereof, subject to the express previous approval of PRONAP.

MAIRA SAWAYA - MEZA
Sworn Public Translator
Register N° 54

14

3. Non-compliance by the CONSULTANT in the commencement of the services shall be subject to a fine of 1.5/10,000 (one point five per each ten thousand) of the updated contractual amount, for each calendar day of delay after the date set in Clause 5, Sub-point 6.

4. Non-compliance by the CONSULTANT in the submission of the Reports within the terms established in Clause 3, Sub-point 1, shall give rise to the application of a fine equivalent to 2/10,000 (two per each ten thousand) of the updated contractual amount, for each calendar day of non compliance.

In no case, whatsoever, may the CONSULTANT exempt himself from rendering the services engaged, except as foreseen in Section 105 of the Consulting Activities Regulations (REGAC).

5. This Agreement may be terminated as provided for in Section 143 of the REGAC and as set forth herein.

6. If PRONAP should find causes to terminate this Agreement, it shall inform the CONSULTANT of this decision by means of a notarial letter, giving fifteen (15) days notice, prior approval by IDB.

7. In addition to the causes already mentioned, this Agreement may be terminated due to stoppage due to acts of God and/or force majeure, not imputable to any of the parties, for more than ninety (90) calendar days, caused by disasters and/or emergencies as set forth in Section 119 of the REGAC.

In such case, PRONAP shall appraise the work performed by the CONSULTANT and shall prepare a liquidation accordingly, pursuant to

MAIRA SAWAYA - HARO
Sworn Public Translator
Register N° 54

15

the provisions set forth in Sections 90 and 119 (as applicable) of the REGAC.

If due events caused by force majeure or acts of God, the continuation of the services should be interrupted and the partial suspension of the execution thereof should be determined, the obligations of the CONSULTANT shall be extended for a term identical to that of the suspension.}

To this effect, force majeure events or acts of God refer to earthquakes, epidemics, floods, damages resulting from the Niño phenomenon or similar, fire, war, social conflicts and other serious events beyond the control of the parties, which may affect the normal execution of the services hereunder.

The CONSULTANT shall submit to the consideration of PRONAP a list of duly justified expenses incurred during the suspension of the services for the respective reimbursement or payment, provided PRONAP was informed accordingly prior to the disbursement.

The CONSULTANT shall submit to the consideration of PRONAP a list of any additional works to be performed or which, having been already performed must be carried out again, whether in whole or in part, as a result of the damages and losses caused by the force majeure events already mentioned.

8. In the event that the payments to the CONSULTANT should exceed the terms foreseen herein, the provisions in Sections 104 and 105 of the REGAC shall apply.

16

## SEVEN:

### Expiry of Agreement

1.  This Agreement shall expire upon delivery by the CONSULTANT of a Final Consulting Activities Report and settlement of any liquidation thereof. The Final Report, with the approval of PRONAP, shall be submitted to the consideration of IDB.

2.  The liquidation of the Agreement shall be made within thirty (30) days following the non-objection by IDB to the Final Report.

3.  PRONAP shall assess the performance of the CONSULTANT and shall inform IDB, issuing the respective Consulting Services Certificate.

**It is hereby established that the opinions and recommendations of the CONSULTANT do not bind PRONAP or IDB, who reserve the right to formulate any observations or provisos that they may deem appropriate.**

## EIGHT:

### Jurisdiction

The parties agree to subject themselves to the competence of the Judges and Courts of the City of Lima or the Arbitration Proceedings, as applicable.

It is hereby established that if any of the provisions hereinabove should be rendered null and void, the other provisions shall remain unaltered and in full force and effect, given that this is an integral legal instrument.

## NINE:

### Notarial Registration

This Agreement may, at the request of either party, be registered notarially, in which case the respective expenses shall be borne by the interested party.

MAIRA SAWAYA - HARE
Sworn Public Translator
Register N° 54

17

**TEN:**

**Entire Agreement**

This Agreement replaces and supersedes all other prior agreements or understandings, whether written or oral which may eventually exist.

**ANNEXES**

The following annexes form an integral part hereof:

Annex 1:    Content of the Reports

Annex 2:    Conditions and annexes thereto

Annex 3:    Terms of reference and annexes thereto

Annex 4:    Technical proposal

Annex 5:    Economic proposal negotiated and agreements adopted during the negotiation of the agreement and others that the parties may expressly determine, including the list of computer equipment and vehicles that will be purchased for the execution of the study.

Annex 6.    List of the professional staff assigned to the study.

It is hereby established that in the event of ambiguity, doubt or disagreement as to the construction of this agreement and the annexes or appendixes hereto, the provisions set forth in the terms of reference shall prevail, except as agreed in writing during the execution of this consulting service.

**SIGNATURES:**

This Agreement is signed in three counterparts, in the City of Lima, Perú, on November 12, 1997.

(signed)    Ing. Wenceslao urbina Moscoso
Executive Director
PRONAP/Seal

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

18

(signed)      Antonio Carlos Do Amaral Zaitune/fingerprint
              Legal Representative
              The CONSULTANT

_____

(running seals and signatures)

Special Project - National Drinking Water Supply and Sewerage Program

Administrative Manager

_____

Special Project - National Drinking Water Supply and Sewerage Program

Legal Advisory
_____

**LEONARDO BARTRA VALDIVIESO**
**ATTORNEY-AT-LAW AND NOTARY PUBLIC IN AND FOR LIMA**
**Av. José Pardo 148, Miraflores**
**Telephone: 241-2158 / 445-7934**

I HEREBY CERTIFY THAT: The foregoing signature is the true, proper and

respective handwriting of Antonio Carlos DO AMARAL ZAITUNE, identified with

Brazilian Passport c o 239293, assuming no responsibility for the contents of

this document.

Miraflores, September 11, 2007

(signed)      Leonardo Bartra Valdivieso
              Attorney at law and Notary Public in and for Lima

_____

LIMA NOTARIES' ASSOCIATION

I, Secretary of the Association of Notaries Public in and for Lima, DO HEREBY

CERTIFY THAT: the signature on the back of this page is the true, proper and

respective handwriting of Leonardo BARTRA VALDIVIESO.

Receipt: F/.85480. Date: September 11, 2007. (illegible)

(signed)     José MONTOYA UNA
             Secretary

———————————————————

MINISTRY OF FOREIGN AFFAIRS OF PERU

GENERAL OFFICE OF CONSULAR AFFAIRS

AUTHENTICATIONS N° 055899

The preceding signature of Jose MONTOYA LUNA is hereby authenticated

without judging the contents of the document.

Lima, September 12, 2007

(seal and illegible signature) Maribel del Rosario LUYO JAVIER
                               Department of Authentication
                               Office of Consular Formalities

———————————————————

I, the undersigned Sworn Public Translator, do hereby certify that the foregoing is a true and correct translation of the original text in Spanish attached hereto. This translation shall not be considered as an acknowledgement of the authenticity of the original document.

In witness whereof, I set my hand and affix my seal in the city of Lima (Peru), this 19th day of November 2007

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

# EXHIBIT E

**FIGUEIREDO FERRAZ/PARSSA**



**RESOLUCIÓN N° 83**

Lima, 03 de Febrero de 2005.

**EL TRIBUNAL ARBITRAL EN MAYORIA**: VISTO: El escrito de aclaración presentado por **PROGRAMA DE APOYO A LA REFORMA DEL SECTOR SANEAMIENTO - PARSSA** con fecha 28 de enero del 2005 y el escrito de aclaración presentado por **FIGUEIREDO FERRAZ CONSULTORIA E ENGENHARIA DE PROJETO LTDA** con fecha 28 de enero del 2005, en relación al Laudo Arbitral en mayoría dictado por los señores Árbitros que suscriben; y, **CONSIDERANDO: PRIMERO.-** Que conforme al articulo 55 de la Ley General de Arbitraje, cualquiera de las partes puede solicitar una aclaración del laudo arbitral en el plazo fijado en dicha norma; **SEGUNDO.-** Que, si bien es cierto, la Ley General de Arbitraje 26572 no define en qué consiste la aclaración, el artículo 406° del Código Procesal Civil, cuyos términos el Tribunal Arbitral estima adecuados para interpretar los alcances del recurso, si lo hace; en consecuencia, el recurso de aclaración tiene por objeto aclarar algún concepto oscuro o dudoso expresado en la parte decisoria de la resolución (entiéndase en este caso, la parte resolutiva del Laudo) o que influya en ella, sin alterar en forma alguna el contenido sustancial de la decisión; **TERCERO.-** Que la aclaración solicitada por **PROGRAMA DE APOYO A LA REFORMA DEL SECTOR SANEAMIENTO - PARSSA** tiene como fundamento la supuesta carencia de motivación del laudo emitido en el extremo referido a la fecha de inicio para efectos de determinar la actualización, así como la metodología utilizada por el Tribunal Arbitral para tales efectos; **CUARTO.-** Que, el punto 2 de la parte resolutiva del Laudo establece con precisión el monto que debe abonarse a la demandante producto de la actualización realizada, lo que es consecuencia de lo establecido en el considerando Quincuagésimo Tercero, por lo que no existe ningún aspecto oscuro o dudoso en la parte resolutiva o en la parte considerativa que conlleve a una interpretación distinta sobre este extremo, no enmarcándose el pedido formulado en los alcances de una aclaración; **QUINTO.-** Que sin perjuicio de lo expresado, este Tribunal considera pertinente manifestar que conforme lo establece claramente la Cláusula Cuarta numeral 01 del contrato suscrito entre las partes la actualización del monto en Nuevos Soles debe ser realizada en función al Índice de Precios al Consumidor de Lima Metropolitana con relación a precios al 18 de septiembre de 1997, por lo que ésa es la fecha de inicio del período de actualización dispuesta por el contrato y que en lo que respecta a la metodología



NOTARIA SOTOMAYOR
Coronel Inclán 179
Miraflores
Teléfs.: 4464592
4466717 - 4460373
4490239

utilizada para determinar la actualización ésta se encuentra claramente explicada en el considerando Quincuagésimo Tercero la que a su vez es coincidente con la referida en la Resolución N° 2 del Consejo Normativo de Contabilidad de la Contaduría Pública de la Nación publicada en el Diario Oficial "El Peruano" el 25 de noviembre de 1990, en cuyo Capítulo III: Normas Generales, literal e) se expresa: "el factor de ajuste se obtiene dividiendo el índice de precios que corresponde a la fecha de cierre del período objeto de actualización, entre el índice de precios a la fecha de origen de las partidas a actualizar"; **SEXTO.-** Que, en lo que respecta a la aclaración solicitada por la demandante, se observa que ésta tiene por objeto que se aclare si la actualización que ha realizado el Tribunal al 31 de diciembre del 2004 en el punto de 2 de la parte resolutiva del Laudo Arbitral, debe continuar efectuándose bajo la metodología establecida en dicho Laudo, hasta la fecha de pago efectivo de la obligación principal; **SETIMO.-** Que , en el considerando QUINCUAGESIMO TERCERO se ha explicado de manera clara que la actualización se ha calculado por el Tribunal hasta la fecha indicada, siendo claro que ésta simplemente corresponde a una fecha de corte para efectos del cálculo, pero en definitiva la actualización debe continuar reconociéndose hasta la fecha efectiva de pago de la obligación por parte de la demandada: **SE RESUELVE: PRIMERO.- Declarar infundado el pedido de aclaración presentado por PARSSA por las razones expuestas en la parte considerativa de la presente resolución. SEGUNDO.- Aclarar el numeral 2 de la parte resolutiva del Laudo Arbitral en el sentido que sin perjuicio del monto allí expresado, corresponde seguir actualizando la deuda en Nuevos Soles hasta la fecha efectiva de pago de la misma;** Notificándose conforme a Ley.

**Víctor Palomino Ramírez**
**Presidente**

**Álvaro González Peláez**
**Árbitro**

CERTIFICACION NOTARIAL AL DORSO

**Luis E. Ubillas Ramírez**
**Secretario**

Republic of Peru                )
Province and City of Lima       )   ss:
Embassy of the                  )
United States of America        )

I certify that the official named below, whose true
signature and official seal are, respectively, subscribed
and affixed to the annexed document, was, on this day,
empowered to act in the official capacity designated in
the annexed document, to which faith and credit are due:

**MARIBEL DEL ROSARIO LUYO JAVIER**

This Embassy assumes no responsibility for the contents of
the attached document.

**Lee A. Belland**
**VICE-CONSUL**
**U.S. EMBASSY, LIMA**

October 3, 2007
(Date)

# EXHIBIT F

**MAIRA SAWAYA HARB**
*Traductora Pública Juramentada*
*CTP 0149 - JVT 54*

# OFFICIAL TRANSLATION

MAIRA SAWAYA - HARB
**Sworn Public Translator**
**Register N° 54**

*Estados Unidos # 982 - Lima 11 - PERU*
*Teléfonos: (511-1) 463-2368 / 261-8793 / 9965-9717 - Fax: 461-6571*
*e-mail: msawaya@terra.com.pe*

Arbitration Process
FIGUEIREDO FERRAZ vs. PARSSA

Ruling Nº 83
Lima, February 3, 2005

The Arbitration Court by Majority: Having reviewed the writ of clarification submitted by the PROGRAM FOR THE SANITATION SECTOR REFORM – PARSSA on January 28, 2008 and the writ of clarification submitted by FIGUEIREDO FERRAZ CONSULTORIA E ENGENHARIA DE PROJETO LTDA., on January 28, 2005; and, **WHEREAS: FIRST:** Pursuant to Section 55 of the Arbitration Act, either party may request a clarification of the arbitral award within the term fixed in such rule. **SECOND:** The provisions set forth in Section 406 of the Civil Procedural Code are deemed applicable by the arbitrators in this Process so as to outline the scopes of the request for clarification since such Section is intended to clarify any obscure or doubtful concept given in the decision of the ruling (understood as Award) or have an influence thereon without altering the substantial content of the award in any sense. **THIRD:** The clarification requested by PARSSA is based on the allegedly groundless award in the part referred to the starting date of the adjustment estimate, as well as the methodology applied by the Arbitration Court for such purposes. **FOURTH:** The paragraph 2 of the operative part of the award exactly indicates the amount to be paid in favor of the plaintiff resulting from the adjustment, which is established in the fifty third conclusion of law; thus, there is no obscure or doubtful concept in the operative part or whereas clauses of the award that lead to a different interpretation on this point, so the request does not meet the requirements for clarification. **FIFTH:**

MAIRA SAWAYA - HARB
Sworn Public Translator
Register Nº 54

2

Notwithstanding the foregoing, this Arbitration Court deems convenient to point out that pursuant Fourth Clause number 01 of the contract executed between the parties, the adjustment to the amount in Nuevos Soles should be made according to the Lima Metropolitan Consumer Price Index related to the prices as of September 18, 1997, which consequently turns out to be the starting date of the adjustment period; and the methodology applied to the adjustment estimate is clearly detailed in the fifty third conclusion of law, the same which is consistent with the one referred to in Ruling N° 2 of the Accounting Standard Board of the Public Accounting Department of the Nation published in the Official Gazette "El Peruano" on November 25, 1990.  The chapter II of the aforesaid ruling: General Provisions, paragraph e) of such Ruling lays down that "the result of adjustment calculation is obtained from dividing the price index corresponding to the closing date of the period subject matter of adjustment, by the price index corresponding to the original date of the items to be adjusted".

**SIXTH:** On the other hand, the plaintiff requested a clarification in order to have a clear explanation on whether the adjustment made by the Arbitration Court on December 31, 2004, as stated in point 2 of the operative part of the Award, would be still effective according to the methodology established in such Award up to the effective payment date of the main duty.  **SEVENTH:** The fifty third whereas clause clearly explains that the adjustment has been estimated by the Arbitration Court up to the date indicated therein, which evidently refers to the a cut-off date for calculation purposes; however, the adjustment should definitely take into account the effective payment date of the defendant's duty.  IT IS HEREBY ORDERED THAT: First.- the request for clarification submitted by



MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

3

PARSSA shall be not admitted due to the grounds explained in the whereas clause of this ruling above. Second.- The number 2 of the operative part of the award shall be clarified to the effect that notwithstanding the amount indicated therein, the debt in Nuevos Soles should be adjusted up to the effective payment date thereof. Let notice be served according to law.

(Signature) Víctor PALOMINO RAMÍREZ -- Chairman

(Signature) Álvaro GONZÁLEZ PELÁEZ -- Arbitrator

(Signature) Luis E. UBILLAS RAMÍREZ -- Clerk

--------------------------

(running seal)

Notaria Sotomayor - Coronel Inclán 179, Miraflores

Telephones: 4464582  4466717  4460373  4460239

--------------------------

I hereby certify that the foregoing signature is the true and proper handwriting of Victor Wenceslao PALOMINO RAMIREZ, identified by National Identity Document N° 06704137.

Lima, February 12, 2007

(illegible signature)  Carlos Augusto SOTOMAYOR BERNOS
                       Notary in and for Lima

--------------------------

JOSE L. MONTOYA VEGA, Secretary of the Lima Notaries Association, hereby that the signature and seals shown on the face of this page correspond to the Notary in and for Lima, Carlos Augusto SOTOMAYOR BERNOS.

Receipt N° F/85665          Date: September 17, 2007

No responsibility is assumed for the contents of the document.

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

4

(illegible signature) Jose L. MONTOYA VERA
Secretary

---

MINISTRY OF FOREIGN AFFAIRS OF PERU

GENERAL OFFICE OF CONSULAR AFFAIRS

AUTHENTICATION Nº 060698

The preceding signature of Jose MONTOYA VERA is hereby authenticated without judging the contents of the document.

Lima, September 18, 2007

(Seal and illegible signature)    Maribel del Rosario LUYO JAVIER

Department of Authentication

Office of Consular Formalities

---

Republic of Peru            )
Province and City of Lima )        ss:
Embassy of the             )
United States of America  )

I certify that the official named below, whose true signature and official seal are, respectively, subscribed and affixed to the annexed document was, on this day, empowered to act in the official capacity designated in the annexed document, to which faith and credit are due:

Maribel del Rosario LUYO JAVIER

This Embassy assumes no responsibility for the contents of the attached document.

(signed)            Lee A. Belland
                    Vice-Consul
                    U.S. Embassy, Lima
                    October 3, 2007

MAIRA SAWAYA · HARO
Sworn Public Translator
Register Nº SA

5

# EXHIBIT G

**CORTE SUPERIOR DE JUSTICIA DE LIMA**
**PRIMERA SALA CIVIL**

SALA CIVIL

*Exp.1036-2005  (18 C)*

Resolución Nro _____4317_____

_____ 11 10 05 _____

**RESOLUCIÓN NRO.**
Lima, cinco de Octubre del dos mil cinco.-

**VISTOS;** con el expediente arbitral acompañado; interviniendo como Vocal Ponente la Doctora Bustamante Oyague; resulta que por escrito de fojas ciento veintiséis y siguientes, el Procurador adjunto a cargo de los asuntos judiciales del Ministerio de Vivienda, Construcción y Saneamiento, designado por Resolución Suprema Nro.179-2002-JUS, interpone demanda de anulación contra el laudo arbitral expedido por el Tribunal Arbitral conformado por los señores Víctor Palomino Ramírez, Héctor Becerra Martínez y Alvaro González Peláez de fecha 20 de enero del 2005, que declara fundada en parte la demanda interpuesta contra PARSSA, por FIGUEIREDO FERRAZ E ENGENHARIA DE PROJETO LTDA.; manifiesta que se han incurrido en las siguientes causales: **a)** la causal establecida en el inciso 4 del artículo ciento veintitrés de la Ley General de Arbitraje (Ley Nro.26572), en la medida que el arbitraje debió ser de derecho; **b)** inaplicación del artículo segundo del TUO de la Ley número veintiséis mil ochocientos cincuenta, aprobada por Decreto Supremo Nro. 012-2001-PCM, cuyo contenido establece que se encuentran sujetas a dicho dispositivo todas las entidades del sector público, con personería jurídica de derecho público y las entidades reguladas por la Ley de Gestión Presupuestaria del Estado; y **c)** inaplicación el artículo ciento ochentiséis del Reglamento de la Ley de CONSUCODE, aprobada por Decreto Supremo Nro.013-2001-PCM (publicada el 03 de agosto de 1997), vigente a los efectos de la relación jurídica sub-materia, que prevé obligatoriamente el arbitraje de derecho en todas las controversias derivadas de los procesos de selección hasta el consentimiento de su liquidación. Pues, conforme a la primera disposición final del citado reglamento se establece que los procesos de selección convocados antes de la vigencia de la Ley, se adecúan a las disposiciones

1

de ésta y del acotado reglamento; ampara su pedido en el artículo setentiuno y numeral cuatro del artículo ciento veintitrés de la Ley General de Arbitraje; que, por resolución del veinticinco de mayo del dos mil cinco, corriente a fojas ciento cuarenta y cuatro, se admite la presente demanda, corriéndose traslado de la misma a la parte demandada; que por escrito de fojas ciento ochentiocho y siguientes , la empresa demandada FIGUEIREDO FERRAZ  Consultoría e Engenharia de Prometo Ltda., Sociedad Civil, absuelve el traslado, exponiendo lo conveniente a su derecho según los fundamentos en él contenidos; que por resolución del dieciocho de julio del dos mil cinco, corriente de fojas doscientos trece, se señaló fecha para la vista de la causa; y habiéndose realizado ésta, ha llegado el momento de expedir sentencia; y **CONSIDERANDO:** **Primero**: Que, "el arbitraje es la institución que regula el acuerdo de voluntades por el cual dos o más partes deciden someter a uno o más terceros, que aceptan el encargo, la solución de un cierto conflicto de derecho privado respecto del cual dichas partes tienen capacidad de disposición, obligándose previamente a no llevar la controversia a los tribunales ordinarios son el previo fallo arbitral, el cual deberá expedirse con arreglo a ciertas formalidades" (Lohmann  Luca de Tena, Juan Guillermo. El arbitraje. Lima: Fondo Editorial de la Pontificia Universidad Católica del Perú, 1987, página cuarentiuno); **Segundo**: Que, conforme lo dispone el artículo sesentiuno de la Ley 26572 –Ley General de Arbitraje-, contra los laudos arbitrales, procede sólo la interposición del recurso de anulación ante el Poder Judicial por las causales taxativamente establecidas en el artículo setentitrés de la citada Ley; teniendo por objeto dicho recurso la revisión de su validez, sin entrar al fondo de la controversia, y se resuelve declarando su validez o nulidad; **Tercero**: que, el artículo cincuentinueve de la Ley número Veintiséis mil quinientos setentidós (Ley General de Arbitraje) propugna el carácter de cosa juzgada de los laudos arbitrales, esto es, la precitada ley dispone que los laudos arbitrales son definitivos, salvo cuando **a)** proceda el recurso de apelación contra el laudo ante el Poder Judicial o ante una segunda instancia arbitral,  y en los casos en

2

que dicha posibilidad se hubiere pactado previa y expresamente en el Convenio arbitral; o cuando, **b)** proceda el recurso de anulación, en los casos de laudos expedidos en una sola instancia - como es el caso que nos ocupa - o contra los laudos de segunda instancia, cuando se verifique cualquiera de las causales taxativamente previstas en el artículo setentitrés de la Ley número Veintiséis mil quinientos setentidós (Ley General de Arbitraje); **Cuarto**: que, en el presente caso, el Procurador adjunto a cargo de los asuntos judiciales del Ministerio de Vivienda, Construcción y Saneamiento interpone demanda de anulación contra la empresa FIGUEIREDO FERRAZ E ENGENHARIA DE PROJETO LTDA., indicando que al expedirse el laudo arbitral cuya anulación pretende, por el Tribunal Arbitral compuesto por los señores Víctor Palomino Ramírez, Héctor Becerra Martínez y Alvaro González Peláez, se ha incurrido en causales de nulidad previstas en el artículo sesentiuno y numeral cuatro del artículo ciento veintitrés de la Ley General de Arbitraje (Ley Nro.26572); **Quinto:** Que, como primer agravio de anulación, el demandante señala que, conforme al numeral cuatro del artículo ciento veintitrés de la Ley General de Arbitraje, se advierte que es anulable un Laudo cuando el procedimiento arbitral se encuentra en conflicto con una disposición legal de la que las partes no pueden apartarse, y que en caso de falta de precisión del convenio arbitral, es de estricta aplicación la Ley General de Arbitraje, que en su artículo tercero señala que es de derecho un arbitraje cuando los árbitros resuelven la cuestión controvertida de acuerdo al derecho aplicable y el artículo noventiuno de la misma Ley, señala que dada la naturaleza internacional de este arbitraje debió ser tramitado como un arbitraje de derecho (al tener las partes domicilios en Estados diferentes); sin embargo, desconociendo su carácter internacional , el Tribunal lo consideró como un arbitraje nacional de conciencia. Además soslayó aplicar las normas de adquisiciones y contrataciones del Estado, que establecían que el arbitraje debía tramitarse como de derecho; **Sexto:** Que, como segundo agravio, se indica que el Tribunal Arbitral no ha evaluado la aplicación del artículo segundo de la Ley de Contrataciones

3

y Adquisiciones del Estado, Ley número veintiséis mil ochocientos cincuenta (TUO aprobado por Decreto Supremo Nro. 012-2001-PCM), cuyo contenido establece que se encuentran sujetas a dicho dispositivo todas las entidades del sector público, con personería jurídica de derecho público y las entidades reguladas por la Ley de Gestión Presupuestaria del Estado; **Sétimo:** Que, como tercer agravio refiere la inaplicación el artículo ciento ochentiséis del Reglamento de la Ley de CONSUCODE, aprobada por Decreto Supremo Nro.013-2001-PCM (publicada el 03 de agosto de 1997), vigente a los efectos de la relación jurídica sub-materia, que prevé obligatoriamente en su artículo ciento ochentiséis el arbitraje de derecho en todas las controversias derivadas de los procesos de selección hasta el consentimiento de su liquidación. Pues, conforme a la primera disposición final del citado reglamento se establece que los procesos de selección convocados antes de la vigencia de la Ley, se adecuan a las disposiciones de ésta y del acotado reglamento; **Octavo:** Que, es de anotar que la parte demandada, el Programa Nacional de Agua y Alcantarillado (PRONAP), se apersona ante el Tribunal Arbitral cuestionando el acta de instalación del referido Tribunal, señalando que el arbitraje de conciencia constituye una grave error, que el arbitraje es internacional y que debe tramitarse como arbitraje de derecho, así aparece de su escrito obrante de fojas tres mil novecientos cincuenticuatro a tres mil novecientos cuarentisiete del tomo XII del expediente arbitral acompañado, sustenta su alegación en el artículo noventa y uno de la Ley General de Arbitraje, según el cual uno de los elementos determinantes que hace que el arbitraje sea internacional, lo constituye el domicilio de la partes, no debiéndose confundir con el domicilio que una de las partes pueda establecer en el Perú para la ejecución de actos jurídicos; que si bien se ha pactado que el contrato se rige de acuerdo a las leyes peruanas, ello no implica que se haya pactado arbitraje nacional; **Noveno:** Que, el Tribunal Arbitral expide la resolución número siete de fecha doce de agosto del dos mil dos, corriente de fojas tres mil novecientos setentiocho a fojas tres mil novecientos setentisiete del tomo XII del expediente arbitral, declarando infundado el recurso planteado por la parte

demandada en el proceso arbitral (demandante en este proceso de anulación de laudo arbitral) que solicitó la modificación del acta de instalación del Tribunal Arbitral, en el extremo que precisa corregir el carácter de conciencia del arbitraje, ratificando plenamente dicho carácter; motivando su resolución en el Contrato de Consultoría suscrito por la Empresa Figueiredo Ferraz Consultoría e Engenharia de Projeto Ltda. y Programa Nacional de Agua Potable y Alcantarillado-PRONAP, donde consta que la empresa demandante fijó domicilio contractual en la ciudad de Lima; e incluso, en la cláusula octava, ambas partes manifestaron su voluntad de someterse a la competencia jurisdiccional de los Jueces y Tribunales de Lima o a la Jurisdicción Arbitral, corroborando los efectos contractuales del domicilio consignado por ambas partes y máxime si en dicho acto jurídico no consta pacto sobre la naturaleza internacional de un eventual arbitraje; además resalta la intervención del Vigésimo Cuarto Juzgado Civil de Lima, Expediente Nro.6336-2002 para designar al Árbitro del Programa Nacional de Agua Potable y Alcantarillado-PRONAP, Ingeniero Héctor Becerra Martínez, proceso en el que se expide la resolución número ocho, de fecha doce de abril del dos mil dos, estableciendo que dicha designación recaía en dicho profesional como árbitro de conciencia, resolución que adquirió calidad de cosa juzgada mediante resolución número diez de fecha once de junio del dos mil dos; y finalmente, se pronuncia citando el artículo noventiuno de la Ley General de Arbitraje, Ley Nro. veintiséis mil quinientos setentidós, que confiere al Tribunal Arbitral la facultad discrecional de optar por el domicilio que guarde una relación más estrecha con el convenio arbitral, cuando ubica en el supuesto de que alguna de las partes tenga más de un domicilio, cual es el caso de la empresa Figueiredo Ferraz Consultoría e Engenharia de Projeto Ltda., cuya matriz tiene domicilio en la ciudad de Sao Paulo-Brasil, pero que para efectos del contrato que lo vincula al Programa Nacional de Agua Potable y Alcantarillado-PRONAP, señaló domicilio contractual en la ciudad de Lima; **Décimo**: Que, este Colegiado ha optado por citar en su integridad el pronunciamiento del Tribunal Arbitral contenido en la Resolución número siete, pues considera que los

5

07

fundamentos expuestos son expresión de la decisión adoptada por el Tribunal Arbitral, decisión que se enmarca en el criterio jurisdiccional reservado a su competencia, materia sobre la cual no puede anularse el laudo arbitral, por lo que no es función de este órgano jurisdiccional entrar al fondo de la controversia dilucidada en el arbitraje cuya anulación se peticiona en el presente proceso, según lo dispone el artículo sesentiuno de la Ley General de Arbitraje; además que el propio Tribunal Arbitral se pronunció declarando infundado el recurso de reposición formulado por la ahora parte demandante contra la resolución numero siete, tal como aparece de la resolución número catorce del quince de octubre del dos mil dos, obrante de fojas cuatro mil cuatrocientos quince y cuatro mil cuatrocientos catorce del tomo XIV del expediente arbitral, resolución en el que se deja señalado que la Ley veintiséis mil ochocientos cincuenta y su reglamento no resultan de aplicación, estando al mandato contenido en la Tercera Disposición Transitoria, según el cual "los procesos de adquisición o contratación iniciados antes de la vigencia de la presente ley, se rigen por sus propias normas"; **Décimo Primero**: Que, el artículo sétimo del Título Preliminar del Código Civil, concordante con el artículo sétimo del Título Preliminar del Código Procesal Civil, señala que el juez debe aplicar el derecho que corresponda al proceso, aunque no haya sido invocado por las partes o lo haya sido erróneamente; en el caso de autos, sin embargo, se aprecia que, los invocados motivos que sustentarían la nulidad del laudo arbitral no se encuentran comprendidos en alguna de las causales que taxativamente se han previsto en el artículo setentitrés de la Ley General de Arbitraje, por un lado, porque lo resuelto en sede arbitral no puede ser reexaminado en el proceso de anulación de laudo arbitral; a lo cual se debe añadir que: **a)** el invocado numeral cuatro del artículo ciento veintitrés y noventiuno de la Ley General de Arbitraje, como sustento para interpretar que el arbitraje aplicable es de derecho, se refiere a una causal de anulación del laudo arbitral internacional, cuestión que ya quedó resuelta por propia decisión del Tribunal Arbitral, al expedir la resolución número siete; **b)** acerca de la alegada omisión del Tribunal Arbitral de aplicar las normas de adquisiciones y contrataciones del Estado; que

6

establecían que el arbitraje debía tramitarse como de derecho, conforme al artículo segundo de la Ley de Contrataciones y Adquisiciones del Estado, Ley número veintiséis mil ochocientos cincuenta y el artículo ciento ochentiséis del Reglamento de dicha Ley; debe estarse a lo resuelto por el propio Tribunal Arbitral en la ya anteriormente citada resolución número siete de fecha doce de agosto del dos mil dos; **Décimo Segundo**: Que, del laudo cuya copia obra de fojas sesentinueve y siguientes se aprecia que, el arbitraje aplicado ha sido el arbitraje de conciencia, e incluso, es de apreciar a fojas ciento dos, la referencia a las resoluciones antes citadas, números siete y catorce, que contienen el criterio del Tribunal Arbitral en el sentido que el Arbitraje en el que intervienen es uno nacional y de conciencia; **Décimo Tercero**: Que, debe tenerse en cuenta que la Ley Orgánica del Ministerio Público, Decreto Legislativo Nro. 052, del dieciséis de marzo de mil novecientos ochentiuno, establece en el apartado "A" los casos en los cuales el Fiscal Superior en lo Civil debe emitir dictamen conforme al artículo 89, mientras que en el apartado "B" señala que "El dictamen será meramente ilustrativo y su omisión no causará nulidad procesal en los casos que expresamente señala la Ley."; Que, el artículo 21 del Decreto Ley Nro. 17537, Ley de Creación del Consejo de Defensa Judicial del Estado prescribe que "El Ministerio Público está obligado a dictaminar en todas las instancias, en los litigios en que el Estado sea parte y sus miembros deben remitir a los Procuradores Generales copia de sus dictámenes para facilitar su actuación funcional", sin especificar si el dictamen es obligatorio o ilustrativo en el caso de los procesos de anulación de laudo arbitral, por lo cual se colige que en el presente caso, conforme a la norma especial, esto es, el artículo 89 de la Ley Orgánica del Ministerio Público no prevé la nulidad procesal por omisión de dictamen fiscal en los casos de anulación de laudo arbitral; **Décimo Cuarto**: Que, conforme al artículo cuatrocientos trece del Código Procesal Civil, el Poder Ejecutivo se encuentra exento de la condena del pago de costas y costos, norma que es de aplicación al presente proceso estando a que la parte demandante pertenece al Poder Ejecutivo del Estado peruano;

09

por estas consideraciones, estando a los considerandos y dispositivos legales glosados, así como a lo dispuesto por el artículo setentitrés de la Ley General de Arbitraje, **DECLARARON: INFUNDADA** la demanda de anulación de laudo arbitral contra el laudo arbitral expedido por el Tribunal Arbitral conformado por los señores Víctor Palomino Ramírez, Héctor Becerra Martínez y Alvaro González Peláez de fecha 20 de enero del 2005, que declara fundada en parte la demanda interpuesta contra PARSSA; sin costas ni costos. En los seguidos por el **Procurador adjunto a cargo de los asuntos judiciales del Ministerio de Vivienda, Construcción y Saneamiento** contra **Figuelredo Ferraz e Engenharia de Projeto Ltda.** sobre **Anulación de Laudo Arbitral.-**

**SS.**

ORTIZ PORTILLA          BUSTAMANTE OYAGUE

POMAREDA CHÁVEZ BEDOYA

# CORTE SUPERIOR DE JUSTICIA DE LIMA
## PRIMERA SALA CIVIL

**SS.  BUSTAMANTE OYAGUE**
**POMAREDA CHAVEZ- BEDOYA**
**AGUIRRE  SALINAS**

**Exp. 1036- 05**
Resolución  número:

**Lima,  trece de diciembre**
Del  año dos mil  cinco.-

　　　**DADO CUENTA**; al escrito que antecede, presentado por Figueroa Ferraz Consultoria;  a los autos la tasa judicial  que se adjunta y  téngase por  cumplido con el mandato contenido en la resolución expedida con fecha  quince de noviembre del año en curso; dando cuenta el escrito de fojas doscientos treintiséis:  expídase las copias certificadas de las piezas procesales que se solicitan, dejandose cosntancia  en autos, haciendose presente  que los  presentes autos se encuentra concluido en razón de  que mediante sentencia  de fecha cinco de octubre del año  en curso,  obrante de fojas doscientos veinticuatro a doscientos treintiuno  se  ha declarado infundada  la demanda de anulación  de laudo arbitral.-

**PODER  JUDICIAL**

JORGE  E.  SALAZAR SANCHEZ
Secretario de Sala
Primera Sala Civil
CORTE SUPERIOR DE JUSTICIA DE LIMA

**16 DIC 2005**

# EXHIBIT H

COURT OF APPEALS IN AND FOR LIMA
FIRST CIVIL DIVISION

Docket 1036-2005 (18C)

Judicial Ruling N°

Lima, October 5, 2005

Having reviewed the arbitral docket attached hereto, intervening Ms. Bustamante Oyague as Judge who writes the court's opinion, it is inferred from writ recorded on pages 126 et seq., that the Deputy Solicitor General in charge of judicial matters of the Ministry of Housing, Construction and Sanitation, having been appointed by Supreme Ruling N° 179-2002-JUS, filed an appeal for nullity against arbitral award dated January 20, 2005 issued by the Court of Arbitration composed of Mr. Victor PALOMINO RAMÍREZ, Héctor BECERRA MARTÍNEZ and Alvaro GONZÁLEZ PELÁEZ-, the same which in part declared the claim filed by FIGUEIREDO FERRAZ E ENGENHARIA DE PROJETO LTDA against PARSSA admitted.   The Deputy Solicitor General filed such appeal claiming that the following reasons have occurred: a) the grounds specified in paragraph 4 of Section 123 of the Arbitration Act (Act N° 26572) have been met because the proceeding should have been conducted as a de jure arbitration; b) failure to enforce section 2 of the Amended Text of Act N° 26850, passed by Supreme Decree N° 012-2001-PCM, which set down that all public entities with legal capacity regulated by public law as well as the entities regulated by the State Budgetary Management Act are to be subject to such Act; and c) failure to enforce section 186 of the Regulations of the CONSUCODE Act, passed by Supreme Decree N° 013-2001-PCM (published on August 3, 1997), currently in effect for the purposes of the legal relationship

8

subject matter hereof, which set down that the de jure arbitration must be applied to controversies arising from selection processes including the consent of its settlement.    Since the first final provision of the abovementioned regulations lays down that the selection processes organized prior to the validity of the Act should be governed by the provisions thereof as well as the abovementioned regulations, the Deputy Solicitor General relies on Section 71 and paragraph 4 of Section 123 of the Arbitration Act. The appeal was admitted by ruling dated May 25, 2005, recorded on pages 144, thereby the defendant was served with copy of such ruling.  Then, by writ recorded on pages 88 et seq., defendant FIGUEIREDO FERRAZ Consultoria e Engenharia de Projeto Ltda. Sociedad Civil (a professional partnership), in response to the service of notice, set out the reasons for its best interest according to the grounds contained therein.  By ruling dated July 18, 2005, recorded on page 213, the date for the final public proceeding was fixed; and upon completion thereof, it is time to issue judgment; and **WHEREAS**: <u>First</u>: "The arbitration is in charge of regulating the meeting of the minds, wherein two or more parties to a dispute concerning the private law refer it, by mutual consent, to one or more third parties who accept the assignment; although such parties to a dispute have the right of disposition, they previously undertake to not submit the controversy to any ordinary court until the arbitral decision is eventually issued, the same which should meet some formal acts" (Lohmann Luca de Tena, Juan Guillermo, The Arbitration. Lima: Publishing Collection of the Pontifical Catholic University of Peru, 1987, page 41).  **Second**: Pursuant to Section 61 of Act 26572 -- Arbitration Act-, the appeal for nullity filed before the Judiciary is only applied to

MAIRA BAMAYA - MARS
Sworn Public Translator
Register N° 34

9

the grounds that are specifically set forth in Section 73 of the aforesaid Act; the purpose of such appeal is to review its validity without dealing with the substance of the dispute, and it is solved by declaring its validity or nullity.

**Third**: Section 59 of Act N° 26572 (Arbitration Act) supports res judicata nature of the awards; that is to say, the aforesaid Act lays down that the awards are to be final unless when a) an appeal is filed against the award before the Judiciary or a second arbitral instance, and cases wherein such possibility would have been previously and expressly accepted in the arbitration pact; or when b) an appeal for nullity is filed against awards issued by a single instance —as it is the case- or awards issued by second instance, and when any of the grounds expressly set forth in Section 73 of Act N° 26572 (Arbitration Act) occurs.

**Fourth**: In this case, the Deputy Solicitor General in charge of the Judicial Matters of the Ministry of Housing, Construction and Sanitation filed an appeal for nullity against FIGUEIREDO FERRAZ E ENGENHARIA DE PROJETO LTDA., arguing that the award issued by the Court of Arbitration composed of Mr. Victor Palomino Ramírez, Héctor Becerra Martínez and Alvaro González Peláez, contains some grounds for nullity set forth in Section 61 and paragraph 4 of Section 123 of the Arbitration Act (Act N° 26572). **Fifth**: The defendant indicates as first grounds for nullity that according to paragraph 4 of Section 123 of the Arbitration Act, an award is voidable only if the arbitration proceeding is inconsistent with a legal provision that the parties to a dispute must observe; and that in case of inaccuracy in the arbitration pact, the parties should be strictly abide by the Arbitration Act, in which section 3 lays down that it is a de jure arbitration when the arbitrators solve the dispute according to the

MAIRA SAWAYA - N° 435
Sworn Public Translator
. Register N° 54

10

applicable law; and Section 91 of the same body of law specifies that due to the international nature of such arbitration, it should be conducted as a de jure arbitration (since the domiciles of the parties are located in different States); however, as the Court of Arbitration was not aware of its international nature, such proceeding was conducted as a national equitable arbitration. In addition, it refrained from enforcing the contracts and procurements Act of the State, which established that this kind of proceedings should be conducted as a de jure arbitration. **Sixth**: The defendant indicates as second grounds for nullity that the Court of Arbitration did not assess the enforcement of Section 2 of the Contracts and Procurements Law of the State, Act Nº 26850 (Amended Text passed by Supreme Decree Nº 012-2001-PCM), which laid down that all public entities with legal capacity regulated by public law as well as the entities regulated by the State Budgetary Management Act are to be subject to such Act. **Seventh**: As third grounds for nullity, the defendant refers to the failure to enforce section 186 of the Regulations of CONSUCODE Act, passed by Supreme Decree Nº 013-2001-PCM (published on August 3, 1997), currently in effect for the purposes of the legal relationship subject matter hereof, which set down that the de jure arbitration must be applied to controversies arising from selection processes including the consent of its settlement. Pursuant to the first final provision of the abovementioned regulations, the selection processes organized prior to the validity of Act are governed by the provisions thereof as well as the abovementioned regulations. **Eighth**: It should be noted that the defendant, National Program of Water and Sewer System (PRONAP), appeared before the Court of Arbitration to question the minute of the Board's

MARIA SAWAYA - maria
Sworn Public Translator
Register Nº 54

11

creation, arguing that for this case, the application of an equitable arbitration is a serious mistake and a de jure arbitration should have been conducted due to its international nature, as read in writ recorded on pages 3954 to 3947 of Book XII of the arbitral file attached thereto. The defendant bases its arguments on Section 91 of the Arbitration Act, which lays down that one of the determining requirements for an international arbitration is the domicile of each party; however, it does not refer to the domicile that one of the parties may establish in Peru for the performance of legal acts. Although the parties have agreed that the contract should be governed by the Peruvian laws, it does not imply that they agree to conduct a national arbitration. **Ninth**: The Court of Arbitration issued ruling N° 7 dated August 12, 2002, recorded on pages 3978 to 3977 of Book XII of the arbitral file, declaring the appeal filed by defendant (which is the plaintiff in the process of nullity of the award) in the arbitration proceeding not admitted; the defendant supported therein the modification of the minute of the Court of Arbitration's creation, in the factual requirement that specifies the correction of equitable arbitration nature. However, such nature was fully ratified by the Court of Arbitration relying on the Contract of Consultancy Services executed between Figueiredo Ferraz Consultoría e Engenharia de Projeto Ltda. and National Program of Water and Sewer System (PRONAP), in which plaintiff indicated the city of Lima as its contractual domicile. Besides, both parties stated in eighth clause therein that they agreed to submit to the jurisdiction of Judges and Courts in and for Lima or to the Court of Arbitration's Jurisdiction, confirming thereby the contractual effects of the domicile that both parties indicated therein; moreover, such contract does not specify any agreement on

the international nature in the event of an arbitration proceeding. Furthermore, it is inferred that 24th Civil Court in and for Lima, Docket N° 6336-2002, appointed Eng. Héctor Becerra Martínez as arbitrator of the National Program of Drinking Water and Sewer System-PRONAP; in such process, ruling N° 8 dated April 12, 2002 was issued establishing that such professional was appointed as equitable arbitrator considered as res judicata by ruling N° 10 dated June 11, 2002. Finally, the Court of Arbitration commented on the case quoting that Section 91 of the Arbitration Act, Act N° 26572, entitles the Court of Arbitration to choose, at its own discretion, the domicile more related to the arbitration pact among those domiciles that the parties may have, as it is the case for Figueiredo Ferraz Consultoría e Engenharia de Projeto Ldta., which headquarters is located in the city of Sao Paulo-Brasil; however, for the purposes of the contract executed with the National Program of Drinking Water and Sewer System-PRONAP, it indicates the city of Lima as the contractual domicile.    **Tenth**: This 3-judge panel has decided to cite the whole pronouncement of the award contained in Ruling N° 7 because according to the panel, the findings explained therein clearly show the decision of the Court of Arbitration that has jurisdictional authority in this matter; the award cannot be annulled since it is not the administrative body's duty to deal with the substance of the dispute solved in the arbitration, which nullity is requested in this proceeding, according to section 61 of the Arbitration Act. In addition, the Court of Arbitration declared not admitted the appeal for reconsideration filed by the plaintiff against Ruling N° 7, as appeared in the ruling N° 14 dated October 15, 2002, recorded on pages 4415 and 4414 of Book XIV of the arbitral file. Such

MAIRA SAWAYA-PERG
Sworn Public Translator
Register N° 54

ruling states that the Act N° 26850 and its regulations are not applicable due to the Third Temporary Provision therein, which lays down that "the process of procurements or contracts prior to the validity of this act are governed by its own rules". **Eleventh**: Section 7 of the Preliminary Title of the Civil Code under cross reference with Section 7 of the Preliminary Title of the Civil Procedural Code, establishes that the judge shall exercise the right according to the process, even though it has not been invoked by the parties or has been wrongly invoked. However, it is inferred from writs that the grounds for nullity of the award are not included in any of the grounds specifically stated in Section 73 of the Arbitration Act because the decision made in the Court of Arbitration cannot be reassessed in a nullity process of the award; moreover, it should be also pointed out that: a) Paragraph 4 of Section 123 and 91 of the Arbitration Act, as a basis of de jure arbitration, refers to a ground for nullity of the international award; such matter has been already solved by the Court of Arbitration in its ruling N° 7; b) concerning the Court of Arbitration's alleged failure to enforce regulations of the procurements and contracts Act of the State, which laid down that a de jure arbitration should be conducted according to Section 2 of the Procurements and Contracts Act of the State, Act N° 26850 and Section 86 of the regulations thereof, it should abide by the award of the Court of Arbitration in the abovementioned ruling N° 7 dated August 12, 2002. **Twelfth**: From the award which copy is recorded on pages 69 et seq., it is inferred that the proceeding applied to this case was an equitable arbitration; furthermore, it is deduced that the aforesaid rulings N° 7 and 14 were referred on page 102 thereto, which contains the discretion of the Court of Arbitration in

14

the sense that the proceedings they took part of is a national and equitable arbitration. **Thirteenth**: It should be pointed out that the Act of the Government Attorney General's Office, Legislative Order N° 052, dated March 16, 1991, lays down in its division "A" the cases in which the Appellate State Attorney with jurisdiction over civil matters shall render judgment according to Section 89, while division "B" specifies that "the judgment shall be merely illustrative and its omission shall not cause the nullity in cases expressly stated in the Law". Section 21 of decree law N° 17537, Act of Creation of the Legal Defense Board of the State prescribes that "the Government Attorney General's Office is obliged to issue ruling in all instances regarding litigations where the State takes part of and its members shall send the Solicitors General copy of its opinion so as to make its role easy"; however, it does not specify whether the ruling is compulsory or illustrative in awards' nullity proceedings; consequently, according to the special rule, that is to say Section 89 of Act of the Government Attorney General's Office, it does not estipulate the procedural nullity due to omission of the Attorney General's ruling for cases of award's nullity. **Fourteenth**: Pursuant to Section 413 of the Civil Procedural Code, the Judiciary is exempted from the procedural court costs and attorney's fees; such rule is applicable to this proceeding since the plaintiff is the Executive of the Peruvian State. Therefore, taking into account the considerations, whereas clauses, abovementioned regulations and provisions set forth in Section 73 of the Arbitration Act, **THIS COURT DECLARES NOT ADMITTED** the appeal for declaration of nullity against award dated January 20, 2005 issued by the Court of Arbitration composed of Mr. Victor Palomino Ramírez, Héctor Becerra

Martínez and Alvaro González Peláez, which in part declared the claim filed

against PARSSA admitted, with no procedural court costs and attorney's fees,

in the proceedings followed by the Deputy Solicitor General in charge of the

Judicial Matters of the Ministry of Housing, Construction and Sanitation against

FIGUEIREDO FERRAZ E ENGENHARIA DE PROJETO LTDA. for nullity of

award.


Your Honor

(Illegible signature) Ortiz Portilla
(Illegible signature) Bustamante Oyague
(Illegible signature) Pomareda Chavez Bedoya
(Illegible signature)
------------------------

(Seal) First Civil Division
        Judicial Ruling N° 4317

------------------------

16

COURT OF APPEALS IN AND FOR LIMA
FIRST CIVIL DIVISION

Your Honor
Bustamante Oyague
Pomareda Chavez-Bedoya
Aguirre Salinas

Docket N° 1036-05

Ruling N°

Lima, December 13, 2005

Having been informed of the foregoing writ filed by Figueiredo Ferraz Consultoria and the writs of the court filing fee attached hereto, let the order contained in the ruling dated November 15, 2005 be considered fulfilled, giving account of the writ recorded on page 236; the certified copies of the court records that are being requested shall be issued, with the corresponding certification of such act on records, specifying that these court records have finished by ruling dated October 5, 2005, recorded on pages 224 to 231 whereby the appeal for nullity of the award has been declared not admitted.

(Two illegible signatures)

(Signature)   Jorge E. SALAZAR SANCHEZ
Court Clerk
First Civil Division
Court of Appeals in and for Lima
The Judiciary

December 16, 2005
-----------------------------

(running seal on verso)

I hereby certify that this is a true copy of the document which has been minutely compared to and is on file in our records, which I refer to, if necessary.

(Signature)   Raul Omar RIVAS AMES

17

Court Clerk
First Civil Division
Court of Appeals in and for Lima
March 7, 2007

(seal)
_____

I, the undersigned Sworn Public Translator, do hereby certify that the foregoing is a true and correct translation of the original text in Spanish attached hereto. This translation shall not be considered as an acknowledgement of the authenticity of the original document.

In witness whereof, I set my hand and affix my seal in the city of Lima (Peru), this 19th day of November 2007

MAIRA SAWAYA - HARB
Sworn Public Translator
Register N° 54

18